# EXHIBIT C-1



AMERICAN ARBITRATION ASSOCIATION
Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Case Number: 01-22-0004-2920

J&J Empire Express, Inc. d/b/a JEE
-vs-
Fed Ex Ground Package System, Inc.

## FINAL AWARD

**The Undersigned Arbitrator,** having been designated in accordance with the arbitration agreement between the parties (their predecessors, successors, and/or assignors or assignees) and having been duly sworn, and having duly heard the proofs and allegations of the Parties and given careful consideration of the evidence of record (including assessments of witness credibility), the authorities cited by the Parties, and the Parties arguments, does hereby, FIND, HOLD and ORDER THIS FINAL AWARD as follows:

1. Overview of the Arbitration Proceedings

The Parties to this arbitration are (1) J&J Empire Express, Inc. dba JEE[1] ("JEE", or "Claimant") a New York corporation headquartered in Matawan, New Jersey and (2) FedEx Ground Package Systems, Inc. ("Respondent" or "FedEx" or the "Company") a national corporation headquartered in Moon Township, Pennsylvania.

On October 11, 2022, Claimant filed a demand for arbitration with the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, effective on September 1, 2022, seeking $1,550,000.00 in damages. Claimant was permitted to amend its claim for damages to allow for relief in the amount of $1,880,000.00 by an Order dated June 1, 2023. Respondent denied all the allegations made by the Claimant and seeks a dismissal of this claim with prejudice.

**Governing Rules**. The September 1, 2022, Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association (the "AAA"), supplemented by (1) the AAA Procedures for Large, Complex Commercial Disputes included in the aforementioned AAA

---

[1] See, J-5.

Commercial Rules (the "AAA Commercial Rules") and, to the extent not inconsistent with the AAA Commercial Rules, (2) the Federal Arbitration Act (9 USC §§ 1 *et seq.*) ("FAA") (the AAA Commercial Rules and the FAA are referred to herein as the "Rules") govern this proceeding. The Parties arbitration agreement provides requirements for Dispute Resolution in Section 16.[2]

**Governing Law**.  According to the Independent Services Provider Agreement ("ISPA") its terms shall be construed and interpreted in accordance with the laws of the State of Pennsylvania. See, Section 18.10[3]

 The Parties have also entered into a Confidentiality agreement which survives the termination of the arbitration. See, also Section 16.5 (D) of the ISPA.

This alleged breach of contract dispute concerns Respondent's contractual obligations under an Independent Services Provider Agreement ("ISPA") covering a term from August 08, 2020, and initially expiring on November 05, 2021[4] but then extended until June 10, 2022, its final expiration date. The Arbitrator reviewed the Parties' submissions and determined the material issues in dispute as discussed below.  To the extent an issue raised by a Party is not specifically raised in the Award analysis, the Arbitrator, in her deliberations, and based on the evidence and applicable law, determined the issue to be immaterial or subsumed within, or decided by, the material issues considered below.  With this contextual background, the Arbitrator discusses the material issues in light of the evidence and applicable law presented by the Parties.

Claimant's principal allegations in its Statement of Claim concern (1) Respondent wrongfully and unreasonably denying Claimant's contractual right to assign its interest in JEE under Sections 17(a) and (b) of the ISPA and, (2) Respondent breaching its contractual duties to Claimant under the ISPA. [5]

Based on the evidence presented by the Parties, evaluated in light of the applicable law, the undersigned finds that Claimant failed to prove that Respondent breached the ISPA or wrongfully withheld Claimant's right of assignment under the ISPA.

2. Bad Faith in the Termination of Claimant's ISPA

Claimant argues that Respondent's bad faith drives Respondents breach of the ISPA and its' denial of the Claimant's contractual right of assignment. As Claimant states, under Pennsylvania law the elements for a claim of breach of contract are (1) the existence of a contract (2) a breach of a duty imposed by the contract and (3) resultant damages. A breach of the covenant of good faith and fair dealing is subsumed in a breach of contract claim. [6] Simply stated Pennsylvania does not allow for a separate cause of action from the breach of contract claim. However,

---

[2] See, Exhibit J-5, p.000017-000020.
[3] See, Exhibit J-5 Governing Law. p.000023.
[4] See J-1, J-2, & J-5.
[5] Claimant's Statement of Claim dated Oct. 11, 2022.
[6] Parties Post Hearing Briefs, See Claimant, Omicron Systems case, 860 A.2d 554 (Pa. Super, 2004); Respondent's case, Kelly v. Carman Corp., 229 A3d 639 (PA Sup Ct. Feb.12, 2020).

2

Claimant can demonstrate how a party's unreasonable or bad faith behavior led to a breach of its duty under the contract.

In addressing the bad faith allegations advanced by Claimant, leading to the termination of Claimant's ISPÅ, it's helpful to understand the history of this relationship.  By June 10, 2022, when this agreement expired Claimant had five (5) year's experience operating under an ISPA agreement with FedEx. The initial routes or Contract Service Areas ("CSA") he serviced included 10027 (including 10015 & 10016)10035, and 10040.

The CSAs described above were purchased by Joseph Ruggiero, Sr., now deceased who was the signatory on the Assignment to ISPA Agreement (the assignment was executed by FedEx, Sergio Montoya, the assignor and J. Ruggiero, Sr. as assignee) and the first ISPA Agreement[7] (was executed between FedEx and JEE). His tenure as Authorized Officer ("AO") covered the period from March 3, 2018, until his son, Joseph Ruggiero, III became the AO after March 25, 2021. As Claimant testified the process included agreement on a price for the CSA to be purchased from its then current owner, Sergio Montoya, (which included all five (5) of his trucks), a review of the routes, and a required review meeting with FedEx management referred to as an Assignee Information Meeting ("AIM"). The sales price paid to Montoya for all three (3) Zip codes and other assets was $800,000.00. While FedEx management executes the Assignment to ISPA Agreement, its terms clearly state that it has no role ***"regarding the negotiated terms of any agreement between the assignor and assignee"***[8].There is no reference at all to any dollar amounts in this agreement. The purchase price undoubtedly would be found in a separate agreement or bill of sale between the assignor and assignee. This point is emphasized here as a repeated contention of the Claimant during these proceedings was the Company's failure to refute Claimant's allegations regarding the value of JEE's business. Clearly that was a space the Company did not occupy.

The Claimant's testimony indicates that there were two meetings with FedEx in February 2018 before the effective date of the ISPA in March.  When Mr. Ruggiero, Sr. presented himself as a potential Service Provider/assignee at an AIM[9], he owned his own air conditioning and refrigeration business, Best Refrigerator/Air Conditioning Co. The senior Ruggiero's business profile provided for a verifiable net worth assisting no doubt in the acceptance of the required Request for Information ("RFI"). Although he was an external assignee, it appears within weeks he had approval as an assignee and he promptly presented all the other documents required by FedEx's onboarding program: articles of incorporation, a certificate of good standing, an EIN number, an Initial Compliance Certificate, W-9, State tax numbers, etc. From 2018 until 2021, while the senior Ruggiero served as the AO, the son served as the Business Contact ("BC") in charge of JEE's daily operations.

---

[7] Id. Footnote 4 above.
[8] J-1, Tr. P. 983, l.7
[9] Tr. P.7-16. He had two meetings before an ISPA was presented to him, first with C. Carter and Ozier Hastings, and then a second meeting at which Carter, Hastings and M. Scherer were in attendance. It is after a successful AIM meeting that a potential assignee presents corporate and compliance documentation. Since the request for same is anticipated, assignees have these ready or in process.

There is testimony in the record that during the COVID period, in particular, Claimant's business grew related to the growth of Amazon and the general population lockdown. However, by 2021, JEE's territory actually shrunk to a CSA covering Zip code 10027 (inclusive of 10015 and 10016). So even if this period might have increased the value of JEE any increase was offset by a likely corresponding decrease in revenues due to the sale of CSAs. Both the 10040 and 10035 zip codes were sold to internal assignees ie existing service providers. The testimony regarding the reasons for the sale of 10040 were minimal indicating that around August 2018 the buyer was GW7 and was triggered by Claimant's desire to avoid operating out of two (2) terminals.[10] No sales price for this Zip code was established in the hearing record. On June 23, 2020, JEE entered a new ISPA with a term of August 8, 2020, to November 5, 2021 for the remaining CSAs 10027(10015, 10016) and 10035. The 10035-Zip code was sold thereafter for $300, 000.00 to AIIM Carrier Corporation (Angel Pena) on June 25, 2021. The record indicates that the Claimant was "forced to sell" this Zip code to cure various service issues[11]. These sales did not include any other assets common to this business such as trucks or scanners.

One of the ways Claimant attempts to demonstrate bad faith by Respondent is to cite, extensively in his post hearing brief, the testimony of JEE's two (2) Business Contacts ("BC"), C. Newton and K. McKenzie. Some examples describing how they were treated differently included a difficult workplace evidenced by mixed up zip code packages, luring away of JEE employees and the lack of a loading position. Many of these "frustrating" issues were balanced by Respondent's witness, S. Pilatowski, the P&D manager at Yonkers. A factor balancing the testimony given by the BCs for this period is that it covered their recent relocation to the Yonkers Station. So, it would make sense that they endured a "settling in" period where mixed up zip code packages created frustration. Perhaps as S. Pilatowski's testimony alluded to, it would have made sense for the AO to have a greater presence and be the "go to" resource in handling his employee's frustrations. These employees never indicated that they sought or obtained any intervention from their AO in the handling of these concerns. Pilatowski was frank in admitting he felt the AO should have made a greater effort to be present at the station. He also flatly denied the allegation regarding the luring away of employees.[12] There were also discrepancies in testimony regarding the loading dock from "yes" they had a spot to "no" they didn't.[13] A dispositive explanation that could have been shared by the AO with these employees is that contractually their "no load" position at the Manhattan Station carried over to the Yonkers Station.[14] On direct examination, C. Newton testified to FedEx transferring JEE's customers to other Service Providers as proof of JEE's bad faith treatment. However, on cross-examination it became clear, notwithstanding his role as a Business Contact, responsible for operations, that he was not aware of FedEx's contractual right to "ensure service" or use "contingency contractors". A right FedEx invokes when a Service Provider is not meeting its contractual level of service. The P&D Manager, Pilatowski, in fact explained that this right was invoked in JEE's case when they could not meet their contractual obligations during "peak periods" due to lack of

---

[10] Tr. P. 36-37, J-3
[11] Tr. 39-40, J-8
[12] Tr. P. 422, l.10-15
[13] Tr. P. 462 & P. 465.
[14] Tr. P. 707-709, See, J-5p.000050, Att. A-1 Section 3.1

4

resources[15]. In the end, I was not persuaded that this testimony equated to a FedEx incentive to drive JEE out of business.

In evaluating whether FedEx's termination of JEE constituted a breach of a duty imposed by the Agreement one must consider the terms of Section 15, the Termination provision.[16] It establishes a termination progression imposing varying obligations on the Parties. For example, the provision clearly states there is no automatic renewal of the contract. Specifically, if the contract reaches its expiration date, there is no duty to renew by either party. The expiration date triggers the termination of the Agreement, no other reason is required. If the expiration date has not arrived then there is a two-tiered process for evaluating the Parties' duties on termination in the event of a breach—one tier is contingent, allowing the parties to place a clock on the termination, ie a right to cure. But the second tier, when a material breach occurs, allows for immediate termination of the Agreement, in essence it eliminates the clock-there is no timetable.

The facts in this case essentially indicate that while a Tier 1 breach event (or events)[17] was being reviewed and JEE was executing letters of assurance and attempting to cure contract violations during a 2020 Agreement extension[18], a Tier 2 or material breach event occurred-the "GWB" incident. As previously indicated, a Tier 2 incident permitted FedEx to terminate the contract and afforded JEE no right to cure. The governing terms of the Termination section in this instance read as follows: "The parties further agree that, for any of the following breaches, *a Party shall have no opportunity or right to cure, and upon given notice the terminating Party shall have the right to immediately terminate this Agreement*". Thereafter the provision provides ten (10) bases upon which the Agreement can be terminated without a right to cure. The basis affording FedEx the right to terminate JEE's ISPA related to their contractual "integrity, safety and security" rules. The facts as developed in the record concern a JEE employee who was a "helper" and therefore not an "authorized driver" who nevertheless drove a JEE delivery truck laden with FedEx packages from NY to NJ to collect paychecks from the AO.[19] Claimant characterized these events as part of FedEx's plan "to get rid of JEE and its principal Joseph Ruggiero", that the "termination [was] trumped up by FedEx" and argued that "it is indisputable that Ruggiero never knew it happened". The evidence supports the opposite. There is adequate evidence to support that the incident involving this unauthorized trip did happen. There is evidence in the form of a corporate security report documenting an employee interview.[20] And Joseph Ruggiero's own testimony verifies the incident occurred, and that he fired the employee involved. His explanation at the hearing was that he thought his employee was going to be driving his own vehicle rather than the JEE delivery truck laden with FedEx packages. He

---

[15] J-36, Tr. p. 457:8-18, In connection with Business Discussions, D. Poindexter also confirms the Claimants inability to service his contracted area during peak periods. Tr. 824:8-12

[16] J-5, Section 15.4, p. 000016-17

[17] J-10, J-11, J-12, J-13, J-14, J-15

[18] First extension of 1/14/22, Notification dated 11/3/21. See, Section 15.3 (4); 15.4, J-12

[19] GWB/Penske Rental Truck Incident, J-16, ISPA Section 15.3 (1), One of the ten (10) bases applied here given the arguments of the Respondent, reads: an act of either Party, including an officer, , or agent of the Party, that is inconsistent with the honesty and integrity and compliance with Applicable Law requirements of Section 5.5 of Attachment A-2 to Schedule A; and subsection (8) the failure of JEE to take reasonable care to ensure safe operations and regulatory compliance in accordance with Schedule I; Tr. p. 143-147; Tr. p. 711-716

[20] December 17, 2021, Security Report

acknowledges this was a violation of contract terms.[21] A review of the ISPA confirms how important safe operating practices are for FedEx that an entire section of the ISPA, Schedule I, is devoted to safety and compliance objectives which clearly notify Service Providers of their obligations to operate in compliance with federal rules and regulations that affect the Company's Safety Rating and Compliance. In addition to acknowledging the violation, Claimant offered no evidence or conflicting testimony that FedEx is lax enforcing these contractual duties of its' Service Providers. Based on the above, I find Claimant failed to carry its burden of proof in showing that FedEx breached its contractual duty when it exercised the termination provisions of the ISPA in this case. Additionally, I do not find any evidence that the Company's actions were motivated by bad faith.

3. <u>Wrongfully withheld Right of Assignment</u>

On December 29, 2021, FedEx issued a written notification that references the GWB incident and JEE's failure to meet its contractual service obligations. The letter moves on to remind JEE that **"there is no automatic right to renewal and that it is not willing to execute the tentative ISPA contemplated to start on January 15, 2022, and instead offers JEE another extension of their current ISPA to February 18, 2022".** The first extension from the November 05, 2021, expiration date of JEE's last ISPA extended the agreement to January 14, 2022.[22] All the written notices of extension remind JEE of its assignment rights. The December notification is followed by a termination notice on February 11, 2022, and four additional written notifications of extensions with the last stating that "to allow additional time for JEE to assign its ISPA, FedEx is willing to extend the date of JEE's ISPA to June 10, 2022". **Each of these written notifications were signed by Joseph Ruggiero**. Claimant could have exercised his right of assignment for approximately seven months.[23] Inexplicably, Claimant did not take advantage of this assignment right in January or February. At least there is no documentation or testimony that supports pursuit of an assignee candidate in this period.[24] The pursuit of an assignee by JEE appears to have become more urgent around April.

The Claimant argues that the Company demonstrated bad faith in limiting the period for exercising its assignment rights. JEE claims that under the Termination provision, Section 15.4, FedEx could have extended their assignment period up to 52 weeks-a year! The ISPA terms do not cross reference this discretion to the right of assignment such that basic principles of contract law construction can be ignored. The right of extension is clearly and unambiguously contained within the Termination provisions. Respondent as indicated above could have terminated the contract immediately. The appropriate interpretation then is that the Company in good faith extends the termination of the ISPA to allow Service Providers a fair opportunity to invoke assignment rights. This is clear from every extension letter reminding Claimant of its assignment right. Further Claimant did not present any evidence as to how FedEx exercised its discretion under these terms. Did they normally extend terminated contracts or assignment rights for 52

---

[21] Tr. P. 143-147
[22] Id. FN 17 above.
[23] Second Extension ("Ext."): 1/14/22-2/18/22, J-17; Third Ext. 2/18/2022-3/25/2022, J-19; 4th Ext. 3/25/22-4/22/22, J-20; Fifth Ext. 4/22/22-5/20/22, J-22; Final Ext. 5/20/22-6/10/22, J-23. The assignment had to be completed by 6/10/22.
[24] Claimant makes a general reference in his testimony that Eric was an early candidate, but no time frame is given.

6

weeks? How did they employ this discretion? That information might have allowed a better assessment of their bad faith allegation. If the evidence demonstrated any motivation on FedEx's part in the exercise of its discretion, it was simply to ensure customer service. Claimant was not extended 52 weeks but as indicated above its right of assignment was extended more than 26 weeks demonstrating that JEE was fairly allowed to exercise its contractual rights. Claimant was given ample time to affect an assignment and so it is difficult to conclude that Respondents' exercise of discretion evidenced bad faith.

The Parties are agreed that ISPA provision Section 17 on Assignments is central in this dispute. JEE agreed in the ISPA to submit such assignments in the form requested by FedEx. In 2022 that meant an electronic notice available through the company's Service Provider portal "MyGroundBiz". The Claimant argued that compliance with this process was secondary to the earlier mentioned AIM meeting. That is true, as FedEx did not prevent JEE from presenting potential assignees even though it failed to comply with this step.

Pursuant to the terms of the ISPA, JEE agreed that FedEx "**could withhold consent of the assignment if in the judgment of FedEx…(A) the proposed assignment would result in the inability of an Independent Service Provider to achieve the results contracted for in this Agreement...**"[25] Claimant disregards this right held by FedEx and concentrated its arguments on the bad faith it believes FedEx demonstrated in not accepting any of JEE's proposed assignees. Before evaluating the proposed assignees, its useful to that review to understand the considerations inherent in FedEx's right to reasonably withhold consent. In avoidance of onboarding potentially unsuccessful assignees, FedEx retains this right in an attempt to ensure effective future performance in its Contracted Service Areas. The objectives are specifically identified and not limited solely to the ability to deliver packages within a CSA, but more significantly by the ability to comply with marketing and branding objectives, critical to this industry is understanding and complying with Department of Transportation ("DOT") regulations, tax laws, employment laws (for e.g hours of service), and safety and security requirements. (See, 1. Objectives, Intent and Compliance with Law) [26] The referenced considerations infer an assignee profile represented by business acumen and experience in managing employees, and a Service Provider that can comply with corporate reporting, tax payments, payroll obligations in addition to other state and federal reporting and filing requirements.

In addition to a consideration of the above and the time allowed to elapse where JEE did not act on its assignment right, Claimant's bad faith allegations need to be further contrasted against another option available to JEE which might have resulted in a successful assignment. Claimant testified of his awareness of a "Craigs List" type platform available to Service Providers where he could have listed his CSA's availability. There is no evidence that he used it. He knew that a proven source of assignees with a profile acceptable to FedEx existed in current Service Providers. In fact, he knew from personal experience, the sale of CSAs 10035 and 10040, that this avenue for the sale of his current CSA was easier and quicker since a lot of the documentation required for onboarding an external assignee could be avoided. He was also aware of internal initiatives to merge home and ground routes referred to as "overlapping" that

---

[25] J-5
[26] See, J-5-000001-000003, J-5-000001-000108.

7

might make his home route appealing to adjacent ground contractors. And yet with all this knowledge, most of his prospects were external candidates. Let's consider JEE's allegations of bad faith against the potential assignees that were rejected.

The following is a consideration of key facts surrounding the Claimants assignment attempts[27]:

- ERIC (no last name): *time frame, March*, Claimant brought this candidate in to meet both Scherer and Poindexter, FedEx management. It appears at the meeting he had not been given a copy of Claimant's ISPA in preparation for the meeting, so a copy was provided to him that day. Scherer indicates that for that reason another meeting was scheduled for him. Claimant describes that Eric was upset when a second meeting was scheduled for him to present a final RFI because he did not have the time to make a second meeting. This candidate never delivered an RFI or was heard from again. The testimony about this meeting was confusing, as Claimant states: "But once he sat down with Mike and **he was going to prepare an RFI and come back**, Mike for some reason schedules a meeting for a guy who told him already at that meeting that he can't make the time" ….. If this assignee was truly a serious candidate for assignment, a "tight calendar" appears a frivolous reason for giving up a business opportunity. Further testimony indicates that while Eric received a copy of Claimant's ISPA, Claimant never obtained a copy of Eric's financials to assess his viability. See, Tr.p.62, 63, 173. Also, Scherer's Deposition, 7.12.23.
- KRYSTLE RUGGIERO: *time frame, early April*. The Claimant's sister presented herself as someone who had gained knowledge about the business through handling of support functions for both AOs of JEE and was granted an AIM. She also indicated to Scherer she was going to make employee changes within JEE. The misstep here was believing JEE's AO would be an acceptable Business Contact ("BC") to FedEx even through the transition of the business. Simply put, FedEx which was in the process of terminating JEE's AO, who they did not deem able to achieve contract results or comply adequately under the contract, would certainly not be found acceptable for any further association with the business. There was conflicting evidence whether a cousin, G.Ruggiero, would serve in that capacity. It appears that the Company felt this was a sham transaction. Even though it's been previously indicated that incorporation documents, etc. are secondary to this AIM meeting, this candidate testified she had yet to incorporate the entity that would purchase the business from JEE. Tr. P.321, 323
- SHAWN PONDS: *time frame April/May*. This AO presented the most viable assignee for the Claimant for several reasons-he was an internal candidate with substantial experience as a Service Provider for FedEx, he was a geographically adjacent ground contractor that would meet the overlap objectives of the company and as discussed internal transfers were the easiest transition. Claimant argues that this candidate in particular demonstrates the Company's bad faith in using this AO to undercut Claimant's ability to assign its business. Claimant advances that Respondent's bad faith actions are proven by (1) a recorded conversation indicating comments by Pond to the effect "we had a deal, but you didn't show up", the theory for bad faith

---

[27] Other potential candidates were mentioned in the hearing, for e.g. Emmanuel Luna, Conrod Newton but not developed by Claimant.

interference with this "deal" is that FedEx shared JEE's termination in advance with this AO resulting in his backing out of a deal with Claimant (2) an affidavit "with a myriad of false statements" presented at the hearing which is allegedly contradicted by his own testimony and (3) his selection by Respondent to handle contingency deliveries on June 12 being tied to the company's efforts to ensure service earlier than June 5 breaching a promise in Claimant's last extension letter. This evidence is not as persuasive as Claimant believes and can be viewed from entirely different lens. Starting with the "we have a deal" quote, this witness explained that discussions were had with Claimant for the purchase of JEE's CSA, but he required more information before sealing the deal. Since, the Claimant didn't show up to their planned second meeting, he unequivocally refuted the deal lacking the information he needed. Tr.p. 521, 529. He denied receiving any advance notice of JEE's termination. His need for paperwork from Claimant syncs up to the alleged contradiction between his testimony and his affidavit. J-41 During his testimony, as in the affidavit (paragraph 3), he made clear that his goal in assessing the purchase from JEE rested on appropriate documentation. Responses were elicited that he obtained 4 weeks or 4 months of settlement statements, but he wanted to see documentation of a full year of revenue to determine whether the price being asked for was justified. Pond's affidavit had four (4) statements and the single one Claimant attempts to impeach him on has a plausible explanation. The affidavit states ***"Mr. Ruggiero provided me with documentation, however it was not for the service area he was currently selling".*** This statement is supported by testimony regarding a 2021 1099 he received which referenced the 10027 CSA and had to have included the sold 10035 CSA ( sold 6/25/2021). Tr.p. 515-516, 521. Ponds is an experienced AO trying to figure out how much 10027 is worth but he knows he can't do that from documentation that applies to two zip codes one of which had already been sold. He was clear he wanted more paperwork. Tr. p. 525, 540.

Finally, Claimant attempts to build a connection between Scherers' testimony that he started "planning" on June 3 for the move of 10027 to a contingency provider and the company's last extension letter in May as further evidence of bad faith. The letter contained language to the effect that the company *"will take steps no earlier than five (5) days prior to the June 10 termination date"*. Without eliciting evidence as to what the Company did on that date-what steps it took or the nature of its actions, Claimant's allegations are not convincing. Scherer testified at the hearing that he did not assign a contingent provider earlier than the period stated in that letter. Tr. p. 758-760. Shawn Ponds testified that he started handling packages in CSA 10027 on June 12. Scherer's actions did not rise to the breach of any duty to the Claimant but rather demonstrated anticipatory preparation for the transfer since to date no viable candidate had been presented.

- <u>FRANKLYN COQUERAN</u>: *time frame, end of May*. Although an employee of FedEx at the time (presumably with access to an internal directory), this candidate dropped an RFI on manager Mike Scherer's desk but didn't bother to follow up with him directly on the status of his submission. Apparently, weeks after this drop, in a follow up phone call to Claimant, he confirmed that the CSA was no longer owned by JEE. This behavior appears at odds with his testimony describing himself as eager to

9

NYSCEF DOC. NO. 5

INDEX NO. 650428/2024
RECEIVED NYSCEF: 01/26/2024

Case 1:23-cv-01675-KAM-TAM   Document 74-3   Filed 07/08/25   Page 11 of 13 PageID #: 1481

- purchase a route he knew, negotiating an acceptable price, and taking action to secure funds, open a bank account, and incorporating an entity. Tr. P. 69, 70, 557, 580 & 587
- <u>CHRIS MESSINA,</u> *time frame April/June*. Chris was the last candidate proposed by Claimant. In fact, Claimant attempted to present him for an AIM on the very date his contract expired. At the hearing he was presented as a financially savvy businessman. He testified he was a partner with two (2) brothers (Sam and Rob) who resided in Florida, one of whom was an Amazon contractor. On close inspection his viability raises questions. While his RFI was submitted into evidence on behalf of the "Capital Management Group ("CMG")" (i) there was no documentary evidence presented as to the principals of that entity to understand what specific authority he had to commit the entity in negotiations with FedEx (ii) in fact, he testified that he would not be the Authorized Officer for CMG, ie the signatory on the ISPA. Rob, the brother with the Amazon contract would be the AO and would be the more capable representative to address the requirements of an RFI in an Assignment Information Meeting (except Rob was not in NY) and (iii) Rob would be the partner that would handle corporate filings in NY. He testified CMG was a Delaware corporation although he didn't explain why the RFI submitted identified it with a New Jersey address. He admitted he was not given a copy of JEE's ISPA, an important document to review prior to an AIM. He also testified that he reviewed 1099s and other financial documents upon which he based his offer as a potential assignee. He indicated he received a 2022 1099 (which would have reflected 2 CSAs) and a "year-to-date" 1099. There is testimony that Claimant and this candidate spent time at an attorney's office on June 10 presumably putting together a "bill of sale" but that wasn't offered into evidence either. With reference to this document, his testimony was inconsistent on whether it had been signed by either party and then he confused matters further by indicating the Claimant wanted to have it notarized. Finally, he testified he had gone on a ride to see the 10027 CSA but then couldn't respond to a question about the demographics of the area. J-25, J-27, Tr. p. 488-499

Claimant attempts to set this candidate up as a further example of FedEx's bad faith contrasted against the Sales Manager, D. Poindexter's testimony, that if Claimant showed up on the last day of his extension period, with a "viable candidate" which he argued described this candidate, consideration for a further extension would have been granted. Unfortunately, his argument is not proven with this candidate. Except for Ponds, as an internal candidate, none of the external candidates presented a business profile or preparation to be promptly processed as assignees. Claimant never produced a single agreement with any of his potential assignees to confirm a sale. In sum, Respondent did not unreasonably withhold consent as Claimant never presented a viable candidate.

I find that any loss suffered by the Claimant was due to a lack of urgency and a failure to manage JEE's assignment rights within the six months that were allocated. I do not agree that FedEx had a duty to extend this right to 52 weeks despite the language in Section 15.4. That language most likely allows FedEx flexibility to extend termination of a contract when it may be difficult to replace an AO for any number of reasons, such as available service providers in a particular location, etc. However, in an active location like New York, that is probably not the case. Claimant was given half a year -a fair opportunity to recover the asset value of CSA 10027.

10

Given the descriptions of sales in this record including JEE's own purchase history for its original CSAs, I find the Claimant had sufficient time to exercise its assignment rights under the ISPA.

Therefore, upon consideration of the documented evidence, the recorded testimony, and the applicable law I do not find that Respondent acted in bad faith regarding their contractual obligations that is breached their obligations under the Termination or Assignment provisions disputed in this case. Respondent did not breach the ISPA, rather it acted reasonably and in good faith and did not unreasonably withhold consent for Claimant to assign the ISPA. Finding no breach of any duty under the ISPA, Respondent has no liability for related damages.

Furthermore, upon finding that Respondent has no liability under the terms of the contract in dispute, I find there is no need to address the applicability of the contractual provisions regarding the assessment of damages or the limitation of damages provision in the contract. I agree with Claimant that under Pennsylvania law, limitation of damages clauses are not disfavored unless unreasonable but here as opposed to the cases cited which concerned dismissal or summary judgment motions, Claimant has had a full opportunity to offer its arguments, present its evidence and examine witnesses and has not prevailed. As such, there is no further evaluation required in this Arbitration.

## AMERICAN ARBITRATION ASSOCIATION

## FINAL AWARD ORDER

For the reasons set forth herein, I Find, Hold and Order this FINAL AWARD as follows:

1. Claimant's claim for $1.88 Million in damages is DENIED.

2. Respondent's claim for costs and attorney fees is DENIED.

3. In accordance with the terms of the Parties Arbitration Agreement of the Independent Service Provider Agreement, specifically Section 16.5 (B) FedEx is responsible for all Arbitrator costs and fees and for court reporter fees for the arbitration hearing therefore:

    The administrative fees and expenses of the American Arbitration Association totaling $24,650.00 shall be borne by Respondent and the compensation and expenses of the arbitrator totaling $35,000.00 shall be borne by Respondent. Therefore, Respondent shall reimburse the sum of $7,700.00 representing that portion of said administrative fees in excess of the apportioned costs previously incurred by Claimant.

4. Each Party is responsible for their own Attorney's fees.

5. This FINAL AWARD is in full and final settlement of all claims and defenses submitted in this arbitration concerning the Agreements and the evidence submitted by the Parties.

6. All claims, counterclaims and defenses not expressly granted herein are DENIED.

Dated: October 30, 2023

*Margarita Echevarria*
Margarita Echevarria, Arbitrator