# EXHIBIT C-2

Page 307

1   AMERICAN ARBITRATION ASSOCIATION

-------------------------------------------X

2   In the Matter of the Arbitration of

3   J&J EMPIRE EXPRESS, INC., d/b/a JEE,

4                           CLAIMANT,

5         -and-           AAA No.:

6

FEDEX GROUND PACKAGE SYSTEM, INC.,

7   i/p/a FED EX GROUND PACKAGE SYSTEM, INC.,

8                           RESPONDENT.

-------------------------------------------X

9

10

11                 DATE: July 25th, 2023

12                 TIME: 9:30 A.M.

13

14

15         DAY 2 of ARBITRATION in the

16   above entitled matter, held at the offices

17   of O'Melveny Law Firm, Times Square Tower,

18   7 Times Square, New York, New York 10036,

19   stenographically transcribed by Marina, a

20   Notary Public of the State of New York,

21   held before MARGARITA ECHEVARRIA,

22   Arbitrator.

23

24

25    Job No. CS6024001

Page 308

```
 1  A P P E A R A N C E S :
 2
 3  MARGARITA ECHEVARRIA
    ARBITRATOR
 4    Margarita@echevarriaadr.com
 5
    THE ROTH LAW FIRM, PLLC
 6    Attorneys for the Claimant
      J&J EMPIRE EXPRESS, INC., d/b/a JEE
 7    295 Madison Avenue, 22nd Floor,
      New York, New York 10017
 8    (212) 542-8882
      BY: RICHARD ROTH, ESQ.
 9      Rich@rrothlaw.com
10
11  CALLAHAN & FUSCO, LLC
      Attorneys for the Respondent
12  FEDEX GROUND PACKAGE SYSTEM, INC.,
      i/p/a FED EX GROUND PACKAGE SYSTEM, INC.
13    40 Exchange Place, 18th Floor,
      New York, New York 10005
14  BY: CHRISTOPHER DEL BOVE, ESQ.
      Cdelbove@callahanfusco.com
15    MITCHELL AYES, ESQ.
      Mayes@callahanfusco.com
16
17  ALSO PRESENT:
18  ANNE LEWIS, ESQ, In house counsel for FedEx
    Ground
19
    MICHAEL SCHERER, FedEx Ground rep
20
21
22
              *    *    *
23
24
25
```

Page 310

```
 1  I N D E X   O F   P R O C E E D I N G S
 2  (CONT'D)
 3
 4  PROCEEDING                    PAGE
 5  Witness: Christopher Messina      467
 6    Direct by Mr. Roth          467
 7    Cross by Mr. Del Bove       487
 8    Redirect by Mr. Roth        503
 9    Recross by Mr. Del Bove        504
10
11  Witness: Shawn Ponds          506
12    Direct by Mr. Ayes          507
13    Cross by Mr. Roth           519
14    Questions by the Arbitrator      546
15
16
17
18
19
20
21
22
23
24
25
```

Page 309

```
 1  I N D E X   O F   P R O C E E D I N G S
 2
 3  PROCEEDING                    PAGE
 4  Witness: Krystle Ruggiero          311
 5    Direct by Mr. Roth          312
 6    Cross by Mr. Del Bove       326
 7    Questions by the Arbitrator      346
 8
 9  Witness: Conrod Newton         349
10    Direct by Mr. Roth          349
11    Cross by Mr. Del Bove       375
12    Joint 37 is marked          400
13    Joint 38, 39, 40 is marked     401
14    Redirect by Mr. Roth        402
15
16  Witness: Steven Pilatowski        407
17  (Appearing via Zoom)
18    Direct by Mr. Ayes          407
19    Cross by Mr. Roth           430
20    Redirect by Mr. Ayes        361
21    Recross by Mr. Roth         464
22
23        (Cont'd next page.)
24
25
```

Page 311

```
 1        Krystle Ruggiero
 2        ARBITRATOR:  We're on the
 3  second day of JEE -- J & J, I'm
 4  sorry, Empire Express versus FedEx
 5  Ground Package System.  American
 6  Arbitration Association Case Number
 7  01-22-0004-2920.
 8        Admonition to all, please turn
 9  off the phones or lower your ringers
10  so we don't have unnecessary
11  interruptions.  You'll be sworn to
12  testify and understand that you stay
13  sworn until your testimony is over.
14  Okay?
15        THE WITNESS:  Uh-huh.
16        ARBITRATOR:  Please raise your
17  right hand.
18        Promise to tell the truth, the
19  whole truth and nothing but the
20  truth?
21        THE WITNESS:  Yes.
22        ARBITRATOR:  Thank you.
23        Okay, Mr. Roth.
24
25
```

2 (Pages 308 - 311)

Page 312

1       Krystle Ruggiero
2  K R Y S T L E   R U G G I E R O,
3       called as a witness, having been
4       first duly sworn by a Notary Public
5       of the State of New York, was
6       examined and testified as follows:
7  DIRECT EXAMINATION
8  BY MR. ROTH:
9       Q.   Can you give me your
10 educational background, please.
11      A.   Sure.  I have a Bachelor's
12 Degree from Manhattan College in
13 psychology, and I continued with a Master's
14 Degree at Mammoth University in psychology
15 and double Master's in education and
16 business.
17      Q.   What years were the
18 undergraduate?
19      A.   I graduated in 2001.  Four-year
20 school, I graduated in 2005.  Then I
21 started actually looking for work.  I
22 started working at Manhattan College and
23 then partially starting my Master's Degree.
24      Q.   When did you get your Master's
25 Degree?

Page 313

1       Krystle Ruggiero
2       A.   I didn't complete my Master's
3  at Manhattan College.  I continued to go to
4  Mammoth University, and that's in New
5  Jersey.
6       Q.   What year did you get your
7  first Master's?
8       A.   So, I started in 2012.  It was
9  around 2017, and then I continued to get my
10 second Master's and my LAC in 2020.
11      Q.   Okay.  Why don't you tell us
12 briefly your employment history.
13      A.   So I started working actually
14 within the school as a work student.  I'll
15 tell myself, go through your Bachelor's.
16      I continued there to work in
17 the admissions office and to start my
18 initial Master's, which -- when you work
19 there, you get free Master's.  So, that was
20 my way of doing that, paying for that.
21      And so I took time off.  I was
22 here and there because of finances.  So in
23 that time I worked as a nanny.  I did all
24 the odds and ends jobs that I could.  My
25 father owns Best Refrigeration and Air

Page 314

1       Krystle Ruggiero
2  Conditioning, so I helped out with that as
3  far as bookkeeping and managing of parts.
4       So in between that, and then I
5  started to go back for a Master's at
6  Mammoth University, and I continued that in
7  2012 and also working in the admissions
8  office at Mammoth University to uphold my
9  Master's.  And then I continued and
10 completed my second Master's in 2020, and
11 that was along with an LAC, which is a
12 Licensed Associate Therapy certificate and
13 the completion in 2020.
14      Q.   Did you ever -- did you also
15 begin to work at J & J?
16      A.   So I started working in J & J
17 around 2019, I believe, just here and there
18 because it's my brother's business, so I
19 was helping where need be.
20      Q.   Tell us what type of stuff did
21 you do at J & J.
22      A.   I was only there about two
23 times a week, but I would do things as far
24 as order uniforms, managing a schedule,
25 helping out with payroll, which is ADP,

Page 315

1       Krystle Ruggiero
2  which is where I calculated hours and then
3  handed that over to my brother to do the
4  rest of payroll.
5       Q.   Hiring?
6       A.   I did hiring with First
7  Advantage.  That's hiring and firing as far
8  as you do their resume, their background
9  check, and then followed with a drug
10 assessment in order to hire them.  That's
11 where I fitted them with uniforms, I also
12 do that.  And like I said, the scheduling.
13      I also dealt with packages,
14 disputing of packages.  If something was
15 either mishandled or not delivered on time,
16 I handled that and put that to the -- not
17 only the BCs, but the managers to finish
18 with.  And yeah, that's about that.
19      Q.   Were you ever yourself
20 interested in buying a FedEx route?
21      A.   I was.  In the beginning of my
22 brother buying a route, my Uncle Gene
23 actually gave the idea to my father.  My
24 father presented it to my brother, and I
25 wanted to have my own separate route.  My

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM
NYSCEF DOC. NO.: 75

INDEX NO. 650428/2024
RECEIVED NYSCEF: 01/26/2024

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 5 of 119 PageID
#: 1488

Page 316

1          Krystle Ruggiero
2 brother was -- you know, I was dealing with
3 finishing my Master's.  So, my brother was
4 the first in line as far as getting the
5 business started.
6          So, he was the first to do
7 that, but we were looking -- my father was
8 looking and had me look personally for
9 myself for my own route.
10     Q.   And what -- so tell me what you
11 did to look for your own route.
12     A.   Well, I searched online.  I
13 know my father was talking to other
14 contractors that were hoping to sell to try
15 to help me out, giving some insight.  And
16 yeah, a lot of Google.
17     Q.   Did there come a time when you
18 learned your brother was going to sell his
19 business?
20     A.   I did learn that he was going
21 to sell his business and actually came at a
22 time where I still had been searching, but
23 hadn't found the right fit.  And so it
24 became perfect that he was looking to move
25 on and going to whatever other company and

Page 317

1          Krystle Ruggiero
2 I could fill those shoes.
3     Q.   Did you talk to your brother
4 then about maybe purchasing his business?
5     A.   I did speak with him about
6 that.
7     Q.   Did you discuss the price?
8     A.   We spoke about 1.88 million.
9 He sent me a valuation of the company.
10     Q.   And did you -- how were you
11 going to -- did you figure out how you were
12 going to pay for it?
13     A.   I do have money saved and then
14 we were going to -- either we were going to
15 figure out some type of financial plan.
16     Q.   With your brother?
17     A.   With my brother, yeah.
18     Q.   And after you had the
19 discussions with your brother -- did there
20 come a time you spoke to Mike Scherer?
21     A.   There was a time I spoke with
22 Mike Scherer.
23     Q.   Tell us about the first time
24 you spoke with him.
25     A.   So, I spoke with Mike Scherer

Page 318

1          Krystle Ruggiero
2 over the phone, just kind of putting it out
3 there about me wanting to have my own
4 route.  My brother was a contractor that
5 was selling.  Like I said, I was looking
6 for other contractors to sell but the price
7 wasn't right.  This happened to fall into
8 place.
9          So, I spoke with Mike Scherer
10 about that.  He said to come in in person,
11 which I did with an RFI.
12     Q.   So let me show you -- I am
13 going to hand you this book.
14     A.   Sure.
15     Q.   Let me show you a document
16 which -- Tab 21.
17     A.   Thank you.
18     Q.   And what is Tab 21?
19     A.   So, it starts by my business
20 experience in the RFI.
21     Q.   This is your RFI you gave to
22 Mike Scherer?
23     A.   Correct.
24     Q.   What's Krystle Clear?
25     A.   That's the name I was going to

Page 319

1          Krystle Ruggiero
2 name my business.
3     Q.   Had you formed it yet?
4     A.   I hadn't created an LLC or INC
5 yet.  Not yet.
6     Q.   Were your intentions to, once
7 you got approval, to form the business and
8 to get it up and running?
9     A.   Yes.
10     Q.   And I think you said you talked
11 to Mike Scherer, and he said come in.
12          Did you go and meet Mike
13 Scherer?
14     A.   I met with him in person with
15 my brother.
16     Q.   The three of you.
17          Do you know approximately when
18 that was?
19     A.   That was sometime in April.
20     Q.   Of 2022?
21     A.   Correct.
22     Q.   And tell us about the meeting
23 you had with Mike Scherer.  Who said what
24 to whom?
25     A.   We just spoke about me being a

4 (Pages 316 - 319)

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 6 of 119 PageID #: 1489

Page 320

1        Krystle Ruggiero
2 prospective buyer. He looked over my hire
3 and fire. He said everything looks good.
4 That we were going to be proceeding
5 forward. At the end of the meeting, it
6 seemed like everything was working out
7 quite fine. He was happy to see my RFI.
8 He said he would follow back with the next
9 steps.
10    Q.   And what happened? What were
11 the next steps, if any? Withdrawn.
12        What happened next?
13    A.   So he never told me what were
14 the proceeding steps yet. He just told me
15 he would get back to me and we'll be
16 following forward.
17    Q.   What's the next thing you heard
18 about the purchase of the business?
19    A.   We did actually meet on a Zoom
20 call where he had told me that they were
21 looking to only sell to existing
22 contractors. Someone who already owned an
23 existing route with FedEx.
24    Q.   So essentially did you learn
25 that your offer was rejected?

Page 321

1        Krystle Ruggiero
2    A.   Yes. In essence, correct.
3    Q.   And was there discussion at all
4 about your brother -- to your best
5 recollection, your brother being involved
6 in the running of the business?
7    A.   It was just voiced to me that
8 he didn't want my brother any longer
9 involved, which I did propose that my
10 brother would be with me for the first
11 three months as I transitioned in
12 ownership. However, I didn't need my
13 brother to be a part of it. That was just
14 a backup for me so they felt secure in the
15 transition.
16    Q.   Okay.
17    A.   Because I wasn't an existing
18 contractor as I now know they wanted.
19    Q.   Okay. Did your cousin Gene
20 offer to be a BC?
21    A.   He did. So I had that
22 security, as well as two other BCs that
23 worked under J & J were excellent.
24    Q.   So, you had Kevin; is that
25 right? Joe had Kevin as a BC; is that

Page 322

1        Krystle Ruggiero
2 right?
3    A.   Potentially, Steve Ponds as
4 someone that would have been a possible BC
5 of mine.
6    Q.   And Gene Ruggiero?
7    A.   And Gene Ruggiero, who was a
8 contractor in Madison.
9        (Whereupon, an off-the-record
10    discussion was held.)
11    ARBITRATOR: These are the
12 extraction reports.
13    MR. ROTH: You may have the
14 same problem, main issues. Mine says
15 27 in Tab 28.
16    ARBITRATOR: Mine does, too.
17    MR. ROTH: 27 should be in Tab
18 27, right?
19    MR. AYES: 27 should be in 27,
20 yes.
21    MR. ROTH: We have to move
22 these back. The first few pages --
23 that's why I couldn't find it -- the
24 first few pages go back to 27, right?
25    MR. DEL BOVE: I'm putting 28

Page 323

1        Krystle Ruggiero
2 in front of the witness.
3    Q.   Let me show you 28 exhibit.
4 It's Tab 28, and you see Number 3, instant
5 messages. This is on 4/7/22.
6        Do you see that?
7    A.   Correct.
8    Q.   That was right around your
9 meeting -- right before your meeting with
10 Mike, right?
11    A.   (No verbal response.)
12    Q.   And this is from -- that
13 Ruggiero, 347-517-8720 where it says: I
14 forgot to ask you earlier. Do I have to be
15 there or on the phone tomorrow or could
16 Joey just list me as a BC?
17        Do you see that?
18    A.   Uh-huh.
19    Q.   Was that Gene's text?
20    A.   I believe so.
21    Q.   So Gene -- is that consistent
22 with your understanding that Gene told Mike
23 that he would be a BC?
24    A.   Yes.
25    Q.   Now, are there things about the

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 7 of 119 PageID #: 1490

**Page 324**

                Krystle Ruggiero
1
2  business you didn't know?
3     A.   Of course there are things I
4  didn't know as being a new contractor
5  because I have great BCs.  I have a lot of
6  people that I could learn through and that
7  I knew had my back while I was
8  transitioning and learning.
9     Q.   And your brother and father,
10 there's things about the business they
11 didn't know when they bought it, correct?
12    A.   Right.  You don't know
13 everything at first, right?  So we're there
14 to learn as far as own and the process.
15    Q.   And were you going to buy the
16 business with the managers so they could
17 continue to run it?
18    A.   Yes.
19    Q.   Now, and so did you then
20 understand that your sale -- you weren't
21 going to be able to buy it from that
22 conversation?
23    A.   That's what I thought.  As far
24 as the whole conversation prior, I thought
25 everything was a sure win moving forward

**Page 325**

                Krystle Ruggiero
1
2  until I heard him say that they wanted an
3  existing contractor.
4     Q.   Did he tell you why?
5     A.   No.
6     Q.   Moving on, do you know about
7  your brother's attempts to sell the
8  business to other people?  Or tell us what
9  you know, if anything, about your brother's
10 attempts to sell.
11    A.   I do know he had discussions
12 with people that were wanting to buy the
13 business.
14    Q.   And did there come a time where
15 you decided to tape record conversations
16 with Mike Scherer and Shawn Ponds and Gene
17 Ruggiero?
18    A.   There was just a time that I
19 know my brother felt uneasy with certain
20 conversations, and so just for security, I
21 wanted to tape.
22    Q.   So you taped them on your
23 phone?
24    A.   On my phone, right.
25    Q.   Now --

**Page 326**

                Krystle Ruggiero
1
2     A.   For clarity.
3     Q.   Okay.  And did you ever come --
4  well, you came to learn your brother wasn't
5  able to sell the business, right?
6     A.   Not that -- I mean, yes.
7     Q.   And was the business just
8  transferred to Shawn Ponds?
9     A.   That's what I learned, yes.
10       MR. ROTH:  I have no further
11    questions.  Thank you.  Mr. Del Bove
12    is going to ask you questions.
13 CROSS EXAMINATION
14 BY MR. DEL BOVE:
15    Q.   Good morning.
16    A.   Good morning.
17    Q.   So, you're under oath so all
18 the same rules apply, all right?
19       You graduated college in '05,
20 you said, right?
21    A.   Correct.
22    Q.   From '05 to '08 you worked at
23 an admissions office at Manhattan College?
24    A.   I did.
25    Q.   And then from '08 to 2012, you

**Page 327**

                Krystle Ruggiero
1
2  worked for Best Refrigeration which was
3  your father's HVAC company?
4     A.   Which has been ongoing, yes.
5     Q.   Okay.  Approximately from '08
6  to 2012; is that correct?
7     A.   Yeah.  On and off up until
8  2017, but it was like if need be when my
9  dad needed something.
10    Q.   Fair enough.  And from 2012 to
11 2016, then you went and you worked at the
12 Mammoth University admissions office?
13    A.   Correct.
14    Q.   From '18 to '20 you were in
15 school and also continued to work at the
16 admissions office; is that correct?
17    A.   Correct.
18    Q.   And then it was in 2018 that
19 you started working for J & J, is that
20 correct, approximately?
21    A.   Approximately.
22    Q.   And while you working at J & J,
23 I think you told me that you worked about
24 twice per week for about 13 hours a week on
25 average?

Page 328

1        Krystle Ruggiero
2    A.   Around, yes.
3    Q.   You also weren't a salaried
4 employee, were you?
5    A.   No, I just helped out.
6    Q.   So you didn't take a salary.
7 You didn't take -- you weren't paid hourly.
8 Is it fair to say you were working for
9 free?
10   A.   Yeah, basically.
11   Q.   And when you started at J & J,
12 you didn't receive any formal training or
13 anything like that, did you?
14   A.    Just speaking with the other
15 contractors, which is my uncle and my
16 cousin and Gene Ruggiero.  So I got to
17 learn a little bit prior to my brother
18 opening it.  So just a bit of a formality
19 and learning about the business overall,
20 but continuing to learn.
21   Q.   Okay.  But no real formal
22 training?
23   A.   No.
24   Q.   And you didn't -- I think you
25 testified you didn't get involved with the

Page 329

1        Krystle Ruggiero
2 routes really, right, with the CSAs, with
3 the contract service areas?
4    A.   I did not.  My brother handled
5 that.
6    Q.   And it would be fair to say
7 back in 2018, you didn't know what CSAs
8 your brothers did or did not have?
9    A.   Yeah.  We all had different
10 responsibilities.
11   Q.   And yours was not dealing with
12 the CSAs?
13   A.   Was not.
14   Q.   And as you sit here today, it's
15 fair to say you don't really know what CSA
16 you were specifically trying to buy back in
17 2021; is that correct?
18   A.   I do know the station of which
19 I was trying to buy, but like there's ins
20 and outs about the business that I was
21 relying on my managers and BCs as I got
22 involved.
23   Q.   Okay.  So, fair to say you
24 weren't fully familiar with the ins and
25 outs of the business?

Page 330

1        Krystle Ruggiero
2    A.   Not a hundred percent, not yet.
3    Q.   You testified Mr. Roth showed
4 you -- you drafted an RFI in this matter,
5 correct?  Or you drafted an RFI --
6    A.   I made an RFI.
7    Q.   You drafted it, right?
8    A.   I did.
9    Q.   Okay.  I think you testified
10 that you said you didn't use any other
11 documents or anything to help you?
12   A.   I didn't, but I did have my
13 brother oversee it before handing it in.
14 So I did have help that way.
15   Q.   I am going to show you side by
16 side.  This is not going to be in evidence
17 or anything.  It's just a demonstrative.
18 And take a look at this.  It's about a
19 five- or six-page document.
20   A.   Uh-huh.
21   Q.   So it's fair to say that your
22 RFI appears on the left-hand portion of the
23 page, correct?
24   A.   I see that.
25   Q.   I'll represent to you that

Page 331

1        Krystle Ruggiero
2 Joe's RFI from back in 2018 appears on the
3 right-hand portion of the page.  You see
4 that?
5    A.   I see that.
6    Q.   Take a look and flip through
7 about five or six pages here.  And I'll
8 represent to you that the highlighting
9 indicates word-for-word cut and paste of --
10 cut and paste from Joe's RFI to your RFI.
11    Do you see that?
12   A.   Okay.
13   Q.   Is it fair to say this RFI is
14 almost word-for-word similar to your
15 brother's RFI?
16   A.   It's similar, but there's an
17 agenda that you need to abide by in the
18 RFI.  So it's all pretty much the same in
19 some instances and so that's why there's
20 similarities.  Have I compared it to that
21 when I gave it to my brother to see what he
22 thought, I am sure he correlated that with
23 what he already made in his RFI.  So maybe
24 that's why there are some similarities.
25   Q.   I mean, there's a ton of

Page 332

```
1          Krystle Ruggiero
2  highlighting here.  There's more than some
3  similarities.
4          MR. ROTH:  There's no question
5     pending.  Asked and answered.  She
6     said there are some similarities.
7     A.  Period, yeah.
8     Q.  And when you submitted the RFI,
9  you indicated that certain changes would
10 need to be made to the business, right?
11    A.  Correct.
12    Q.  You indicated that you wanted
13 different -- to hire different drivers,
14 right?
15    A.  Well, I indicated that I just
16 wanted a different format, like where the
17 helpers and drivers were working better
18 together.  So, if I had to orchestrate a
19 different schedule and maybe change up
20 drivers to the helpers where they were on
21 the same trucks together.  Before they
22 might work better when they're on different
23 routes, something like that, just
24 adjusting.
25    Q.  And you wanted to do that
```

Page 333

```
1          Krystle Ruggiero
2  because you testified that J & J was
3  failing service because it didn't have
4  enough manpower, right?
5     A.  I don't believe -- I don't
6  recall saying that.
7     Q.  Okay.
8     A.  There was more than enough
9  manpower.
10        MR. ROTH:  Failing service.
11    A.  I don't recall that.
12    Q.  I'm turning to page 51 of your
13 deposition in this matter.  Question: So
14 back then, people were not necessarily
15 showing up, question.
16        Answer:  Then that would be an
17 issue, right, for failing service because
18 we don't have enough manpower.
19        Question:  Okay.  Anything else
20 you would do differently?
21        Answer:  I think I said it all.
22        Having me read that deposition
23 testimony back to you, does that refresh
24 your recollection?
25    A.  So, when you're saying enough
```

Page 334

```
1          Krystle Ruggiero
2  manpower.  So it sounds misspoken when I am
3  saying that.  When the fact is that certain
4  employees would call out, I would try to
5  adjust their schedule so that that would
6  happen less.  And so having enough
7  manpower, like adjusting their routes and
8  people are coming from different direction,
9  we just got moved to Yonkers.  So, there
10 was a lot of transition with that alone.
11        So, that's what I was
12 discussing.  Not necessarily having the
13 amount of people, but the scheduling that I
14 probably could adjust to work better.  That
15 was my hope.
16    Q.  And you also agree that J & J
17 was having issues with packages being
18 returned back to the station, right?
19    A.  There has been -- there has
20 been a write-up for that I've known in the
21 past.
22    Q.  You knew it was an issue with
23 J & J?
24    A.  I know it's an issue with all
25 contractors unfortunately, but I've heard
```

Page 335

```
1          Krystle Ruggiero
2  of it happening.
3     Q.  And you worked for J & J, and
4  you didn't even know whether or not they
5  had their own handbook, correct?
6     A.  We all had a handbook according
7  to FedEx, but a privately drawn-up handbook
8  for J & J?  Is that what you're saying?
9     Q.  Did J & J have a handbook?
10    A.  Its own personal handbook, it's
11 not something I have seen before.
12    Q.  Do you know if it exists one
13 way or the other?
14    A.  I know FedEx has a handbook,
15 no.  Then, no.
16    Q.  And I think you also testified
17 you're not familiar with New York or New
18 York City laws on overtime, right?
19    A.  Well, I know we don't have
20 drivers drive a certain amount of time.
21 That we can't go over 40 hours a week.  I
22 know that's the minimum I've ever allowed
23 to happen.  That these are also things I
24 would be learning in more detail.
25    Q.  So fair to say you weren't
```

8 (Pages 332 - 335)

Page 336

1       Krystle Ruggiero
2 familiar with hour of service requirements
3 for trucking companies?
4       A.   That's something that the
5 manager handled.
6       Q.   And you also had no plan for
7 training drivers, other than the BC going
8 out with them on the road for two days,
9 correct?
10      A.   I mean, we do go over a safety
11 handbook and we speak to our employees
12 about that.  We also have them go with
13 someone that has been on the job for quite
14 a while and train one-on-one.
15      Q.   And you testified that your
16 brother gave you a copy of the ISPA in this
17 case, correct?
18      A.   I've seen the ISPA before.
19      Q.   Other than the ISPA, you were
20 given no additional documents, right, by
21 your brother?
22      A.   No.
23      Q.   And you never went on the route
24 with your brother or any of the BCs to see
25 the route, understand the route?

Page 337

1       Krystle Ruggiero
2       A.   Well, I've met on the route
3 before, but not as on the FedEx truck.
4       Q.   Okay.  As well as a part of --
5       A.   So, I do know -- I am familiar
6 with the route and the locations.
7       Q.   But I thought you testified
8 earlier that you weren't familiar with the
9 route?
10      A.   I just never went on route with
11 the trucks.
12      Q.   You also never talked to a
13 financial advisor about the transaction,
14 right?
15      A.   I did speak with someone about
16 the transaction before.  I was trying to
17 figure out how I could possibly buy the
18 business.
19      Q.   Who did you speak with?
20      A.   I spoke with my bank, and then
21 I was speaking with my brother about how
22 we're going to make this happen.  And like
23 I said, I do have money that I could put
24 down and we were going to figure out some
25 type of financial plan moving forward.

Page 338

1       Krystle Ruggiero
2       Q.   You said J & J, you had no
3 experience in the logistics and the pick-up
4 delivery business, right?
5       A.   I've never worked in a business
6 like FedEx before, knowing J & J.
7       Q.   I think you testified that you
8 acknowledged you had to learn DOT
9 regulations and DOT rules, right?
10      A.   Yeah.  I just needed to be
11 groomed and a little bit of everything is
12 an owner.
13      Q.   And you also, I think,
14 testified you weren't familiar with the
15 maintenance requirements and you had to
16 learn those, as well?
17      A.   Well, that's what I had a BC
18 for.  They were right on point with
19 everything with J & J and willing to train
20 me as I needed.  They were onsite all the
21 time.
22      Q.   Isn't it true that you really
23 had no idea of the actual volume in terms
24 of the number of packages for that specific
25 CSA?

Page 339

1       Krystle Ruggiero
2       A.   It all changes, right,
3 depending on the season.  But there were
4 about 800 packages give or take -- I mean,
5 the volume, like I said, increases based on
6 season.
7       Q.   You also had no real prior
8 experience with customer service, right?
9       A.   I did get phone calls about
10 left package or undelivered package, and
11 that I would relay back to the manager and
12 they would handle that one on one, handle
13 that onsite.
14      Q.   Weren't those phone calls just
15 from your brother, though?  They weren't
16 from actual FedEx customers, right?
17      A.   Right.  It would trickle down
18 to me, and I would keep a record of that
19 stuff, hand it to my manager to handle.
20      Q.   Okay.  You told us you were
21 going to buy the business for 1.88, I think
22 you testified with Mr. Roth, right?
23      A.   Yes, I did.
24      Q.   During your deposition you said
25 you planned to put a hundred thousand down

9 (Pages 336 - 339)

Page 340

```
1          Krystle Ruggiero
2  for payment?
3      A.   I didn't say an amount exactly.
4  I don't remember saying the exact amount,
5  but whatever need be, we would work it out.
6      Q.   But did you have a specific
7  amount you planned to put down?
8      A.   We never discussed an exact
9  amount.
10     Q.   I think you also testified that
11 your uncle Gene Ruggiero, he was never --
12 it's your understanding he was never going
13 to buy J & J from your brother; is that
14 correct?
15     A.   It wasn't my cousin that's the
16 contractor.
17     Q.   I'm sorry, your cousin, Gene
18 Ruggiero.  He was never --
19        [Simultaneous Speech]
20     Q.   Fair enough.  So Gene Ruggiero,
21 the FedEx contractor.
22     A.   Yes, sir.
23     Q.   You testified that he was, in
24 fact, never going to buy J & J from your
25 brother; is that correct?
```

Page 341

```
1          Krystle Ruggiero
2      A.   From what I understand, I don't
3  think he was, no, not directly.
4         ARBITRATOR:  I'm sorry, the
5      uncle or the cousin?
6         MR. DEL BOVE:  The cousin.
7         THE WITNESS:  The cousin is
8      Gene.  My uncle -- but Gene, the
9      cousin, he is a contractor for
10     Madison Avenue.
11        ARBITRATOR:  He owns his own
12     FedEx routes?
13        THE WITNESS:  Yes.
14     Q.   To your understanding he was
15 never going to buy Joe's route, correct?
16     A.   From what I understand, no.
17 Not that I know.
18        (Whereupon, a short break was
19     taken at this time.)
20     Q.   Would it be fair to say you
21 never communicated with FedEx Ground
22 directly, right?  All communications went
23 through your brother?
24     A.   I did speak with Mike Scherer.
25     Q.   Perhaps I asked a bad question.
```

Page 342

```
1          Krystle Ruggiero
2      I am saying in your duties and
3  roles with J & J, so not talking about the
4  assignment, would it be fair to say you
5  never communicated with FedEx to dispute a
6  package or do anything like that?
7      A.   No.  That was passed down
8  through my brother to me and through a
9  manager to myself.
10     Q.   All the communication went
11 through Joe, correct?
12     A.   All the communication went
13 through the manager who told my brother, so
14 it trickled down from there.  They wanted
15 me to line up phone calls, like
16 distributing packages that went wrong or
17 stolen or something happened, I would make
18 a list of that and then give that to the
19 manager at the end.  He would make all the
20 phone calls and handle it one on one with
21 the customer.
22     Q.   Krystle Clear never
23 incorporated, right?  It never formed
24 articles of corporation, nothing like that?
25     A.   No, I never started a company
```

Page 343

```
1          Krystle Ruggiero
2  with it yet.
3      Q.   And Mr. Roth showed you Exhibit
4  28-1 which you have in front of you here,
5  which you testified was a text from Gene,
6  correct?
7      A.   Correct.
8      Q.   All right.  And the text says:
9  "I forgot to ask you earlier, do I have to
10 be there or on the phone tomorrow or could
11 Joey just list me as a BC."
12        MR. ROTH:  This is to Mike
13     Scherer?
14        MR. DEL BOVE:  Yeah, same text.
15        ARBITRATOR:  This is Gene
16     cousin.
17        MR. ROTH:  Gene cousin to Mike
18     Scherer.
19     Q.   It's Gene cousin, correct?
20     A.   Correct.
21     Q.   Now, this text doesn't say
22 anything about you or your business,
23 correct?
24     A.   No, but it is insinuating the
25 BC was for me.
```

10 (Pages 340 - 343)

Veritext Legal Solutions

800-567-8658                                                973-410-4098

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 12 of 119 PageID #: 1495

---

Page 344

Krystle Ruggiero

1
2      Q.   Doesn't it, in fact, say could
3  Joey just list me as a BC, correct?  It
4  doesn't say Krystle just list me as a BC?
5           MR. ROTH:  We'll stipulate it
6      says Joey, not Krystle.
7           MR. DEL BOVE:  Let the witness
8      answer, please.
9           MR. ROTH:  She doesn't need to
10     answer.  We'll stipulate to it.
11     A.   No, no.  It does say his name,
12  but it was based on me buying the business.
13  That's why there'd be a BC at all.
14     Q.   Okay.  But it doesn't say that,
15  fair?
16           MR. ROTH:  Asked and answered.
17      You don't have to answer.
18     A.   Unfortunately, it doesn't say
19  that there.  It says Joey.  He said Joey
20  instead of my name.  I see what you're
21  saying, however, that's --
22     Q.   And you testified you were
23  relying on your business contacts and your
24  managers to advise you and train you on
25  what you needed to know, right?

---

Page 345

Krystle Ruggiero

1
2      A.   Well, there's a lot that I do
3  know about the business.  What I don't
4  know, I would have BCs that already handled
5  such situations where I felt comfortable
6  learning from.
7      Q.   So the BCs would be helping
8  you?
9      A.   Of course.
10     Q.   Am I correct to say that isn't
11  the AO, the owner of the company ultimately
12  the one that's responsible for the company?
13     A.   I would be responsible for the
14  company, I understand underlyingly.  But
15  with the help -- I mean, it's all of us
16  that make a company, come together, right?
17  So, that's why we do have drivers, we have
18  helpers, we have BCs, we have managers.  We
19  have -- there's all types of positions
20  that, you know, make it a positive
21  experience.
22           MR. DEL BOVE:  Okay.  No
23      further questions.
24           MR. ROTH:  Great.  No
25      questions.

---

Page 346

Krystle Ruggiero

1
2           ARBITRATOR:  I have a couple of
3  questions.
4           Ms. Ruggiero, could you tell us
5  again exactly what was asked of you
6  by Mike Scherer for the assignment?
7  What specific documents?  Was there
8  any specific procedure that you had
9  to follow?  What exactly did he tell
10  you.
11           THE WITNESS:  So what he told
12  me when we discussed the RFI in
13  person, he said that he would be
14  following up with me for ongoing
15  steps.  He said this looks like a
16  good purchase, and we see this
17  proceeding forward.  He will be in
18  touch with me as to what those next
19  coming steps would be.
20           ARBITRATOR:  And then what next
21  steps did you hear from him?
22           THE WITNESS:  Then when I
23  finally spoke with him again, it was
24  via Zoom.  That's when he relayed --
25  that's when he had told me that they

---

Page 347

Krystle Ruggiero

1
2  weren't going to -- they weren't
3  going to sell to me.  They were going
4  to sell and wanted to sell to an
5  existing contractor of FedEx.
6           So my -- the whole purchase
7  discussion was off the table at that
8  moment.
9           ARBITRATOR:  So there's no list
10  of items you had to present in order
11  to get the business?
12           THE WITNESS:  No, everything
13  was good, proceeding forward and then
14  that was the next message from him.
15           ARBITRATOR:  Okay.
16           THE WITNESS:  Unfortunately.
17  Thank you.  Yeah.
18           ARBITRATOR:  Who is your next
19  witness?
20           MR. ROTH:  I have Conrod here.
21  If we could take a quick bathroom
22  break, literally five minutes and we
23  can bring him back and then I think
24  the timing should be good.
25           ARBITRATOR:  Let's reconvene at

---

11 (Pages 344 - 347)

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM
INDEX NO. 650428/2024
NYSCEF DOC. NO. 7
RECEIVED NYSCEF: 01/26/2024

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 13 of 119 PageID
#: 1496

Page 348

1          Krystle Ruggiero
2      10:45.  That gives you seven minutes.
3          (Whereupon, a short break was
4      taken at this time.)
5          XXXX
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 349

1          Conrod Newton
2          ARBITRATOR:  Please raise your
3      right hand.
4          Do you promise to tell the
5      truth, the whole truth and nothing
6      but the truth?
7          THE WITNESS:  Yes, ma'am.
8          ARBITRATOR:  Okay.
9  C O N R O D   N E W T O N,
10     called as a witness, having been
11     first duly sworn by a Notary Public
12     of the State of New York, was
13     examined and testified as follows:
14  DIRECT EXAMINATION
15  BY MR. ROTH:
16     Q.   Good morning, Conrod,
17  Mr. Newton.
18     A.   Yes.
19     Q.   Tell us if you would briefly
20  your employment background.
21     A.   Employment background --
22     Q.   And talk as loud because she's
23  going to record it.  So do your best.
24     A.   My employment background, I
25  started work at -- in 2007.

Page 350

1          Conrod Newton
2      Q.   2007 doing what?
3      A.   I used to work at White Castle.
4  After three months, I became a manager
5  there, and I worked until 2012 for five
6  years.
7      Q.   Let me stop you.  So, you were
8  manager at White Castle for five years?
9      A.   Yes.
10     Q.   Okay.  And what next?
11     A.   I move on to work at the
12  airport at Swiss Port, and I stayed there
13  until -- I was a ramp agent.  I stood there
14  until 2016.
15     Q.   2012 to '16 you were ramp agent
16  at the airport?
17     A.   Yes.
18     Q.   What did you do in 2016?
19     A.   In 2016 I applied for FedEx and
20  started working with Sergio Montoya.
21     Q.   So, you worked with the people
22  that owned the route before Mr. Ruggiero's
23  company bought it?
24     A.   Yes.
25     Q.   What did you do when you first

Page 351

1          Conrod Newton
2  started FedEx?
3      A.   I was a driver.
4      Q.   And did there come a time when
5  you became a BC, a business contact?
6      A.   Yes.
7      Q.   When was that?
8      A.   That was pretty much a year
9  later.
10     Q.   So 2017?
11     A.   Yes.
12     Q.   What is a business contact?
13  What does it mean?
14     A.   In the case of the -- pretty
15  much the contractor is not around, I'm
16  second in command.  You speak to me.  We
17  talk about business, whatever to go on for
18  the day or you want the employees to --
19  what I am saying is that as a business
20  contact, I am second in command for the
21  boss and under the contractor.
22          I pretty much oversee all the
23  contract employees.  In case they gotta --
24  I gotta make sure they take packages.  They
25  want them to do something, if they make a

12 (Pages 348 - 351)

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 14 of 119 PageID #: 1497

---

**Page 352**

Conrod Newton

1
2 mistake on a package wrong, they will give
3 me paperwork. I would take it, give it to
4 them, show them how to fill it out. And
5 they go on the route, they talk to the
6 customer.
7         There might be a chance of the
8 customer being impatient and they expect
9 package earlier. So they call FedEx and
10 they say, Hey, I didn't get it. And then
11 they will say, I did deliver it to them.
12 Go back to them, have them sign it. I
13 didn't receive it, it went back, have it
14 signed, and turn it back in at the end of
15 the day.
16     Q.   Now, so were you a BC until up
17 through 2022?
18     A.   Yes.
19     Q.   And what do you do now?
20     A.   Now I'm a driver for FedEx.
21     Q.   You're a driver for FedEx?
22     A.   Yeah.
23     Q.   Okay. And tell me, did you --
24 while you were the BC, I guess it was 28 --
25 so you were the -- were you the number 1 BC

---

**Page 353**

Conrod Newton

1
2 for J & J from the date it was purchased to
3 the date that J & J didn't own the route?
4     A.   Yes.
5     Q.   Tell me, did you find -- were
6 there difficulties that you experienced
7 being the number 1 BC for J & J with FedEx?
8     A.   Yeah, there was a difficulties.
9     Q.   Let's start with, what was the
10 first difficulty?
11     A.   First difficulty in what terms?
12     Q.   What?
13     A.   In what terms?
14     Q.   Well, like in trucks and
15 delivering and whatever.
16     A.   So my first difficulty is in
17 handling of the packages distributed to
18 each route.
19     Q.   Explain that. What do you mean
20 by that?
21     A.   So, we -- let's say I go to the
22 younger terminal, for instance, right.
23 When I went there, the first month -- no,
24 the first day, let's say the first three
25 weeks. They put all my zip codes together.

---

**Page 354**

Conrod Newton

1
2 I had two zip codes. There were no routes.
3 Everything was split up and organized
4 before I go there.
5         I saw the system myself. I was
6 like perfect, we're going to do so good
7 there. I was actually hyping myself, I was
8 so impressed. I am going to go there and
9 do good.
10         And when I get there,
11 everything was together. I had to spend --
12 we didn't leave the terminal -- I get there
13 6:30, I had to spend all day sorting it out
14 until 1:00 p.m.
15     Q.   Was that typical of other home
16 deliver companies, independent contractors?
17     A.   No.
18     Q.   Why not?
19     A.   No. For that day, the other
20 contractors, them, they didn't go through
21 what we went through.
22     Q.   What did you go through that
23 was different than the other independent
24 contractors?
25     A.   What we went through was that

---

**Page 355**

Conrod Newton

1
2 they mixed up everything. They pretty much
3 told us that we don't know your routes.
4 You guys gotta do it for yourself.
5     Q.   And what did you have to do
6 that was different -- what did you have to
7 do that was different?
8     A.   We had to manually sort out
9 each and every package and pack it on the
10 truck.
11     Q.   The other independent
12 contractors home delivery didn't have to
13 manually sort?
14     A.   No.
15     Q.   Did you have conveyer belts
16 that you worked with?
17     A.   Yes, but we didn't get none.
18     Q.   So let me see if I -- so, there
19 were conveyer belts at the Yonkers
20 terminal?
21     A.   Yes.
22     Q.   But when you say we didn't get
23 them, what does it mean?
24     A.   Basically, they put us on the
25 outside and we had to sort out packages,

---

13 (Pages 352 - 355)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 15 of 119 PageID #: 1498

Page 356

1          Conrod Newton
2 pack it into a cart, bring it outside, pack
3 it into the truck.
4     Q.   Is that all seasons, including
5 the winter?
6     A.   Yes.
7     Q.   And how would that -- how did
8 that make it harder for you?
9     A.   Make it harder for me because
10 my drivers and helpers get frustrated and
11 go home.  And I turn around, I would pack
12 the truck, turn around, deliver everything
13 and come back.  Some time just because of
14 that situation in the morning upsetting
15 everyone, we -- I'll be out there late at
16 night.
17     Q.   You were delivering still late
18 at night?
19     A.   Yes.
20     Q.   Were other independent
21 contractors doing that?
22     A.   No.
23     Q.   Did you complain to anyone,
24 Mike Scherer about how J & J was being
25 treated differently?

Page 357

1          Conrod Newton
2     A.   Yes.
3     Q.   How often?
4     A.   On a daily basis, actually.
5     Q.   He was at Yonkers, also?
6     A.   Yes.
7     Q.   What did you say to him?
8     A.   I was saying why can't we fix
9 this?  We need to get it fixed properly
10 because everyone else is complaining that
11 this guy's finished.  This contractor come
12 back at 12:00, this contractor come back at
13 1:00, this one come back at 3:00.  I got
14 family, I don't spend time with my kids.
15          What is going on?  What is
16 going on?  He was good.  We'll get it
17 sorted it out to the P and D managers in
18 the terminal.  They direct me to Mike
19 Scherer, that's the guy you talk to if you
20 have an issue.
21     Q.   So you talked to Mike Scherer?
22     A.   Yes.
23     Q.   What did you tell Mike Scherer?
24     A.   I told him, Can we fix this?
25     Q.   What did he say?

Page 358

1          Conrod Newton
2     A.   He said he is going to get it
3 fixed, but it never changed.
4     Q.   The whole Yonkers?
5     A.   The whole period.
6     Q.   The whole period?
7     A.   The whole period nothing
8 changed.  Pretty much we had to do a lot of
9 manual labor.
10     Q.   As BC number one, when were you
11 generally going home?
12     A.   At eleven o'clock.
13     Q.   At eleven o'clock at night?
14     A.   At night, yeah.
15     Q.   Wow.  And were you frustrated?
16     A.   Yes.
17     Q.   Why?
18     A.   Because I didn't get no time
19 for myself.  By the time I get back home --
20 because I live in Brooklyn, so by the time
21 I get back home it's like one o'clock in
22 the morning.  I sleep for three hours,
23 gotta get back at 5:00 to come back out for
24 6:30 again the next day.
25     Q.   Was this six days a week?

Page 359

1          Conrod Newton
2     A.   Actually it was seven.
3     Q.   Seven days a week?
4     A.   Yes.
5     Q.   And let's talk about -- let me
6 change the subject.  Did there come a time
7 where you learned that Mr. -- I think
8 Pilatowski was telling drivers they could
9 get paid more from other independent
10 contractors?
11     A.   Yes.
12     Q.   Mr. Pilatowski, is that his
13 name?
14     A.   Yes.
15     Q.   Who is he?
16     A.   He's one of the P and D
17 managers.
18     Q.   At FedEx?
19     A.   Yes.
20     Q.   Tell me what you learned.
21     A.   Pretty much when my guys was
22 complaining that this contractor getting
23 out at earlier time -- when my employees
24 was complaining that contractors then
25 getting off -- the trucks getting off

14 (Pages 356 - 359)

Page 360

```
 1           Conrod Newton
 2  at twelve o'clock, one o'clock, they went
 3  to him and tell him and they said they pay
 4  more money and get out earlier.  I don't
 5  know why you're with J & J.
 6      Q.   So, you learned that the driver
 7  told you that Pilatowski told him he can
 8  get more money with other independent
 9  contractors?
10      A.   Yes.
11      Q.   How often did that happen?
12      A.   That happened on a weekly
13  basis.
14      Q.   Did drivers leave?
15      A.   Yes, four of my drivers leave
16  and I had to get four more new drivers, and
17  those new drivers come in.  They get into
18  in the same situation with the packages in
19  the morning and confusion and they leave,
20  too.
21      Q.   They left also?
22      A.   Yes.
23      Q.   How many drivers total did you
24  have on the routes?
25      A.   At that time I pretty much had
```

Page 361

```
 1           Conrod Newton
 2  seven main drivers and two extra drivers.
 3      Q.   So seven and two is nine.  Four
 4  leaving is pretty big hit, right?
 5      A.   Pretty big hit.
 6      Q.   How does that affect your
 7  ability to run -- to be the BC?
 8      A.   That affected me really bad
 9  because now I have to go on the route by
10  myself to make sure those 300 and 400 pages
11  are delivered for the day.
12      Q.   Who is Kevin McKenzie?
13      A.   He's my assistant BC.
14      Q.   Okay.  Was he let go?
15      A.   Yes.
16      Q.   Tell me what your understanding
17  is of why he was let go.
18      A.   They wrongfully drug tested
19  him.  He's a helper.  Helper doesn't get
20  drug tested.
21      Q.   I'm sorry, I missed the
22  beginning of that.  I heard a helper
23  doesn't get drug tested.  Say that again.
24      A.   They wrongfully drug tested
25  him.
```

Page 362

```
 1           Conrod Newton
 2      Q.   What do you mean helper doesn't
 3  get drug tested?
 4      A.   Because when we apply for FedEx
 5  as a helper, the helper, he's a helper.  He
 6  doesn't go to the requirements as a driver.
 7  The requirements as a driver is for you to
 8  be able to focus and make sure everything
 9  go perfectly for the day.
10      Q.   And so they wrongfully drug
11  tested.  And what happened after the drug
12  test, do you know?
13      A.   After the drug test, they
14  didn't give him a result.
15      Q.   They didn't give him result?
16      A.   No.
17      Q.   What happened next?
18      A.   They told him he can't come
19  into the terminal no more because they said
20  he failed.  And three months later, after
21  three months, like six months later, they
22  said, Oh, we don't have anything against
23  Kevin.  He could come back.  And we was
24  like, how could he come back if he failed?
25  And they was like, No, he did not fail, he
```

Page 363

```
 1           Conrod Newton
 2  could come back and we was like, okay,
 3  what's going on?
 4      Q.   So, six months later, if I
 5  understand it correctly.  Who said he
 6  didn't fail?
 7      A.   Steve.
 8      Q.   Pilatowski?
 9      A.   Pilatowski, yeah.
10      Q.   So all you know is that he was
11  told he failed and then six months later
12  he's told he didn't fail and he could come
13  back?
14      A.   Yeah.
15      Q.   And by then was he doing
16  something else, Kevin?
17      A.   Pretty much, yeah.
18      Q.   Now, did you -- was there
19  pressure put on -- other than what you
20  testified to, was there pressure put on you
21  to basically just wash your hands of the
22  business?
23      A.   Wash my hands?
24      Q.   Well, was there pressure put on
25  you to basically just quit?
```

15 (Pages 360 - 363)

Case 1:23-cv-01675-KAM-TAM Document 74-4 Filed 07/08/25 Page 17 of 119 PageID #: 1500

Page 364

1          Conrod Newton
2     A.   Yes.
3     Q.   Tell us about the pressure put
4 on you.
5     A.   All right.  Well, plenty of
6 time I heard it mention from Mike Scherer,
7 too, said to me, Why you so loyal to Joey?
8 Why you so -- why don't you just find
9 somewhere else to go?  And I didn't reply,
10 pretty much I didn't reply.  I just ignored
11 it and keep on moving.
12          And then there was another time
13 that Pilatowski said the same thing.
14     Q.   He said the same thing?
15     A.   Yes.
16     Q.   When did Mike Scherer say that
17 approximately, if you remember?
18     A.   I don't have a timeline on it,
19 but it's pretty much end of 2021.
20     Q.   What about Mr. Pilatowski?  He
21 said it after that?
22     A.   After that, yes.
23     Q.   When did he say it
24 approximately?
25     A.   Pretty much early 2022.  2022.

Page 365

1          Conrod Newton
2     Q.   What was your answer to these
3 guys?
4     A.   My answer was like, I am here
5 to do my best.  Then after I can't do my
6 best and I can't do no more, that's it.
7     Q.   Were you also -- if drivers are
8 leaving, did that create more pressure on
9 you?
10     A.   Yes.
11     Q.   How did you get the job done
12 how -- did you get the routes filled with
13 these employees drivers leaving?
14     A.   FedEx take like seven days to
15 two -- I mean, two weeks, one week to two
16 weeks to approve a driver.  So during that
17 time for those two weeks I had to put,
18 like, two routes in one truck and I took it
19 out, delivered it.
20          And there would be days that I
21 would deliver it.  Came in, rushed out,
22 delivered, turned back, come back, packed
23 up and go back out and deliver it just to
24 complete the day.
25     Q.   So you did double the task; is

Page 366

1 that right?
2     A.   Yes.
3     Q.   Now, anything else they did to
4 put pressure on you or break you, if you
5 recall?
6     A.   Our packing situation in the
7 terminal, like, we didn't get a space to
8 park the truck so they could load it
9 properly.  So they put us on the side of
10 the building.
11          And when they put us on the
12 side of the building -- and when they put
13 us on the side of the building, we have
14 to -- when the contractors are moving, we
15 had to reverse back out the terminal to
16 drive back in to continue packing.
17     Q.   And that was difficult?
18     A.   It was very frustrating.
19     Q.   Let me switch gears.  Did there
20 come a time where you talked to Joey about
21 buying the business?
22     A.   Yes.
23     Q.   When was that?
24     A.   In 2021.  I'm not too sure on

Page 367

1          Conrod Newton
2 the months, but in 2021 I spoke to him.  He
3 was standing right beside Mike Scherer
4 together and they were talking about the
5 situation of the trucks.  And I was like,
6 it would be better if I took off of the
7 routes and he said okay.
8     Q.   Who is "he"?
9     A.   Who is he?
10     Q.   You said he said okay.
11     A.   Yeah.  Both Joey and Mike
12 Scherer said okay.  Joe was like that's
13 pretty good.  And I was like, Okay, cool.
14          He said to Joe, Let's go and
15 talk more better.  So they went off and
16 talked, and then Joe came back and said
17 Mike Scherer said no.
18     Q.   Was this in connection with
19 purchasing one of the ZIP codes, either
20 10035 or 40?
21     A.   It's 127th.
22     Q.   27th, okay.
23          And did you come to learn why
24 Mike Scherer said no?
25     A.   Joey told me FedEx is doing a

16 (Pages 364 - 367)

Page 368

```
 1              Conrod Newton
 2  merger for the overlap.
 3      Q.   What's an overlap?
 4      A.   Overlap is a merger between
 5  ground and home delivery coming to be one.
 6      Q.   So do I understand that FedEx
 7  wanted an overlap over you?
 8      A.   Yes.
 9      Q.   Did you discuss price with Joey
10  or was that the extent of it?
11      A.   Yeah, we discussed price.
12      Q.   Did you come up with an
13  agreement?
14      A.   Yeah.  It was supposed to be --
15  starting off it was supposed to be --
16  because I showed my credit line, and it
17  started off at 500,00, and then I would
18  pay -- my next payment 300,000 over the
19  course of the time.
20      Q.   Okay.  And who ended up --
21           Did Angel Pena end up getting
22  it?
23      A.   Yes.
24      Q.   This is a route that Angel got,
25  not Shawn Ponds?
```

Page 369

```
 1              Conrod Newton
 2      A.   No.  Shawn Ponds got the 27th,
 3  the one that I asked for and Angel Pena got
 4  the 35 ZIP.
 5      Q.   And your conversation was about
 6  the 27 or 35, if you remember?
 7      A.   Technically, it was about both.
 8  I was mainly focusing on 27.
 9      Q.   And that was the extent of it.
10  You basically learned from Joe that Mike
11  said no and it went nowhere?
12      A.   Yeah.
13      Q.   It didn't even get to a point
14  where you prepared an RFI?
15      A.   No.
16      Q.   Now, are you familiar with the
17  term "business discussions"?
18      A.   Yes.
19      Q.   What's a business discussion?
20      A.   Business discussion is whenever
21  a contractor is failing, he's written up
22  discussion to say what do you improve on to
23  make business survive better.
24      Q.   And did you -- is that also a
25  conversation between FedEx and the
```

Page 370

```
 1              Conrod Newton
 2  independent contractor?
 3      A.   Yes.
 4      Q.   Were you ever part of a
 5  conversation with FedEx about a business
 6  discussion?
 7      A.   No.
 8      Q.   Never?
 9      A.   Never.
10      Q.   Okay.  So -- how did you --
11  well, were there any instances where you
12  believe that J & J was being faulted for
13  delivery when it should have come under a
14  different contractor?
15      A.   Yes.
16      Q.   Tell us about that.
17      A.   Some of the J & J packages were
18  offset to other contractors.  Let's say one
19  of our routes, they claimed that we was
20  failing.  I didn't see that because like I
21  told you, I went out there myself to take
22  two routes out and I still come back with
23  an empty truck, no complaints, everything
24  was good.
25           But they still took off our
```

Page 371

```
 1              Conrod Newton
 2  doorman.  They pretty much go to our routes
 3  and pick out all the doormen and package
 4  room locations and give it to another
 5  contractor.
 6      Q.   When you say "they," you mean
 7  FedEx gave it to a different contractor?
 8      A.   Yeah, FedEx.
 9      Q.   Are there instances where FedEx
10  gave packages that you were supposed to
11  deliver to other contractors?
12      A.   Yes, yes.
13      Q.   And tell me what happened in
14  connection with that.
15      A.   So in connection with that now,
16  we was getting complaints and disputes and
17  failures off of what they give them.  Me
18  and Kevin was like, Oh, they fail and the
19  doorman and package room route.  Packages
20  getting left outside the building because
21  they didn't know they had to buzz a certain
22  place to get their package in.
23      Q.   Go ahead.
24      A.   Because some of the addresses,
25  they run vice versa.  So, you are on this
```

17 (Pages 368 - 371)

Page 372

```
1           Conrod Newton
2  avenue here and it said 9900 and over here
3  on Lexington it said 9900.  So they would
4  drop 9900 Madison at Lexington and 9900
5  Lexington on Madison.
6           And they would get a lot of
7  mix-ups, so we would get pretty much two
8  times of this paperwork to fill out.  When
9  I look at it, I see ID numbers that doesn't
10  match to the guys' IDs.  I am like, Where's
11  this coming from?
12          And Tyler, she's one of the
13  P and D managers, too.  And she said forget
14  about it.  Because I went to her, was like,
15  Hey, these are not my people.  Why are my
16  stops on their trucks?  I guess it was on a
17  need-to-know basis so we didn't know about
18  it because, but they made a mistake and
19  gave it back to us.
20          That's when I'm like, Hey,
21  you're pretty much robbing us.  It's
22  supposed to be on our truck and you are
23  giving it to someone else and we're
24  disputing the complaints; that's not right.
25  Q.  Do I understand that there were
```

Page 373

```
1           Conrod Newton
2  disputed complaints that were, I think you
3  said twice the size of those papers?
4  A.  Yes, yes.
5  Q.  Those were complaints of the
6  J & J business even though that was not a
7  fault of the J & J business?
8  A.  Yes.
9  Q.  And did you tell FedEx that?
10  A.  Yes.
11  Q.  And what did they say?
12  A.  They said -- they told me
13  forget about it, don't worry.  That's not
14  yours.
15  Q.  Tell me, how many packages --
16  you were the BC number one, so you know how
17  many packages were approximately delivered
18  a day, correct?
19  A.  Yes.
20  Q.  How many packages were
21  delivered on average a day?
22  A.  On average, we pretty much get
23  like over 1500 to 2,000 per day.  And out
24  of all of that, I will say we probably
25  brought back like 20.  20 pieces.
```

Page 374

```
1           Conrod Newton
2  Q.  So did you believe that -- how
3  did you believe your company performed when
4  it comes to delivering a package for FedEx?
5  A.  They performed really good.
6  Q.  Why do you say that?
7  A.  Because I do walk around at
8  times and look at other contractors to see
9  who bring back more, and there are a lot of
10  contractors that bring back more packages
11  than us.  I used to wonder why they're
12  saying we failing when we're doing better
13  than everybody else.
14  Q.  Did you ever get an answer to
15  that question?
16  A.  No.  I never get an answer.
17  They told me my boss need to be here for me
18  to answer the question.
19      MR. ROTH:  I have no further
20    questions.
21      (Whereupon, a short break was
22    taken at this time.)
23      ARBITRATOR:  Okay.  We're back
24    on the record with cross-examination
25    of Conrod Newton.
```

Page 375

```
1           Conrod Newton
2      You're still under oath,
3    Mr. Newton.  Do you understand that?
4      THE WITNESS:  Yes, ma'am.
5  CROSS EXAMINATION
6  BY MR. DEL BOVE:
7  Q.  Good morning, sir.  I have a
8  few questions for you.
9  A.  Good morning.
10  Q.  When did you start working for
11  Sermont Express?
12  A.  2016, but -- it's in August
13  2016.
14  Q.  Okay.  When did you switch over
15  to J & J?
16  A.  It was a year later.  So J & J
17  spent one year and like three months.  So
18  company switch over to J & J probably 2017,
19  in either January or February.
20  Q.  And how long did you work for
21  J & J for?
22  A.  Working for J & J from 2017 to
23  2002.
24      MR. ROTH:  '2 or '22?
25  A.  No, sorry.  2022.  Sorry, I'm
```

18 (Pages 372 - 375)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 20 of 119 PageID #: 1503

Page 376

Conrod Newton

1
2  not thinking straight.
3          MR. ROTH:  It's okay, I do it,
4      too.
5      Q.  Are you currently working for a
6  contractor now?
7      A.  Yes.
8      Q.  The name of that contractor is
9  ULUG, right?
10     A.  Yes.
11     Q.  Did you start working for them
12 in June 17th of 2021?
13     A.  June.
14     Q.  17th of 2021.
15     A.  No.
16     Q.  I am going to show you -- it's
17 not in evidence, but I am going to show you
18 what's called an association information
19 printout.  I only have one copy, but I'll
20 circulate it here.
21         If I show you that it says
22 effective date and it lists June 17th,
23 2021, and it lists the ISP name as ULUG,
24 does that refresh your recollection as to
25 when you started to work for ULUG?

Page 377

Conrod Newton

1
2          MR. ROTH:  Objection.  He never
3      said he needed his recollection
4      refreshed.  He said he didn't start
5      for ULUG till 2022.
6      Q.  Is that your answer?
7          ARBITRATOR:  Can I see that?
8      A.  No, because I was still going
9  back and forth.  I am still on the list for
10 J & J.  If you check it right now, I am
11 still in the list as BC.  I never get
12 removed.
13     Q.  Do you know what a right to
14 ensure service is?  Have you ever heard
15 that term?
16     A.  No.
17     Q.  Are you aware FedEx Ground has
18 a right to ensure service for its
19 contractors?
20     A.  No.
21     Q.  Do you know what a contingency
22 contractor is?  Have you heard that term?
23     A.  No.
24     Q.  And so fair to say you don't
25 know what it means for FedEx Ground to run

Page 378

Conrod Newton

1
2  contingency?  Have you ever heard that term
3  before?
4      A.  No, I didn't hear that term.
5      Q.  And so you're not aware that
6  FedEx Ground has to pay more money to be
7  able to run contingency; is that correct?
8      A.  The term, I don't know.  Can
9  you explain it more better to me?
10     Q.  Sure.  Well, fair to say,
11 though, you're just not familiar with the
12 term, right?
13     A.  Yes.  Can you explain it to me?
14     Q.  Sure.  When you run a
15 contingency, it means I am having another
16 contractor deliver packages.
17     A.  Okay.
18     Q.  When you were delivering
19 packages for J & J, you'd have to log in to
20 your scanner, right?
21     A.  Yes.
22     Q.  And those scanners would keep
23 track of how many hours you were working,
24 right?
25     A.  Yes.

Page 379

Conrod Newton

1
2      Q.  And you're a contractor so
3  you're familiar with hour of service rules,
4  correct?
5      A.  Yes.
6      Q.  You're aware there are certain
7  limits on the amount of hours you could
8  work per day, per week, correct?
9      A.  Yes.
10     Q.  So would you agree with me it
11 would be impossible for you to work from
12 6:00 a.m. to 10:00 p.m. or whatever seven
13 days a week?
14     A.  I get why you say that part.
15 Let me explain better to you.  First, FedEx
16 doesn't allow us to log in to the scanner
17 until you're able to drive in the terminal.
18 So that's why the hours are so different
19 from what you got on the paper.  If I scan
20 my ID to walk inside the terminal, it
21 should be a different time to the time I
22 walked out.  You get what I'm saying?
23         I am not going to log in to the
24 scanner while I am sorting the packages and
25 moving it around.

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 21 of 119 PageID #: 1504

Page 380

Conrod Newton

1
2    Q.  Understood.  Go ahead.
3    A.  Because when I started at home
4  delivery, we used to scan the packages on
5  the pallets.  Do you remember that?
6        We scan packages on the
7  pallets.  Do you remember that?  No?  When
8  we scan it on the pallets, it usually
9  violate that time stop.  Violated it a few
10  times because I had to do a pick-up for
11  people that -- from the old terminal, used
12  to be from the other terminal.
13        He used to pull the same stunt
14  with Joey.  They tried to take advantage of
15  him.  So I got BC to cover for other
16  routes.  So when I take extra, I used to
17  have a weekly threshold of 70 hours, that's
18  what he's trying to say.  That's why I
19  asked him to explain it better to me.
20    Q.  I'm not sure what you're asking
21  me, but part of the process is for me to
22  ask the questions.  I think you answered
23  the question.  Fair enough.
24        ARBITRATOR:  Were you saying
25    violate?

Page 381

Conrod Newton

1
2        THE WITNESS:  Yeah.  Violate
3  the hours of service, that's why he
4  said contingency.  I didn't
5  understand that.
6        ARBITRATOR:  I think
7  contingency is something else.  It
8  has to do with alternative
9  contractors delivering for J & J.
10  Then the second line of questioning
11  was about the hours.
12        And I just want -- I wasn't
13  sure whether you used the word
14  "violate."
15        THE WITNESS:  Yeah.  With DOT
16  if you go over -- I think it is 60 or
17  70 hours for the week, you violate
18  the hours of service because you have
19  a certain slip period for a driver to
20  be off the road.
21        So, what they do now, instead
22  of have the drivers scan the boxes in
23  the morning, the terminal will scan
24  it for you and pack into the truck.
25  Then you log in to the scanner and

Page 382

Conrod Newton

1
2  you drive out.
3        So whatever time when I leaving
4  out at one o'clock in the afternoon,
5  I am only going to log in to the
6  scanner at one o'clock.  So I work
7  from 1:00 to 11:00, they count
8  ten-hour to eight-hour shift.
9  Instead of putting from when I walked
10  into that terminal.
11        The time I gave earlier was the
12  time I walk inside the terminal until
13  I walk outside.
14        ARBITRATOR:  Okay.
15    Q.  Sir, you agree you worked for
16  J & J, correct?
17    A.  Yes.
18    Q.  It's J & J's job and
19  responsibility to be monitoring its drivers
20  and employees and making sure they're not
21  violating hours of service requirements,
22  right?
23    A.  Yes.
24    Q.  And as a BC, that falls on you
25  to make sure people are not violating that?

Page 383

Conrod Newton

1
2    A.  Yes.  Because as a BC, even
3  though it says BC is required by me to make
4  sure no one is violating that hours, is
5  also on FedEx for -- to advise us on that
6  part.
7        Because the thing about it,
8  even though we didn't got fully monitored
9  off the system as yet.  This was a new
10  moving over.  If you think about it, I
11  started in 2016, 2017.  J & J came in and
12  was still scanning on pallets.
13        In 2018, that's when for home
14  delivery they started to scan the packages
15  for us.  Right?  Is it 2018 or 2019, they
16  started scanning for us.  Before that they
17  never did that.
18        FedEx Ground does it the way
19  after scanning it and loading on the truck
20  for them in a certain timeline.
21    Q.  You agree that FedEx advises
22  you via business discussions as to hours of
23  service?
24    A.  Advises us for our business
25  discussions of hours of service?  Not with

Veritext Legal Solutions
800-567-8658                                                    973-410-4098

Page 384

Conrod Newton

1
2  J & J.
3      Q.   You're aware that Mike Scherer
4  is not in operations, right?  He's not
5  responsible for running the terminal,
6  correct?
7      A.   Yes.
8      Q.   Okay.  In fact, he deals with
9  contractor relations, right?
10     A.   Yes.
11     Q.   So you would agree with me it
12  wouldn't make sense to complain to Mike
13  Scherer about any situations at the station
14  if he's, in fact, not responsible for
15  operations?
16     A.   That's the thing, right?  Mike
17  should be on J & J's side as contractor
18  relations.  Mike Scherer supposed to be on
19  J & J's side as contractor relations.  If
20  we have an issue, we're supposed to direct
21  it to him, to Mike Scherer.  Mike Scherer
22  supposed to direct it back to the terminal.
23        When we got to Yonkers, he was
24  more on the side of the terminal, not the
25  side of the contractors.  Because even

Page 385

Conrod Newton

1
2  though JT and RV Shipping was -- they got
3  these parts, they were comfortable.  They
4  still have little issues and they still
5  will reach out to Mike Scherer to adjust it
6  for them.  It's not just J & J.
7        He's supposed to be on our
8  side, not on the terminal side.
9      Q.   Did you have any conversations
10  with Mr. Roth or Joe prior to coming here
11  today?
12     A.   I had to.  That's how I get
13  here.
14     Q.   Other than explaining to you
15  where the building is, the address, did you
16  have any conversations with them about your
17  testimony here today?
18     A.   No.  They told me to come and
19  speak and tell the truth.  Like, pretty
20  much tell them what I went through.
21     Q.   When you were working for Joe,
22  would he sometimes pay you in cash?
23     A.   No.  What he did --
24     Q.   He never paid you in cash?
25     A.   No.

Page 386

Conrod Newton

1
2      Q.   Would he sometimes buy lunch
3  for you?
4      A.   Yes.
5      Q.   As far as you know, is that
6  improper?  Is that incorrect in any way?
7      A.   No, because everything is on my
8  checks pretty much.
9      Q.   Were you responsible for
10  handing out paychecks to the other
11  employees?
12     A.   Yes.
13     Q.   Would you do that on a weekly
14  basis?
15     A.   Yes.
16     Q.   You came here today to tell the
17  truth, right?
18     A.   Yeah.
19     Q.   Isn't it true, though, that
20  you're either currently or recently under
21  investigation by FedEx for stealing an
22  iPhone worth $500?
23     A.   Yes.
24     Q.   And on June 27th this year, a
25  customer made a complaint about you?

Page 387

Conrod Newton

1
2      A.   About what, the iPhone?
3      Q.   About the iPhone?
4      A.   Yes.  I'll tell you about that.
5  Pretty much, this is the deal with that
6  stop.  That stop has a lot of issues going
7  on with them, and they said they got
8  scammed before.  They got a bunch of stuff
9  going on.
10        In the morning, I am driving a
11  boat truck.  Boat truck is a 26-foot box
12  truck that I don't stop myself.  I don't
13  rearrange, nothing.  Pretty much if that
14  truck went out and I am missing something
15  off of it, I am on camera.  When I pull up
16  to the location to offload the package to
17  those guys, they came down and took
18  everything from my truck right there.
19        And then I call my manager and
20  say, Hey, my scanner says twelve pieces,
21  but I only got eight, so four was missing.
22  Pretty much they said that iPhone is
23  stolen, but three other packages got
24  delivered by someone else, not me.  So how
25  does that count?

21 (Pages 384 - 387)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 23 of 119 PageID #: 1506

Page 388

1          Conrod Newton
2    Q.   Wasn't it true during the
3 course of that investigation -- you spoke
4 with FedEx security, right?
5    A.   Uh-huh.
6    Q.   You gave a statement?
7    A.   Yes.
8    Q.   And you initially stated that
9 the iPhone wasn't on your truck, right?
10   A.   Yeah, it wasn't on my truck.
11   Q.   But then later you told
12 security that the rear of the truck, the
13 door was malfunctioning and you believe the
14 package fell out of the back of the truck?
15   A.   No.  They were trying to coerce
16 my words to say that the rear of the truck
17 was open.  That they were trying to say, Is
18 it the rear that was open?  Is it possible
19 someone went into your truck?  I told them
20 no.
21   Q.   Are you still suspended for
22 that?
23   A.   No.
24   Q.   You were reinstated?
25   A.   Yes.

Page 389

1          Conrod Newton
2    Q.   You're currently working for
3 ULOG?
4    A.   Yes.  I am clear and I am good.
5    Q.   Earlier you testified Joe was
6 going to attempt to assign you J & J; is
7 that correct?
8    A.   Yes.
9    Q.   And you discussed -- you were
10 talking about the sale of -- simultaneously
11 talking about the sale of two ZIP codes?
12   A.   Yeah.
13   Q.   But isn't it true that Joe had
14 sold one of those ZIP codes years prior to
15 that discussion?
16   A.   Not really.  Because the only
17 one that he sold like years prior was the
18 40 ZIP.  But when me and Joe had a
19 discussion, he had 27 and the 35 ZIP
20 together.
21   Q.   So, you believed you were going
22 to be buying both the 27 and the 35?
23   A.   No.  I asked him for one of
24 them.  Whichever one he would give me, I
25 would take.

Page 390

1          Conrod Newton
2    Q.   When did that conversation take
3 place, roughly?
4    A.   It was back in like early 2021.
5 It's either early 2021 or later 2020.  But
6 I know it was around there.  It was around
7 that time.  It's between November to
8 February, the time slot.
9    Q.   You indicated that you were
10 going to get a $500,000 loan, correct?
11   A.   Yes.
12   Q.   And you were going to finance
13 the rest of the deal?
14   A.   Yes.
15   Q.   You never put together an RFI?
16   A.   No, it didn't get that far.
17 This is between me and him discussion, and
18 he mentioned it over to Mike Scherer.  Mike
19 Scherer says, Good idea.
20        Then he come back to me as I
21 said earlier and tell me, he said, no go.
22        ARBITRATOR:  Was it Mike that
23    said it was no go?
24        THE WITNESS:  Joe told me Mike
25    said that.  Because they went off to

Page 391

1          Conrod Newton
2    talk, so that's why.
3    Q.   And other than what you told
4 us, fair to say you didn't take any other
5 steps to attempt to buy the business?
6    A.   In 2022 he called me back and
7 tell me it's a go and do you want it still?
8 And I said yes.  And I call him back, like,
9 probably a day later, couple of hours
10 later.  I guess he mentioned off to Mike
11 Scherer because, you know, he's contractor
12 relations.
13        So when he mentioned it to him,
14 he was pissed off.  This guy don't want to
15 sell it to you.  He's saying the overlap
16 and stuff like that so...
17   Q.   When did that call take place?
18   A.   That was in 2022.
19   Q.   Do you remember the month?
20   A.   No, I don't remember the month.
21 Like I said, I never came off his -- even
22 though I was associated with ULUG, I still
23 used to go on weekends.  So, you know, it's
24 seven days a week.
25   Q.   In 2022, did you take any steps

Veritext Legal Solutions
800-567-8658                                    973-410-4098

Page 392

Conrod Newton

1    such as checking your credit or getting a
2    loan?
3    A.   No.
4    Q.   Earlier you testified that you
5    never conducted any business discussions
6    with FedEx; is that correct?
7    A.   No -- yeah.
8    Q.   You never did?
9    A.   Yes, I never did.  It never
10   went that far.
11   Q.   It never went that far, okay.
12       So I am showing you what's been
13   previously produced as FedEx 461.  And this
14   is a business discussion dated February 7th
15   of 2020, and you see your name there as
16   business contact, Conrod Newton.  You see
17   your name there?
18   A.   Okay, cool.
19       MR. ROTH:  Where you looking?
20       MR. DEL BOVE:  Center of the
21       document.
22   Q.   You see your FedEx ID there?
23   A.   Yes.
24   Q.   Is that your FedEx number, your

Page 393

Conrod Newton

1    ID?
2    A.   Yes.
3    Q.   And you see at the bottom of
4    the page where it says:  Manager discussion
5    summary.  I met with the BC and made him
6    aware of the discussion.  BC understood.
7        It goes on to discuss the
8    specific incident.  You can read it to
9    yourself if you'd like.  But seeing this
10   document, does this refresh your
11   recollection as to whether you had any
12   business discussions with FedEx?
13   A.   No.  Because this is deal with
14   FedEx when I -- so this is Julia.  So this
15   wasn't our discussion with her.  This was
16   more of a -- she was on the phone with Joey
17   and Joey told us I cosign off on it.  That
18   was it.  It wasn't a discussion.
19   Q.   Okay.  But fair to say on or
20   about February of 2020, you had some
21   conversation with Julia Tamora Creed; is
22   that correct?  You had a conversation with
23   her?
24   A.   No.  She and Joey had a

Page 394

Conrod Newton

1    conversation over the phone, and he told me
2    this is okay.
3    Q.   Do you believe this document is
4    a falsified or incorrect in some way?
5    A.   It's not falsified.  But me and
6    her sitting, having a discussion like we
7    are right now, no.
8    Q.   But it says met with the BC.
9    Is it fair to say you never met with her?
10   A.   Correct.
11   Q.   I am handing you what's
12   previously been produced as FedEx 459.
13       MR. ROTH:  Do you want to mark
14       these exhibits?
15       MR. DEL BOVE:  Yeah, we will.
16       ARBITRATOR:  Are these in the
17       exhibit book?
18       MR. DEL BOVE:  They're not.
19       It's for impeachment.
20   Q.   And you see -- again, you see
21   your name there in the middle?
22   A.   Yes.
23   Q.   You see your FedEx ID?
24   A.   Yes.

Page 395

Conrod Newton

1    Q.   Okay.  And I'll read to you the
2    manager discussion:  Spoke to BC about the
3    failed signature packages.  And the
4    document goes on, you can read it to
5    yourself if you would like.
6    A.   Yeah.
7    Q.   Does seeing this document
8    refresh your recollection as to the
9    conversation you would have had with Rosa
10   Fernandez?
11   A.   Yeah.  But this is the deal,
12   this is another business discussion.  This
13   is just -- a business discussion is one
14   time I got to write back to FedEx how I am
15   going to fix the business.  This is just a
16   complaint dispute.
17   Q.   Sir, you see the last sentence
18   of this where -- I'm not going to read it
19   to you and waste everyone's time, but the
20   last sentence states:  BC understood.
21       Do you see that there, the last
22   sentence?
23   A.   Yes.
24   Q.   So wouldn't that imply that

INDEX NO. 650428/2024
RECEIVED NYSCEF: 01/26/2024
Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 25 of 119 PageID #: 1508

Page 396

Conrod Newton

1    there was a conversation back and forth
2    between you and Ms. Fernandez?
3    A.    Yes.
4    Q.    Okay.  All right.  I am handing
5    you what we have previously marked as FedEx
6    460.
7        And you see your name there in
8    the middle of the document?
9    A.    Yeah.
10    Q.    And you see the day of the
11    discussion above that is February 12th,
12    2020?
13    A.    Uh-huh.
14    Q.    Again, you see the first top
15    sentence there:  I spoke to BC about these
16    disputes that were never answered?  The
17    bottom of the document.
18    A.    Yes.
19    Q.    So, does seeing this document
20    refresh your recollection as to whether you
21    had any business discussions with FedEx?
22    A.    Like I said, this was disputes
23    that Rosa had.  And we pretty much, like I
24    told you, these were disputes that we had.

Page 397

Conrod Newton

1    This was one was offset -- this one wasn't
2    offset to the other contractors.  This one
3    wasn't offset, but these ones was signed
4    and taken care of, but they were printed on
5    extra copies.
6        And we talked to her about it,
7    and she's -- she didn't tell me it was a
8    business discussion.
9    Q.    I am handing you one more
10    document, FedEx 464.
11        For the record, I've handed you
12    FedEx 464, which is date of discussion
13    February 19th, 2020.  And again, you see
14    your name there?
15    A.    Yes.
16    Q.    I'm not going to read it to
17    you, but you see the summary of discussion
18    you had with Ms. Fernandez again?  You see
19    that at the bottom?
20    A.    Yes.
21    Q.    Again, does seeing this
22    document refresh your recollection as to a
23    business discussion you had with FedEx?
24    A.    My thing is this, this is not a

Page 398

Conrod Newton

1    business discussion.
2    Q.    What is it, to your knowledge?
3    A.    This was just -- Rosa wanted to
4    speak to Joe and he wasn't there, right?
5    So this was company's disputes that me and
6    Joey fixed, and Rosa was still printing
7    them back up over and over.
8    Q.    Is it fair to say after looking
9    at these documents -- and I'll represent to
10    you there are many more, but for purposes
11    of time, I am going to show you these four.
12        But it would be fair to say you
13    did have many, many business discussions
14    with FedEx, right?
15    A.    But this is not a business
16    discussion.  It's not a business
17    discussion.
18    Q.    I think you just said regarding
19    this business discussion, Joey wasn't
20    around.  Did FedEx typically have a hard
21    time getting in touch with Joey?
22    A.    No, they're always on the phone
23    with Joey talking because during this
24    period of time, he had -- I think during

Page 399

Conrod Newton

1    this time, he had a death in the family.  I
2    think his grandfather passed away.
3        If you check back, most of this
4    stuff occurred whenever he have like a
5    family issue.  Like, they apply more
6    pressure once he's not there.  So plenty
7    other times that there's business
8    discussion, because I didn't think it was
9    business discussion at the time because she
10    didn't tell me directly this is a business
11    discussion.
12        I was going to say that during
13    the time that -- that Joey not around, they
14    kind of like mess with us a lot so they do
15    extra printing of paperwork.  Because there
16    was a period of time that we stay back in
17    the terminal and have guys -- when I was in
18    Q Manhattan, other guys would go to the
19    office and fill out these paperwork for the
20    tracking numbers.  We call them Code 85s.
21        So when I have them fill it
22    out, they put it in their drawers and in
23    the morning, the same person, the following
24    day, they always told us, You guys don't

Page 400

1    Conrod Newton
2  get your stuff in order.  You guys don't
3  get your stuff in order.  And I tell them,
4  No, we did.
5    So like a week later they would
6  come back and say, Oh, I got this for you.
7  At the time Rosa already submit all these
8  things.
9    Q.   Do you know Joseph Ruggiero,
10 Sr.?
11   A.   Yeah.
12   Q.   Joey's dad.  Was he the AO in
13 2020?
14   A.   Yes.
15      MR. DEL BOVE:  Nothing further.
16      MR. ROTH:  Before I redirect,
17   can we mark these?  I'd like to do
18   this in the order they came.  The one
19   with Bates stamp 461 is going to be
20   Joint 37.
21      (Whereupon, business discussion
22   was marked as Claimant's Exhibit 37
23   for identification as of this date by
24   the Attorney.)
25      MR. ROTH:  The one with Bates

Page 401

1    Conrod Newton
2  stamp 459 will be Joint 38.
3      (Whereupon, a business
4   discussion was marked as Claimant's
5   Exhibit 38 for identification as of
6   this date by the Attorney.)
7      MR. ROTH:  The one with Bates
8   stamp 460 would be Joint 39.
9      (Whereupon, business discussion
10   was marked as Claimant's Exhibit 39
11   for identification as of this date by
12   the Attorney.)
13      MR. ROTH:  And then the one
14   with Bates stamp 464 would be Joint
15   40.  Okay, everyone?
16      ARBITRATOR:  Yeah.
17      (Whereupon, business discussion
18   was marked as Plaintiff's Exhibit 40
19   for identification as of this date by
20   the Attorney.)
21      MR. ROTH:  Just do me a favor,
22   can you write the numbers on it to
23   make it easier for him?
24      I'm numbering them 37, 38, 39
25   and 40.  Easier to refer to them.

Page 402

1    Conrod Newton
2      THE WITNESS:  Okay.  Got you.
3      MR. ROTH:  Okay.
4      MR. DEL BOVE:  He's got 37 in
5   front of him.
6      MR. ROTH:  You got them all?
7   Just put them all in front of him,
8   I'll wait.
9  REDIRECT EXAMINATION
10 BY MR. ROTH:
11   Q.   Let's just look at these four
12 documents, Mr. Newton.  Looking at 37.
13   A.   Okay.
14   Q.   Which is February 7th, 2020.
15   Do you see that?
16   A.   Yes.
17   Q.   Do you see that tracking
18 number, 152610765302?  You see that
19 tracking number?
20      ARBITRATOR:  Where are you
21   reading?
22   Q.   At the bottom of the document,
23 document reference with the tracking
24 number, 152610765302.
25   Do you see that?

Page 403

1    Conrod Newton
2   A.   Yes.
3   Q.   Turn to J39 -- I'm sorry, my
4  bad.  Let me do it this way.
5    So I understand J37 was on
6  February 7th, 2020.  That's the date of
7  whatever this document's called, correct?
8   A.   Yes.
9      MR. DEL BOVE:  Rich, the date
10   of discussion is different than the
11   date you said.  What date are you
12   going by?
13   Q.   Let's go to date of discussion.
14 February 9th, 2020, okay?  You see that?
15 Right after February in the middle, it
16 says: Discussion detail, February 9th.
17 Right in the middle.
18   A.   Got you.
19   Q.   That's the date of discussion,
20 right?  Yes?
21   A.   Yes.
22   Q.   You never had that discussion
23 as I understand it, correct?
24   A.   No.
25   Q.   That's something Joey talked to

25 (Pages 400 - 403)

INDEX NO. 650428/2024
RECEIVED NYSCEF: 01/26/2024

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 27 of 119 PageID
#: 1510

Page 404

1          Conrod Newton
2  them about, correct?
3     A.  Yes.
4     Q.  Turn to J38.  That date of
5  discussion is February 7th, 2020.  So two
6  days earlier, correct?
7     A.  Yes.
8     Q.  That's something which I
9  think -- was it that you do recall or don't
10 recall?
11    A.  Rosa --
12    Q.  Was this something you recall;
13 you spoke with Ms. Fernandez or no?
14    A.  Yeah.  I spoke to her, but it
15 wasn't a business discussion.
16    Q.  It was what?
17    A.  It was just a dispute.  A
18 person never received their package.
19    Q.  Let's turn to J39.  That
20 business discussion was on February 12th.
21 You see that date of discussion?  2020,
22 right?
23    A.  Yes.
24    Q.  And then let's turn to the last
25 one, J40.  That's sent February 19th, a

Page 405

1          Conrod Newton
2  week later, 2020.
3        Do you see that?
4     A.  Yes.
5     Q.  And do you know when J & J's --
6  originally, you bought the business in '18,
7  correct?
8     A.  Yeah.
9     Q.  Are you aware in or about
10 August of 2020, Federal Express renewed the
11 J & J contract?
12    A.  I know they renewed it, but I
13 don't know the exact date.
14    Q.  You said when you originally
15 spoke to Mr. Ruggiero, who spoke to
16 Mr. Scherer about the purchase, I think you
17 said late '20, early '21.
18        Do you remember that?
19    A.  Yes.
20    Q.  And was that business -- was
21 that sold to Angel Pena?
22    A.  Not as yet.
23    Q.  That ZIP code wasn't at the
24 time?
25    A.  No.

Page 406

1          Conrod Newton
2        MR. ROTH:  Okay.  I have no
3  further questions.
4        MR. DEL BOVE:  No further
5  questions.
6        (Whereupon, a short break was
7  taken at this time.)
8        XXXX
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 407

1          Steven Pilatowski
2        MR. AYES:  Steve, can you hear
3  us?
4        THE WITNESS:  Yes, I can.  Can
5  you hear me?
6        MR. AYES:  We can.
7        ARBITRATOR:  We're starting
8  with Respondents' witness, Steve
9  Pilatowski?
10       THE WITNESS:  Yes.
11       ARBITRATOR:  Would you please
12 raise your right hand.
13       You promise to tell the truth,
14 the whole truth and nothing but the
15 truth?
16       THE WITNESS:  Yes.
17       ARBITRATOR:  Thank you.
18 S T E V E   P I L A T O W S K I,
19 called as a witness, having been
20 first duly sworn by a Notary Public
21 of the State of New York, was
22 examined and testified as follows:
23 DIRECT EXAMINATION
24 BY MR. AYES:
25    Q.  Okay.  Steve, we're on a video

26 (Pages 404 - 407)

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 28 of 119 PageID
#: 1511

Page 408

Steven Pilatowski

1  connection.  If you can't hear anyone or
2  there's a lag in the video, please let us
3  know before we proceed.
4       A.   Yes.
5            ARBITRATOR:  And you're alone
6   in that room?
7            THE WITNESS:  Yes, I am.
8       Q.   All right.  Mr. Pilatowski,
9  thanks for coming here today.  Can you
10  please give us the benefit of your current
11  employer?  Who do you work for?
12      A.   I work for FedEx Ground.
13      Q.   And what is your current
14  position?
15      A.   I am a pick-up and delivery
16  manager.
17      Q.   And what does a pick-up and
18  delivery manager mean?
19      A.   I oversee the --
20      Q.   Can you repeat that and try to
21  talk into the mic?
22      A.   I'm sorry, yes.  I oversee the
23  pick-up and delivery of packages within our
24  work areas.
25

Page 409

Steven Pilatowski

1       Q.   How long have you been in this
2  position?
3       A.   Approximately, almost 15 years.
4       Q.   And what station are you
5  currently based out of?
6       A.   Yonkers.
7       Q.   Can you give us a brief
8  overview of your educational background?
9       A.   Sure.  Grammar school located
10  in Old Tappan, New Jersey.  I went to
11  Bergen Catholic High School in Oradell,
12  New Jersey.  And I graduated from college
13  at Long Island University with a Bachelor's
14  of Science in criminal justice.
15      Q.   How long have you been working
16  for FedEx Ground?
17      A.   A little over 26 years.
18      Q.   And have you had any other
19  roles in FedEx Ground other than a
20  P and D manager?
21      A.   Yes.  When I first started, I
22  was what they call a coordinator and then I
23  worked on the outbound manager, which we
24  oversaw the picking up of the packages and
25

Page 410

Steven Pilatowski

1  distributing them into the trailers to go
2  to the hubs.
3       And then I worked on what we
4  called the preload, which is the overnight
5  shift which oversee the packages coming
6  into the building from the various hubs and
7  distributing them among the different
8  entities.
9       Q.   What is -- what's your
10  knowledge of J & J?  Do you know who they
11  are?
12      A.   I know who J & J are, yes, by
13  being at Yonkers.
14      Q.   When did you first become
15  acquainted with J & J?
16      A.   When they first arrived at the
17  station.  I don't know the exact date, but
18  I met them when they first came in.
19      Q.   Do you recall why they first
20  came into Yonkers?
21      A.   It was a decision by FedEx
22  engineering to realign the stations and
23  balance out the volume amongst the
24  different stations.
25

Page 411

Steven Pilatowski

1       Q.   What do you mean by "balance
2  out the volume amongst different stations"?
3       A.   Service stations were -- they
4  were -- had way too much capacity than what
5  they were engineered for.  So it was a
6  decision to move certain entities around to
7  different stations that had capacity to --
8  so they could operate.
9       Q.   And was this decision made on a
10  corporate level as opposed to station
11  level?
12      A.   This was a corporate level,
13  yes.
14      Q.   Was J & J moved to Yonkers as a
15  result of any -- a disciplinary behavior at
16  their prior station?
17      A.   No.
18      Q.   Was J & J moved to Yonkers as a
19  result of any service issues at their prior
20  station?
21      A.   No.
22      Q.   Do you know where J & J's prior
23  station was located?
24      A.   Yes.  It was in Queens at 3102.
25

27 (Pages 408 - 411)

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 29 of 119 PageID #: 1512

Page 412

```
 1          Steven Pilatowski
 2     Q.   What does 3102 mean?  What does
 3 that stand for?
 4     A.   That's just their station
 5 number.  Yonkers is 107 and that station
 6 was Q Manhattan actually.  That's their
 7 call letters, Q Manhattan 3102.
 8     Q.   Are you familiar with Joseph
 9 Ruggiero, III?
10     A.   Yes.
11     Q.   Are you familiar with Joseph
12 Ruggiero's father?
13     A.   No.
14     Q.   When did you first meet Joseph
15 Ruggiero, III?
16     A.   When he first arrived at
17 Yonkers, within a day or two.
18     Q.   And why would you have met
19 Mr. Ruggiero within a day or two of when he
20 arrived at Yonkers?
21     A.   Just to introduce myself and
22 talk to him and just to get to know him.
23     Q.   I want you to talk to us
24 generally about how packages are loaded
25 onto vehicles.  The first type being an HD
```

Page 413

```
 1 or home delivery vehicle, how did that
 2 process occur?
 3     A.   This is done by -- first the
 4 packages would arrive at the station with
 5 the ZIP codes.  They come in first with ZIP
 6 codes, and then they are cut -- I use the
 7 word "cut," to the entities through a DRO
 8 system, which is a sorting system that we
 9 use.
10     And they would go to the
11 different various work areas according to
12 where the AO would want his packages to go
13 to.  Certain streets would go to certain
14 trucks, side streets would go to certain
15 trucks.  But he would have complete control
16 over that, where he could move his freight
17 and balance out his workload for the day.
18     Q.   What does DRO stand for?
19     A.   I don't know the exact name.  I
20 was -- it was always called DRO.  I
21 apologize for that.
22     Q.   What about the term "work
23 areas"?  What does that mean?
24     A.   It's a general work area.
25
```

Page 414

```
 1          Steven Pilatowski
 2 Every truck has a work area, that's what we
 3 refer to it as.  Work area is where they --
 4 okay.
 5     Q.   For the loading of HD packages,
 6 how would the HD service provider load
 7 their vehicles?
 8     A.   They would load -- the driver
 9 would load their own vehicle's.  Packages
10 were set aside for them either in carts or
11 in pallets and then the driver would load
12 his own vehicle.
13     Q.   Were any other contractors
14 besides HD loaded that way?
15     A.   They were all loaded that way.
16     Q.   When J & J first came to the
17 Yonkers terminal, do you know where they
18 were loading from within the terminal?
19     A.   They were loaded over by what
20 we call the 100 belt by the wall, the end
21 wall there.
22     Q.   Was that inside the building?
23     A.   Yes.
24     Q.   There was testimony so far in
25 this arbitration that J & J was required to
```

Page 415

```
 1          Steven Pilatowski
 2 load their vehicles outside of the terminal
 3 in the weather.  Is that an accurate
 4 statement?
 5     A.   No, it is not accurate at all.
 6     Q.   Why is it not accurate?
 7     A.   Because they did not -- they
 8 weren't pushed outside by any means.  If
 9 they wanted to load their vehicle outside
10 on a nice day, that was their prerogative.
11 But we wanted them inside the building for
12 security reasons and keep them inside the
13 building.  They were not pushed outside for
14 any reason whatsoever.
15     Q.   Do you know what the term "load
16 positions" refers to?
17     A.   It's where a van would park on
18 the dock.  It was a numbered spot, a
19 parking spot.  We call it a load position.
20     Q.   Are there certain vehicles that
21 need to be loaded on the dock versus
22 another place in the terminal?
23     A.   That would be the ground
24 trucks.  They're bigger and they fit up
25 against the dock, and this way the package
```

28 (Pages 412 - 415)

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 30 of 119 PageID #: 1513

---

Page 416

Steven Pilatowski

1
2 handlers can load those vehicles.
3    Q.   Are there certain types of
4 trucks or vehicles that are loaded onto the
5 dock, models of vehicles?
6    A.   Yes.
7    Q.   What would those be?
8    A.   Yes.  Their bumpers have to be
9 flush against the dock.  So for safety
10 reasons that the package handler can step
11 into the truck and not trip.  We refer to
12 them as either P 1000s or P 1200s.
13    Q.   Do you know what type of
14 vehicles J & J had when they first came to
15 Yonkers?
16    A.   They mostly had rental
17 vehicles.  What I mean by rentals, they
18 were box trucks rented from Penske or
19 U-Haul.
20    Q.   The -- at some point during
21 J & J's tenure at Yonkers, did they make
22 any complaints to you about their load
23 positions?
24    A.   He mentioned it to me a few
25 times that he would like to get loaded

---

Page 417

Steven Pilatowski

1
2 along the van line.
3    Q.   What's a van line?
4    A.   A van line is where the
5 vehicles park and the conveyer -- and where
6 the conveyer system is.
7    Q.   Was there a reason they were
8 not able to be loaded on the van line?
9    A.   It was an operational decision
10 that was made due to their size.  They were
11 a small entity that only dispatched four
12 trucks, approximately four trucks a day,
13 four or five trucks and their volume didn't
14 warrant a load position that we had
15 available at the time.  So they were -- the
16 decision was made to put them -- load their
17 packages in labeled carts so they could
18 load their own vehicles.
19    Q.   Were any other contractors
20 loading the same manner that J & J was?
21    A.   Yes.
22    Q.   Can you approximate how many
23 others?
24    A.   We have approximately 16
25 entities in the building and I believe at

---

Page 418

Steven Pilatowski

1
2 one time every entity had work areas loaded
3 in carts.
4    Q.   And what about off the van
5 line?  How many entities have been loaded
6 off the van line?
7    A.   Approximately three or four.
8    Q.   Are you familiar with the term
9 "business discussions"?
10    A.   Yes.
11    Q.   In your position as
12 P and D manager, would you have business
13 discussions with contractors?
14    A.   Yes.
15    Q.   What is the purpose of business
16 discussion?
17    A.   It's a documented discussion
18 that we use to record the events of the day
19 of an incident.  It could be either a
20 service failure or a safety defect.  It
21 would be noted in a business discussion.
22    Q.   And did you have business
23 discussions with J & J?
24    A.   Repeat the last word again,
25 Mitch.

---

Page 419

Steven Pilatowski

1
2    Q.   Did you have business
3 discussions with J & J?
4    A.   Yes.
5    Q.   Who at J & J would you have
6 business discussions with?
7    A.   Joe.  Joseph, III.
8    Q.   Would you have --
9    A.   And his BC.
10    Q.   Who was the BC or BCs that you
11 had discussions with?
12    A.   Andrew McKenzie.
13    Q.   Any others?
14    A.   Conrod.
15    Q.   Is that Conrod Newton?
16    A.   Yes, sir.
17    Q.   If there was testimony in this
18 case from Andrew and Conrod that they never
19 had business discussions with Ground, would
20 you agree with that statement?
21    A.   I would not agree with that
22 statement.
23    Q.   At some point did J & J get a
24 position on the van line to load vehicles?
25    A.   Yes, they did.

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 31 of 119 PageID
#: 1514

Page 420

1          Steven Pilatowski
2     Q.   Okay.  Why did they get a
3  position to load vehicles?
4     A.   Again, there was another
5  engineering decision to move three or four
6  entities out of our building, which freed
7  up some van line space.  And then we put
8  J & J on a van line where they could back
9  up their trucks up to the dock, the HD side
10 and they can load their vehicles.
11    Q.   Do you know who Mike Scherer
12 is?
13    A.   Yes.
14    Q.   Is Mike -- does Mike Scherer
15 report to you?
16    A.   No.
17    Q.   Do you report to Mike?
18    A.   No.
19    Q.   Is Mike in a different segment
20 of the business than you are in?
21    A.   Yes, he is.
22    Q.   Would Mike -- is Mike in the
23 operations department of the business?
24    A.   He's not in operations, no.
25 He's business development solutions.

Page 421

1          Steven Pilatowski
2     Q.   So, that's the group that
3  Mike's in, right?
4     A.   Yes, sir.
5     Q.   If there was a service
6  provider, whether it be an AO or BC that
7  had a complaint or wanted to have a
8  discussion, would they go to your group to
9  have that discussion?
10    A.   They can come to our group, or
11 they can reach out to Mike Scherer.
12    Q.   If there were operational
13 discussions in terms of an issue with
14 service that occurred, would that be
15 discussed with your group?
16    A.   Yes.
17    Q.   The term "overlap" has come up
18 throughout the course of this arbitration.
19 Can you tell us what that means?
20    A.   Yes.  Overlap is when an entity
21 has both ground and HD in their work area.
22    Q.   And are the overlap contractors
23 loaded in a different manner?
24    A.   Their ground trucks are loaded
25 by package handlers, but their HD routes

Page 422

1  are -- again, they're either carted or
2  they're put on pallets and they load them
3  on the trucks.
4     Q.   There's testimony from
5  Mr. Ruggiero's BCs that you told drivers
6  that they might be able to make more money
7  working for other contractors.  Is that a
8  true statement?
9     A.   No, that is not a true
10 statement at all.
11    Q.   Did you ever discuss money or
12 how much a driver can earn with
13 contractors?
14    A.   No.
15    Q.   Does FedEx have any incentive
16 to pull any packages from any of their
17 service providers?
18    A.   The only incentive would be to
19 provide service, but if they're failing in
20 service, we get the packages delivered for
21 the customer and the shipper.
22    Q.   So in order to keep the
23 business operating and continuing; is that
24 right?

Page 423

1          Steven Pilatowski
2     A.   That's correct, to keep the
3  business going.
4     Q.   There's no incentive that FedEx
5  has to pull packages other than to make
6  sure the business is continuing to operate
7  properly; is that correct?
8     A.   Correct.
9          MR. ROTH:  I have to object.  I
10    can talk about this guy, but FedEx's
11    incentive to pull packages?  Unless
12    his name is FedEx, I don't know if
13    there's even foundation that says he
14    knows where packages went to and from
15    in which they were pulled.  So the
16    question is improper.
17         ARBITRATOR:  Overruled.  We'll
18    take it for what it's worth.
19    Q.   Are you aware of any packages
20 that were pulled from J & J's service area?
21    A.   Yes.
22    Q.   Why did that occur?
23    A.   Failure to provide service.
24    Q.   What do you mean by that?
25    A.   He didn't have enough resources

30 (Pages 420 - 423)

INDEX NO. 650428/2024
RECEIVED NYSCEF: 01/26/2024

Page 424

```
 1          Steven Pilatowski
 2  to provide service that -- those particular
 3  days, so the packages were given to other
 4  entities who had extra resources to deliver
 5  the packages.
 6      Q.   When you say the term
 7  "resources," what are you referring to?
 8      A.   Drivers, helpers, trucks.
 9      Q.   So there were certain
10  situations where J & J didn't have those
11  resources in order to deliver the packages;
12  is that right?
13      A.   That is right.  Correct.
14      Q.   The other day we heard
15  Mr. McKenzie testify -- and you know who
16  Mr. McKenzie is, correct?
17      A.   Yes.
18      Q.   We heard Mr. McKenzie testify
19  that Joe Ruggiero was not always at the
20  station.  Would you agree with that
21  statement?
22      A.   Yes.
23      Q.   Were other contractors or other
24  AOs, authorized officers, at the station
25  more than Joe?
```

Page 425

```
 1          Steven Pilatowski
 2      A.   Yes.
 3      Q.   Did you have any conversations
 4  with Joe about being at the station more?
 5      A.   Yes.  I've had conversations
 6  with him.
 7      Q.   Can you describe what those
 8  conversations were?
 9      A.   Yeah.  I just asked him if he
10  needs to come to the station more often to
11  see his operation and see what's going on.
12  He needs to be in a more leadership role
13  and organize his people to show an
14  interest.
15      Q.   Why did you have these
16  conversations with Joe that you wanted him
17  to show more of an interest and be involved
18  in more leadership?
19      A.   I feel he needed to be there
20  more than he was there because I wanted to
21  talk to the AO.  I didn't want to talk to
22  the BCs anymore.  I wanted to talk to the
23  AOs because things just weren't getting
24  better.
25      Q.   What is the purpose of an AO at
```

Page 426

```
 1          Steven Pilatowski
 2  the station?
 3      A.   It's the face of the entity.
 4  He's the owner and he's the leader.
 5      Q.   Are you aware of what a scanner
 6  is?
 7      A.   Excuse me again?
 8      Q.   Do you know what a scanner is?
 9      A.   Yes.  A scanner, yes.
10      Q.   What is a scanner?
11      A.   A scanner is a device used to
12  capture the information on a package, on a
13  barcode to give realtime information to the
14  shippers, to the customers, where their
15  package is and to record the delivery or
16  the exception codes on the package.
17      Q.   Do service providers have
18  scanners?
19      A.   Yes, they do.
20      Q.   How do the service providers
21  get the scanners?
22      A.   They purchase them through a
23  scanner company.
24      Q.   Are there any other ways
25  they're able to obtain scanners?
```

Page 427

```
 1          Steven Pilatowski
 2      A.   They can borrow them, rent them
 3  from the station.
 4      Q.   The station being a FedEx
 5  station where they're domiciled?
 6      A.   Yeah.  The facility where
 7  they're domiciled.
 8      Q.   I've used the word "domiciled."
 9  Can you tell us what that means?
10      A.   It's just an acronym we use.
11  Like entity would be domiciled at Yonkers.
12  It's their home base.  That's where their
13  contract is, and I would use the word
14  because that's where I am domiciled.
15      Q.   Was J & J domiciled at Yonkers?
16      A.   Yes, they were.
17      Q.   Do you know if J & J purchased
18  scanners?
19      A.   He said that Joe, III, said he
20  purchased scanners.
21      Q.   Did J & J rent scanners from
22  ground?
23      A.   Yes.
24      Q.   Do you know why J & J rented
25  scanners from ground?
```

31 (Pages 424 - 427)

Page 428

Steven Pilatowski

1
2    A.   Because they didn't have enough
3  scanners that day to go around to their
4  people, so he would rent them.
5    Q.   Are you familiar with the term
6  "hours of service"?
7    A.   Yes, sir.
8    Q.   Do you know what an hours of
9  service violation is?
10    A.   Yes, sir.
11    Q.   Can you explain to us what that
12  is?
13    A.   There's three types of hours of
14  service.  There's a 10-hour hours of
15  service violation, which means that a
16  driver needs 10 hours of rest, continual
17  rest before he comes to work -- before he
18  logged on duty the next day.
19        Then there's a 14-hour
20  violation, which means that he's only
21  allowed to be on duty for 14 hours in a
22  day.
23        And then there's a 70-hour
24  violation, which means that a driver can
25  only be on duty 70 hours in an eight-day

Page 429

Steven Pilatowski

1
2  period.
3    Q.   Who keeps track of these
4  violations?
5    A.   The scanner logs -- when the
6  drivers log in and out of the scanners,
7  they track their hours of service and then
8  it is transmitted to the safety department.
9    Q.   Did you say the safety
10  department?
11    A.   The safety department, yes.
12    Q.   Is the AO or BC or the service
13  provider notified, as well?
14    A.   Yes.  They would be notified as
15  soon as we're notified.
16    Q.   Is it important to know about
17  the hours of service issues for every
18  driver?
19    A.   Yes, it's a Department of
20  Transportation rule.
21    Q.   Is there anywhere -- are you
22  familiar with the agreement, the ISPA
23  agreement in general?
24    A.   I'm familiar with the
25  agreement, yes, sir.

Page 430

Steven Pilatowski

1
2    Q.   Is there anywhere in the
3  agreement that references hours of service?
4    A.   Yes, it would be Schedule I.
5    Q.   If there's -- if there are --
6  if drivers go above the threshold you
7  mentioned before, the 10, the 14 or the
8  70-hour threshold, would that -- it's a
9  violation of law; would it also be a
10  violation of the agreement?
11    A.   Yes.
12    Q.   And who is ultimately
13  responsible for hours of service, keeping
14  track of hours of service for the drivers?
15    A.   The AO or BC is responsible to
16  keep track of their drivers' available
17  hours of service.
18        MR. AYES:  All right.  Thank
19    you, Steve.  I have no further
20    questions.
21  CROSS EXAMINATION
22  BY MR. ROTH:
23    Q.   Mr. Pilatowski, Richard Roth.
24  Can you hear me?
25    A.   Yes.

Page 431

Steven Pilatowski

1
2    Q.   Let's start with the hours of
3  service.
4        To your knowledge, was J & J
5  ever in violation of the hours of service
6  rule?
7    A.   I believe so.  I can't tell you
8  exactly what date, but I believe they had
9  some violations.
10    Q.   A lot or a few?
11    A.   I don't know what a lot is.
12    Q.   You're in the business, I don't
13  either.  Was it more than the norm?
14    A.   I think they had two or three,
15  possibly more.
16    Q.   So two or three or four over a
17  five-year time period?
18        MR. AYES:  Objection.
19    A.   I've only known him for two
20  years.
21    Q.   So, you only got involved with
22  J & J starting when?
23    A.   When they arrived to Yonkers.
24    Q.   Which was when?
25    A.   I don't know the exact date

32 (Pages 428 - 431)

Page 432

Steven Pilatowski

1
2 they came to Yonkers.
3      Q.   Do you know a year?  You work
4 in Yonkers, I don't.  Approximately?
5      A.   2021 of October possibly.
6      Q.   So do I understand that you
7 became the P -- what is it?  Pick-up and
8 delivery manager for J & J starting October
9 2021?
10      MR. AYES:  Objection.
11      THE WITNESS:  Can you repeat
12   the question?
13      MR. ROTH:  What's the
14   objection?
15      MR. AYES:  It's
16   mischaracterization of the testimony.
17      Q.   Let me explore it.  So, were
18 you the P and D?
19      ARBITRATOR:  Pick-up and
20   delivery.
21      Q.   Pick-up and delivery manager at
22 Yonkers prior to 2021?
23      A.   Yes, sir.
24      Q.   Okay.  And when did J & J come
25 to Yonkers?

Page 433

Steven Pilatowski

1
2      A.   I believe in either September
3 or October of '21, '20.
4      Q.   Well, there's a difference.
5 You don't remember?
6      A.   I don't remember.
7      Q.   That's fine.
8      But -- well, let me ask you
9 this:  Was -- you know, do you not, that
10 J & J was no longer an independent
11 contractor as of June of 2022, correct?
12      A.   I believe so, yes.
13      Q.   So to your recollection was
14 J & J an independent contractor for
15 approximately ten months under you?  Or you
16 think it was a year, almost two years under
17 you?
18      A.   Probably almost two years, sir.
19 About two years.
20      Q.   You think it was about by
21 October 2020, ending in June '22; does that
22 make sense?
23      A.   Possibly, yes.  I don't have
24 the exact dates in front of me.
25      Q.   You don't know as you sit here

Page 434

Steven Pilatowski

1
2 if it was October '20 or October '21?
3      A.   No, I don't.
4      Q.   Now, in any event during that
5 time period there were, I think four --
6 three or four, you said, violations of
7 hours of service?
8      A.   Possibly.
9      Q.   Possibly?
10      A.   Possibly.
11      Q.   You're not certain?
12      A.   I'm not certain.
13      Q.   Okay.  And you do know, though,
14 don't you, there are several instances
15 where J & J had to deliver and come back to
16 the facility and pick up more boxes and go
17 out and deliver again?
18      A.   Yes.
19      Q.   And, in fact, isn't it also
20 true that J & J's trucks never got out
21 until eleven or twelve o'clock on a daily
22 basis?
23      A.   That was by their choice.
24      Q.   By their choice, let's talk
25 about that.

Page 435

Steven Pilatowski

1
2      A.   Sure.
3      Q.   So, your facility, how many
4 different spots are there for trucks to be
5 adjoined to the building?
6      A.   How many trucks are in our
7 building or how many load positions in the
8 building?
9      Q.   I'm sorry, I don't know the
10 lingo.  How many load positions are there?
11      A.   About maybe 80 to 85.
12      Q.   80 to 85 load positions.
13      A.   Approximately.
14      Q.   You said that J & J had four
15 trucks.  Are you aware that Conrod Newton
16 testified there were nine trucks?
17      A.   No.  I wasn't aware that he
18 testified they had nine trucks.
19      Q.   Are you aware they had nine
20 trucks?
21      A.   Does that include their
22 rentals?
23      Q.   The trucks that were being used
24 for service, rental or purchased that they
25 had nine out?

33 (Pages 432 - 435)

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 35 of 119 PageID #: 1518

Page 436

Steven Pilatowski

1
2    A.   Okay.  They had nine trucks.
3    Operational?
4    Q.   If you don't know, you don't
5    know.  I am not here to answer your
6    questions.  I'm just trying to get your
7    understanding.
8         You don't know if they had
9    four, six, eight or nine trucks operational
10   on any given day, correct?
11   A.   Correct.
12   Q.   Now, you said there were 80 to
13   85 load positions.  How many of those 80 to
14   85 were with ground versus home?
15   A.   I'm not sure of the exact
16   number.
17   Q.   Is it half?  Is it 10 percent?
18   Give me your best approximation.
19   A.   Like I said, I don't have the
20   exact number.  I don't want to approximate.
21   Q.   Mr. Pilatowski, I am not asking
22   for the exact number.  You're running the
23   facility.  You can't tell me what
24   percentage or a range of what ground had in
25   load position?

Page 437

Steven Pilatowski

1
2    A.   About 50/50.
3    Q.   So 50 percent ground and 50
4    percent home; is that right?
5    A.   Yes.
6    Q.   And so do you know how many
7    trucks J & J had or were able to put in the
8    load position when it first came to
9    Yonkers?
10   A.   They were looking at
11   approximately four or five vehicles.
12   Q.   Do you know?  Mr. McKenzie
13   testified initially they were only allowed
14   two load positions.  Were you aware of
15   that?
16   A.   No, I wasn't aware of that.
17   Q.   Are you aware that Mr. McKenzie
18   testified both load positions were taken
19   away, and they had no load positions?
20   A.   I wasn't aware of that.
21        MR. AYES:  Objection.
22   Q.   Are you aware --
23        ARBITRATOR:  Hold on.  He has
24      an objection.
25        MR. AYES:  The objection is,

Page 438

Steven Pilatowski

1
2    are you asking if he's aware of the
3    testimony that Mr. McKenzie gave?  Or
4    are you asking him if he is aware of
5    the substantive nature of the
6    testimony?
7         MR. ROTH:  I asked if he's
8    aware of the testimony, and he said
9    he wasn't aware.  Now we move on.
10   Q.   Are you aware that, in fact,
11   J & J ended up going from two load
12   positions to zero?
13   A.   No.
14   Q.   Do you know --
15        ARBITRATOR:  You have to
16   rephrase that question.
17        MR. ROTH:  I'm not asking
18   testimony.  I moved on.  I am with
19   you.
20   Q.   Do you know if there was ever a
21   time where J & J had no load positions for
22   the trucks?
23   A.   Yes.
24   Q.   And was there a time that J & J
25   had no load positions for the truck?

Page 439

Steven Pilatowski

1
2    A.   Yes.
3    Q.   Okay.  And by having no load
4    positions, that meant that they had to put
5    everything on manually, correct?
6    A.   Their packages were loaded on
7    carts and they loaded their own trucks.
8    Q.   Right.  If it's a load
9    position, is there a conveyer there?  How
10   does that work?
11   A.   Yes, there's a conveyer on the
12   dock.
13   Q.   Okay.  So let me see if I
14   understand it.  If you're in load position,
15   you're able to utilize a conveyer, correct?
16   A.   For ground, yes, sir.
17   Q.   For home?
18   A.   Home, it was a static roller
19   that was connected to the dock that the
20   packages came down on a static roller.  The
21   conveyer system is for the ground.
22   Q.   My lingo may not be right.
23        My analogy, Mr. Pilatowski, is
24   sort of like when you pick up your luggage
25   from the airport.  Is that what happened

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 36 of 119 PageID
#: 1519

Page 440

Steven Pilatowski

1
2  with home; that the -- it would roll and
3  then you would pick it up and put it on the
4  truck?
5       A.  For ground, yes, sir.
6       Q.  How about for home?
7       A.  No.
8       Q.  How did home work?
9       A.  It came down.  It was split and
10  it came down, like I said, the static
11  roller.  And the package handler would put
12  packages on a platform or in a cart.
13      Q.  If that was -- was that where
14  the home trucks had load position?
15      A.  Yes.
16      Q.  And if a truck did not have
17  load position, there would be no static
18  roller, correct?
19      A.  No.  It was loaded in another
20  part of the building on another static on
21  another roller, and they would cart over to
22  them.  It would be brought over to them
23  after the sort ended.
24      Q.  Are you aware that J & J
25  actually manually loaded all of its trucks

Page 441

Steven Pilatowski

1
2  without any kind of assistance?
3       A.  Yes.
4       Q.  So you know, then.
5           And you know, do you not, that
6  J & J complained to either you or Mike
7  Scherer about the fact that it had to
8  manually load all of its trucks?
9       A.  Yes, they were HD.  HD loads
10  their own.
11      Q.  All HD loads its own trucks?
12      A.  Yes.
13      Q.  So no HD -- when HD is in load
14  position, does it not utilize any conveyer
15  system?
16      A.  No.  It would -- came down on a
17  static roller.  The packages were put on a
18  platform, and then they would take the
19  packages off the platform or the carts and
20  they would put them on their trucks.
21      Q.  What's a static roller?  What
22  does that mean?
23      A.  A nonmotorized roller.  It's
24  just a -- just rollers.
25      Q.  Like on a pallet?

Page 442

Steven Pilatowski

1
2       A.  No, it's not pallet.  It's a
3  roller.  It's a metal piece that's
4  connected to the dock, lower level and it's
5  nonmotorized.  The packages would be
6  manually pushed down the rollers.
7       Q.  Is it fair to say that when
8  your truck was up against the loading dock,
9  you could push the boxes onto the rollers
10  and then lift them onto the trucks,
11  correct?
12      A.  No.  Package handlers handle
13  the packages and put them on the platforms,
14  and then the driver or the helper would put
15  them into their trucks.  They scan the
16  packages onto their platform.
17      Q.  Let me say it differently.  If
18  you had a loading position, someone would
19  put the box on this roller and then they
20  would be loaded onto the trucks, correct?
21      A.  The packages would be sent down
22  the rollers and the package handler would
23  pick up the boxes off the rollers and place
24  them on either a cart or a platform.
25      Q.  Okay.  And when you didn't have

Page 443

Steven Pilatowski

1
2  load positions --
3           MR. AYES:  Can we just make
4       sure the entire was --
5       Q.  When a truck didn't have load
6  position, they were unable to use these
7  rollers, correct?
8       A.  No.  They didn't have -- they
9  need the rollers.  They were already -- the
10  packages were already scanned and put in a
11  cart, and then they would be brought to
12  their trucks.
13      Q.  So it would all be done
14  manually if you weren't in load position,
15  correct?
16      A.  Yes.
17      Q.  Okay.  And do I understand it
18  was 50/50 ground and home for the loading
19  docks, then -- and you had 80 to 85 spaces,
20  then approximately 40 spaces -- 40 to 42 --
21  no.  42 to 43 spaces in the loading dock
22  would be for home, correct?
23      A.  Yes.
24      Q.  And you agree there was a time
25  J & J had zero of those loading spaces?

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 37 of 119 PageID #: 1520

Page 444

```
 1            Steven Pilatowski
 2     A.   Yes.
 3     Q.   Okay.  Got that.
 4          Now, you said that you would
 5  liked to have Joe come to the station more
 6  often, correct?
 7     A.   Correct.
 8     Q.   But that was just your desire.
 9  There was no obligation to come, correct?
10     A.   I would like to talk to Joe in
11  person and then to sit down with him and
12  show him the operation and to help him
13  along.
14     Q.   I understand that.  But you
15  could pick up the phone and talk to Joe,
16  correct?
17     A.   Yeah.
18     Q.   And you did that, correct?
19     A.   Correct.
20     Q.   Okay.  Do I understand over the
21  years of '20, '21, '22, you never met Joe,
22  Sr., Joe's father?
23     A.   I never met Joe, Sr.
24     Q.   Now, you said that the boxes
25  came in -- I think you said when boxes came
```

Page 445

```
 1            Steven Pilatowski
 2  in, they were cut between ZIP codes.
 3          Do you remember that testimony?
 4     A.   Yes, sir.
 5     Q.   Are you aware of whether the
 6  J & J boxes were cut between ZIP codes or
 7  if they were all thrown in together?
 8     A.   I don't understand "thrown in
 9  together."  What --
10     Q.   I just had someone this morning
11  testify that they were not.  They were all
12  thrown together and they had to separate
13  them.
14          Are you aware as to whether the
15  J & J boxes were cut by ZIP code, or
16  whether they were put in cages together?
17     A.   Joe separated his boxes through
18  the DRO system.  Whether they were thrown
19  together or moved around between his
20  different work areas amongst his drivers,
21  that's another thing.  But they were all
22  cut according to how he wanted the packages
23  to drop on the work areas.
24     Q.   That's not what I am asking.
25          Are you aware when they came
```

Page 446

```
 1            Steven Pilatowski
 2  into J & J, they were not -- well, let me
 3  ask you this question:  When packages came
 4  into the home delivery independent
 5  contractor, were they, prior to coming in,
 6  divided by ZIP code?
 7     A.   Yeah.  He serviced a certain
 8  ZIP code, so he would get the packages for
 9  that ZIP code.
10     Q.   Were the ones that he had
11  divided within his territory by ZIP code,
12  or were they all put together?
13     A.   Well, he divided his packages
14  in the ZIP code.
15     Q.   That's not my question.
16          Are you saying that if, for
17  example, J & J had 10035, 10027, that would
18  all be put together prior to his people
19  putting it on trucks?
20     A.   Yeah.  They would -- he would
21  already know what packages are going on his
22  trucks.  He would already predetermine
23  that.
24     Q.   I am being inartful, let me try
25  again.
```

Page 447

```
 1            Steven Pilatowski
 2          Are you saying that the boxes
 3  before going to the service provider were
 4  all divided by ZIP code within one service
 5  provider's area?  In other words, if I have
 6  five zip codes, did the boxes come into me
 7  in five different piles or were they all
 8  put together?
 9     A.   Well, they wouldn't be all
10  mixed up.  They would be sorted through how
11  he wanted the packages to be -- to go to
12  the work areas.  He would separate.  So if
13  one person did 125th Street, that truck
14  would do 125th Street.  He would set that
15  on his DRO.  They wouldn't be mixed up with
16  the three sevens and the two sixes.  They
17  wouldn't just all be meshed in together.
18     Q.   Now, there's testimony by both
19  Kevin -- by the way, is it Andrew McKenzie
20  or Kevin McKenzie?
21     A.   McKenzie.  Andrew McKenzie.
22     Q.   There's testimony from McKenzie
23  and from Newton that they had to take the
24  boxes manually and because they didn't have
25  anything in the station or on the loading
```

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 38 of 119 PageID
#: 1521

Page 448

Steven Pilatowski

1
2 docks, they had to actually move the boxes
3 from the cages, take them outdoors and put
4 them in the trucks manually.
5        Are you aware of that?
6    A.   If they wanted to take the
7 packages outside, that was their
8 prerogative.  Nobody forced them.
9    Q.   That's not my question.
10       Are you aware that the trucks
11 were outside and were not allowed in?
12   A.   The trucks were always allowed
13 in.  They weren't forbidden not to come
14 into the building.
15   Q.   Are you aware Conrod Newton
16 complained to Mr. Scherer, I think he said
17 on a weekly or daily basis about the labor
18 that was involved in order to load the
19 trucks?
20   A.   No, I wasn't aware of that.
21   Q.   So Mr. Scherer never told you
22 anything about that?
23   A.   I was not aware that Conrod
24 complained to Mr. Scherer.
25   Q.   And not only did he complain to

Page 449

Steven Pilatowski

1
2 Mr. Scherer, Mr. Scherer said he would fix
3 it, but it was never fixed.
4        That never came to your
5 attention?
6    A.   No.
7    Q.   And wouldn't that be something
8 that would come to your attention as the
9 pick-up and delivery person?
10   A.   Yeah.  He would -- Joe
11 mentioned it to me too and Conrod mentioned
12 it to me.
13   Q.   Conrod mentioned it to you.
14 What did you say to him?
15   A.   I said I don't have any
16 positions available right at this moment.
17   Q.   What did they say to you?
18   A.   Can we get a load position?  I
19 said, I don't have one available.
20   Q.   So, is it fair to say of the
21 42, 43 load positions that you gave to home
22 delivery during your entire tenure while
23 J & J was there, there were no load
24 positions available?
25   A.   Not in the beginning, but they

Page 450

Steven Pilatowski

1
2 got load positions the last year they were
3 there.
4    Q.   When did they get load
5 positions?
6    A.   The last year they were there.
7    Q.   How many positions did they
8 get?
9    A.   I believe they got five load
10 positions.
11   Q.   So if Mr. Newton and
12 Mr. McKenzie said they didn't have any,
13 you'd say they're mistaken?
14   A.   In the beginning.  Conrod was
15 only there for a year.  He left J & J.
16   Q.   Conrod left J & J when?
17   A.   After the first year they were
18 there.
19   Q.   It's hard because you don't
20 remember the year, but you're saying if you
21 started in October '20, you're saying
22 Conrod was gone by October '21?
23   A.   He was only there for a year.
24   Q.   And what about Mr. McKenzie?
25 How long was he there for?

Page 451

Steven Pilatowski

1
2    A.   I'm not sure the exact
3 timeframe he was there.  He was there
4 for --
5    Q.   I'm sorry I interrupted you.
6 Go ahead.
7    A.   He wasn't a driver.
8    Q.   He was a helper, right?
9    A.   He helped on the trucks.  He
10 wasn't a qualified driver.
11   Q.   Do helpers get drug tested or
12 just drivers?
13   A.   Drivers.
14   Q.   So drivers get drug tested and
15 Mr. McKenzie wasn't a driver, correct?
16   A.   Correct.
17   Q.   Do you know whether
18 Mr. McKenzie got drug tested?
19   A.   I was aware that he got drug
20 tested.  I wasn't there when he got drug
21 tested.  I was on leave or vacation at the
22 time.
23   Q.   And are you aware that they
24 prohibited him from coming onto the
25 premises?

37 (Pages 448 - 451)

Page 452

1          Steven Pilatowski
2     A.   I was not aware.
3     Q.   Are you aware that six months
4  later, they told him he could come back in?
5     A.   I wasn't aware of that, no.
6     Q.   But to your knowledge, only
7  drivers get drug tested with drugs,
8  correct?
9     A.   Correct.
10    Q.   What was the volume to your
11 recollection of J & J?
12    A.   Excuse me again, what was the
13 question?
14    Q.   What was the volume, either
15 daily or weekly, if you recall, of J & J,
16 volume of boxes?
17    A.   It varied day-to-day and weekly
18 and the time of month it was.
19    Q.   Give me the range, if you
20 could.
21    A.   Maybe 800, 800 packages per day
22 maybe.
23    Q.   Okay.  And --
24    A.   Maybe less.
25    Q.   I'm sorry?

Page 453

1          Steven Pilatowski
2     A.   Maybe less given the time of
3  month.  There are peak seasons that would
4  increase.  You know, it varied from month
5  to month.
6     Q.   Was it one of the smaller
7  independent contractors, that is by
8  delivery?
9     A.   Yes.
10    Q.   The independent contractor that
11 had the most deliveries on a daily basis,
12 how much -- what was the size of that
13 delivery?
14    A.   Stops or packages?  Which one?
15    Q.   Packages.
16    A.   Probably about 3,000.
17    Q.   Okay.  Business discussion,
18 let's talk about that for a second.  Do I
19 understand business discussions are an
20 internal record at FedEx?
21    A.   Yes.
22    Q.   And they are not signed by the
23 independent contractors or their business
24 contacts?
25    A.   Correct.

Page 454

1          Steven Pilatowski
2     Q.   And they're not even provided
3  to the business contact or the independent
4  contractors, the AOs?
5     A.   I never gave a copy of a
6  business discussion to an AO or a BC.
7     Q.   So would it be the case, then,
8  that if you have a discussion with, let's
9  say Conrod, about somebody saying that they
10 didn't get their package, you would have an
11 obligation to list that as a business
12 discussion, but Conrod wouldn't get a copy
13 of that, correct?
14    A.   Correct.
15    Q.   And Conrod wouldn't even know
16 it's, quote, a business discussion.  You
17 would just talk to him about it, correct?
18    A.   Well, I would like to do -- I
19 would do a business discussion in private
20 in my office.  And if I couldn't do it in
21 person, I would do it over the phone with
22 Joe.  It wouldn't be a business discussion
23 out in public on the loading dock.
24    Q.   I understand that.  I'm sorry,
25 it was an inartful question.

Page 455

1          Steven Pilatowski
2          My question is:  You can have a
3  discussion with Joe or Conrod about some
4  kind of service issue, but you don't
5  necessarily label it a business discussion.
6  In other words, you don't say -- do you
7  say, Joe, we need to have a business
8  discussion?  Or do you say, Joe, let's talk
9  about the failure delivery of a box in some
10 location?
11    A.   No.  Business discussion is a
12 serious matter I would have with the
13 individual.  It's not a random thing you
14 throw out there.  It's a serious documented
15 discussion detailing service or safety
16 issues.
17    Q.   Right.  Documented by you, but
18 not provided to them, correct?
19    A.   Correct.
20    Q.   And Mike Scherer, was his role
21 sort of -- was his role the liaison between
22 the independent contractors and FedEx,
23 essentially?
24    A.   Yes.
25    Q.   So, was he the guy that the AOs

38 (Pages 452 - 455)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 40 of 119 PageID #: 1523

Page 456

Steven Pilatowski

1     or the independent contractors would go to
2     and rely on when they had issues with
3     FedEx?
4         A.   Yes.
5         Q.   You were asked about a
6     conversation that was spoken about earlier
7     where you talked to somebody about maybe
8     making more money with another independent
9     contractor.  Remember that?  You were just
10    asked that by your lawyer?
11        A.   Yes, I recall.
12        Q.   And is it the case that you
13    don't recall ever having a conversation
14    with a driver about maybe making more money
15    with a different independent contractor?
16        A.   I never had that conversation
17    with a driver.
18        Q.   Are you aware as to whether
19    anyone else at FedEx had a conversation
20    with a driver to tell them they could make
21    more money with other independent
22    contractors?
23        A.   No.
24        Q.   Okay.  I think you had talked

Page 457

Steven Pilatowski

1     about -- you were asked about packages
2     being pulled from J & J for failure
3     delivery?
4         A.   Yes.
5         Q.   How often did that happen?
6         A.   It happened for at least almost
7     two months during J & J's last peak season
8     with us.  He did not have -- it was the
9     last year and the last peak that he had at
10    FedEx and our station where he didn't
11    have --
12        Q.   I apologize, I did it again.
13    Go ahead.  He didn't have enough?
14        A.   Drivers or vehicles to service
15    his work areas.
16        Q.   When was peak season?
17        A.   We consider peak the last two
18    weeks of October, November and right
19    through December.
20        Q.   Let me see if I understand it.
21    Are you saying starting the last two weeks
22    of November through December; is that what
23    you're saying?
24        A.   No.  Starting the last two

Page 458

Steven Pilatowski

1     weeks of October into November and then
2     December.
3         Q.   Okay.  So that whole time
4     period?
5         A.   Yeah.
6         Q.   Was that the only time packages
7     were pulled from J & J?
8         A.   Yes.  It was called contingency
9     because he couldn't service his work area.
10    He didn't have enough people to provide
11    service.
12        Q.   Did you tell him beforehand
13    that you were pulling?
14        A.   Yes.
15        Q.   And did he say -- and did Joe
16    say okay?
17        A.   He couldn't provide any drivers
18    or extra trucks so he went along with it.
19        Q.   We talked about overlapping.
20    Do you know who Shawn Ponds is?
21        A.   No.
22        Q.   You don't know who Shawn Ponds
23    is.  So overlapping is where, I understand,
24    where ground and home -- there's the same

Page 459

Steven Pilatowski

1     provider for ground and home service,
2     correct?
3         A.   Correct.
4         Q.   Is that preferred at FedEx that
5     you will have someone doing both?
6         A.   It is preferred, yes.
7         Q.   Why is that preferred?
8         A.   It's more -- I think it's more
9     efficient, and this way the drivers -- the
10    entities are not -- they know exactly where
11    the boundaries are, the streets.  There's
12    no two people, two different entities on
13    the same street, the same block delivering
14    packages.
15        Q.   Okay.  And did you say you
16    had -- how many different home service
17    providers did you have?
18        A.   Pure home entities or
19    overlapped entities?
20        Q.   I'm sorry, pure home entities.
21        A.   About four or five.
22        Q.   Four or five pure home?
23        A.   Yes.
24        Q.   And are you aware -- you do

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 41 of 119 PageID #: 1524

Page 460

Steven Pilatowski

1    know that there came a day when J & J was
2    no longer a service provider, correct?
3        A.    Yes.
4        Q.    And let me just tell you that
5    was on or about June 10th, 2022.  Okay?
6        A.    I don't know the exact, exact
7    date, but I do know that it came to an end.
8        Q.    Are you aware of that, in fact,
9    boxes were being sent -- instead of to
10   Yonkers, to Brooklyn that were for the Zip
11   codes that J & J was before June 10th?
12       A.    I don't know about before June
13   10th, but if that was their deadline, yes,
14   packages were sent to another station to be
15   serviced by another entity.
16       Q.    I understand that.  My question
17   is:  Are you aware that, in fact, before
18   June 10th, some of the packages that would
19   have gone to Yonkers for J & J went to
20   Brooklyn for the same ZIP code in
21   anticipation of June 10th?
22       A.    I was not aware of that.
23            MR. ROTH:  Okay.  I have no
24        further questions.  Thank you.

Page 461

Steven Pilatowski

1    REDIRECT EXAMINATION
2    BY MR. AYES:
3        Q.    Hey, Steve, just a couple of
4    questions based on what Mr. Roth just asked
5    you.
6            We were talking about Conrod
7    Newton and when he was an employee at the
8    station.  Do you know the entity ULUG?
9        A.    No, I am not familiar with
10   them.
11       Q.    Do you know that Conrod left
12   employment with J & J at some point?
13       A.    Yes, I do.
14       Q.    And was Conrod at the station
15   to your knowledge after he left employment
16   with J & J?
17       A.    I didn't see Conrod after he
18   left J & J at the station.
19       Q.    I know you said that the first
20   year, J & J may not have had load
21   positions, correct?
22       A.    That's correct.
23       Q.    And so is it possible that some
24   time after Conrod left, J & J could have

Page 462

Steven Pilatowski

1    gotten those load positions?
2        A.    After Conrod left, eventually
3    J & J did get load positions.
4        Q.    And we talked about
5    Mr. McKenzie getting a drug test.  And he
6    was a helper, right?
7        A.    Right.
8        Q.    If there is a complaint against
9    a helper, can there be a drug test issued?
10       A.    I'm not aware of that -- of
11   that helper getting drug tested.
12       Q.    You're not aware of that, of
13   Mr. McKenzie you're talking about?
14       A.    Yeah, I did not know that he
15   got drug tested.  I wasn't there at the
16   station.  I was on leave or on vacation at
17   the time, and I don't know the
18   circumstances around that.
19       Q.    My question is, generally
20   speaking, if there's a complaint against a
21   helper related to drugs, is the helper able
22   to get drug tested?
23            MR. ROTH:  Is he able to?
24            ARBITRATOR:  Able?

Page 463

Steven Pilatowski

1        Q.    I'll rephrase the question.
2            If there's a complaint lodged
3    against the helper for an issue regarding
4    drugs, can FedEx Ground ask the helper to
5    get drug tested?
6        A.    I'm not aware of that policy,
7    I'm sorry.
8        Q.    At the business discussions
9    meetings, is there anything that's
10   preventing the AO or BC from taking their
11   own notes?
12       A.    No.
13       Q.    Or maintaining their own
14   records?
15       A.    No.
16       Q.    I think we talked a little bit
17   about -- Mr. Roth asked you questions about
18   packages that were being removed from
19   J & J.  Do you remember that?
20       A.    Yeah.
21       Q.    Do you know what Schedule K of
22   the agreement is?
23       A.    I do, but I don't know it
24   verbatim.

Veritext Legal Solutions
800-567-8658                                          973-410-4098

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 42 of 119 PageID #: 1525

Page 464

Steven Pilatowski

1
2  Q.  Do you know what it refers to?
3  A.  Moneys received for peak
4 season.
5  Q.  Does Schedule K outline
6 circumstances that the contractor has to
7 follow during peak season?
8  A.  Yes.
9  Q.  We also talked about packages
10 being cut, and Mr. Roth asked you some
11 questions about that.
12  Does the AO control how the
13 packages are assigned to his route?
14  A.  AO has 100 percent control over
15 how the packages are assigned to his route.
16  Q.  In this case Joe as the AO
17 would have had the control over how
18 packages are assigned; is that right?
19  (Whereupon, an off-the-record
20  discussion was held.)
21  A.  That is correct.
22  MR. AYES:  Nothing further from
23  me.
24 RECROSS EXAMINATION
25 GbY MR. ROTH:

Page 465

Steven Pilatowski

1
2  Q.  Let me just ask one math
3 question, I'm fiddling with numbers.  There
4 are 80 to 85 load positions, correct?
5  A.  Approximately, yeah.
6  Q.  Okay.  And 50 percent are for
7 home and 50 percent are for ground,
8 correct?
9  A.  Yes.
10  Q.  And there's only four to five
11 home -- only home delivery companies,
12 independent contractors at Yonkers,
13 correct?
14  A.  Yeah.  Approximately four to
15 five or three to four.
16  Q.  So does that mean 42 trucks got
17 loading -- there's a point in time where 42
18 trucks of the three or four home, only
19 independent contractors got loading docks
20 and J & J didn't have one of those 42?
21  A.  They didn't have a load
22 position, no.
23  Q.  Okay.
24  MR. ROTH:  I have no further
25  questions.  Thank you.

Page 466

Steven Pilatowski

1
2  MR. AYES:  Thanks, Steve.
3  MR. ROTH:  Thank you,
4 Mr. Pilatowski.  Go enjoy your
5 vacation.
6  THE WITNESS:  Thank you, sir.
7  (Whereupon, a short break was
8 taken at this time.)
9  XXXX

Page 467

Christopher Messina

1
2  ARBITRATOR:  Okay.
3 Mr. Messina, would you please raise
4 your right hand.
5  Do you promise to tell the
6 truth, the whole truth and nothing
7 but the truth?
8  THE WITNESS:  Yes.
9 C H R I S T O P H E R  M E S S I N A,
10 called as a witness, having been
11 first duly sworn by a Notary Public
12 of the State of New York, was
13 examined and testified as follows:
14  ARBITRATOR:  Now spell your
15 name for the stenographer.
16  THE WITNESS:  First name
17 Christopher, C-H-R-I-S-T-O-P-H-E-R.
18 Last name Messina, M-E-S-S-I-N-A.
19  MR. DEL BOVE:  Do you have a
20 middle name?
21  THE WITNESS:  Paul.
22 DIRECT EXAMINATION
23 BY MR. ROTH:
24  Q.  Mr. Messina, tell us if you
25 would your educational background.

41 (Pages 464 - 467)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 43 of 119 PageID
#: 1526

Page 468

Christopher Messina

1
2     A.   I went to William Patterson
3  College in Wayne, New Jersey.  Studied
4  communications and business finance.
5     Q.   Okay.  And after college you
6  started working?
7     A.   Yeah.  I started at Ecolab for
8  the first four years or so and after that,
9  I got into finance and started in the
10  mortgage business.
11     Q.   And give me approximately what
12  year.
13     A.   1991 probably -- '95, I started
14  doing mortgages.
15     Q.   Who did you work for in 1995?
16     A.   I started off with First
17  Laridian Mortgage.  We shared licenses with
18  him.  So I was still an independent.
19         I then merged with Homestar
20  Mortgage, and Homestar Mortgage Services
21  out of Paramus, New Jersey.  And I stayed
22  with them up until 2008, as a matter of
23  fact.
24     Q.   What did you do after 2008?
25     A.   Before -- you know, I saw the

Page 469

Christopher Messina

1
2  implode coming.  I saw some stuff
3  happening.  During my managing of my
4  offices, I would focus on difficult to
5  finance loans, so I met a lot of high net
6  worth individuals and hedge funds and
7  whatnot.
8         So, my career kind of ventured
9  off into doing more commercial finance and
10  I did hard money lending and difficult to
11  finance loans.
12     Q.   What years was that, from when
13  to when?
14     A.   From 2008 when I got out to
15  current.
16     Q.   So you have relationships with
17  a lot of high net worth individuals?
18     A.   Yes.
19     Q.   And is there anything about
20  your employment that we missed or is that
21  it?
22     A.   Well, I often get involved
23  with -- you know, when companies come and
24  they need help restructuring, I'll get
25  involved with that.  I'll sometimes try to

Page 470

Christopher Messina

1
2  raise capital for them.
3         What I ended up doing was I got
4  into the PP&E industry for -- I am still
5  kind of in it at this point, waiting for
6  the final contracts to get funded.  That's
7  kind of what's thrown me off because it's
8  taking way too long, but I got involved
9  with that.  When that wraps up, I'll be
10  moving onto a skin project.
11     Q.   What skin?
12     A.   It's going to be the
13  rejuvenation -- it's going to be the
14  replacement of skin grafting.  It's too
15  much to get into, but it's fascinating.
16     Q.   Let's talk about the facts of
17  this case.  Did there come a time where you
18  heard of or met Joe Ruggiero?
19     A.   Yes.
20     Q.   Tell us how that happened.
21     A.   There was this guy Kevin who
22  was always at this person's house, and he
23  was telling me about this guy Joe and he's
24  going to be selling his FedEx route.  He
25  heard me on the phone all the time because

Page 471

Christopher Messina

1
2  I am constantly on the phone; it's my life.
3         And he just kind of mentioned
4  the fact that you guys should get together,
5  and one thing led to another and we finally
6  got together over at his place.  That's
7  kind of how this whole relationship
8  started.
9     Q.   Approximately, when was that?
10     A.   This was March, I think.
11     Q.   Of 2022?
12     A.   Yeah.
13     Q.   Okay.  And did you -- tell us
14  about your first conversations with Joe.
15     A.   My first conversations with him
16  was that, you know, I was kind of -- I
17  thought I was wasting my time because he
18  said he pretty much had it done and it was
19  sold.  And the numbers he was asking for
20  were, you know, pretty aggressive, but he
21  was very confident it was a done deal.
22         So I said okay.  Well, let me
23  know if it becomes available.  At this
24  point, good luck.  You know, good luck to
25  you.

Veritext Legal Solutions

800-567-8658                                          973-410-4098

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 44 of 119 PageID #: 1527

Page 472

Christopher Messina

2    Q.   Did you know who that sale was
3  to?
4    A.   No.  He mentioned it, but it
5  was people in the game.
6    Q.   Would the name Shawn Ponds
7  sound familiar?
8    A.   No, it was a while ago.
9    Q.   He said it was sold.  You said,
10  let me know if it falls through?
11    A.   Yes.
12    Q.   And that was in March or so.
13  Tell us what happened next.
14    A.   Well, this guy Kevin was kind
15  of our common denominator.  And he had
16  mentioned -- and I said, What's going on
17  with Joe?  Did he sell it?  Is it done?  He
18  said, No, I don't think so.
19        So, I reached out to see what
20  was happening because I was intrigued by it
21  because a couple of my partners, one of
22  them owns an Amazon route out in Florida
23  and he likes it a lot.  He expanded it.  He
24  says it's very turnkey.  It's kind of
25  self-ran.

Page 473

Christopher Messina

2        So the due diligence on it was
3  simple and the numbers worked.  He was
4  asking for an aggressive price, but the
5  territory was -- you know, it was a great
6  location, Manhattan.  Manhattan is
7  Manhattan.
8    Q.   When approximately were these
9  next conversations after you learned it
10  fell through?
11    A.   I guess it was maybe three or
12  four months.
13    Q.   Was it May?
14    A.   I guess it was May.
15    Q.   Of '22?  Okay.
16        And tell us about -- let's
17  focus on your conversations about the
18  price.  What did he want?  What did you
19  offer?  How did you come up with the
20  number?
21    A.   First I came in lower than his
22  offer on the table just because I was ready
23  to go and they were still talking.  Then I
24  brought it down to what the sales were, but
25  he did say that his couple of routes were

Page 474

Christopher Messina

2  taken from him, some stops were taken from
3  him.  And it showed on the balance sheet,
4  it showed on the revenue that they were
5  dropped for about eight months or so, I
6  want to say.
7        But part of the agreement in
8  the sale was that FedEx was going to add
9  those drops back in so the numbers would go
10  back up to that 1.88 million.
11    Q.   Well, you said 1.88 million --
12  well, first, before we get to the 1.88
13  million.
14        Did Mr. Ruggiero show you --
15  you mentioned balance sheets, financial
16  statements, tax returns, 1099s?
17    A.   Yeah.  We went through them
18  together.  I didn't leave with them
19  until -- I just actually sent them down.
20  Once we knew we were going forward, he
21  e-mailed me a set.  And I sent them to my
22  guy Rob.  He's the Amazon guy down in
23  Florida.
24    Q.   And what did you -- you said
25  you mentioned 1.88 million.  How did

Page 475

Christopher Messina

2  that -- was that a number agreed on?
3    A.   We agreed on that number.
4    Q.   How was that reached?
5    A.   Because the number at 1.5 came
6  in for -- where he landed and then if you
7  do the add back of the stops, it came out
8  to 1.88.  And if we did the one and a half
9  times, I think he said it was 2.5 million.
10  So we just did the add on of the drops
11  going back in.
12    Q.   Did you believe that one and a
13  half times revenue was a typical multiple
14  for these routes?
15    A.   I think so.
16    Q.   Did you learn that from the
17  Amazon guy, Rob?
18    A.   Yeah.  He said it was an easy
19  underwrite.
20    Q.   So did you agree on 1.88
21  million?
22    A.   I did.  I had some struggle
23  with the guy, you know, with not one but
24  two partners.  But the attractive thing to
25  this was that Joe was going to stay on for

43 (Pages 472 - 475)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 45 of 119 PageID #: 1528

Page 476

Christopher Messina

1
2  as long as we needed him to kind of handle
3  anything and transition any hiccups that we
4  had and keep everything smoothly operating.
5        That was one of the attractive
6  things.  And, of course, he would hold
7  paper, if need be.
8    Q.   And tell us, did you meet with
9  Joe after you learned that his other sale
10 fell through?
11   A.   Yes.
12   Q.   How many times?
13   A.   We met a couple of times.  The
14 one time was taking a ride and seeing the
15 territory, seeing the routes.  We saw
16 Columbus.
17   Q.   Columbia University?
18   A.   Columbia University.  And then
19 we saw 125th Street.  Those were the two we
20 went on and headed back over.
21   Q.   Did he show you the terminal?
22   A.   I didn't go into the terminal.
23   Q.   And so one of the meetings you
24 said he took you on the routes.  Did you
25 meet him a second time?

Page 477

Christopher Messina

1
2    A.   Not at the location.
3    Q.   Did you meet him in New Jersey?
4    A.   Yeah.  We met -- his condo
5  wasn't too far from where I am at.
6    Q.   And after you discussed and
7  agreed on price, what did you anticipate to
8  happen next?
9    A.   I heard we were supposed to --
10 I heard FedEx doesn't get involved with the
11 sale too much.  It was pretty much between
12 the entities that were coming in, so it
13 was -- the contractors worked it out
14 amongst themselves.  But they had to meet
15 the new contractor, and that was one of the
16 requirements.
17       We were eager to move it along,
18 so I just kind of kept saying, When are we
19 doing this?  He said he was trying to get
20 ahold of him and he was trying to get a day
21 and set it up for an onsite where I would
22 meet these guys and that day never came.
23   Q.   Did you learn from Mr. Ruggiero
24 he was having difficulty getting the FedEx
25 people to meet with him?

Page 478

Christopher Messina

1
2    A.   Yeah, that was the key of the
3  frustration.  And then I started to get
4  frustrated myself because my guys are
5  waiting and my Amazon guys busted my chops
6  a little bit about, What are you doing
7  getting into this business?  You know,
8  going to commercial finance buildings to
9  your real estate.
10       But I pushed for this and then
11 we couldn't get it done.  We couldn't get
12 in there, which was frustrating.  And Joe
13 just kept saying he's trying, he's trying.
14       And he did say he had to get an
15 extension a couple of times.  He said that
16 wasn't all his problem, it was kind of a
17 problem with the sellers -- I mean with the
18 buyers and problem with FedEx-something.
19   Q.   And did there come a time where
20 either you or Joe said, let's just go there
21 and meet him because they won't answer?
22   A.   Yeah.  It was right towards the
23 expiration of the last extension.
24   Q.   How did it happen that you
25 decided to get in the car and go meet him?

Page 479

Christopher Messina

1
2    A.   Joe -- I had given him the RFI
3  and I filled it out, most of it, and then I
4  had to get something signed by my guy in
5  Florida.  It was -- I think it was the last
6  day, couple of days before the expiration
7  of the final contract.
8        (Whereupon, the requested
9    portion of the transcript was read
10   back by the reporter.)
11   Q.   So, let me stop you there.  You
12 said RFI.  Did you understand that an RFI
13 had to be presented to FedEx?
14   A.   Yeah, I understood it.  They
15 wanted to get an overview and snapshot of
16 what the new contractor was going to be
17 that he agreed to go into business with.
18   Q.   Had you prepared that well in
19 advance of the last day of the contract?
20   A.   Yeah.  I had put it together --
21 when we knew that -- when Joe was telling
22 me he was serious, we still haven't had a
23 date to go in to meet everybody.  And he
24 said no, I have this thing, we're going to
25 meet.  You know, I've gotten these guys.

44 (Pages 476 - 479)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 46 of 119 PageID
#: 1529

Page 480

Christopher Messina

1
2    Trust me, we're going to make it happen.
3    We're going to get it done.  He was eager
4    to get it done.
5          So at that point I had given it
6    to him.  And everything in there was fresh
7    enough, not too much time went by, so I
8    didn't have to refresh anything I thought
9    was important.
10     Q.   So did there come a time where
11   you -- either you or Joe said, well, if
12   they're not answering my call or not
13   answering my text, let's just go there?
14     A.   Yeah.  That was the day he and
15   I were in the truck and heading over, but
16   he didn't tell me that.  He told me he had
17   an appointment.
18     Q.   Oh, he told you he had an
19   appointment?
20     A.   Yeah.  Well, he led --
21         ARBITRATOR:  Led you to
22     believe.
23         THE WITNESS:  Right.
24     A.   He didn't tell me we were going
25   in a hundred percent blind.  I knew it was

Page 481

Christopher Messina

1
2    the final day and I knew this was it.  I
3    kind of referenced, you know, talk about
4    last minute.  This is a barn-burner kind of
5    thing.
6      Q.   So tell us about that day.  Let
7    me just tell you it was June 10th, 2022.
8      A.   Okay.
9      Q.   Tell us about that day.
10     A.   We just came out of the tunnel
11   and Joe had called -- he called his guys at
12   FedEx and said we're on our way.  We were
13   on the phone with the attorneys, and Joe
14   wanted to get this contract.  He wanted the
15   contract done and signed.  He wanted to get
16   it notarized.  He kept racing around
17   talking about the notary, which wasn't
18   really that significant but he wanted to do
19   it to show these guys that he was serious
20   and we were doing it.
21         He finally got on the phone
22   with one of them, I don't remember who.
23   There were two guys we spoke to on that
24   call.
25     Q.   Let me just give you a history

Page 482

Christopher Messina

1
2    if it helps.  There's a Mike Scherer and
3    David Poindexter.
4          MR. DEL BOVE:  Objection.
5          MR. ROTH:  He said he didn't
6      remember the names.
7      A.   I know it was two guys.  I
8    remember Mike.  And the first guy, I know
9    they talked a lot about his father.  He was
10   genuinely sorry about his dad, you know.
11     Q.   Was this -- you're in a car, is
12   this on speaker phone?
13     A.   Yeah, we're on speaker.
14     Q.   Okay.  Go ahead, I'm sorry.  I
15   interrupted you.
16     A.   So, Joe's like I've got the
17   buyer with me.  We're ready.  He's ready to
18   meet you.  Come on, what are we doing?  And
19   then the call was like dead stopped.  It
20   was no deal.  No deal on the table, which
21   didn't make much sense to me.
22         So, Joe went through about
23   five, six different emotions.  And I've
24   gotten to know him pretty good at this
25   point, but not well enough to expect what

Page 483

Christopher Messina

1
2    it was.  He went from shocked, scared,
3    aggravated, you know, almost crying, like
4    begging to get in there and do this.
5          But what ended up happening,
6    which didn't make a lot of sense to me was
7    they basically said it's too late, it's a
8    done deal.  We've already divided it out
9    amongst some other -- you know, the
10   other -- what do you call them?
11         ARBITRATOR:  Contractors?
12     Q.   Independent contractors?
13     A.   Yeah, but I think they used a
14   different phrase.
15         ARBITRATOR:  Service providers?
16     Q.   Service providers.
17     A.   Yeah.  Something along those
18   lines, we've already done it.  We've
19   already made the changes.  Why would I go
20   back and reverse it?  We got done what we
21   wanted to get done.  Just take it to
22   arbitration, take it to arbitration.
23     Q.   Let me understand.  So, one of
24   the two people on the speaker phone in the
25   car said to Joe with you listening, Just

45 (Pages 480 - 483)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 47 of 119 PageID #: 1530

Page 484

```
1          Christopher Messina
2  take it to arbitration?
3      A.  Yeah.
4      Q.  Do you remember if it was Mike
5  or the other guy?
6      A.  I think it was Mike.  Whoever
7  we spoke to later in the call.  It was just
8  you're better off taking it to arbitration.
9  At this point you'll get a good amount of
10 the money back, the good amount of the
11 money.  You'll get probably your asking
12 price and it moves very quickly.
13     Q.  What was Joe's response?
14     A.  He said, I don't want to do
15 that.  I want to have a good relationship.
16 I believed in your guys and, you know, we
17 were supposed to do this together.  He was
18 just really trying to put it back on the
19 rail for me and for him because he knew
20 that we were going to build something
21 together too.
22         I just couldn't believe this
23 was over without notice, I guess.  But I
24 mean, it was clear.  He's like, Let me just
25 come in, I have him with me.  I want you to
```

Page 485

```
1          Christopher Messina
2  meet him.
3          And they basically said don't
4  come to the property.  You're really kind
5  of not welcome.
6      Q.  And how did it end?  Is that
7  how it ended?
8      A.  Pretty much, yeah.  It's a
9  formula, there was a formula.  Just look at
10 the contract and do the formula and the
11 formula will determine what you can
12 probably get at arbitration.
13         I kept saying, Where's this
14 formula?  Let's check out this formula, you
15 know.  We gotta figure out what's going on.
16 I think I even said, Before you even go
17 home, go and stop by with the attorney and
18 get it in process, get it started, because
19 the quicker you get it going, the quicker
20 it will end.  You'll get your money.
21     Q.  And what were you thinking?
22     A.  I was pissed.
23     Q.  You were pissed?
24     A.  I was.  I was upset.
25     Q.  Why?
```

Page 486

```
1          Christopher Messina
2      A.  Because I spent a lot of time
3  prepping for it and keeping it alive for
4  the most part.  I wanted to see Joe move on
5  to something else.  His father's -- the
6  loss of his dad was devastating for him.
7  He was his best friend.  So he really
8  struggled with that; he had a hard time.
9          He needed this problem over
10 with, this thing that was delaying.  And
11 then I looked like a fool.  You know, I
12 looked like an idiot because this deal that
13 I kept saying keep alive, keep alive.  I've
14 got the financing, we're in good shape, and
15 then it's gone with no warning, no
16 anything.
17         Oh, they dismantled it and
18 reworked it with the existing contractors
19 within the company.  It's no longer
20 available or needed.  So it made me look
21 kind of foolish.
22     Q.  Did you get back in the car and
23 go back to New Jersey?
24     A.  We were still in the car.  We
25 never got out of the car.
```

Page 487

```
1          Christopher Messina
2      Q.  Oh, you never got out.  You
3  were in the car the whole time?
4      A.  Yes.  I was like, Let's go.
5  This isn't happening.  It's clearly -- you
6  know, this is a dead issue.  So that was
7  it.  Back through the tunnel we went.
8      Q.  Then you went back to
9  New Jersey and that was it?
10     A.  Yeah.
11         MR. ROTH:  I have no further
12     questions.  Thank you.
13 CROSS EXAMINATION
14 BY MR. DEL BOVE:
15     Q.  Good afternoon, sir.  My name
16 is Chris Del Bove.  I represent FedEx.  I
17 have a few follow-up questions here.
18         Do you know what an ISPA is?
19 Have you ever heard that term, ISPA?  Do
20 you know what that is?
21     A.  I've heard of an ISPA.
22     Q.  What is it?
23     A.  I mean, I've heard of it.  You
24 tell me.
25     Q.  Again, part of the process is
```

Page 488

Christopher Messina

1 
2 the attorneys get to ask the questions
3 here.
4          Did Joe give you a copy of the
5 contract between him and FedEx?
6     A.   No, I never got a -- I didn't
7 get a copy of the contract.
8     Q.   So as part of your review
9 vetting process of the business, you never
10 reviewed a copy of the contract?
11     A.   Not between those two.
12     Q.   Between Joe and FedEx?
13     A.   Right.
14     Q.   What did you review?
15     A.   The financials.
16     Q.   What financials were there?
17     A.   We reviewed the revenue stream
18 that he had, the balance sheet, and his own
19 1099 because he's an independent contract.
20 You know, he will operate on independent.
21 Sole proprietorships or LLCs.
22     Q.   So the 1099, would that be
23 something -- well, let me ask you.  Which
24 years of the 1099s did you review?
25     A.   We looked at the last two.  We

Page 489

Christopher Messina

1 
2 looked at '22 and -- no, we looked at year
3 to date '22 and we looked at '21.  But
4 again, I sent it down to my guy in Florida.
5 I identified the opportunity, but I sent it
6 to the guys.
7     Q.   You said the guy is Kevin,
8 right, in Florida, the gentleman?
9     A.   No.
10     Q.   What was the gentleman's name
11 in Florida?
12     A.   It's Sam and Rob.
13     Q.   Great.  What's Sam's last name?
14     A.   Kaplowitz.
15     Q.   And Rob, same last name?
16     A.   Correct.  They're brothers.
17 Sam is the chiropractor and Rob is the
18 entrepreneur.
19     Q.   You also looked at the balance
20 sheets?
21     A.   Yes.
22     Q.   When you say balance sheets,
23 tell us what that is.
24     A.   We reviewed the run rate of the
25 business, what they did monthly, how the

Page 490

Christopher Messina

1 
2 business did on gross revenue.
3     Q.   Understood.  But when you say
4 you looked at the balance sheets, was this
5 something that Joe prepared?  Was this
6 something FedEx prepared?  Something else?
7     A.   It was a printout of Joe's LLC.
8 It was something that came from Joe.  It
9 was the numbers of the operation that we
10 were buying.
11     Q.   And this was something that Joe
12 prepared for you?
13     A.   Yes.
14     Q.   And was it prepared for the
15 purposes of the transaction, or is it
16 something prepared in J & J's ordinary
17 course of business, if you know?
18     A.   I don't know.  It's what Rob
19 wanted to look at.  He was the one that did
20 the underwriting, and I requested it and
21 sent it down.
22     Q.   When you say "underwriting,"
23 what do you mean by that?
24     A.   That's a mortgage term for me.
25     Q.   And insurance term for me.

Page 491

Christopher Messina

1 
2     A.   It's to review the documents of
3 a company.  Due diligence.
4     Q.   Okay.  When you say
5 "underwriting," it's just doing due
6 diligence research?
7     A.   Yeah.  It's looking, you know,
8 at the business.
9     Q.   Did you ever confirm the
10 transaction with Joe in writing, e-mail,
11 letter, anything like that?
12     A.   What, our transaction?
13     Q.   Yes.
14     A.   Yes.  We had a document.  We
15 had a -- I think we had a bill of sale or
16 something he prepared.
17     Q.   Joe had prepared?
18     A.   Joe had prepared it.  We were
19 on the phone with one of his guys that was
20 going to do a notary.  He wanted to get it
21 notarized so he could show you guys.
22     Q.   Did you ever see this bill of
23 sale with your own eyes?  Did you ever see
24 the document before?
25     A.   Yeah.  I saw it on an e-mail, I

Page 492

Christopher Messina

1
2 believe.
3      Q.   Okay.  Do you know how many
4 pages it was?  One page?
5      A.   It was a couple of pages.  It's
6 a simple document, bill of sale.
7      Q.   Okay.  I'll represent to you I
8 haven't seen it to date.
9          Other than the bill of sale,
10 any other documents between you guys?
11      A.   No.
12      Q.   Did you ever, in fact, sign
13 that document?
14      A.   No.
15      Q.   Okay.  So you never signed it;
16 you never got it notarized?
17      A.   Actually, I think we did.  He
18 wanted to get it notarized.
19      Q.   So you signed it, correct?
20      A.   I believe so, yes.
21      Q.   And Joe signed it, correct?
22      A.   I don't know.  I believe so.
23      Q.   If you don't know, that's fine.
24 That's a perfectly acceptable answer.
25          Do you know one way or the

Page 493

Christopher Messina

1
2 other whether Joe signed it or not?
3      A.   I don't know.  I'm sure he did
4 but...
5      Q.   I think earlier you said you
6 sort of shadowed Joe's route once or twice
7 with him?
8      A.   Just one time.  We went down to
9 a couple of areas down here in New York.
10      Q.   And was that you and Joe?
11      A.   Yes.
12      Q.   Anyone else present?
13      A.   No.
14      Q.   Did you ever ride on or go on
15 the trucks at all?
16      A.   No.
17      Q.   Did you have a plan -- well,
18 let me ask you this:  If the capital group
19 took over, who was going to be the AO?
20      A.   Rob was going to be -- he's the
21 Amazon guy in Florida.  He has family up
22 here, so he had two or three different
23 people that he was going to come in here
24 and, you know, be there for day-to-day
25 operations.

Page 494

Christopher Messina

1
2          And he was going to work with
3 Joe during the transition, however long it
4 took.  You know, he said he would stay on
5 up to six months if he had to, but from
6 what I understand, it was a pretty simple
7 turnkey operation.
8      Q.   I'll represent to you that
9 there could only be one AO of each company.
10 Do you guys identify who that would be?
11      A.   Like I said Rob, he was the
12 Amazon guy.  He was going to be structuring
13 that whole time.
14      Q.   So Rob would as AO?
15      A.   Until he had somebody from
16 New Jersey.
17      Q.   Did Rob intend to move up here
18 to New York?
19      A.   No, he didn't intend to move up
20 here.
21      Q.   Do you agree with me you
22 provided an RFI in this case, correct?
23      A.   Yes.
24      Q.   You agree with me that your RFI
25 doesn't indicate your or the capital

Page 495

Christopher Messina

1
2 group's financial viability?
3      A.   What do you mean?
4      Q.   Sure.  You agree with me, you
5 prepared an RFI, right?
6      A.   Yes.
7      Q.   And contained within that RFI
8 doesn't confirm or provide any proof of
9 financials, correct?
10      A.   No, it does not.
11      Q.   What was your plan to cover
12 expenses, payroll, fuel, things like that?
13      A.   Again, the day-to-day operation
14 was going to be done by Rob.  He was going
15 to come in with it, and Joe was going to be
16 handling the transition.  But the cash flow
17 was more than enough to support the
18 operation.
19      Q.   Besides yourself, Rob, and Sam,
20 any other partners of the capital group?
21      A.   No.
22      Q.   Did the capital group ever file
23 articles of incorporation or anything like
24 that?
25      A.   Sure.

48 (Pages 492 - 495)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 50 of 119 PageID #: 1533

Page 496

Christopher Messina

1
2     Q.   Which state was that?
3     A.   Delaware.
4     Q.   Okay.  Did you file -- J & J
5  was going to be operating out of New York
6  though, right?
7     A.   Yes.
8     Q.   Did you file anything in
9  New York?
10    A.   We didn't yet.  I don't know.
11  I'd have to ask Rob.  Rob may have to
12  secure the name, I don't know.  But that
13  would have been something he would do.
14    Q.   What steps did you take to
15  educate yourself on the pick-up and
16  delivery business thing?
17    A.   Again, I am the one who
18  identified the opportunity because of the
19  relationship with Joe.  I learned what I
20  did from talking with Joe and getting an
21  understanding of it, but it wasn't going to
22  be my day-to-day operations.  So I am not
23  an expert in the delivery business.
24    Q.   Okay.  Prior -- I know you gave
25  a little history about your background,

Page 497

Christopher Messina

1
2  your resume, if you will.
3          Have you ever done any prior
4  deals with transportation logistics
5  companies?
6     A.   Me personally, no.
7     Q.   Do you have any prior
8  experience working face-to-face with
9  customers?
10    A.   Sure.
11    Q.   Where was that?
12    A.   I mean, I've been doing
13  mortgages, you know, my whole life, dealing
14  with people all the time.
15    Q.   Did you form an understanding
16  as to the demographics of the station and
17  the CSA location?
18    A.   Again, you're asking me
19  questions of the daily operation, and I am
20  not going to be able to help you with that.
21    Q.   Same questions, if I asked you
22  about peak and things like that, you kind
23  of don't know what that is and you're going
24  to rely on your partners?
25    A.   Yeah.

Page 498

Christopher Messina

1
2     Q.   Did the capital group, did it
3  draft any employee handbooks or anything
4  like that?  Did it draft any documents in
5  preparation?
6     A.   Again, that would be Rob.
7     Q.   If I ask you same questions
8  about DOT guidelines, safety, things like
9  that, that would all be Rob, as well?
10    A.   It would be.  And in my
11  experience when we get involved with
12  companies, I am going to say probably no to
13  most of those questions because we hadn't
14  been able to solidify the final phases.
15          That's part of the aggravation
16  that they had with me because time just
17  kept slipping by and the transaction wasn't
18  moving ahead.  And they were wondering why
19  can't we just get this thing finished.  Are
20  we doing it or not?
21    Q.   Did you form an understanding
22  as to the volume of packages that that area
23  that you were going to contract for?
24    A.   The discussions -- I was on the
25  conference calls between Joe and Rob, but I

Page 499

Christopher Messina

1
2  don't know.  Again, I paid attention, but
3  not really.  I was multitasking just
4  because it's not my area of expertise on
5  this.
6     Q.   Earlier you testified about an
7  individual Kevin.
8     A.   Yeah.
9     Q.   What's Kevin's last name?
10    A.   I don't know.  I don't know
11  Kevin.  He was just the liaison between
12  the -- he was a boyfriend of somebody.
13    Q.   Did Kevin work for Joe?
14    A.   No.
15    Q.   Did Kevin have any type of
16  family cousin relationship?
17    A.   I really don't know.
18    Q.   You indicated when talking to
19  Mr. Roth, you spent a lot of time trying to
20  keep the deal alive.
21          Do you remember saying
22  something to that effect?
23    A.   I just kept the conversation
24  with Joe and kept in touch with him,
25  finding out what was happening with the

49 (Pages 496 - 499)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 51 of 119 PageID #: 1534

---

Page 500

```
 1          Christopher Messina
 2   transaction.
 3       Q.   All right.  Do you recall
 4   being -- were you aware that Joe was
 5   notified that an assignment needed to be
 6   completed by June 10th?  Did Joe ever tell
 7   you that?
 8       A.   Joe said the cutoff date of
 9   June 10th was the last day that we had to
10   get in there and meet with everybody.
11   That's all I remember.  That's when he
12   said, I am just ready to go in there and --
13   let's go in, let's just get there so we can
14   do it.  And I made myself available.
15       Q.   All right.  Did he tell you
16   that the actual -- the deal contract had to
17   be done by that date?  Was that your
18   understanding?
19       A.   No, I don't know.  I just know
20   that June 10th was the date we got in the
21   car -- on the truck and headed in.  I mean,
22   I thought they were expecting us, to be
23   honest with you.
24          (Whereupon, a short break was
25       taken at this time.)
```

---

Page 501

```
 1          Christopher Messina
 2       Q.   I just wanted to confirm your
 3   testimony.  Is it that Rob -- the capital
 4   group had planned to be the AO, right?
 5       A.   Yes.
 6       Q.   Would it be fair to say Rob
 7   never looked at the routes.  He never
 8   physically came down to New York to drive
 9   along them?
10       A.   He did not physically get to
11   New York, but Joe and him spent quite a bit
12   of time talking things through -- Rob never
13   made it up to New York to physically do the
14   routes, but he -- they spent a lot of time
15   on the phone.
16          But Rob is from New York.  He
17   had a couple of -- he had a nail salon up
18   here and he had a couple of Airbnbs.  So he
19   knew New York very well.
20       Q.   So fair to say you never looked
21   at the ISPA and fair to say Rob never
22   looked at the ISPA either?
23       A.   I don't know if Rob did.  If
24   anyone did, it would have been Rob.
25       Q.   Well, earlier I think you said
```

---

Page 502

```
 1          Christopher Messina
 2   that Joe never gave it to you guys, right?
 3       A.   I said I wasn't sure.
 4       Q.   Fair enough.
 5          The day you and Joe drove up to
 6   the station, was it just the two of you in
 7   the car, no one else?
 8       A.   Yes.
 9       Q.   And fair to say Rob never met
10   FedEx face-to-face?
11       A.   No.
12       Q.   Rob never -- Rob wasn't driving
13   up with you there that day, correct?
14       A.   No.
15       Q.   And Rob never spoke to FedEx
16   about anything, correct?
17       A.   I don't think he ever spoke to
18   the guys at FedEx.
19          MR. DEL BOVE:  No further
20       questions.
21          MR. ROTH:  I want to ask you
22       one question.
23   REDIRECT EXAMINATION
24   BY MR. ROTH:
25       Q.   Before I do, I wanted to ask
```

---

Page 503

```
 1          Christopher Messina
 2   you if you could identify Tab 25.  Just
 3   look through it and just tell me what it is
 4   because I forgot to ask you that.  Just
 5   skim through it and tell me what it is.
 6       A.   Looks like it's an e-mail from
 7   Joe referencing the RFI that was completed.
 8       Q.   Is that your RFI on Tab 25?
 9       A.   Yeah.
10       Q.   My one question is this:  So,
11   you were asked a lot of questions by
12   counsel about your knowledge of the
13   business, who was going to operate the
14   business, all those questions you were
15   asked.
16          Were those the questions you
17   anticipated being asked when you went to
18   meet with FedEx and they didn't let you in?
19       A.   No.
20       Q.   What did you expect at that
21   meeting?
22       A.   I expected that they wanted to
23   get to know who we were, what businesses we
24   have been involved with, what we currently
25   have.  You know, was there anything with
```

Page 504

Christopher Messina

1
2 the current operation that, you know, you'd
3 like to see some changes with.
4        I mean, we heard FedEx is a
5 great company.  You know, a good company to
6 work for.  Very, you know, American.  And,
7 you know, it turned out not to be that way,
8 that's for sure.  In this particular
9 situation.
10    Q.    Meaning you never even had the
11 opportunity to answer questions or ask
12 questions?
13    A.    Yeah.  I never got to -- well,
14 it was almost like it was dismantled before
15 I had a chance -- we had a chance to close
16 on it.  So we kind of just wasted our time.
17        MR. ROTH:  I have no further
18    questions.  Thank you.
19        MR. DEL BOVE:  I have one
20    question.
21 RECROSS EXAMINATION
22 BY MR. DEL BOVE:
23    Q.    Is it your name or Rob's name
24 that is on the RFI?
25        ARBITRATOR:  What exhibit is

Page 505

Christopher Messina

1
2    that?
3        MR. DEL BOVE:  25.
4    Q.    That's your name, right?
5    A.    That's my name.
6        MR. DEL BOVE:  No further
7    questions.
8        (Whereupon, a short break was
9    taken at this time.)
10        XXXX
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 506

Shawn Ponds

1
2    ARBITRATOR:  Can you hear me?
3    THE WITNESS:  Yes, ma'am.
4    ARBITRATOR:  Would you please
5 raise your right hand.
6        Do you promise to tell the
7 truth, the whole truth and nothing
8 but the truth?
9        THE WITNESS:  Yes, ma'am.
10 S H A W N   P O N D S,
11 called as a witness, having been
12 first duly sworn by a Notary Public
13 of the State of New York, was
14 examined and testified as follows:
15    ARBITRATOR:  We'll start with
16 Respondents' direct.
17        Are you alone in that room?
18        THE WITNESS:  Yes, sir.  My son
19 is about to leave right now.
20        ARBITRATOR:  Okay.  Good.  Yes,
21 you should be alone.
22        All right.  Mr. Ayes, you are
23 going to run the direct?
24        MR. AYES:  Yes.
25        ARBITRATOR:  Okay.

Page 507

Shawn Ponds

1
2        MR. AYES:  Thank you.
3 DIRECT EXAMINATION
4 BY MR. AYES:
5    Q.    Thanks, Shawn.  Can you please
6 start -- and you can put your hand down.
7        Can you please start by telling
8 us your current employment?
9        ARBITRATOR:  By telling us your
10 name and spelling it.
11        THE WITNESS:  My name is Shawn
12 Ponds, S-H-A-W-N, P-O-N-D-S.  I am
13 currently a FedEx Ground contractor
14 ISP.
15    Q.    What company do you work for?
16    A.    Fire and Ice Trucking.
17    Q.    Is that your company?
18    A.    Yes.
19    Q.    Are you the AO for that
20 company?
21    A.    Yes.
22        ARBITRATOR:  I missed the name
23    of the company.
24        MR. AYES:  Fire and Ice.
25    Q.    And what area do you work

51 (Pages 504 - 507)

Page 508

Shawn Ponds

1   for -- do you service for FedEx Ground?
2   
3   A.   27 -- 10027 ZIP.
4   Q.   And that's a ZIP code and
5   that's within Manhattan; is that right?
6   A.   Yes, yes.  New York, New York.
7   Q.   Are you familiar with
8   Mr. Ruggiero and JEE?
9   A.   Yes.
10  Q.   How do you know Mr. Ruggiero?
11  A.   We was -- we sat down a couple
12  of times.  We do the same area so I see
13  some of his guys, and we came to -- we had
14  to do an overlap.  So first we tried to sit
15  down and see what we was going to do with
16  that.
17       The company was going into,
18  like -- everybody had to overlap and they
19  put it out there to get in contact with the
20  person that's in your area.
21  Q.   And you're aware that we are in
22  arbitration today.  We're at a hearing
23  about a dispute that Mr. Ruggiero has with
24  FedEx Ground?
25  A.   Yes, yes.

Page 509

Shawn Ponds

1
2   Q.   In connection with this matter,
3   were you asked to provide an affidavit?
4   A.   Yes.
5   Q.   Okay.  Do you recall providing
6   one?
7   A.   Yes.
8   Q.   The affidavit that you
9   provided, was it a sworn statement?
10  A.   Yes.
11  Q.   And it was notarized, as well?
12  A.   Yes.
13  Q.   And it was provided to me,
14  correct?
15  A.   Yes, sir.
16       MR. AYES:  I'm going to show
17   you that affidavit, Chris.
18  Q.   Can you see on the screen, it
19  says Affidavit of Shawn Ponds?
20  A.   Yes.
21  Q.   You can read it to yourself,
22  sir.
23  A.   All right.  Yes.
24  Q.   Do you recognize this document?
25  A.   Yes.

Page 510

Shawn Ponds

1
2       MR. AYES:  Just for the record,
3   this was produced as FXG-002122.
4   Q.   Do you recognize what's
5   contained in this document?  And scroll on
6   the second page, too.
7   A.   Say again?
8   Q.   Do you recognize what's
9   contained in this affidavit?
10  A.   Yes.
11  Q.   Is that your signature on --
12  A.   Yes.
13  Q.   -- the second page?
14  A.   Yes.
15  Q.   And did you have this
16  notarized?
17  A.   Yes.  Yes, sir.
18  Q.   Now, you've had an opportunity
19  to review this affidavit here in front of
20  you?
21  A.   Yes.
22  Q.   The statements that are
23  contained in this affidavit, are those
24  still true and accurate statements?
25  A.   Yes.

Page 511

Shawn Ponds

1
2   Q.   Did you ever have an agreement
3   with Mr. Ruggiero to purchase 10027?
4   A.   No.
5   Q.   Can you explain what your
6   interactions were with Mr. Ruggiero
7   regarding this area?
8   A.   We -- first time I spoke to
9   him, we went down and we sat down and
10  talked.  We talked about how his business
11  works, who did he have and things of that
12  nature.  Like, oh, I have this person, this
13  person, they're good.
14       The next time we're supposed to
15  meet was, I was supposed to go to Yonkers
16  on a Saturday where -- which I did.  I went
17  to Yonkers on a Saturday, Saturday morning
18  and he never showed up.
19  Q.   And what happened after that?
20  A.   After that he sent me a text
21  saying that he got pulled over by the
22  police and some other things.  But yeah, he
23  said he got pulled over by the police or
24  something like that.
25       But the problem that I had with

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 54 of 119 PageID
#: 1537

Page 512

Shawn Ponds

1
2 that was, I'm talking to the guy right next
3 to me. I'm standing here. You're talking
4 to your worker right next to me, why not
5 talk to me? You can call him, but you
6 can't me? And you made me come here.
7    Q.  Did you ever have a
8 conversation with Mr. Ruggiero in or around
9 May or June of 2022 on the phone?
10    A.  Yes, I had several
11 conversations with him on the phone.
12    Q.  Do you know if any of those
13 conversations were ever recorded by
14 Mr. Ruggiero?
15    A.  Not to my knowledge. I was
16 never made aware of it. Not to my
17 knowledge.
18    Q.  Did he ever tell you he was
19 recording any phone calls with you?
20    A.  Never. Never.
21    Q.  When was the last time you
22 spoke with Mr. Ruggiero about the potential
23 opportunity to purchase his area?
24    A.  The last time was the time when
25 I went up there, he never showed up.

Page 513

Shawn Ponds

1
2    Q.  Do you recall approximately
3 when that was?
4    A.  I don't know what day that was.
5 I don't know, but that was the last time
6 after that. If you make me come somewhere
7 and you don't show up when we're supposed
8 to do business, that means you don't want
9 to do business with me.
10    Q.  In the affidavit, if you look
11 at paragraph 4.
12    A.  Uh-huh.
13    Q.  It states: Mr. Ruggiero
14 provided me with documentation, however, it
15 was not for the service area he was
16 currently selling.
17    Did I read that right?
18    A.  Yeah.
19    MR. ROTH:  Hold on. I have an
20    objection.
21    ARBITRATOR:  Hold on,
22    Mr. Ponds.
23    MR. ROTH:  I have an objection.
24    When you have a witness on the stand,
25    you don't put an affidavit in

Page 514

Shawn Ponds

1
2 evidence to support the testimony.
3 You ask him questions; you get
4 answers.
5    I mean, the affidavit -- you
6 don't -- it's improper to say here's
7 your affidavit, is this what it says?
8 I think the affidavit is no longer
9 important, and you get his testimony
10 under oath. That's the way it's
11 done.
12    MR. AYES:  I would respond this
13 is an issue we brought the other day,
14 and I think it was explained that if
15 we wanted to get the affidavit for
16 the arbitrator's consideration, we
17 would need to bring in Mr. Pond
18 subject to cross-examination so his
19 affidavit could be formally admitted.
20    That's what we are doing. I
21 would ask the arbitrator to give it
22 the weight she desires in deciding
23 this case.
24    MR. ROTH:  My answer is you
25 don't put somebody on the stand

Page 515

Shawn Ponds

1
2 unless there's an inconsistency
3 corroborated in the affidavit.
4    ARBITRATOR:  I am going to let
5 it go because he's basically using
6 the affidavit to fashion his
7 questions. And we'll have the
8 affidavit and we'll have the
9 questions in the transcript, and they
10 will mirror each other basically.
11    In fact, at this point you
12 could have the affidavit in your hand
13 and not on the screen and ask
14 Mr. Ponds the questions.
15    MR. AYES:  Mr. Ponds needs it
16 for purposes of --
17    ARBITRATOR:  Oh, he needs it.
18 Okay.
19    Q.  All right. Mr. Ponds, going
20 back to paragraph 4, can you explain what
21 the documentation was that Mr. Ruggiero
22 provided you?
23    A.  He sent me a 1099. A 1099 of
24 the contract that he has. And the 1099 --
25 and this is what I spoke to him about --

53 (Pages 512 - 515)

Page 516

Shawn Ponds

1
2 the 1099 showed everything that he had, but
3 he didn't have everything that -- you know,
4 he showed me 35 ZIP and 27 ZIP.
5        I wasn't interested in
6 purchasing 35 ZIP. All I wanted was 27.
7 So that was -- this is what I explained to
8 him. I said you have to show me 27 ZIP
9 only. You can't show me both and think
10 that's how it works. You gotta show me 27
11 only.
12    Q.   After you explained this to
13 Mr. Ruggiero, were you ever provided with
14 any further documentation concerning the 27
15 ZIP?
16    A.   No. He did not send me -- no,
17 he didn't send me things that says 27. He
18 did not, because what he would have had to
19 do would have had to go by settlement.
20 Like this is what -- after the 35 was gone,
21 he had to show me what 27 really made.
22    Q.   And before June 10th which was
23 the date that Mr. Ruggiero's agreement
24 expired, did you ever deliver any HD J & J
25 packages?

Page 517

Shawn Ponds

1
2    A.   No.
3    Q.   When was the first time you
4 started to deliver HD packages in your
5 area?
6    A.    It had to be after -- it should
7 have been probably -- it was in June some
8 time, but it was towards like the middle of
9 June or something like that. But it wasn't
10 when we was trying to do business, because
11 I remember my terminal was in Maspeth. His
12 terminal is all the way in Yonkers.
13        My terminal is 300 Maspeth,
14 that's all the way in Brooklyn. His was
15 all the way in Yonkers.
16    Q.   Prior to getting those HD
17 packages in your service area, did anyone
18 from FedEx Ground tell you that J & J's
19 agreement was ending?
20    A.   No, I didn't know it was
21 ending. I didn't know. Nobody told me it
22 was going down.
23    Q.   Did Mike Scherer ever tell you
24 that J & J's agreement was ending before
25 you got HD packages?

Page 518

Shawn Ponds

1
2    A.   He said -- I think he said it
3 was a possibility that he was selling. He
4 didn't say he was -- it was ending. He
5 didn't tell me that it was ending.
6    Q.   Do you know when he told you
7 that?
8    A.   It was way before. It was way
9 before -- I can't remember, but I know that
10 he told me that you need to look into -- he
11 didn't tell me it was ending. We had to do
12 the overlap. So look into the person in
13 your area, they might be selling. That was
14 the conversation.
15    Q.   Do you know what overlap was?
16    A.   We had a meeting. What they
17 provided is that ground and home will be
18 together. So I would have had to sit down
19 with Joey and try to split out our route.
20 He would take some of the home and I would
21 take some of the ground.
22        At the time, I had ground, and
23 I would have had to take some of his home
24 delivery. He would have had to take some
25 of my ground packages.

Page 519

Shawn Ponds

1
2    Q.   How did you first learn that
3 you were acquiring the area to service HD
4 as well as ground?
5    A.   It was a -- I think it was
6 like -- they said, Can you handle some
7 additional packages?
8    Q.   I think your video went off,
9 Mr. Ponds.
10    A.   Hold on one second.
11        So they said that, Can I handle
12 some additional packages? I said, Sure,
13 you know. I will try to handle it, but
14 then they gave me a whole bunch.
15    Q.   First time they gave you
16 packages, were you the only contractor that
17 was servicing that 10027 area?
18    A.   Yes, sir.
19        MR. AYES: I don't have any
20    further questions. Thank you.
21    Mr. Roth may have some questions for
22    you, Mr. Ponds.
23 CROSS EXAMINATION
24 BY MR. ROTH:
25    Q.   Hi, Mr. Ponds. Can you hear

54 (Pages 516 - 519)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 56 of 119 PageID
#: 1539

Page 520

Shawn Ponds

1
2 me?
3     A.   Yes, sir.
4     Q.   Let's focus on Number 4 in your
5 affidavit.
6         It says:  Mr. Ruggiero provided
7 me with documentation, however, it was not
8 for the service area he was currently
9 selling?
10        That's not accurate, is it?
11    A.   Yes, that's accurate.
12    Q.   So, he gave you the 1099 for
13 10027 and 10035; is that correct?
14    A.   Yes.  He gave me a 1099 -- he
15 gave -- this is what we spoke about.  He
16 gave me a 1099 for everything.  He didn't
17 break it up.
18    Q.   And what was everything that he
19 had at the time?
20    A.   35 and 27.
21    Q.   Did he have 35 in 2022?
22    A.   35 and 27.
23    Q.   My question is:  Do you know if
24 Mr. Ruggiero or J & J actually had 10035 in
25 2022?

Page 521

Shawn Ponds

1
2     A.   He showed me 2021.
3     Q.   Do you know if he had --
4         ARBITRATOR:  Let him answer the
5     question.
6         MR. ROTH:  I thought he did.
7         ARBITRATOR:  No.
8     A.   2021 1099.
9     Q.   You done?
10    A.   Yes, sir.
11    Q.   Okay.  So do you know what
12 routes Mr. Ruggiero had in 2021?
13    A.   Yes.  He had -- I know he had
14 35 and 27.
15    Q.   Do you know if he sold 35 in
16 2021?
17    A.   To my knowledge, he did.
18    Q.   I didn't hear, I'm sorry.
19 What?
20    A.   To my knowledge, he did.
21    Q.   He did sell 35.
22        So do you know when in 2021 he
23 sold 35?
24    A.   I don't have the slightest idea
25 when.

Page 522

Shawn Ponds

1
2     Q.   It's not that he gave you the
3 information for the wrong service area,
4 which is what four says.  You're saying he
5 gave you the information for that service
6 area and potentially more than that service
7 area, correct?
8     A.   Yes.  He gave me everything in
9 2001.
10    Q.   Did you say to him, Well, I
11 want something which is more just on 27?
12    A.   Yes, that's what I told him.
13    Q.   In fact, didn't you meet
14 Mr. Ruggiero at a barbecue -- at a
15 restaurant that had a barbecue restaurant?
16    A.   Yeah, a BBQ restaurant.
17    Q.   BBQ, okay.  When was that?
18    A.   I can't recall the day, though.
19    Q.   Was it in April or May of 2022?
20    A.   It could have been.  I don't
21 know the exact date.
22    Q.   Let's do it this way.  You know
23 that on June 10th you took over the routes.
24 June 11th, correct?
25    A.   I don't know what day that is.

Page 523

Shawn Ponds

1
2         MR. AYES:  Objection.
3     Mischaracterization.
4     Q.   Let me represent to you
5 Mr. Ruggiero's contract terminated on June
6 10th.  How far before June 10th do you
7 believe it was that you met with
8 Mr. Ruggiero at the BBQ?
9     A.   The BBQ was before the time he
10 didn't meet me.  It was before that time.
11    Q.   And you also met on the route,
12 didn't you?
13    A.   No.  He never came to the
14 route.
15    Q.   But at the BBQ you discussed
16 the purchase of the business, correct?
17    A.   Yes.
18    Q.   And Mr. Ruggiero gave you
19 information about the business in that
20 meeting, didn't he?
21    A.   Yes, he did.
22    Q.   And you don't know when it was,
23 but you know it was before he was gone from
24 the business, correct?
25    A.   Uh-huh.

55 (Pages 520 - 523)

Veritext Legal Solutions
800-567-8658                                              973-410-4098

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 57 of 119 PageID #: 1540

Page 524

Shawn Ponds

1
2    Q.    And you spoke -- was that a
3  yes?
4    A.    Yes.
5    Q.    You spoke to Mike Scherer about
6  the sale of Mr. Ruggiero's business to you
7  before he was terminated, correct?
8    A.    I spoke to Mike Scherer way
9  before he was terminated to do the overlap.
10  That's when we had a meeting with
11  everybody.  Not just me, everybody.  And
12  this was said in the meeting.  You guys
13  need to get with the guy that's in your
14  area because overlap is coming.
15    Q.    So FedEx was promoting overlap;
16  is that right?
17    A.    Yes.
18    Q.    And when approximately was that
19  meeting, bearing in mind that the last day
20  of J & J was June 10th?
21    A.    That was before then.  Way
22  before then.
23    Q.    Was it 2022?  2021?
24    A.    Probably early 2022, but it was
25  way before.  That's how we knew we had to

Page 525

Shawn Ponds

1
2  get in contact with people because they're
3  doing overlap.
4    Q.    And FedEx wanted there to be
5  overlap among the ZIP codes, right?
6    A.    Yes.
7    Q.    So FedEx would prefer if
8  Mr. Ruggiero were selling his business, for
9  you to buy or you to take it, either one,
10  because you could do both ground and home,
11  correct?
12    A.    They would prefer, but we have
13  to come up with an agreement.  They can't
14  tell us what to do.  We have to come up
15  with an agreement.
16    Q.    So didn't Mike Scherer call you
17  up and say how's the sale going?
18    A.    Yes.  He called me and asked me
19  what's going on.
20    Q.    What did you say to him?
21    A.    I said right now, it's nothing.
22  We still -- one thing I told him, I said,
23  we still talking.  And one of the things
24  that I didn't like, I told Mike Scherer is
25  that he's sending me stuff that's not

Page 526

Shawn Ponds

1
2  accurate.
3    Q.    Joe's sending stuff that's not
4  accurate?
5    A.    Yeah, Joe.
6    Q.    Got it.  And I know you said
7  you didn't know that you were being
8  recorded, but did you come to learn that
9  there was a recorded conversation between
10  you and Joe?
11    A.    No.
12    Q.    Yeah?
13    A.    No.
14    Q.    You did not, okay.
15        Are you aware that in every
16  recorded conversation you said, quote, We
17  had a deal, but you didn't show up,
18  something like that?
19        MR. AYES:  Objection.
20    A.    What did you just say?
21    Q.    I'm saying, are you aware
22  during that conversation you said, We had a
23  deal, but you didn't show up?
24        ARBITRATOR:  He wasn't aware of
25    the recording.

Page 527

Shawn Ponds

1
2    Q.    No, no, no.  Are you aware that
3  in a conversation you said to Joe that we
4  had a deal, but you didn't show up?  Are
5  you aware you said that in a conversation?
6    A.    That could have been around the
7  time when he didn't show up.  So that could
8  have been the time where he didn't show up
9  in Yonkers.  It could have been around
10  there.
11    Q.    My focus --
12    A.    He didn't show up.
13    Q.    My focus is not on the second
14  part of that sentence, but the first.  We
15  had a deal, but you didn't show up.
16        Are you aware you said to Joe
17  in a recorded conversation, which
18  apparently you didn't know of at the time,
19  that you had a deal?
20    A.    If you don't show up, how do
21  you have a deal, sir?
22    Q.    My question is:  Do you
23  remember saying we had a deal?
24    A.    I am asking you a question.
25    Q.    You have to answer mine.

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 58 of 119 PageID
#: 1541

Page 528

Shawn Ponds

1
2    A.    Hello?
3    Q.    You have to answer mine.  My
4  question is very simple:  Is it, in fact,
5  true you said to Joe, We had a deal, but
6  you didn't show up.  Meaning that you had a
7  deal in place, but he didn't show up?
8    A.    I could have said that.  If you
9  don't show up, we don't have a deal.  I
10  can't have a deal, if you don't show up.
11    Q.    Well, you can have a deal and
12  have a subsequent meeting or a subsequent
13  telephone call, right?
14    A.    If you don't show up, that
15  means you don't want the deal.  It's your
16  business.
17    Q.    So if you could have said we
18  had a deal, what was the deal before he
19  didn't show up?
20    A.    What was what deal?
21    Q.    Sure.  You said we had a deal.
22  What was the deal?
23    A.    If you don't show up -- you
24  have to bring more paperwork.  He didn't
25  bring that.  As a matter of fact, he didn't

Page 529

Shawn Ponds

1
2  come, period.
3        So what do you want me to say
4  or what do you want me to do?  If you don't
5  show up, okay.  I'm just going to say, No
6  problem, sir.  You didn't show up, we still
7  have a deal.  That's not going to happen.
8  That's not how business works.
9    Q.    What does the word "deal" mean
10  to you?  A transaction?
11    A.    It means that someone agrees
12  upon something.
13        ARBITRATOR:  Mr. Roth, you can
14  move on.  I think he answered your
15  question.
16        MR. ROTH:  I am.  I am well on.
17    Q.    In fact, in that same
18  conversation you told Joe, did you not,
19  that you learned he was being terminated --
20  his contract, he was being terminated from
21  somebody other than Joe?
22    A.    No, I never told him that.
23    Q.    You didn't say that?
24    A.    I never told him that.
25    Q.    Okay.

Page 530

Shawn Ponds

1
2    A.    Not to my knowledge.
3    Q.    I'm not sure you're going to be
4  able to hear this or not, but we're going
5  to take a shot.
6    A.    Okay.
7        MR. AYES:  Can we identify?
8        MR. ROTH:  It's 11:28 on the
9  tape.
10        (Whereupon, an audio recording
11    was played at this time.)
12        (Whereupon, the audio recording
13    was stopped at this time.)
14    Q.    Did you hear that?  I didn't
15  know you had 30 days.  You didn't tell that
16  to me.  Did you hear that?
17    A.    Uh-huh.
18    Q.    You did or you didn't hear it?
19    A.    Yes, I heard that.
20    Q.    So when you said, I didn't know
21  you had 30 days, you didn't tell that to
22  me.  You meant, did you not, that you
23  learned that he had 30 days from somebody
24  other than Joe, correct?
25    A.    No, that's not what I meant.

Page 531

Shawn Ponds

1
2  Okay.  That's the whole conversation?
3    Q.    That's not the whole
4  conversation.  I am taking that one
5  sentence where you said, I didn't know you
6  had 30 days.  You didn't tell me that.
7    A.    Okay.  You have to go for the
8  whole conversation because the whole
9  conversation when it started was that I
10  only have a little bit of time.  And when I
11  respond to and say that, I didn't know you
12  had that much time.  That was the whole
13  conversation.
14    Q.    But you said, You didn't tell
15  me that.  Isn't that, in fact, true that
16  someone else --
17    A.    No, no, no, no.  That's not the
18  whole conversation.  You didn't tell me
19  that.  He told me that day.  He didn't
20  tell me that before.
21    Q.    Right.
22    A.    That's the whole conversation.
23    Q.    Let get my question.
24        What did you mean when you
25  said, You didn't tell me that?  Does that

57 (Pages 528 - 531)

Page 532

```
1              Shawn Ponds
2  mean someone else told you?
3     A.   No.
4     Q.   Let me move on.
5     A.   You don't have the whole
6  conversation taped.
7     Q.   I got your answer, I am moving
8  on.
9     A.   No problem.
10    Q.   Now, when did you say -- you
11 learned you took over the routes?
12    A.   It was a Saturday.
13    Q.   Saturday in June?
14    A.   Yes, it was a Saturday in June.
15    Q.   So let me just go to my
16 calendar and we'll see if we can figure
17 this out.  I am looking at June of 2022.
18 I'll represent to you June of 2022, June
19 10th is a Friday.
20         Did you take over the routes on
21 the 11th?
22    A.   Yes.
23    Q.   So the very next day?
24    A.   Uh-huh.
25    Q.   When did you sign an ISPA for
```

Page 533

```
1              Shawn Ponds
2  these routes?
3     A.   I didn't sign it.
4     Q.   So was there something that
5  contractually gives you these routes?
6     A.   No.  It was work that needed to
7  be done, and they asked me can I service
8  them.  I didn't sign a contract for them at
9  that time.  It was work that needed to be
10 done.  It was work that needed to be done.
11    Q.   Okay.  And so how did you learn
12 all of a sudden -- well, how many packages
13 do you currently deliver in 10027 ZIP code?
14    A.   How many do I deliver now or I
15 delivered then?
16    Q.   How many now?
17    A.   Say, like 9 to 1100.
18    Q.   Nine to 1100 a day?
19    A.   Yes, packages.
20    Q.   And was it the case that all of
21 a sudden on that Saturday -- withdrawn.
22         How many did you deliver back
23 then?
24    A.   Seven to 800.
25    Q.   And how many do you deliver,
```

Page 534

```
1              Shawn Ponds
2  other than your 10027?
3     A.   Huh?
4     Q.   How many packages -- I'm sorry.
5  You also do home delivery, correct?
6          I'm sorry, not home.  You have
7  ground delivery, correct?
8     A.   I have ground delivery, yes.
9     Q.   And that's 10027?
10    A.   Yes.
11    Q.   And other than what you've
12 picked up from the J & J business, how many
13 packages did you deliver a day?
14         MR. AYES:  Objection to
15    relevance.
16    A.   Eight to 900.
17         MR. AYES:  We're focused on
18    10027.  I don't see how it's relevant
19    for other ZIP codes or any other
20    service areas in this matter.
21         ARBITRATOR:  I don't think he
22    was asking about any other ZIP code.
23    I think he was asking about 10027
24    before and after.
25    Q.   I was asking -- I actually was
```

Page 535

```
1              Shawn Ponds
2  asking about all of -- and I'll explain
3  why.
4          My question was:  How big was
5  your business daily before you picked up
6  not 7 to 900 packages on the 11th?
7     A.   My business, I had two ZIP
8  codes.  126, 127, and 131.
9     Q.   How big was that business
10 before you picked up the 700, the 900 on
11 the 11th?
12    A.   No, no, no, no.  That's what I
13 was doing.  You just asked me what was I
14 doing.  I was doing 7 to 900 packages.
15 That's what I was doing.
16    Q.   I thought you said you picked
17 up 7 to 900 from 10027, correct?
18    A.   No, no, I didn't say that.  We
19 picked up probably, like, four to five in
20 the beginning.  We didn't pick up seven and
21 eight, because you gotta remember.  I had
22 127, 126, 131.
23    Q.   Okay.  So my question is:
24 You're saying overnight you were able to go
25 from 7 to 900 packages to 1300 to 1500
```

```
                                              Page 536
 1            Shawn Ponds
 2   packages?
 3      A.   With the helper.  And the way
 4   we went on our route is our trucks are not
 5   that full.  We have P 1200s.  We don't have
 6   small trucks like home delivery have.
 7   P 1200s are the bigger trucks, so we can
 8   actually fit more packages in our trucks.
 9      Q.   What happened to the drivers,
10   the drivers that were for J & J on the
11   10th?  Did they become your driver's on the
12   11th?
13      A.   I took a couple of helpers.
14   The drivers got spreaded out [sic].  They
15   went to different routes and different
16   things of that nature.
17      Q.   To your knowledge --
18      A.   I got a couple of his helpers.
19   I have one of his drivers that was
20   originally driving for me, he came back to
21   me.
22      Q.   So to your knowledge, the J & J
23   drivers and helpers landed at different
24   independent contractors.  They didn't all
25   go to you, but they landed somewhere?
```

```
                                              Page 537
 1            Shawn Ponds
 2      A.   They landed somewhere, yes.
 3      Q.   So is it fair to say that --
 4   let me ask you this:  We heard your tape
 5   recording.
 6            When did you come to learn --
 7   by the way, are you alone in the room?
 8      A.   Yes, I am by myself.
 9      Q.   You did come to learn before
10   Joe's termination that he was going to be
11   terminated, correct?
12      A.   I didn't.
13      Q.   You did not?
14      A.   I did what?
15      Q.   You did come to learn before
16   the termination of J & J, that it was going
17   to be terminated, correct?
18      A.   Probably a day -- a day of, a
19   day before.
20      Q.   Okay.  And by who?
21      A.   When I spoke to Joey on that
22   call right there, what day was that call?
23      Q.   Was that how you learned that
24   Joe or J & J was going to be terminated?
25      A.   Yes.  What day was that call?
```

```
                                              Page 538
 1            Shawn Ponds
 2      Q.   Okay.  You answered my
 3   question.
 4            If I could take a five-minute
 5   break.
 6            ARBITRATOR:  Sure.  Mr. Ponds,
 7      we're going to take a five-minute
 8      break, but we want you to stay on the
 9      phone for some additional questions.
10            THE WITNESS:  No problem.
11            ARBITRATOR:  Okay.  Thank you.
12            (Whereupon, a short break was
13      taken at this time.)
14      Q.   Mr. Ponds, can you hear me?
15      A.   Yes, sir.
16      Q.   How many years have you been
17   at -- an independent contractor for FedEx?
18      A.   17, 18 years.
19      Q.   So you know the different
20   reporting -- the different reporting for
21   FedEx settlement reports and different
22   reports, correct?
23      A.   Yes.
24      Q.   When you met with Mr. Ruggiero
25   at BBQ, didn't he bring with him settlement
```

```
                                              Page 539
 1            Shawn Ponds
 2   reports?
 3      A.   No.
 4      Q.   You don't remember going
 5   through with him settlement reports?
 6      A.   When I met with him, four
 7   weeks.
 8      Q.   What about four weeks?  I don't
 9   understand that?
10      A.   He brought four weeks' worth of
11   paperwork, settlements.
12      Q.   Let me see if I understand.
13   So, he did bring a document with him to
14   BBQ, correct?
15      A.   Yeah.  No, he had it -- he
16   texted it to me, four weeks' worth of
17   settlements.
18      Q.   Okay.  So he gave you four
19   weeks' worth of settlements reports just
20   for 10027, correct?
21      A.   Yes.
22      Q.   And what were the four weeks
23   that he sent?  Do you know what four weeks
24   that was?
25      A.   No, it was such a long time.  I
```

59 (Pages 536 - 539)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 61 of 119 PageID #: 1544

Page 540

Shawn Ponds

1
2 don't know what weeks it was.
3    Q.   But he gave you a sample of one
4 month of 10027, correct?
5    A.   Yes, sir.
6    Q.   So that was -- isn't that --
7 the fact that he delivered it, be it one
8 week or four weeks, isn't that not what
9 your affidavit says; that he didn't give
10 you any of the relevant information?
11    A.   No.  He didn't give me a year's
12 worth of work.  That's relevant.  You can't
13 give me four -- all right.  This is how
14 it's going to go.
15        If you give me a year's worth
16 of work, I could see what you made.  You
17 can't give me four weeks of work in the
18 summertime where it's slow.  I can't do
19 that.
20    Q.   In fact, isn't that a
21 conservative four weeks if it's slow,
22 right?
23    A.   It's slow.  I mean, everything
24 is slow.  I can't take on something if I
25 don't know actually what's going on.

Page 541

Shawn Ponds

1
2 Remember, I have my own and you have guys
3 that he want me to take over.  If I am not
4 making it, I can't do it.
5    Q.   I got it.  But my question is
6 very simple.  Isn't it, in fact, true that
7 the statement you have in your affidvit
8 that Mr. Ruggiero provided me with
9 documentation, however, it was not for the
10 service area he was currently selling,
11 that's false, isn't it?
12    A.   No.  That's not false.
13    Q.   Didn't he give you four weeks
14 for this --
15    A.   He gave me a 1099.  He gave me
16 two sets of documents.  1099, which didn't
17 reflect what he gave me with the four
18 months.  He gave me a 1099.
19    Q.   Four months or four weeks?
20    A.   1099.
21    Q.   Didn't he give you four months?
22    A.   Huh?
23    Q.   I'll move on.
24        Do you agree, do you not, that
25 whatever he gave you at BBQ was for the

Page 542

Shawn Ponds

1
2 service area he was currently selling,
3 correct?
4    A.   Yes.
5    Q.   Now, you went to the terminal
6 and met all of his employees, correct?
7    A.   Yes.
8    Q.   And you also saw how his
9 operation ran, correct?
10    A.   Yes.
11    Q.   And you also met his BCs,
12 correct?
13    A.   Yes.
14    Q.   Okay.  This was all before --
15 well, this was all in contemplation of
16 buying the business, correct?
17    A.   Yeah, it was all together.
18    Q.   Okay.  Do I understand that
19 your terminal is Brooklyn?
20    A.   Yes.
21    Q.   And J & J was Yonkers?
22    A.   Yes, sir.
23    Q.   Do you know how long it takes
24 to actually -- withdrawn.
25        So is it the case that on June

Page 543

Shawn Ponds

1
2 11th, all the boxes went from -- went to
3 the Brooklyn station, not the Yonkers
4 station?
5    A.   I can't answer that question.
6 I don't know what was in Yonkers and what
7 not was in Yonkers.  But I can say 127 is
8 my area that I do.  There was other people
9 in there working, so I don't know.
10    Q.   But you agree with me, do you
11 not, if a contingency plan was set up for
12 10027 for home delivery, that would have
13 been necessarily through the Yonkers
14 terminal, correct?
15    A.   Yes.
16    Q.   And yet somehow they all ended
17 up going to Brooklyn the next day?
18    A.   I can't say all of it went to
19 there, sir.  I can't say.  I can't.
20    Q.   But you wouldn't be the
21 contingency plan for the J & J -- you
22 couldn't be the contingency -- your video,
23 there you go -- you couldn't be a
24 contingency plan for J & J if you weren't
25 in the Yonkers branch, correct?

60 (Pages 540 - 543)

Page 544

1          Shawn Ponds
2      A.   I don't know what their
3  contingency plans is up there.  I can't
4  answer that.  I don't know.
5      Q.   Did you come to conclude that
6  somehow FedEx put into effect the transfer
7  of the 10027 home delivery boxes from
8  Yonkers to Brooklyn before June 10th so
9  they -- before June 11th so they can all go
10  there on June 11th?
11      A.   I don't know their contingency
12  plan.  That's something you have to ask
13  FedEx in Yonkers or Mike Scherer.  I don't
14  know.
15      Q.   I guess my question is this:
16  You concluded, did you not, that because
17  all the boxes overnight went, instead of
18  Yonkers to Brooklyn, that something -- I
19  know you don't know how it was done -- but
20  you concluded that FedEx started this
21  process prior to June 11th, correct?
22      A.   They didn't come to me prior to
23  June 11th, so I don't know what they did.
24  I don't know what they did.  They didn't
25  come to me prior to June 11th.

Page 545

1          Shawn Ponds
2      Q.   But they came to you on June
3  11th, correct?
4      A.   I don't know if all.  I know I
5  got some work, yes, sir.
6          MR. ROTH:  Okay.  I have no
7      further questions.  Thank you.
8          Actually, one more question.
9          THE WITNESS:  Okay.
10      Q.   While you were willing to pay
11  for the business in late May, early June
12  2022, correct?  For the J & J business,
13  correct?
14      A.   Yes.
15      Q.   And on June 10th you ended up
16  getting it for free, correct?
17      A.   Your client did not show up.
18      Q.   That's not my question.
19          Mr. Ponds, you can avoid it.
20  Let me try again.  Mr. Ponds, you got it
21  for free, didn't you?
22      A.   We had a deal until he didn't
23  show up.  He didn't show up.
24      Q.   We had a deal.
25          MR. ROTH:  I have no further

Page 546

1          Shawn Ponds
2  questions.
3          THE WITNESS:  He didn't show
4  up.
5          MR. ROTH:  Thank you.  I have
6  no further questions.  We had a deal.
7          MR. AYES:  No further
8  questions.
9          ARBITRATOR:  I was going to try
10  and clarify that whole business with
11  production.
12          Mr. Ponds?
13          THE WITNESS:  Hold on one
14  second, I can't hear you.  Hold on
15  one second.
16          I can hear you now a little
17  bit.
18          ARBITRATOR:  Can you hear me
19  now?
20          THE WITNESS:  Yeah, I hear you.
21          ARBITRATOR:  I just want to
22  clarify my understanding.  Prior to
23  your discussions about the purchase
24  of 10027 home delivery --
25          THE WITNESS:  Yes.

Page 547

1          Shawn Ponds
2          ARBITRATOR:  -- from
3  Mr. Ruggiero.
4          THE WITNESS:  Yes.
5          ARBITRATOR:  You had 10027
6  ground.
7          THE WITNESS:  Yes.
8          ARBITRATOR:  And you made a
9  statement about your volume of
10  delivery.
11          THE WITNESS:  Yes.
12          ARBITRATOR:  And the number I
13  recorded was some 9 to 1100 packages
14  a day.
15          THE WITNESS:  Yes.
16          ARBITRATOR:  That's correct for
17  ground.
18          THE WITNESS:  Uh-huh.
19          ARBITRATOR:  Okay.  Then
20  subsequent to that, you made some
21  statement about 7 to 800 a day.  Was
22  that additional home?
23          THE WITNESS:  No, it wasn't.
24  No, it wasn't additional.  We
25  received, say, 3 to 400 packages.  So

61 (Pages 544 - 547)

Page 548

Shawn Ponds

1     Shawn Ponds
2  I'm quite sure we didn't get
3  everything.
4     ARBITRATOR:  Let me just
5  reiterate what you just said to me.
6  So you did 9 to 1100 packages a day
7  ground and because of this overlap
8  initiative of FedEx, you gained 3 to
9  400 packages a day for home delivery?
10     THE WITNESS:  Uh-huh.
11     ARBITRATOR:  That's correct?
12     THE WITNESS:  Something like
13  that, yes.
14     ARBITRATOR:  And we're only
15  limiting our conversation to 10027
16  ZIP code.
17     THE WITNESS:  Okay.
18     ARBITRATOR:  And when was that?
19  When did you -- was that June 11th
20  that you started getting --
21     THE WITNESS:  We didn't get all
22  of that.  June 11th, we didn't get --
23  I will have to go back and see what
24  did we actually get.  Because
25  remember, like I said, I had a bunch

Page 549

1     Shawn Ponds
2  of stuff, also.
3     So I can try to go back and
4  see, but I don't know.  I can't -- we
5  cannot have taken 5 to 600 packages
6  the very next day.  So that couldn't
7  work, because I have also other ZIP
8  codes.  So that could -- I couldn't
9  take 5 to 600 the very next day.
10     ARBITRATOR:  So it wasn't 5 to
11  600 that you said earlier.  You said
12  3 to 400.
13     THE WITNESS:  Yes, something
14  like that.
15     ARBITRATOR:  Yes, you could?
16  Or yes, no?
17     THE WITNESS:  I could take 3 to
18  4, but I couldn't take -- I could
19  take 3 to 4, yes.
20     ARBITRATOR:  Home delivery?
21     THE WITNESS:  Yes.
22     ARBITRATOR:  The next day?
23     THE WITNESS:  I could have
24  taken that, yes.
25     ARBITRATOR:  In addition,

Page 550

1     Shawn Ponds
2  then -- okay, so here we are.  We
3  are -- prior to June 11th, we are
4  doing 9 to 1100 ground packages a
5  day.  And then June 11th and
6  thereafter, we add 3 to 400 home
7  delivery a day.  Correct?
8     THE WITNESS:  Yes.
9     ARBITRATOR:  And then that's in
10  addition to 10026 and 10031?
11     THE WITNESS:  The thing on
12  Saturday and Sunday, we don't work.
13     ARBITRATOR:  What does that
14  have to do with my question that you
15  don't work on Saturday and Sunday?
16     THE WITNESS:  Home delivery
17  doesn't work -- I mean, ground
18  doesn't work on Saturday and Sunday.
19  So home delivery, it just goes out on
20  Saturday and Sunday.  So there's
21  nothing that we take out on Saturday
22  and Sunday.
23     ARBITRATOR:  You're trying to
24  say, then, that yes, you took on home
25  delivery the next day, but you had

Page 551

1     Shawn Ponds
2  the capacity to do that because
3  ground doesn't work on Saturday and
4  Sunday?
5     THE WITNESS:  Yes, ground
6  doesn't work on Saturday and Sunday.
7     ARBITRATOR:  Okay.  So I got
8  that.  Ground doesn't work on
9  Saturday and Sunday, freeing up
10  capacity for home.
11     THE WITNESS:  Yes.
12     ARBITRATOR:  And not
13  interfering with 10026 and 1031,
14  which are all ground.
15     THE WITNESS:  Yes, ma'am.
16     ARBITRATOR:  We have a clear
17  picture.  Thank you.  That's all I
18  had.
19     MR. AYES:  Thank you, Sean.
20     MR. ROTH:  Thank you,
21  Mr. Ponds.
22     MR. AYES:  Just one
23  housekeeping for the record.  We
24  just -- Joint Exhibit 41 is now
25  marked as the affidavit of Shawn

62 (Pages 548 - 551)

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 64 of 119 PageID #: 1547

Page 552

Shawn Ponds

1
2      Ponds, just for recordkeeping.
3              MR. ROTH:  I don't object to
4      it.
5              (Whereupon, the proceedings
6      concluded at 4:45 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 553

1          Arbitration Proceeding
2          C E R T I F I C A T E
3
4  STATE OF NEW YORK      )
                          :
5  COUNTY OF RICHMOND     )
6
7      I, MARINA DUBSON, a Notary Public
8  within and for the State of New York, do
9  hereby certify that the within Proceeding
10 was held before me on the 25TH DAY of JULY,
11 2023.
12
13     IN WITNESS WHEREOF, I have hereunto
14 set my hand this 25th day of July 2023.
15
16

_____
17          MARINA DUBSON
18
19
20
21
22
23
24
25

63 (Pages 552 - 553)

**[& - 12th]**

**&**

**&** 308:11 311:3
314:15,16,21
321:23 327:19
327:22 328:11
333:2 334:16
334:23 335:3,8
335:9 338:2,6
338:19 340:13
340:24 342:3
353:2,3,7
356:24 360:5
370:12,17
373:6,7 375:15
375:16,18,21
375:22 377:10
378:19 381:9
382:16,18
383:11 384:2
384:17,19
385:6 389:6
405:5,11
410:11,13,16
411:15,19,23
414:16,25
416:14,21
417:20 418:23
419:3,5,23
420:8 423:20
424:10 427:15
427:17,21,24
431:4,22 432:8
432:24 433:10
433:14 434:15
434:20 435:14

437:7 438:11
438:21,24
440:24 441:6
443:25 445:6
445:15 446:2
446:17 449:23
450:15,16
452:11,15
457:3,8 458:8
460:2,12,20
461:13,17,19
461:21,25
462:4 463:20
465:20 490:16
496:4 516:24
517:18,24
520:24 524:20
534:12 536:10
536:22 537:16
537:24 542:21
543:21,24
545:12

**0**

**002122** 510:3
**01-22-0004-...**
311:7
**05** 326:19,22
**08** 326:22,25
327:5

**1**

**1** 352:25 353:7
**1.5** 475:5
**1.88** 317:8
339:21 474:10

474:11,12,25
475:20
**1.88.** 475:8
**10** 428:14,16
430:7 436:17
**100** 414:20
464:14
**10005** 308:13
**1000s** 416:12
**10017** 308:7
**10026** 550:10
551:13
**10027** 446:17
508:3 511:3
519:17 520:13
533:13 534:2,9
534:18,23
535:17 539:20
540:4 543:12
544:7 546:24
547:5 548:15
**10031** 550:10
**10035** 367:20
446:17 520:13
520:24
**10036** 307:18
**1031** 551:13
**107** 412:5
**1099** 488:19,22
515:23,23,24
516:2 520:12
520:14,16
521:8 541:15
541:16,18,20

**1099s** 474:16
488:24
**10:00** 379:12
**10:45** 348:2
**10th** 460:6,12
460:14,19,22
481:7 500:6,9
500:20 516:22
522:23 523:6,6
524:20 532:19
536:11 544:8
545:15
**1100** 533:17,18
547:13 548:6
550:4
**11:00** 382:7
**11:28** 530:8
**11th** 522:24
532:21 535:6
535:11 536:12
543:2 544:9,10
544:21,23,25
545:3 548:19
548:22 550:3,5
**1200s** 416:12
536:5,7
**125th** 447:13
447:14 476:19
**126** 535:8,22
**127** 535:8,22
543:7
**127th** 367:21
**12:00** 357:12
**12th** 396:12
404:20

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 66 of 119 PageID #: 1549

| | | | |
|---|---|---|---|
| **13**  327:24 | **2001**  312:19 | **2021**  329:17 | **26**  387:11 |
| **1300**  535:25 | 522:9 | 364:19 366:25 | 409:18 |
| **131**  535:8,22 | **2002**  375:23 | 367:2 376:12 | **27**  322:15,17,18 |
| **14**  428:19,21 | **2005**  312:20 | 376:14,23 | 322:19,19,24 |
| 430:7 | **2007**  349:25 | 390:4,5 432:5 | 369:6,8 389:19 |
| **15**  409:4 | 350:2 | 432:9,22 521:2 | 389:22 508:3 |
| **1500**  373:23 | **2008**  468:22,24 | 521:8,12,16,22 | 516:4,6,8,10,14 |
| 535:25 | 469:14 | 524:23 | 516:17,21 |
| **152610765302** | **2012**  313:8 | **2022**  319:20 | 520:20,22 |
| 402:18,24 | 314:7 326:25 | 352:17 364:25 | 521:14 522:11 |
| **16**  350:15 | 327:6,10 350:5 | 364:25 375:25 | **27th**  367:22 |
| 417:24 | 350:15 | 377:5 391:6,18 | 369:2 386:24 |
| **17**  538:18 | **2016**  327:11 | 391:25 433:11 | **28**  322:15,25 |
| **17th**  376:12,14 | 350:14,18,19 | 460:6 471:11 | 323:3,4 352:24 |
| 376:22 | 375:12,13 | 481:7 512:9 | **28-1**  343:4 |
| **18**  327:14 | 383:11 | 520:21,25 | **295**  308:7 |
| 405:6 538:18 | **2017**  313:9 | 522:19 524:23 | **29593**  553:16 |
| **18th**  308:13 | 327:8 351:10 | 524:24 532:17 | |
| **1991**  468:13 | 375:18,22 | 532:18 545:12 | **3** |
| **1995**  468:15 | 383:11 | **2023**  307:11 | |
| **19th**  397:14 | **2018**  327:18 | 553:11,14 | **3**  323:4 547:25 |
| 404:25 | 329:7 331:2 | **21**  318:16,18 | 548:8 549:12 |
| **1:00**  354:14 | 383:13,15 | 405:17 433:3 | 549:17,19 |
| 357:13 382:7 | **2019**  314:17 | 434:2 444:21 | 550:6 |
| | 383:15 | 450:22 489:3 | **3,000**  453:16 |
| **2** | **2020**  313:10 | **212**  308:8 | **30**  530:15,21,23 |
| | 314:10,13 | **22**  375:24 | 531:6 |
| **2**  307:15 | 390:5 392:16 | 433:21 444:21 | **300**  361:10 |
| 375:24 | 393:21 396:13 | 473:15 489:2,3 | 517:13 |
| **2,000**  373:23 | 397:14 400:13 | **22nd**  308:7 | **300,000**  368:18 |
| **2.5**  475:9 | 402:14 403:6 | **25**  503:2,8 | **3102**  411:25 |
| **20**  327:14 | 403:14 404:5 | 505:3 | 412:2,7 |
| 373:25,25 | 404:21 405:2 | **25th**  307:11 | **311**  309:4 |
| 405:17 433:3 | 405:10 433:21 | 553:10,14 | **312**  309:5 |
| 434:2 444:21 | | | **326**  309:6 |
| 450:21 | | | **346**  309:7 |

**347-517-8720**
323:13
**349** 309:9,10
**35** 369:4,6
389:19,22
516:4,6,20
520:20,21,22
521:14,15,21
521:23
**361** 309:20
**37** 309:12
400:20,22
401:24 402:4
402:12
**375** 309:11
**38** 309:13
401:2,5,24
**39** 309:13
401:8,10,24
**3:00** 357:13

**4**

**4** 513:11
515:20 520:4
549:18,19
**4/7/22** 323:5
**40** 308:13
309:13 335:21
367:20 389:18
401:15,18,25
443:20,20
**400** 309:12
361:10 547:25
548:9 549:12
550:6

**401** 309:13
**402** 309:14
**407** 309:16,18
**41** 551:24
**42** 443:20,21
449:21 465:16
465:17,20
**43** 443:21
449:21
**430** 309:19
**459** 394:13
401:2
**460** 396:7
401:8
**461** 392:14
400:19
**464** 309:21
397:11,13
401:14
**467** 310:5,6
**487** 310:7
**4:45** 552:6

**5**

**5** 549:5,9,10
**50** 437:3,3
465:6,7
**50/50** 437:2
443:18
**500** 386:22
**500,00** 368:17
**500,000** 390:10
**503** 310:8
**504** 310:9
**506** 310:11

**507** 310:12
**51** 333:12
**519** 310:13
**542-8882** 308:8
**546** 310:14
**5:00** 358:23

**6**

**60** 381:16
**600** 549:5,9,11
**6:00** 379:12
**6:30** 354:13
358:24

**7**

**7** 307:18 535:6
535:14,17,25
547:21
**70** 380:17
381:17 428:23
428:25 430:8
**700** 535:10
**7th** 392:15
402:14 403:6
404:5

**8**

**80** 435:11,12
436:12,13
443:19 465:4
**800** 339:4
452:21,21
533:24 547:21
**85** 435:11,12
436:13,14
443:19 465:4

**85s** 399:21

**9**

**9** 533:17
547:13 548:6
550:4
**900** 534:16
535:6,10,14,17
535:25
**95** 468:13
**9900** 372:2,3,4
372:4
**9:30** 307:12
**9th** 403:14,16

**a**

**a.m.** 307:12
379:12
**aaa** 307:5
**abide** 331:17
**ability** 361:7
**able** 324:21
326:5 362:8
378:7 379:17
417:8 422:7
426:25 437:7
439:15 462:22
462:24,25
497:20 498:14
530:4 535:24
**above** 307:16
396:12 430:6
**acceptable**
492:24
**accurate** 415:3
415:5,6 510:24

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 68 of 119 PageID #: 1551

[accurate - answer]

520:10,11
526:2,4
**acknowledged**
338:8
**acquainted**
410:16
**acquiring**
519:3
**acronym**
427:10
**actual** 338:23
339:16 500:16
**actually** 312:21
313:13 315:23
316:21 320:19
354:7 357:4
359:2 412:6
440:25 448:2
474:19 492:17
520:24 534:25
536:8 540:25
542:24 545:8
548:24
**add** 474:8
475:7,10 550:6
**addition**
549:25 550:10
**additional**
336:20 519:7
519:12 538:9
547:22,24
**address** 385:15
**addresses**
371:24

**adjoined** 435:5
**adjust** 334:5,14
385:5
**adjusting**
332:24 334:7
**admissions**
313:17 314:7
326:23 327:12
327:16
**admitted**
514:19
**admonition**
311:8
**adp** 314:25
**advance** 479:19
**advantage**
315:7 380:14
**advise** 344:24
383:5
**advises** 383:21
383:24
**advisor** 337:13
**affect** 361:6
**affected** 361:8
**affidavit** 509:3
509:8,17,19
510:9,19,23
513:10,25
514:5,7,8,15,19
515:3,6,8,12
520:5 540:9
541:7 551:25
**afternoon**
382:4 487:15

**agenda** 331:17
**agent** 350:13
350:15
**aggravated**
483:3
**aggravation**
498:15
**aggressive**
471:20 473:4
**ago** 472:8
**agree** 334:16
379:10 382:15
383:21 384:11
419:20,21
424:20 443:24
475:20 494:21
494:24 495:4
541:24 543:10
**agreed** 475:2,3
477:7 479:17
**agreement**
368:13 429:22
429:23,25
430:3,10
463:23 474:7
511:2 516:23
517:19,24
525:13,15
**agrees** 529:11
**ahead** 371:23
380:2 451:6
457:14 482:14
498:18
**ahold** 477:20

**air** 313:25
**airbnbs** 501:18
**airport** 350:12
350:16 439:25
**alive** 486:3,13
486:13 499:20
**allow** 379:16
**allowed** 335:22
428:21 437:13
448:11,12
**alternative**
381:8
**amazon** 472:22
474:22 475:17
478:5 493:21
494:12
**american** 307:1
311:5 504:6
**amount** 334:13
335:20 340:3,4
340:7,9 379:7
484:9,10
**analogy** 439:23
**andrew** 419:12
419:18 447:19
447:21
**angel** 368:21
368:24 369:3
405:21
**anne** 308:18
**answer** 333:16
333:21 344:8
344:10,17
365:2,4 374:14
374:16,18

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM
NYSCEF DOC. NO. 7

INDEX NO. 650428/2024
RECEIVED NYSCEF: 01/26/2024

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 69 of 119 PageID
#: 1552

[answer - arrived]                                                          Page 5

377:6 436:5
478:21 492:24
504:11 514:24
521:4 527:25
528:3 532:7
543:5 544:4

**answered**
332:5 344:16
380:22 396:17
529:14 538:2

**answering**
480:12,13

**answers**  514:4

**anticipate**
477:7

**anticipated**
503:17

**anticipation**
460:22

**anymore**
425:22

**ao**  345:11
400:12 413:13
421:6 425:21
425:25 429:12
430:15 454:6
463:11 464:12
464:14,16
493:19 494:9
494:14 501:4
507:19

**aos**  424:24
425:23 454:4
455:25

**apologize**
413:22 457:13

**apparently**
527:18

**appearing**
309:17

**appears**  330:22
331:2

**applied**  350:19

**apply**  326:18
362:4 399:6

**appointment**
480:17,19

**approval**  319:7

**approve**  365:16

**approximate**
417:22 436:20

**approximately**
319:17 327:5
327:20,21
364:17,24
373:17 409:4
417:12,24
418:7 432:4
433:15 435:13
437:11 443:20
465:5,14
468:11 471:9
473:8 513:2
524:18

**approximation**
436:18

**april**  319:19
522:19

**arbitration**
307:1,2,15
311:6 414:25
421:18 483:22
483:22 484:2,8
485:12 508:22
553:1

**arbitrator**
307:22 308:3
309:7 310:14
311:2,16,22
322:11,16
341:4,11
343:15 346:2
346:20 347:9
347:15,18,25
349:2,8 374:23
377:7 380:24
381:6 382:14
390:22 394:17
401:16 402:20
407:7,11,17
408:6 423:17
432:19 437:23
438:15 462:25
467:2,14
480:21 483:11
483:15 504:25
506:2,4,15,20
506:25 507:9
507:22 513:21
514:21 515:4
515:17 521:4,7
526:24 529:13
534:21 538:6

**arbitration**
538:11 546:9
546:18,21
547:2,5,8,12,16
547:19 548:4
548:11,14,18
549:10,15,20
549:22,25
550:9,13,23
551:7,12,16

**arbitrator's**
514:16

**area**  413:25
414:2,3 421:21
423:20 447:5
458:10 498:22
499:4 507:25
508:12,20
511:7 512:23
513:15 517:5
517:17 518:13
519:3,17 520:8
522:3,6,7
524:14 541:10
542:2 543:8

**areas**  329:3
408:25 413:12
413:24 418:2
445:20,23
447:12 457:16
493:9 534:20

**arrive**  413:5

**arrived**  410:17
412:16,20
431:23

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 70 of 119 PageID #: 1553

[articles - back]

**articles** 342:24
495:23
**aside** 414:10
**asked** 332:5
341:25 344:16
346:5 369:3
380:19 389:23
425:9 438:7
456:6,11 457:2
461:5 463:18
464:10 497:21
503:11,15,17
509:3 525:18
533:7 535:13
**asking** 380:20
436:21 438:2,4
438:17 445:24
471:19 473:4
484:11 497:18
527:24 534:22
534:23,25
535:2
**assessment**
315:10
**assign** 389:6
**assigned**
464:13,15,18
**assignment**
342:4 346:6
500:5
**assistance**
441:2
**assistant**
361:13

**associate**
314:12
**associated**
391:22
**association**
307:1 311:6
376:18
**attempt** 389:6
391:5
**attempts** 325:7
325:10
**attention** 449:5
449:8 499:2
**attorney**
400:24 401:6
401:12,20
485:17
**attorneys** 308:6
308:11 481:13
488:2
**attractive**
475:24 476:5
**audio** 530:10
530:12
**august** 375:12
405:10
**authorized**
424:24
**available**
417:15 430:16
449:16,19,24
471:23 486:20
500:14
**avenue** 308:7
341:10 372:2

**average** 327:25
373:21,22
**avoid** 545:19
**aware** 377:17
378:5 379:6
384:3 393:7
405:9 423:19
426:5 435:15
435:17,19
437:14,16,17
437:20,22
438:2,4,8,9,10
440:24 445:5
445:14,25
448:5,10,15,20
448:23 451:19
451:23 452:2,3
452:5 456:19
459:25 460:9
460:18,23
462:11,13
463:7 500:4
508:21 512:16
526:15,21,24
527:2,5,16
**ayes** 308:15
309:18,20
310:12 322:19
407:2,6,24
430:18 431:18
432:10,15
437:21,25
443:3 461:3
464:22 466:2
506:22,24

507:2,4,24
509:16 510:2
514:12 515:15
519:19 523:2
526:19 530:7
534:14,17
546:7 551:19
551:22

**b**

**b** 307:3 308:6
**bachelor's**
312:11 313:15
409:14
**back** 314:5
320:8,15
322:22,24
324:7 329:7,16
331:2 333:14
333:23 334:18
339:11 347:23
352:12,13,14
356:13 357:12
357:12,13
358:19,21,23
358:23 362:23
362:24 363:2
363:13 365:22
365:22,23
366:16,17
367:16 370:22
372:19 373:25
374:9,10,23
377:9 384:22
388:14 390:4
390:20 391:6,8

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM INDEX NO. 650428/2024
NYSCEF DOC. NO. 57 RECEIVED NYSCEF: 01/26/2024

395:15 396:2
398:8 399:4,17
400:6 420:8
434:15 452:4
474:9,10 475:7
475:11 476:20
479:10 483:20
484:10,18
486:22,23
487:7,8 515:20
533:22 536:20
548:23 549:3
**background**
312:10 315:8
349:20,21,24
409:9 467:25
496:25
**backup** 321:14
**bad** 341:25
361:8 403:4
**balance** 410:24
411:2 413:18
474:3,15
488:18 489:19
489:22 490:4
**bank** 337:20
**barbecue**
522:14,15
**barcode** 426:13
**barn** 481:4
**base** 427:12
**based** 339:5
344:12 409:6
461:5

**basically**
328:10 355:24
363:21,25
369:10 483:7
485:3 515:5,10
**basis** 357:4
360:13 372:17
386:14 434:22
448:17 453:11
**bates** 400:19,25
401:7,14
**bathroom**
347:21
**bbq** 522:16,17
523:8,9,15
538:25 539:14
541:25
**bc** 321:20,25
322:4 323:16
323:23 336:7
338:17 343:11
343:25 344:3,4
344:13 351:5
352:16,24,25
353:7 358:10
361:7,13
373:16 377:11
380:15 382:24
383:2,3 393:6
393:7 394:9
395:3,21
396:16 419:9
419:10 421:6
429:12 430:15
454:6 463:11

**bcs** 315:17
321:22 324:5
329:21 336:24
345:4,7,18
419:10 422:6
425:22 542:11
**bearing** 524:19
**begging** 483:4
**beginning**
315:21 361:22
449:25 450:14
535:20
**behavior**
411:16
**believe** 314:17
323:20 333:5
370:12 374:2,3
388:13 394:4
417:25 431:7,8
433:2,12 450:9
475:12 480:22
484:22 492:2
492:20,22
523:7
**believed** 389:21
484:16
**belt** 414:20
**belts** 355:15,19
**benefit** 408:11
**bergen** 409:12
**best** 313:25
321:4 327:2
349:23 365:5,6
436:18 486:7

**better** 332:17
332:22 334:14
367:6,15
369:23 374:12
378:9 379:15
380:19 425:24
484:8
**big** 361:4,5
535:4,9
**bigger** 415:24
536:7
**bill** 491:15,22
492:6,9
**bit** 328:17,18
338:11 463:17
478:6 501:11
531:10 546:17
**blind** 480:25
**block** 459:14
**boat** 387:11,11
**book** 318:13
394:18
**bookkeeping**
314:3
**borrow** 427:2
**boss** 351:21
374:17
**bottom** 393:4
396:18 397:20
402:22
**bought** 324:11
350:23 405:6
**boundaries**
459:12

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 72 of 119 PageID #: 1555

**bove** 308:14
  309:6,11 310:7
  310:9 322:25
  326:11,14
  341:6 343:14
  344:7 345:22
  375:6 392:21
  394:16,19
  400:15 402:4
  403:9 406:4
  467:19 482:4
  487:14,16
  502:19 504:19
  504:22 505:3,6
**box** 387:11
  416:18 442:19
  455:9
**boxes** 381:22
  434:16 442:9
  442:23 444:24
  444:25 445:6
  445:15,17
  447:2,6,24
  448:2 452:16
  460:10 543:2
  544:7,17
**boyfriend**
  499:12
**branch** 543:25
**break** 341:18
  347:22 348:3
  366:5 374:21
  406:6 466:7
  500:24 505:8
  520:17 538:5,8

  538:12
**brief** 409:8
**briefly** 313:12
  349:19
**bring** 347:23
  356:2 374:9,10
  514:17 528:24
  528:25 538:25
  539:13
**brooklyn**
  358:20 460:11
  460:21 517:14
  542:19 543:3
  543:17 544:8
  544:18
**brother** 315:3
  315:22,24
  316:2,3,18
  317:3,16,17,19
  318:4 319:15
  321:4,5,8,10,13
  324:9 325:19
  326:4 328:17
  329:4 330:13
  331:21 336:16
  336:21,24
  337:21 339:15
  340:13,25
  341:23 342:8
  342:13
**brother's**
  314:18 325:7,9
  331:15
**brothers** 329:8
  489:16

**brought** 373:25
  440:22 443:11
  473:24 514:13
  539:10
**build** 484:20
**building**
  366:11,13,14
  371:20 385:15
  410:7 414:22
  415:11,13
  417:25 420:6
  435:5,7,8
  440:20 448:14
**buildings** 478:8
**bumpers** 416:8
**bunch** 387:8
  519:14 548:25
**burner** 481:4
**business**
  312:16 314:18
  316:5,19,21
  317:4 318:19
  319:2,7 320:18
  321:6 324:2,10
  324:16 325:8
  325:13 326:5,7
  328:19 329:20
  329:25 332:10
  337:18 338:4,5
  339:21 343:22
  344:12,23
  345:3 347:11
  351:5,12,17,19
  363:22 366:22
  369:17,19,20

  369:23 370:5
  373:6,7 383:22
  383:24 391:5
  392:6,15,17
  393:13 395:13
  395:14,16
  396:22 397:9
  397:24 398:2
  398:14,16,17
  398:20 399:8
  399:10,11
  400:21 401:3,9
  401:17 404:15
  404:20 405:6
  405:20 418:9
  418:12,15,21
  418:22 419:2,6
  419:19 420:20
  420:23,25
  422:24 423:3,6
  431:12 453:17
  453:19,23
  454:3,6,11,16
  454:19,22
  455:5,7,11
  463:9 468:4,10
  478:7 479:17
  488:9 489:25
  490:2,17 491:8
  496:16,23
  503:13,14
  511:10 513:8,9
  517:10 523:16
  523:19,24
  524:6 525:8

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 73 of 119 PageID #: 1556

[business - christopher]                                                      Page 9

528:16 529:8
534:12 535:5,7
535:9 542:16
545:11,12
546:10
**businesses**
503:23
**busted**  478:5
**buy**  324:15,21
325:12 329:16
329:19 337:17
339:21 340:13
340:24 341:15
386:2 391:5
525:9
**buyer**  320:2
482:17
**buyers**  478:18
**buying**  315:20
315:22 344:12
366:22 389:22
490:10 542:16
**buzz**  371:21

**c**

**c**  308:1 309:1
310:1 349:9
467:9,17 553:2
553:2
**cages**  445:16
448:3
**calculated**
315:2
**calendar**
532:16

**call**  320:20
334:4 352:9
387:19 391:8
391:17 399:21
409:23 412:7
414:20 415:19
480:12 481:24
482:19 483:10
484:7 512:5
525:16 528:13
537:22,22,25
**callahan**
308:11
**callahanfusc...**
308:14,15
**called**  312:3
349:10 376:18
391:6 403:7
407:19 410:5
413:21 458:9
467:10 481:11
481:11 506:11
525:18
**calls**  339:9,14
342:15,20
498:25 512:19
**camera**  387:15
**capacity**  411:5
411:8 551:2,10
**capital**  470:2
493:18 494:25
495:20,22
498:2 501:3
**capture**  426:12

**car**  478:25
482:11 483:25
486:22,24,25
487:3 500:21
502:7
**care**  397:5
**career**  469:8
**cart**  356:2
440:12,21
442:24 443:11
**carted**  422:2
**carts**  414:10
417:17 418:3
439:7 441:19
**case**  311:6
336:17 351:14
351:23 419:18
454:7 456:13
464:16 470:17
494:22 514:23
533:20 542:25
**cash**  385:22,24
495:16
**castle**  350:3,8
**catholic**  409:12
**cdelbove**
308:14
**center**  392:21
**certain**  325:19
332:9 334:3
335:20 371:21
379:6 381:19
383:20 411:7
413:14,14,15
415:20 416:3

424:9 434:11
434:12 446:7
**certificate**
314:12
**certify**  553:9
**chance**  352:7
504:15,15
**change**  332:19
359:6
**changed**  358:3
358:8
**changes**  332:9
339:2 483:19
504:3
**check**  315:9
377:10 399:4
485:14
**checking**  392:2
**checks**  386:8
**chiropractor**
489:17
**choice**  434:23
434:24
**chops**  478:5
**chris**  487:16
509:17
**christopher**
308:14 310:5
467:1,17 468:1
469:1 470:1
471:1 472:1
473:1 474:1
475:1 476:1
477:1 478:1
479:1 480:1

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 74 of 119 PageID #: 1557

[christopher - complaint]                                        Page 10

481:1 482:1
483:1 484:1
485:1 486:1
487:1 488:1
489:1 490:1
491:1 492:1
493:1 494:1
495:1 496:1
497:1 498:1
499:1 500:1
501:1 502:1
503:1 504:1
505:1
**circulate**
376:20
**circumstances**
462:19 464:6
**city** 335:18
**claimant** 307:4
308:6
**claimant's**
400:22 401:4
401:10
**claimed** 370:19
**clarify** 546:10
546:22
**clarity** 326:2
**clear** 318:24
342:22 389:4
484:24 551:16
**clearly** 487:5
**client** 545:17
**close** 504:15
**code** 399:21
405:23 445:15

446:6,8,9,11,14
447:4 460:21
508:4 533:13
534:22 548:16
**codes** 353:25
354:2 367:19
389:11,14
413:6,7 426:16
445:2,6 447:6
460:12 525:5
534:19 535:8
549:8
**coerce** 388:15
**college** 312:12
312:22 313:3
326:19,23
409:13 468:3,5
**columbia**
476:17,18
**columbus**
476:16
**come** 316:17
317:20 318:10
319:11 325:14
326:3 345:16
351:4 356:13
357:11,12,13
358:23 359:6
360:17 362:18
362:23,24
363:2,12
365:22 366:21
367:23 368:12
370:13,22
385:18 390:20

400:6 413:6
421:10,17
425:10 432:24
434:15 444:5,9
447:6 448:13
449:8 452:4
469:23 470:17
473:19 478:19
480:10 482:18
484:25 485:4
493:23 495:15
512:6 513:6
525:13,14
526:8 529:2
537:6,9,15
544:5,22,25
**comes** 374:4
428:17
**comfortable**
345:5 385:3
**coming** 334:8
346:19 368:5
372:11 385:10
408:10 410:6
446:5 451:24
469:2 477:12
524:14
**command**
351:16,20
**commercial**
469:9 478:8
**common**
472:15
**communicated**
341:21 342:5

**communication**
342:10,12
**communicati...**
341:22 468:4
**companies**
336:3 354:16
465:11 469:23
497:5 498:12
**company**
316:25 317:9
327:3 342:25
345:11,12,14
345:16 350:23
374:3 375:18
426:23 486:19
491:3 494:9
504:5,5 507:15
507:17,20,23
508:17
**company's**
398:6
**compared**
331:20
**complain**
356:23 384:12
448:25
**complained**
441:6 448:16
448:24
**complaining**
357:10 359:22
359:24
**complaint**
386:25 395:17
421:7 462:9,21

463:3

**complaints**
370:23 371:16
372:24 373:2,5
416:22

**complete** 313:2
365:24 413:16

**completed**
314:10 500:6
503:7

**completion**
314:13

**concerning**
516:14

**conclude** 544:5

**concluded**
544:16,20
552:6

**conditioning**
314:2

**condo** 477:4

**conducted**
392:6

**conference**
498:25

**confident**
471:21

**confirm** 491:9
495:8 501:2

**confusion**
360:19

**connected**
439:19 442:4

**connection**
367:18 371:14

371:15 408:2
509:2

**conrod** 309:9
347:20 349:1
349:16 350:1
351:1 352:1
353:1 354:1
355:1 356:1
357:1 358:1
359:1 360:1
361:1 362:1
363:1 364:1
365:1 366:1
367:1 368:1
369:1 370:1
371:1 372:1
373:1 374:1,25
375:1 376:1
377:1 378:1
379:1 380:1
381:1 382:1
383:1 384:1
385:1 386:1
387:1 388:1
389:1 390:1
391:1 392:1,17
393:1 394:1
395:1 396:1
397:1 398:1
399:1 400:1
401:1 402:1
403:1 404:1
405:1 406:1
419:14,15,18
435:15 448:15

448:23 449:11
449:13 450:14
450:16,22
454:9,12,15
455:3 461:7,12
461:15,18,25
462:3

**conservative**
540:21

**consider**
457:18

**consideration**
514:16

**consistent**
323:21

**constantly**
471:2

**cont'd** 309:23
310:2

**contact** 351:5
351:12,20
392:17 454:3
508:19 525:2

**contacts** 344:23
453:24

**contained**
495:7 510:5,9
510:23

**contemplation**
542:15

**contingency**
377:21 378:2,7
378:15 381:4,7
458:9 543:11
543:21,22,24

544:3,11

**continual**
428:16

**continue**
324:17 366:17

**continued**
312:13 313:3,9
313:16 314:6,9
327:15

**continuing**
328:20 422:24
423:6

**contract** 329:3
351:23 405:11
427:13 479:7
479:19 481:14
481:15 485:10
488:5,7,10,19
498:23 500:16
515:24 523:5
529:20 533:8

**contractor**
318:4 321:18
322:8 324:4
325:3 340:16
340:21 341:9
347:5 351:15
351:21 357:11
357:12 359:22
369:21 370:2
370:14 371:5,7
376:6,8 377:22
378:16 379:2
384:9,17,19
391:11 433:11

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM

NYSCEF DOC. NO. 7

INDEX NO. 650428/2024

RECEIVED NYSCEF: 01/26/2024

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 76 of 119 PageID #: 1559

[contractor - count]                                                                Page 12

433:14 446:5
453:10 456:10
456:16 464:6
477:15 479:16
507:13 519:16
538:17
**contractors**
316:14 318:6
320:22 328:15
334:25 354:16
354:20,24
355:12 356:21
359:10,24
360:9 366:15
370:18 371:11
374:8,10
377:19 381:9
384:25 397:3
414:13 417:19
418:13 421:22
422:8,14
424:23 453:7
453:23 454:4
455:22 456:2
456:23 465:12
465:19 477:13
483:11,12
486:18 536:24
**contracts** 470:6
**contractually**
533:5
**control** 413:16
464:12,14,17
**conversation**
324:22,24

369:5,25 370:5
390:2 393:22
393:23 394:2
395:10 396:2
456:7,14,17,20
499:23 512:8
518:14 526:9
526:16,22
527:3,5,17
529:18 531:2,4
531:8,9,13,18
531:22 532:6
548:15
**conversations**
325:15,20
385:9,16 425:3
425:5,8,16
471:14,15
473:9,17
512:11,13
**conveyer**
355:15,19
417:5,6 439:9
439:11,15,21
441:14
**cool** 367:13
392:19
**coordinator**
409:23
**copies** 397:6
**copy** 336:16
376:19 454:5
454:12 488:4,7
488:10

**corporate**
411:11,13
**corporation**
342:24
**correct** 318:23
319:21 321:2
323:7 324:11
326:21 327:6
327:13,16,17
327:20 329:17
330:5,23
332:11 335:5
336:9,17
340:14,25
341:15 342:11
343:6,7,19,20
343:23 344:3
345:10 373:18
378:7 379:4,8
382:16 384:6
389:7 390:10
392:7 393:23
394:11 403:7
403:23 404:2,6
405:7 423:2,7
423:8 424:13
424:16 433:11
436:10,11
439:5,15
440:18 442:11
442:20 443:7
443:15,22
444:6,7,9,16,18
444:19 451:15
451:16 452:8,9

453:25 454:13
454:14,17
455:18,19
459:3,4 460:3
461:22,23
464:21 465:4,8
465:13 489:16
492:19,21
494:22 495:9
502:13,16
509:14 520:13
522:7,24
523:16,24
524:7 525:11
530:24 534:5,7
535:17 537:11
537:17 538:22
539:14,20
540:4 542:3,6
542:9,12,16
543:14,25
544:21 545:3
545:12,13,16
547:16 548:11
550:7
**correctly** 363:5
**correlated**
331:22
**corroborated**
515:3
**cosign** 393:18
**counsel** 308:18
503:12
**count** 382:7
387:25

[county - dead]

Page 13

county  553:5
couple  346:2
  391:9 461:4
  472:21 473:25
  476:13 478:15
  479:6 492:5
  493:9 501:17
  501:18 508:11
  536:13,18
course  324:3
  345:9 368:19
  388:3 421:18
  476:6 490:17
cousin  321:19
  328:16 340:15
  340:17 341:5,6
  341:7,9 343:16
  343:17,19
  499:16
cover  380:15
  495:11
create  365:8
created  319:4
credit  368:16
  392:2
creed  393:22
criminal
  409:15
cross  309:6,11
  309:19 310:7
  310:13 326:13
  374:24 375:5
  430:21 487:13
  514:18 519:23

crying  483:3
cs6024001
  307:25
csa  329:15
  338:25 497:17
csas  329:2,7,12
current  408:11
  408:14 469:15
  504:2 507:8
currently  376:5
  386:20 389:2
  409:6 503:24
  507:13 513:16
  520:8 533:13
  541:10 542:2
customer  339:8
  342:21 352:6,8
  386:25 422:22
customers
  339:16 426:14
  497:9
cut  331:9,10
  413:7,8 445:2
  445:6,15,22
  464:10
cutoff  500:8

d

d  307:3 308:6
  309:1,1 310:1
  310:1 349:9
  357:17 359:16
  372:13 409:21
  418:12 432:18
  506:10 507:12

dad  327:9
  400:12 482:10
  486:6
daily  357:4
  434:21 448:17
  452:15 453:11
  497:19 535:5
date  307:11
  353:2,3 376:22
  397:13 400:23
  401:6,11,19
  403:6,9,11,11
  403:13,19
  404:4,21
  405:13 410:18
  431:8,25 460:8
  479:23 489:3
  492:8 500:8,17
  500:20 516:23
  522:21
dated  392:15
dates  433:24
david  482:3
day  307:15
  311:3 351:18
  352:15 353:24
  354:13,19
  358:24 361:11
  362:9 365:24
  373:18,21,23
  379:8 391:9
  396:11 399:25
  412:17,19
  413:18 415:10
  417:12 418:18

424:14 428:3
428:18,22,25
436:10 452:17
452:17,21
460:2 477:20
477:22 479:6
479:19 480:14
481:2,6,9
493:24,24
495:13,13
496:22,22
500:9 502:5,13
513:4 514:13
522:18,25
524:19 531:19
532:23 533:18
534:13 537:18
537:18,19,22
537:25 543:17
547:14,21
548:6,9 549:6
549:9,22 550:5
550:7,25
553:10,14
days  336:8
358:25 359:3
365:14,20
379:13 391:24
404:6 424:3
479:6 530:15
530:21,23
531:6
dead  482:19
487:6

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 78 of 119 PageID
#: 1561

**deadline**
  460:14
**deal**  387:5
  390:13 393:14
  395:12 471:21
  482:20,20
  483:8 486:12
  499:20 500:16
  526:17,23
  527:4,15,19,21
  527:23 528:5,7
  528:9,10,11,15
  528:18,18,20
  528:21,22
  529:7,9 545:22
  545:24 546:6
**dealing**  316:2
  329:11 497:13
**deals**  384:8
  497:4
**dealt**  315:13
**death**  399:2
**december**
  457:20,23
  458:3
**decided**  325:15
  478:25
**deciding**
  514:22
**decision**  410:22
  411:7,10 417:9
  417:16 420:5
**defect**  418:20
**degree**  312:12
  312:14,23,25

**del**  308:14
  309:6,11 310:7
  310:9 322:25
  326:11,14
  341:6 343:14
  344:7 345:22
  375:6 392:21
  394:16,19
  400:15 402:4
  403:9 406:4
  467:19 482:4
  487:14,16
  502:19 504:19
  504:22 505:3,6
**delaware**  496:3
**delaying**
  486:10
**deliver**  352:11
  354:16 356:12
  365:21,23
  371:11 378:16
  424:4,11
  434:15,17
  516:24 517:4
  533:13,14,22
  533:25 534:13
**delivered**
  315:15 361:11
  365:19,22
  373:17,21
  387:24 422:21
  533:15 540:7
**deliveries**
  453:11

**delivering**
  353:15 356:17
  374:4 378:18
  381:9 459:14
**delivery**  338:4
  355:12 368:5
  370:13 380:4
  383:14 408:16
  408:19,24
  413:2 426:15
  432:8,20,21
  446:4 449:9,22
  453:8,13 455:9
  457:4 465:11
  496:16,23
  518:24 534:5,7
  534:8 536:6
  543:12 544:7
  546:24 547:10
  548:9 549:20
  550:7,16,19,25
**demographics**
  497:16
**demonstrative**
  330:17
**denominator**
  472:15
**department**
  420:23 429:8
  429:10,11,19
**depending**
  339:3
**deposition**
  333:13,22
  339:24

**describe**  425:7
**desire**  444:8
**desires**  514:22
**detail**  335:24
  403:16
**detailing**
  455:15
**determine**
  485:11
**devastating**
  486:6
**development**
  420:25
**device**  426:11
**difference**
  433:4
**different**  329:9
  332:13,13,16
  332:19,22
  334:8 354:23
  355:6,7 370:14
  371:7 379:18
  379:21 403:10
  410:8,25 411:3
  411:8 413:12
  420:19 421:23
  435:4 445:20
  447:7 456:16
  459:13,17
  482:23 483:14
  493:22 536:15
  536:15,23
  538:19,20,21
**differently**
  333:20 356:25

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 79 of 119 PageID #: 1562

[differently - doorman]                                                        Page 15

442:17
**difficult**  366:18
469:4,10
**difficulties**
353:6,8
**difficulty**
353:10,11,16
477:24
**diligence**  473:2
491:3,6
**direct**  309:5,10
309:18 310:6
310:12 312:7
349:14 357:18
384:20,22
407:23 467:22
506:16,23
507:3
**direction**  334:8
**directly**  341:3
341:22 399:11
**disciplinary**
411:16
**discuss**  317:7
368:9 393:8
422:12
**discussed**  340:8
346:12 368:11
389:9 421:15
477:6 523:15
**discussing**
334:12
**discussion**
321:3 322:10
347:7 369:19

369:20,22
370:6 389:15
389:19 390:17
392:15 393:5,7
393:16,19
394:7 395:3,13
395:14 396:12
397:9,13,18,24
398:2,17,18,20
399:9,10,12
400:21 401:4,9
401:17 403:10
403:13,16,19
403:22 404:5
404:15,20,21
418:16,17,21
421:8,9 453:17
454:6,8,12,16
454:19,22
455:3,5,8,11,15
464:20
**discussions**
317:19 325:11
369:17 383:22
383:25 392:6
393:13 396:22
398:14 418:9
418:13,23
419:3,6,11,19
421:13 453:19
463:9 498:24
546:23
**dismantled**
486:17 504:14

**dispatched**
417:11
**dispute**  342:5
395:17 404:17
508:23
**disputed**  373:2
**disputes**  371:16
396:17,23,25
398:6
**disputing**
315:14 372:24
**distributed**
353:17
**distributing**
342:16 410:2,8
**divided**  446:6
446:11,13
447:4 483:8
**dock**  415:18,21
415:25 416:5,9
420:9 439:12
439:19 442:4,8
443:21 454:23
**docks**  443:19
448:2 465:19
**document**
318:15 330:19
392:22 393:11
394:4 395:5,8
396:9,18,20
397:11,23
402:22,23
491:14,24
492:6,13
509:24 510:5

539:13
**document's**
403:7
**documentation**
513:14 515:21
516:14 520:7
541:9
**documented**
418:17 455:14
455:17
**documents**
330:11 336:20
346:7 398:10
402:12 491:2
492:10 498:4
541:16
**doing**  313:20
350:2 356:21
363:15 367:25
374:12 459:6
468:14 469:9
470:3 477:19
478:6 481:20
482:18 491:5
497:12 498:20
514:20 525:3
535:13,14,14
535:15 550:4
**domiciled**
427:5,7,8,11,14
427:15
**door**  388:13
**doorman**  371:2
371:19

800-567-8658                                                                    973-410-4098

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 80 of 119 PageID #: 1563

[doormen - employee]

**doormen** 371:3
**dot** 338:8,9
    381:15 498:8
**double** 312:15
    365:25
**draft** 498:3,4
**drafted** 330:4,5
    330:7
**drawers** 399:23
**drawn** 335:7
**drive** 335:20
    366:17 379:17
    382:2 501:8
**driver** 351:3
    352:20,21
    360:6 362:6,7
    365:16 381:19
    414:8,11
    422:13 428:16
    428:24 429:18
    442:14 451:7
    451:10,15
    456:15,18,21
**driver's** 536:11
**drivers** 332:13
    332:17,20
    335:20 336:7
    345:17 356:10
    359:8 360:14
    360:15,16,17
    360:23 361:2,2
    365:7,13
    381:22 382:19
    422:6 424:8
    429:6 430:6,14

430:16 445:20
451:12,13,14
452:7 457:15
458:18 459:10
536:9,10,14,19
536:23
**driving** 387:10
    502:12 536:20
**dro** 413:8,19,21
    445:18 447:15
**drop** 372:4
    445:23
**dropped** 474:5
**drops** 474:9
    475:10
**drove** 502:5
**drug** 315:9
    361:18,20,23
    361:24 362:3
    362:10,11,13
    451:11,14,18
    451:19,20
    452:7 462:6,10
    462:12,16,23
    463:6
**drugs** 452:7
    462:22 463:5
**dubson** 553:7
    553:17
**due** 417:10
    473:2 491:3,5
**duly** 312:4
    349:11 407:20
    467:11 506:12

**duties** 342:2
**duty** 428:18,21
    428:25

e

**e** 308:1,1 309:1
    309:1,1 310:1
    310:1,1 312:2
    312:2 349:9
    407:18,18
    467:9,9,17,18
    474:21 491:10
    491:25 503:6
    553:2,2
**eager** 477:17
    480:3
**earlier** 323:14
    337:8 343:9
    352:9 359:23
    360:4 382:11
    389:5 390:21
    392:5 404:6
    456:7 493:5
    499:6 501:25
    549:11
**early** 364:25
    390:4,5 405:17
    524:24 545:11
**earn** 422:13
**easier** 401:23
    401:25
**easy** 475:18
**echevarria**
    307:21 308:3
**echevarriaadr...**
    308:4

**ecolab** 468:7
**educate** 496:15
**education**
    312:15
**educational**
    312:10 409:9
    467:25
**effect** 499:22
    544:6
**effective**
    376:22
**efficient** 459:10
**eight** 382:8
    387:21 428:25
    436:9 474:5
    534:16 535:21
**either** 315:15
    317:14 367:19
    375:19 386:20
    390:5 414:10
    416:12 418:19
    422:2 431:13
    433:2 441:6
    442:24 452:14
    478:20 480:11
    501:22 525:9
**eleven** 358:12
    358:13 434:21
**emotions**
    482:23
**empire** 307:3
    308:6 311:4
**employee** 328:4
    461:8 498:3

[employees - explaining]                                   Page 17

| | | | |
|---|---|---|---|
| **employees** | 477:12 | **exactly**  340:3 | 325:3 347:5 |
| 334:4 336:11 | **entitled**  307:16 | 346:5,9 431:8 | 486:18 |
| 351:18,23 | **entity**  417:11 | 459:11 | **exists**  335:12 |
| 359:23 365:13 | 418:2 421:20 | **examination** | **expanded** |
| 382:20 386:11 | 426:3 427:11 | 312:7 326:13 | 472:23 |
| 542:6 | 460:16 461:9 | 349:14 374:24 | **expect**  352:8 |
| **employer** | **entrepreneur** | 375:5 402:9 | 482:25 503:20 |
| 408:12 | 489:18 | 407:23 430:21 | **expected** |
| **employment** | **esq**  308:8,14,15 | 461:2 464:24 | 503:22 |
| 313:12 349:20 | 308:18 | 467:22 487:13 | **expecting** |
| 349:21,24 | **essence**  321:2 | 502:23 504:21 | 500:22 |
| 461:13,16 | **essentially** | 507:3 514:18 | **expenses** |
| 469:20 507:8 | 320:24 455:23 | 519:23 | 495:12 |
| **empty**  370:23 | **estate**  478:9 | **examined** | **experience** |
| **ended**  368:20 | **event**  434:4 | 312:6 349:13 | 318:20 338:3 |
| 438:11 440:23 | **events**  418:18 | 407:22 467:13 | 339:8 345:21 |
| 470:3 483:5 | **eventually** | 506:14 | 497:8 498:11 |
| 485:7 543:16 | 462:3 | **example** | **experienced** |
| 545:15 | **everybody** | 446:17 | 353:6 |
| **ends**  313:24 | 374:13 479:23 | **excellent** | **expert**  496:23 |
| **engineered** | 500:10 508:18 | 321:23 | **expertise**  499:4 |
| 411:6 | 524:11,11 | **exception** | **expiration** |
| **engineering** | **everyone's** | 426:16 | 478:23 479:6 |
| 410:23 420:5 | 395:20 | **exchange** | **expired**  516:24 |
| **enjoy**  466:4 | **evidence** | 308:13 | **explain**  353:19 |
| **ensure**  377:14 | 330:16 376:17 | **excuse**  426:7 | 378:9,13 |
| 377:18 | 514:2 | 452:12 | 379:15 380:19 |
| **entire**  443:4 | **ex**  307:7 308:12 | **exhibit**  323:3 | 428:11 511:5 |
| 449:22 | **exact**  340:4,8 | 343:3 394:18 | 515:20 535:2 |
| **entities**  410:9 | 405:13 410:18 | 400:22 401:5 | **explained** |
| 411:7 413:8 | 413:20 431:25 | 401:10,18 | 514:14 516:7 |
| 417:25 418:5 | 433:24 436:15 | 504:25 551:24 | 516:12 |
| 420:6 424:4 | 436:20,22 | **exhibits**  394:15 | **explaining** |
| 459:11,13,19 | 451:2 460:7,7 | **existing**  320:21 | 385:14 |
| 459:20,21 | 522:21 | 320:23 321:17 | |

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 82 of 119 PageID
#: 1565

**explore** 432:17
**express** 307:3
308:6 311:4
375:11 405:10
**extension**
478:15,23
**extent** 368:10
369:9
**extra** 361:2
380:16 397:6
399:16 424:4
458:19
**extraction**
322:12
**eyes** 491:23

**f**

**f** 309:1 310:1
553:2
**face** 426:3
497:8,8 502:10
502:10
**facility** 427:6
434:16 435:3
436:23
**fact** 334:3
340:24 344:2
384:8,14
434:19 438:10
441:7 460:9,18
468:23 471:4
492:12 515:11
522:13 528:4
528:25 529:17
531:15 540:7
540:20 541:6

**facts** 470:16
**fail** 362:25
363:6,12
371:18
**failed** 362:20
362:24 363:11
395:4
**failing** 333:3,10
333:17 369:21
370:20 374:12
422:20
**failure** 418:20
423:23 455:9
457:3
**failures** 371:17
**fair** 327:10
328:8 329:6,15
329:23 330:21
331:13 335:25
340:20 341:20
342:4 344:15
377:24 378:10
380:23 391:4
393:20 394:10
398:9,13 442:7
449:20 501:6
501:20,21
502:4,9 537:3
**fall** 318:7
**falls** 382:24
472:10
**false** 541:11,12
**falsified** 394:5
394:6

**familiar** 329:24
335:17 336:2
337:5,8 338:14
369:16 378:11
379:3 412:8,11
418:8 428:5
429:22,24
461:10 472:7
508:7
**family** 357:14
399:2,6 493:21
499:16
**far** 314:3,23
315:7 316:4
324:14,23
386:5 390:16
392:11,12
414:24 477:5
523:6
**fascinating**
470:15
**fashion** 515:6
**father** 313:25
315:23,24
316:7,13 324:9
412:12 444:22
482:9
**father's** 327:3
486:5
**fault** 373:7
**faulted** 370:12
**favor** 401:21
**february**
375:19 390:8
392:15 393:21

396:12 397:14
402:14 403:6
403:14,15,16
404:5,20,25
**fed** 307:7
308:12
**federal** 405:10
**fedex** 307:6
308:12,18,19
311:4 315:20
320:23 335:7
335:14 337:3
338:6 339:16
340:21 341:12
341:21 342:5
347:5 350:19
351:2 352:9,20
352:21 353:7
359:18 362:4
365:14 367:25
368:6 369:25
370:5 371:7,8
371:9 373:9
374:4 377:17
377:25 378:6
379:15 383:5
383:18,21
386:21 388:4
392:7,14,23,25
393:13,15
394:13,24
395:15 396:6
396:22 397:11
397:13,24
398:15,21

Case 1:23-cv-01675-KAM-TAM Document 74-4 Filed 07/08/25 Page 83 of 119 PageID #: 1566

[fedex - follows]

408:13 409:17
409:20 410:22
422:16 423:4
423:12 427:4
453:20 455:22
456:4,20
457:11 459:5
463:5 470:24
474:8 477:10
477:24 478:18
479:13 481:12
487:16 488:5
488:12 490:6
502:10,15,18
503:18 504:4
507:13 508:2
508:24 517:18
524:15 525:4,7
538:17,21
544:6,13,20
548:8
**fedex's** 423:10
**feel** 425:19
**fell** 388:14
473:10 476:10
**felt** 321:14
325:19 345:5
**fernandez**
395:11 396:3
397:19 404:13
**fiddling** 465:3
**figure** 317:11
317:15 337:17
337:24 485:15
532:16

**file** 495:22
496:4,8
**fill** 317:2 352:4
372:8 399:20
399:22
**filled** 365:12
479:3
**final** 470:6
479:7 481:2
498:14
**finally** 346:23
471:5 481:21
**finance** 390:12
468:4,9 469:5
469:9,11 478:8
**finances** 313:22
**financial**
317:15 337:13
337:25 474:15
495:2
**financials**
488:15,16
495:9
**financing**
486:14
**find** 322:23
353:5 364:8
**finding** 499:25
**fine** 320:7
433:7 492:23
**finish** 315:17
**finished** 357:11
498:19
**finishing** 316:3

**fire** 320:3
507:16,24
**firing** 315:7
**firm** 307:17
308:5
**first** 312:4
313:7 315:6
316:4,6 317:23
321:10 322:22
322:24 324:13
349:11 350:25
353:10,11,16
353:23,24,24
379:15 396:15
407:20 409:22
410:15,17,19
410:20 412:14
412:16,25
413:4,6 414:16
416:14 437:8
450:17 461:20
467:11,16
468:8,16
471:14,15
473:21 474:12
482:8 506:12
508:14 511:8
517:3 519:2,15
527:14
**fit** 316:23
415:24 536:8
**fitted** 315:11
**five** 330:19
331:7 347:22
350:5,8 417:13

431:17 437:11
447:6,7 450:9
459:22,23
465:10,15
482:23 535:19
538:4,7
**fix** 357:8,24
395:16 449:2
**fixed** 357:9
358:3 398:7
449:3
**flip** 331:6
**floor** 308:7,13
**florida** 472:22
474:23 479:5
489:4,8,11
493:21
**flow** 495:16
**flush** 416:9
**focus** 362:8
469:4 473:17
520:4 527:11
527:13
**focused** 534:17
**focusing** 369:8
**follow** 320:8
346:9 464:7
487:17
**followed** 315:9
**following**
320:16 346:14
399:24
**follows** 312:6
349:13 407:22
467:13 506:14

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM INDEX NO. 650428/2024
NYSCEF DOC. NO. 3 RECEIVED NYSCEF: 01/26/2024

**fool** 486:11
**foolish** 486:21
**foot** 387:11
**forbidden**
 448:13
**forced** 448:8
**forget** 372:13
 373:13
**forgot** 323:14
 343:9 503:4
**form** 319:7
 497:15 498:21
**formal** 328:12
 328:21
**formality**
 328:18
**formally**
 514:19
**format** 332:16
**formed** 319:3
 342:23
**formula** 485:9
 485:9,10,11,14
 485:14
**forth** 377:9
 396:2
**forward** 320:5
 320:16 324:25
 337:25 346:17
 347:13 474:20
**found** 316:23
**foundation**
 423:13
**four** 312:19
 360:15,16

361:3 387:21
398:12 402:11
417:11,12,13
418:7 420:5
431:16 434:5,6
435:14 436:9
437:11 459:22
459:23 465:10
465:14,15,18
468:8 473:12
522:4 535:19
539:6,8,10,16
539:18,22,23
540:8,13,17,21
541:13,17,19
541:19,21
**free** 313:19
 328:9 545:16
 545:21
**freed** 420:6
**freeing** 551:9
**freight** 413:17
**fresh** 480:6
**friday** 532:19
**friend** 486:7
**front** 323:2
 343:4 402:5,7
 433:24 510:19
**frustrated**
 356:10 358:15
 478:4
**frustrating**
 366:19 478:12
**frustration**
 478:3

**fuel** 495:12
**full** 536:5
**fully** 329:24
 383:8
**funded** 470:6
**funds** 469:6
**further** 326:10
 345:23 374:19
 400:15 406:3,4
 430:19 460:25
 464:22 465:24
 487:11 502:19
 504:17 505:6
 516:14 519:20
 545:7,25 546:6
 546:7
**fusco** 308:11
**fxg** 510:3

**g**

**g** 309:1 310:1
 312:2,2
**gained** 548:8
**game** 472:5
**gby** 464:25
**gears** 366:20
**gene** 315:22
 321:19 322:6,7
 323:21,22
 325:16 328:16
 340:11,17,20
 341:8,8 343:5
 343:15,17,19
**gene's** 323:19
**general** 413:25
 429:23

**generally**
 358:11 412:24
 462:20
**gentleman**
 489:8
**gentleman's**
 489:10
**genuinely**
 482:10
**getting** 316:4
 359:22,25,25
 368:21 371:16
 371:20 392:2
 398:22 425:23
 462:6,12
 477:24 478:7
 496:20 517:16
 545:16 548:20
**give** 312:9
 339:4 342:18
 352:2,3 362:14
 362:15 371:4
 371:17 389:24
 408:11 409:8
 426:13 436:18
 452:19 468:11
 481:25 488:4
 514:21 540:9
 540:11,13,15
 540:17 541:13
 541:21
**given** 336:20
 424:3 436:10
 453:2 479:2
 480:5

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM
NYSCEF DOC. NO. 57

INDEX NO. 650428/2024
RECEIVED NYSCEF: 01/26/2024

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 85 of 119 PageID
#: 1568

[gives - ground]                                                    Page 21

gives 348:2
533:5
giving 316:15
372:23
go 313:3,15
314:5 319:12
322:24 335:21
336:10,12
351:17 352:5
352:12 353:21
354:4,8,20,22
356:11 361:9
361:14,17
362:6,9 364:9
365:23 367:14
371:2,23 380:2
381:16 390:21
390:23 391:7
391:23 399:19
403:13 410:2
413:11,13,14
413:15 421:8
428:3 430:6
434:16 447:11
451:6 456:2
457:14 466:4
473:23 474:9
476:22 478:20
478:25 479:17
479:23 480:13
482:14 483:19
485:16,17
486:23 487:4
493:14 500:12
500:13 511:15

515:5 516:19
531:7 532:15
535:24 536:25
540:14 543:23
544:9 548:23
549:3
goes 393:8
395:5 550:19
going 316:18
316:20,25
317:11,12,14
317:14 318:13
318:25 320:4
324:15,21
326:12 330:15
330:16 336:7
337:22,24
339:21 340:12
340:24 341:15
347:2,3,3
349:23 354:6,8
357:15,16
358:2,11 363:3
376:16,17
377:8 379:23
382:5 387:6,9
389:6,21
390:10,12
395:16,19
397:17 398:12
399:13 400:19
403:12 423:3
425:11 438:11
446:21 447:3
470:12,13,24

472:16 474:8
474:20 475:11
475:25 478:8
479:16,24
480:2,3,24
484:20 485:15
485:19 491:20
493:19,20,23
494:2,12
495:14,14,15
496:5,21
497:20,23
498:12,23
503:13 506:23
508:15,17
509:16 515:4
515:19 517:22
525:17,19
529:5,7 530:3
530:4 537:10
537:16,24
538:7 539:4
540:14,25
543:17 546:9
good 320:3
326:15,16
346:16 347:13
347:24 349:16
354:6,9 357:16
367:13 370:24
374:5 375:7,9
389:4 390:19
471:24,24
482:24 484:9
484:10,15

486:14 487:15
504:5 506:20
511:13
google 316:16
gotta 351:23,24
355:4 358:23
485:15 516:10
535:21
gotten 462:2
479:25 482:24
graduated
312:19,20
326:19 409:13
grafting 470:14
grammar
409:10
grandfather
399:3
great 324:5
345:24 473:5
489:13 504:5
groomed
338:11
gross 490:2
ground 307:6,7
308:12,12,18
308:19 311:5
341:21 368:5
377:17,25
378:6 383:18
408:13 409:17
409:20 415:23
419:19 421:21
421:24 427:22
427:25 436:14

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 86 of 119 PageID #: 1569

436:24 437:3
439:16,21
440:5 443:18
458:25 459:2
463:5 465:7
507:13 508:2
508:24 517:18
518:17,21,22
518:25 519:4
525:10 534:7,8
547:6,17 548:7
550:4,17 551:3
551:5,8,14
**group**  421:2,8
421:10,15
493:18 495:20
495:22 498:2
501:4
**group's**  495:2
**guess**  352:24
372:16 391:10
473:11,14
484:23 544:15
**guidelines**
498:8
**guy**  357:19
391:14 423:10
455:25 470:21
470:23 472:14
474:22,22
475:17,23
479:4 482:8
484:5 489:4,7
493:21 494:12
512:2 524:13

**guy's**  357:11
**guys**  355:4
359:21 365:3
372:10 387:17
399:18,19,25
400:2 471:4
477:22 478:4,5
479:25 481:11
481:19,23
482:7 484:16
489:6 491:19
491:21 492:10
494:10 502:2
502:18 508:13
524:12 541:2

**h**

**h**  467:9,9,17,17
506:10 507:12
**half**  436:17
475:8,13
**hand**  311:17
318:13 330:22
331:3 339:19
349:3 407:12
467:4 506:5
507:6 515:12
553:14
**handbook**
335:5,6,7,9,10
335:14 336:11
**handbooks**
498:3
**handed**  315:3
397:12

**handing**  330:13
386:10 394:12
396:5 397:10
**handle**  339:12
339:12,19
342:20 442:12
476:2 519:6,11
519:13
**handled**  315:16
329:4 336:5
345:4
**handler**  416:10
440:11 442:22
**handlers**  416:2
421:25 442:12
**handling**
353:17 495:16
**hands**  363:21
363:23
**happen**  334:6
335:23 337:22
360:11 457:6
477:8 478:24
480:2 529:7
**happened**
318:7 320:10
320:12 342:17
360:12 362:11
362:17 371:13
439:25 457:7
470:20 472:13
511:19 536:9
**happening**
335:2 469:3
472:20 483:5

487:5 499:25
**happy**  320:7
**hard**  398:21
450:19 469:10
486:8
**harder**  356:8,9
**haul**  416:19
**hd**  412:25
414:5,6,14
420:9 421:21
421:25 441:9,9
441:11,13,13
516:24 517:4
517:16,25
519:3
**headed**  476:20
500:21
**heading**  480:15
**hear**  346:21
378:4 407:2,5
408:2 430:24
506:2 519:25
521:18 530:4
530:14,16,18
538:14 546:14
546:16,18,20
**heard**  320:17
325:2 334:25
361:22 364:6
377:14,22
378:2 424:14
424:18 470:18
470:25 477:9
477:10 487:19
487:21,23

[heard - impeachment]                                                    Page 23

504:4 530:19
537:4
**hearing** 508:22
**hedge** 469:6
**held** 307:16,21
322:10 464:20
553:10
**hello** 528:2
**help** 316:15
330:11,14
345:15 444:12
469:24 497:20
**helped** 314:2
328:5 451:9
**helper** 361:19
361:19,22
362:2,5,5,5
442:14 451:8
462:7,10,12,22
462:22 463:4,5
536:3
**helpers** 332:17
332:20 345:18
356:10 424:8
451:11 536:13
536:18,23
**helping** 314:19
314:25 345:7
**helps** 482:2
**hereunto**
553:13
**hey** 352:10
372:15,20
387:20 461:4

**hi** 519:25
**hiccups** 476:3
**high** 409:12
469:5,17
**highlighting**
331:8 332:2
**hire** 315:10
320:2 332:13
**hiring** 315:5,6
315:7
**history** 313:12
481:25 496:25
**hit** 361:4,5
**hold** 437:23
476:6 513:19
513:21 519:10
546:13,14
**home** 354:15
355:12 356:11
358:11,19,21
368:5 380:3
383:13 413:2
427:12 436:14
437:4 439:17
439:18 440:2,6
440:8,14
443:18,22
446:4 449:21
458:25 459:2
459:17,19,21
459:23 465:7
465:11,11,18
485:17 518:17
518:20,23
525:10 534:5,6

**hi** 519:25
536:6 543:12
544:7 546:24
547:22 548:9
549:20 550:6
550:16,19,24
551:10
**homestar**
468:19,20
**honest** 500:23
**hope** 334:15
**hoping** 316:14
**hour** 336:2
379:3 382:8,8
428:14,19,23
430:8
**hourly** 328:7
**hours** 315:2
327:24 335:21
358:22 378:23
379:7,18
380:17 381:3
381:11,17,18
382:21 383:4
383:22,25
391:9 428:6,8
428:13,14,16
428:21,25
429:7,17 430:3
430:13,14,17
431:2,5 434:7
**house** 308:18
470:22
**housekeeping**
551:23

**how's** 525:17
**hubs** 410:3,7
**huh** 311:15
323:18 330:20
388:5 396:14
513:12 523:25
530:17 532:24
534:3 541:22
547:18 548:10
**hundred** 330:2
339:25 480:25
**hvac** 327:3
**hyping** 354:7

**i**

**ice** 507:16,24
**idea** 315:23
338:23 390:19
521:24
**identification**
400:23 401:5
401:11,19
**identified**
489:5 496:18
**identify** 494:10
503:2 530:7
**idiot** 486:12
**ids** 372:10
**ignored** 364:10
**iii** 412:9,15
419:7 427:19
**impatient**
352:8
**impeachment**
394:20

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 88 of 119 PageID
#: 1571

[implode - j]                                                      Page 24

implode  469:2
imply  395:25
important
  429:16 480:9
  514:9
impossible
  379:11
impressed
  354:8
improper  386:6
  423:16 514:6
improve
  369:22
inartful  446:24
  454:25
incentive
  422:16,19
  423:4,11
incident  393:9
  418:19
include  435:21
including  356:4
inconsistency
  515:2
incorporated
  342:23
incorporation
  495:23
incorrect  386:6
  394:5
increase  453:4
increases  339:5
independent
  354:16,23
  355:11 356:20

359:9 360:8
370:2 433:10
433:14 446:4
453:7,10,23
454:3 455:22
456:2,9,16,22
465:12,19
468:18 483:12
488:19,20
536:24 538:17
indicate  494:25
indicated  332:9
  332:12,15
  390:9 499:18
indicates  331:9
individual
  455:13 499:7
individuals
  469:6,17
industry  470:4
information
  376:18 426:12
  426:13 522:3,5
  523:19 540:10
initial  313:18
initially  388:8
  437:13
initiative  548:8
ins  329:19,24
inside  379:20
  382:12 414:22
  415:11,12
insight  316:15
insinuating
  343:24

instance  353:22
instances
  331:19 370:11
  371:9 434:14
instant  323:4
insurance
  490:25
intend  494:17
  494:19
intentions
  319:6
interactions
  511:6
interest  425:14
  425:17
interested
  315:20 516:5
interfering
  551:13
internal  453:20
interrupted
  451:5 482:15
interruptions
  311:11
intrigued
  472:20
introduce
  412:21
investigation
  386:21 388:3
involved  321:5
  321:9 328:25
  329:22 425:17
  431:21 448:18
  469:22,25

470:8 477:10
498:11 503:24
iphone  386:22
  387:2,3,22
  388:9
island  409:14
isp  376:23
  507:14
ispa  336:16,18
  336:19 429:22
  487:18,19,21
  501:21,22
  532:25
issue  333:17
  334:22,24
  357:20 384:20
  399:6 421:13
  455:4 463:4
  487:6 514:13
issued  462:10
issues  322:14
  334:17 385:4
  387:6 411:20
  429:17 455:16
  456:3
items  347:10

j

j  311:3,3
  314:15,15,16
  314:16,21,21
  321:23,23
  327:19,19,22
  327:22 328:11
  328:11 333:2,2
  334:16,16,23

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 89 of 119 PageID #: 1572

| | | | |
|---|---|---|---|
| 334:23 335:3,3 | 424:10 427:15 | 520:24 524:20 | **jobs** 313:24 |
| 335:8,8,9,9 | 427:15,17,17 | 524:20 534:12 | **joe** 321:25 |
| 338:2,2,6,6,19 | 427:21,21,24 | 534:12 536:10 | 342:11 367:12 |
| 338:19 340:13 | 427:24 431:4,4 | 536:10,22,22 | 367:14,16 |
| 340:13,24,24 | 431:22,22 | 537:16,16,24 | 369:10 385:10 |
| 342:3,3 353:2 | 432:8,8,24,24 | 537:24 542:21 | 385:21 389:5 |
| 353:2,3,3,7,7 | 433:10,10,14 | 542:21 543:21 | 389:13,18 |
| 356:24,24 | 433:14 434:15 | 543:21,24,24 | 390:24 398:5 |
| 360:5,5 370:12 | 434:15,20 | 545:12,12 | 419:7 424:19 |
| 370:12,17,17 | 435:14,14 | **j&j** 307:3 | 424:25 425:4 |
| 373:6,6,7,7 | 437:7,7 438:11 | 308:6 | 425:16 427:19 |
| 375:15,15,16 | 438:11,21,21 | **j's** 382:18 | 444:5,10,15,21 |
| 375:16,18,18 | 438:24,24 | 384:17,19 | 444:23 445:17 |
| 375:21,21,22 | 440:24,24 | 405:5 411:23 | 449:10 454:22 |
| 375:22 377:10 | 441:6,6 443:25 | 416:21 423:20 | 455:3,7,8 |
| 377:10 378:19 | 443:25 445:6,6 | 434:20 457:8 | 458:16 464:16 |
| 378:19 381:9,9 | 445:15,15 | 490:16 517:18 | 470:18,23 |
| 382:16,16,18 | 446:2,2,17,17 | 517:24 | 471:14 472:17 |
| 383:11,11 | 449:23,23 | **j37** 403:5 | 475:25 476:9 |
| 384:2,2,17,19 | 450:15,15,16 | **j38** 404:4 | 478:12,20 |
| 385:6,6 389:6 | 450:16 452:11 | **j39** 403:3 | 479:2,21 |
| 389:6 405:5,11 | 452:11,15,15 | 404:19 | 480:11 481:11 |
| 405:11 410:11 | 457:3,3,8 | **j40** 404:25 | 481:13 482:22 |
| 410:11,13,13 | 458:8,8 460:2 | **january** 375:19 | 483:25 486:4 |
| 410:16,16 | 460:2,12,12,20 | **jee** 307:3 308:6 | 488:4,12 490:5 |
| 411:15,15,19 | 460:20 461:13 | 311:3 508:8 | 490:8,11 |
| 411:19,23 | 461:13,17,17 | **jersey** 313:5 | 491:10,17,18 |
| 414:16,16,25 | 461:19,19,21 | 409:11,13 | 492:21 493:2 |
| 414:25 416:14 | 461:21,25,25 | 468:3,21 477:3 | 493:10 494:3 |
| 416:14,21 | 462:4,4 463:20 | 486:23 487:9 | 495:15 496:19 |
| 417:20,20 | 463:20 465:20 | 494:16 | 496:20 498:25 |
| 418:23,23 | 465:20 490:16 | **job** 307:25 | 499:13,24 |
| 419:3,3,5,5,23 | 496:4,4 516:24 | 336:13 365:11 | 500:4,6,8 |
| 419:23 420:8,8 | 516:24 517:18 | 382:18 | 501:11 502:2,5 |
| 423:20 424:10 | 517:24 520:24 | | 503:7 526:5,10 |

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 90 of 119 PageID #: 1573

527:3,16 528:5
529:18,21
530:24 537:24
**joe's** 331:2,10
341:15 444:22
482:16 484:13
490:7 493:6
526:3 537:10
**joey** 323:16
343:11 344:3,6
344:19,19
364:7 366:21
367:11,25
368:9 380:14
393:17,18,25
398:7,20,22,24
399:14 403:25
518:19 537:21
**joey's** 400:12
**joint** 309:12,13
400:20 401:2,8
401:14 551:24
**joseph** 400:9
412:8,11,14
419:7
**jt** 385:2
**julia** 393:15,22
**july** 307:11
553:10,14
**june** 376:12,13
376:22 386:24
433:11,21
460:6,12,13,19
460:22 481:7
500:6,9,20

512:9 516:22
517:7,9 522:23
522:24 523:5,6
524:20 532:13
532:14,17,18
532:18 542:25
544:8,9,10,21
544:23,25
545:2,11,15
548:19,22
550:3,5
**justice** 409:15

## k

**k** 312:2 407:18
463:22 464:5
**kaplowitz**
489:14
**keep** 339:18
364:11 378:22
415:12 422:23
423:2 430:16
476:4 486:13
486:13 499:20
**keeping** 430:13
486:3
**keeps** 429:3
**kept** 477:18
478:13 481:16
485:13 486:13
498:17 499:23
499:24
**kevin** 321:24
321:25 361:12
362:23 363:16
371:18 447:19

447:20 470:21
472:14 489:7
499:7,11,13,15
**kevin's** 499:9
**key** 478:2
**kids** 357:14
**kind** 318:2
399:15 441:2
455:4 469:8
470:5,7 471:3
471:7,16
472:14,24
476:2 477:18
478:16 481:3,4
485:4 486:21
497:22 504:16
**knew** 324:7
334:22 474:20
479:21 480:25
481:2 484:19
501:19 524:25
**know** 316:2,13
319:17 321:18
324:2,4,11,12
325:6,9,11,19
329:7,15,18
334:24 335:4
335:12,14,19
335:22 337:5
341:17 344:25
345:3,4,20
355:3 360:5
362:12 363:10
371:21 372:17
372:17 373:16

377:13,21,25
378:8 386:5
390:6 391:11
391:23 400:9
405:5,12,13
408:4 410:11
410:13,18
411:23 412:22
413:20 414:17
415:15 416:13
420:11 423:12
424:15 426:8
427:17,24
428:8 429:16
431:11,25
432:3 433:9,25
434:13 435:9
436:4,5,8
437:6,12
438:14,20
441:4,5 446:21
451:17 453:4
454:15 458:21
458:23 459:11
460:2,7,8,13
461:9,12,20
462:15,18
463:22,24
464:2 468:25
469:23 471:16
471:20,23,24
472:2,10 473:5
475:23 478:7
479:25 481:3
482:7,8,10,24

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM

483:3,9 484:16
485:15 486:11
487:6,18,20
488:20 490:17
490:18 491:7
492:3,22,23,25
493:3,24 494:4
496:10,12,24
497:13,23
499:2,10,10,17
500:19,19
501:23 503:23
503:25 504:2,5
504:6,7 508:10
512:12 513:4,5
516:3 517:20
517:21 518:6,9
518:15 519:13
520:23 521:3
521:11,13,15
521:22 522:21
522:22,25
523:22,23
526:6,7 527:18
530:15,20
531:5,11
538:19 539:23
540:2,25
542:23 543:6,9
544:2,4,11,14
544:19,19,23
544:24 545:4,4
549:4
**knowing** 338:6

**knowledge**
398:3 410:11
431:4 452:6
461:16 503:12
512:15,17
521:17,20
530:2 536:17
536:22
**known** 334:20
431:19
**knows** 423:14
**krystle** 309:4
311:1 312:1
313:1 314:1
315:1 316:1
317:1 318:1,24
319:1 320:1
321:1 322:1
323:1 324:1
325:1 326:1
327:1 328:1
329:1 330:1
331:1 332:1
333:1 334:1
335:1 336:1
337:1 338:1
339:1 340:1
341:1 342:1,22
343:1 344:1,4
344:6 345:1
346:1 347:1
348:1

**l**

**l**  312:2 407:18
**label**  455:5
**labeled**  417:17
**labor**  358:9
448:17
**lac**  313:10
314:11
**lag**  408:3
**landed**  475:6
536:23,25
537:2
**laridian**  468:17
**late**  356:15,17
405:17 483:7
545:11
**law**  307:17
308:5 430:9
**laws**  335:18
**lawyer**  456:11
**leader**  426:4
**leadership**
425:12,18
**learn**  316:20
320:24 324:6
324:14 326:4
328:17,20
338:8,16
367:23 475:16
477:23 519:2
526:8 533:11
537:6,9,15
**learned**  316:18
326:9 359:7,20
360:6 369:10

473:9 476:9
496:19 529:19
530:23 532:11
537:23
**learning**  324:8
328:19 335:24
345:6
**leave**  354:12
360:14,15,19
451:21 462:17
474:18 506:19
**leaving**  361:4
365:8,13 382:3
**led**  471:5
480:20,21
**left**  330:22
339:10 360:21
371:20 450:15
450:16 461:12
461:16,19,25
462:3
**lending**  469:10
**letter**  491:11
**letters**  412:7
**level**  411:11,12
411:13 442:4
**lewis**  308:18
**lexington**  372:3
372:4,5
**liaison**  455:21
499:11
**licensed**  314:12
**licenses**  468:17
**life**  471:2
497:13

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 92 of 119 PageID #: 1575

**lift** 442:10
**liked** 444:5
**likes** 472:23
**limiting** 548:15
**limits** 379:7
**line** 316:4
  342:15 368:16
  381:10 417:2,3
  417:4,8 418:5
  418:6 419:24
  420:7,8
**lines** 483:18
**lingo** 435:10
  439:22
**list** 323:16
  342:18 343:11
  344:3,4 347:9
  377:9,11
  454:11
**listening**
  483:25
**lists** 376:22,23
**literally** 347:22
**little** 328:17
  338:11 385:4
  409:18 463:17
  478:6 496:25
  531:10 546:16
**live** 358:20
**llc** 308:11
  319:4 490:7
**llcs** 488:21
**load** 366:9
  414:6,8,9,11
  415:2,9,15,19

416:2,22
417:14,16,18
419:24 420:3
420:10 422:3
435:7,10,12
436:13,25
437:8,14,18,19
438:11,21,25
439:3,8,14
440:14,17
441:8,13 443:2
443:5,14
448:18 449:18
449:21,23
450:2,4,9
461:21 462:2,4
465:4,21
**loaded** 412:24
414:14,15,19
415:21 416:4
416:25 417:8
418:2,5 421:23
421:24 439:6,7
440:19,25
442:20
**loading** 383:19
414:5,18
417:20 442:8
442:18 443:18
443:21,25
447:25 454:23
465:17,19
**loads** 441:9,11
**loan** 390:10
392:3

**loans** 469:5,11
**located** 409:10
  411:24
**location** 387:16
  455:10 473:6
  477:2 497:17
**locations** 337:6
  371:4
**lodged** 463:3
**log** 378:19
  379:16,23
  381:25 382:5
  429:6
**logged** 428:18
**logistics** 338:3
  497:4
**logs** 429:5
**long** 375:20
  409:2,14,16
  450:25 470:8
  476:2 494:3
  539:25 542:23
**longer** 321:8
  433:10 460:3
  486:19 514:8
**look** 316:8,11
  330:18 331:6
  372:9 374:8
  402:11 485:9
  486:20 490:19
  503:3 513:10
  518:10,12
**looked** 320:2
  486:11,12
  488:25 489:2,2

489:3,19 490:4
501:7,20,22
**looking** 312:21
316:7,8,24
318:5 320:21
392:20 398:9
402:12 437:10
491:7 532:17
**looks** 320:3
346:15 503:6
**loss** 486:6
**lot** 316:16
324:5 334:10
345:2 358:8
372:6 374:9
387:6 399:15
431:10,11
469:5,17
472:23 482:9
483:6 486:2
499:19 501:14
503:11
**loud** 349:22
**lower** 311:9
442:4 473:21
**loyal** 364:7
**luck** 471:24,24
**luggage** 439:24
**lunch** 386:2

**m**

**m** 467:9,18
**ma'am** 349:7
375:4 506:3,9
551:15

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 93 of 119 PageID #: 1576

| | | | |
|---|---|---|---|
| **made** 330:6 | **making** 382:20 | **manual** 358:9 | **mayes** 308:15 |
| 331:23 332:10 | 456:9,15 541:4 | **manually** 355:8 | **mckenzie** |
| 372:18 386:25 | **malfunctioning** | 355:13 439:5 | 361:12 419:12 |
| 393:6 411:10 | 388:13 | 440:25 441:8 | 424:15,16,18 |
| 417:10,16 | **mammoth** | 442:6 443:14 | 437:12,17 |
| 483:19 486:20 | 312:14 313:4 | 447:24 448:4 | 438:3 447:19 |
| 500:14 501:13 | 314:6,8 327:12 | **march** 471:10 | 447:20,21,21 |
| 512:6,16 | **manager** 336:5 | 472:12 | 447:22 450:12 |
| 516:21 540:16 | 339:11,19 | **margarita** | 450:24 451:15 |
| 547:8,20 | 342:9,13,19 | 307:21 308:3,4 | 451:18 462:6 |
| **madison** 308:7 | 350:4,8 387:19 | **marina** 307:19 | 462:14 |
| 322:8 341:10 | 393:5 395:3 | 553:7,17 | **mean** 326:6 |
| 372:4,5 | 408:17,19 | **mark** 394:14 | 331:25 336:10 |
| **mail** 491:10,25 | 409:21,24 | 400:17 | 339:4 345:15 |
| 503:6 | 418:12 432:8 | **marked** 309:12 | 351:13 353:19 |
| **mailed** 474:21 | 432:21 | 309:13 396:6 | 355:23 362:2 |
| **main** 322:14 | **managers** | 400:22 401:4 | 365:15 371:6 |
| 361:2 | 315:17 324:16 | 401:10,18 | 408:19 411:2 |
| **maintaining** | 329:21 344:24 | 551:25 | 412:2 413:24 |
| 463:14 | 345:18 357:17 | **maspeth** | 416:17 423:24 |
| **maintenance** | 359:17 372:13 | 517:11,13 | 441:22 465:16 |
| 338:15 | **managing** | **master's** | 478:17 484:24 |
| **make** 337:22 | 314:3,24 469:3 | 312:13,15,23 | 487:23 490:23 |
| 342:17,19 | **manhattan** | 312:24 313:2,7 | 495:3 497:12 |
| 345:16,20 | 312:12,22 | 313:10,18,19 | 500:21 504:4 |
| 351:24,25 | 313:3 326:23 | 314:5,9,10 | 514:5 529:9 |
| 356:8,9 361:10 | 399:19 412:6,7 | 316:3 | 531:24 532:2 |
| 362:8 369:23 | 473:6,6,7 | **match** 372:10 | 540:23 550:17 |
| 382:25 383:3 | 508:5 | **math** 465:2 | **meaning** |
| 384:12 401:23 | **manner** 417:20 | **matter** 307:2 | 504:10 528:6 |
| 416:21 422:7 | 421:23 | 307:16 330:4 | **means** 377:25 |
| 423:5 433:22 | **manpower** | 333:13 455:12 | 378:15 415:8 |
| 443:3 456:21 | 333:4,9,18 | 468:22 509:2 | 421:19 427:9 |
| 480:2 482:21 | 334:2,7 | 528:25 534:20 | 428:15,20,24 |
| 483:6 513:6 | | | 513:8 528:15 |

[means - money]                                                Page 30

529:11
**meant** 439:4
530:22,25
**meet** 319:12
320:19 412:14
476:8,25 477:3
477:14,22,25
478:21,25
479:23,25
500:10 503:18
511:15 522:13
523:10
**meeting** 319:22
320:5 323:9,9
503:21 518:16
523:20 524:10
524:12,19
528:12
**meetings**
463:10 476:23
**mention** 364:6
**mentioned**
390:18 391:10
391:13 416:24
430:7 449:11
449:11,13
471:3 472:4,16
474:15,25
**merged** 468:19
**merger** 368:2,4
**meshed** 447:17
**mess** 399:15
**message** 347:14

**messages** 323:5
**messina** 310:5
467:1,3,18,24
468:1 469:1
470:1 471:1
472:1 473:1
474:1 475:1
476:1 477:1
478:1 479:1
480:1 481:1
482:1 483:1
484:1 485:1
486:1 487:1
488:1 489:1
490:1 491:1
492:1 493:1
494:1 495:1
496:1 497:1
498:1 499:1
500:1 501:1
502:1 503:1
504:1 505:1
**met** 319:14
337:2 393:6
394:9,10
410:19 412:18
444:21,23
469:5 470:18
476:13 477:4
502:9 523:7,11
538:24 539:6
542:6,11
**metal** 442:3
**mic** 408:22

**michael** 308:19
**middle** 394:22
396:9 403:15
403:17 467:20
517:8
**mike** 317:20,22
317:25 318:9
318:22 319:11
319:12,23
323:10,22
325:16 341:24
343:12,17
346:6 356:24
357:18,21,23
364:6,16 367:3
367:11,17,24
369:10 384:3
384:12,16,18
384:21,21
385:5 390:18
390:18,22,24
391:10 420:11
420:14,14,17
420:19,22,22
421:11 441:6
455:20 482:2,8
484:4,6 517:23
524:5,8 525:16
525:24 544:13
**mike's** 421:3
**million** 317:8
474:10,11,13
474:25 475:9
475:21

**mind** 524:19
**mine** 322:5,14
322:16 527:25
528:3
**minimum**
335:22
**minute** 481:4
538:4,7
**minutes** 347:22
348:2
**mirror** 515:10
**mischaracteri...**
432:16 523:3
**mishandled**
315:15
**missed** 361:21
469:20 507:22
**missing** 387:14
387:21
**misspoken**
334:2
**mistake** 352:2
372:18
**mistaken**
450:13
**mitch** 418:25
**mitchell** 308:15
**mix** 372:7
**mixed** 355:2
447:10,15
**models** 416:5
**moment** 347:8
449:16
**money** 317:13
337:23 360:4,8

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 95 of 119 PageID #: 1578

[money - never]

378:6 422:7,12
456:9,15,22
469:10 484:10
484:11 485:20
**moneys** 464:3
**monitored**
383:8
**monitoring**
382:19
**month** 353:23
391:19,20
452:18 453:3,4
453:5 540:4
**monthly**
489:25
**months** 321:11
350:4 362:20
362:21,21
363:4,11 367:2
375:17 433:15
452:3 457:8
473:12 474:5
494:5 541:18
541:19,21
**montoya**
350:20
**morning**
326:15,16
349:16 356:14
358:22 360:19
375:7,9 381:23
387:10 399:24
445:10 511:17
**mortgage**
468:10,17,20

468:20 490:24
**mortgages**
468:14 497:13
**move** 316:24
322:21 350:11
411:7 413:17
420:5 438:9
448:2 477:17
486:4 494:17
494:19 529:14
532:4 541:23
**moved** 334:9
411:15,19
438:18 445:19
**moves** 484:12
**moving** 324:25
325:6 337:25
364:11 366:15
379:25 383:10
470:10 498:18
532:7
**multiple**
475:13
**multitasking**
499:3

**n**

**n** 308:1 309:1,1
310:1,1 349:9
349:9,9 467:9
467:18 506:10
506:10 507:12
507:12
**nail** 501:17
**name** 318:25
319:2 344:11

344:20 359:13
376:8,23
392:16,18
394:22 396:8
397:15 413:20
423:12 467:15
467:16,18,20
472:6 487:15
489:10,13,15
496:12 499:9
504:23,23
505:4,5 507:10
507:11,22
**names** 482:6
**nanny** 313:23
**nature** 438:5
511:12 536:16
**necessarily**
333:14 334:12
455:5 543:13
**need** 314:19
321:12 327:8
331:17 332:10
340:5 344:9
357:9 372:17
374:17 415:21
443:9 455:7
469:24 476:7
514:17 518:10
524:13
**needed** 327:9
338:10,20
344:25 377:3
425:19 476:2
486:9,20 500:5

533:6,9,10
**needs** 425:10
425:12 428:16
515:15,17
**net** 469:5,17
**never** 320:13
336:23 337:10
337:12 338:5
340:8,11,12,18
340:24 341:15
341:21 342:5
342:22,23,25
358:3 370:8,9
374:16 377:2
377:11 383:17
385:24 390:15
391:21 392:6,9
392:10,10,12
394:10 396:17
403:22 404:18
419:18 434:20
444:21,23
448:21 449:3,4
454:5 456:17
477:22 486:25
487:2 488:6,9
492:15,16
501:7,7,12,20
501:21 502:2,9
502:12,15
504:10,13
511:18 512:16
512:20,20,25
523:13 529:22
529:24

Case 1:23-cv-01675-KAM-TAM Document 74-4 Filed 07/08/25 Page 96 of 119 PageID #: 1579

[new - office]

**new** 307:18,18
307:20 308:7,7
308:13,13
312:5 313:4
324:4 335:17
335:17 349:12
360:16,17
383:9 407:21
409:11,13
467:12 468:3
468:21 477:3
477:15 479:16
486:23 487:9
493:9 494:16
494:18 496:5,9
501:8,11,13,16
501:19 506:13
508:6,6 553:4
553:8
**newton** 309:9
349:1,17 350:1
351:1 352:1
353:1 354:1
355:1 356:1
357:1 358:1
359:1 360:1
361:1 362:1
363:1 364:1
365:1 366:1
367:1 368:1
369:1 370:1
371:1 372:1
373:1 374:1,25
375:1,3 376:1
377:1 378:1

379:1 380:1
381:1 382:1
383:1 384:1
385:1 386:1
387:1 388:1
389:1 390:1
391:1 392:1,17
393:1 394:1
395:1 396:1
397:1 398:1
399:1 400:1
401:1 402:1,12
403:1 404:1
405:1 406:1
419:15 435:15
447:23 448:15
450:11 461:8
**nice** 415:10
**night** 356:16,18
358:13,14
**nine** 361:3
435:16,18,19
435:25 436:2,9
533:18
**nonmotorized**
441:23 442:5
**norm** 431:13
**notarized**
481:16 491:21
492:16,18
509:11 510:16
**notary** 307:20
312:4 349:11
407:20 467:11
481:17 491:20

506:12 553:7
**noted** 418:21
**notes** 463:12
**notice** 484:23
**notified** 429:13
429:14,15
500:5
**november**
390:7 457:19
457:23 458:2
**number** 311:6
323:4 338:24
352:25 353:7
358:10 373:16
392:25 402:18
402:19,24
412:5 436:16
436:20,22
473:20 475:2,3
475:5 520:4
547:12
**numbered**
415:18
**numbering**
401:24
**numbers** 372:9
399:21 401:22
465:3 471:19
473:3 474:9
490:9

**o**

**o** 309:1,1 310:1
310:1 312:2
349:9,9,9
407:18 467:9

467:17 506:10
507:12
**o'clock** 358:12
358:13,21
360:2,2 382:4
382:6 434:21
**oath** 326:17
375:2 514:10
**object** 423:9
552:3
**objection** 377:2
431:18 432:10
432:14 437:21
437:24,25
482:4 513:20
513:23 523:2
526:19 534:14
**obligation**
444:9 454:11
**obtain** 426:25
**occur** 413:3
423:22
**occurred** 399:5
421:14
**october** 432:5,8
433:3,21 434:2
434:2 450:21
450:22 457:19
458:2
**odds** 313:24
**offer** 320:25
321:20 473:19
473:22
**office** 313:17
314:8 326:23

[office - overlapped]

327:12,16
399:20 454:20
**officers** 424:24
**offices** 307:16
469:4
**offload** 387:16
**offset** 370:18
397:2,3,4
**oh** 362:22
371:18 400:6
480:18 486:17
487:2 511:12
515:17
**okay** 311:14,23
313:11 321:16
321:19 326:3
327:5 328:21
329:23 330:9
331:12 333:7
333:19 337:4
339:20 344:14
345:22 347:15
349:8 350:10
352:23 361:14
363:2 367:7,10
367:12,13,22
368:20 370:10
374:23 375:14
376:3 378:17
382:14 384:8
392:12,19
393:20 394:3
395:2 396:5
401:15 402:2,3
402:13 403:14

406:2 407:25
414:4 420:2
432:24 434:13
436:2 439:3,13
442:25 443:17
444:3,20
452:23 453:17
456:25 458:4
458:17 459:16
460:6,24 465:6
465:23 467:2
468:5 471:13
471:22 473:15
481:8 482:14
491:4 492:3,7
492:15 496:4
496:24 506:20
506:25 509:5
515:18 521:11
522:17 526:14
529:5,25 530:6
531:2,7 533:11
535:23 537:20
538:2,11
539:18 542:14
542:18 545:6,9
547:19 548:17
550:2 551:7
**old** 380:11
409:11
**once** 319:6
399:7 474:20
493:6
**ones** 397:4
446:10

**ongoing** 327:4
346:14
**online** 316:12
**onsite** 338:20
339:13 477:21
**open** 388:17,18
**opening** 328:18
**operate** 411:9
423:6 488:20
503:13
**operating**
422:24 476:4
496:5
**operation**
425:11 444:12
490:9 494:7
495:13,18
497:19 504:2
542:9
**operational**
417:9 421:12
436:3,9
**operations**
384:4,15
420:23,24
493:25 496:22
**opportunity**
489:5 496:18
504:11 510:18
512:23
**opposed** 411:11
**oradell** 409:12
**orchestrate**
332:18

**order** 314:24
315:10 347:10
400:2,3,18
422:23 424:11
448:18
**ordinary**
490:16
**organize**
425:13
**organized**
354:3
**originally**
405:6,14
536:20
**outbound**
409:24
**outdoors** 448:3
**outline** 464:5
**outs** 329:20,25
**outside** 355:25
356:2 371:20
382:13 415:2,8
415:9,13 448:7
448:11
**overall** 328:19
**overlap** 368:2,3
368:4,7 391:15
421:17,20,22
508:14,18
518:12,15
524:9,14,15
525:3,5 548:7
**overlapped**
459:20

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 98 of 119 PageID #: 1581

**overlapping**
458:20,24
**overnight**
410:5 535:24
544:17
**overruled**
423:17
**oversaw** 409:25
**oversee** 330:13
351:22 408:20
408:23 410:6
**overtime**
335:18
**overview** 409:9
479:15
**own** 315:25
316:9,11 318:3
324:14 335:5
335:10 341:11
353:3 414:9,12
417:18 439:7
441:10,11
463:12,14
488:18 491:23
541:2
**owned** 320:22
350:22
**owner** 338:12
345:11 426:4
**ownership**
321:12
**owns** 313:25
341:11 472:22
**o'melveny**
307:17

**p**

**p** 307:7 308:1,1
308:12 309:1
310:1 357:17
359:16 372:13
407:18 409:21
416:12,12
418:12 432:7
432:18 467:9
467:17 506:10
507:12 536:5,7
**p.m.** 354:14
379:12 552:6
**pack** 355:9
356:2,2,11
381:24
**package** 307:6
307:7 308:12
308:12 311:5
339:10,10
342:6 352:2,9
355:9 371:3,19
371:22 374:4
387:16 388:14
404:18 415:25
416:10 421:25
426:12,15,16
440:11 442:12
442:22 454:10
**packages**
315:13,14
334:17 338:24
339:4 342:16
351:24 353:17
355:25 360:18

370:17 371:10
371:19 373:15
373:17,20
374:10 378:16
378:19 379:24
380:4,6 383:14
387:23 395:4
408:24 409:25
410:6 412:24
413:5,13 414:5
414:9 417:17
422:17,21
423:5,11,14,19
424:3,5,11
439:6,20
440:12 441:17
441:19 442:5
442:13,16,21
443:10 445:22
446:3,8,13,21
447:11 448:7
452:21 453:14
453:15 457:2
458:7 459:15
460:15,19
463:19 464:9
464:13,15,18
498:22 516:25
517:4,17,25
518:25 519:7
519:12,16
533:12,19
534:4,13 535:6
535:14,25
536:2,8 547:13

547:25 548:6,9
549:5 550:4
**packed** 365:22
**packing** 366:7
366:17
**page** 309:3,23
310:4 330:19
330:23 331:3
333:12 393:5
492:4 510:6,13
**pages** 322:22
322:24 331:7
361:10 492:4,5
**paid** 328:7
359:9 385:24
499:2
**pallet** 441:25
442:2
**pallets** 380:5,7
380:8 383:12
414:11 422:3
**paper** 379:19
476:7
**papers** 373:3
**paperwork**
352:3 372:8
399:16,20
528:24 539:11
**paragraph**
513:11 515:20
**paramus**
468:21
**park** 366:9
415:17 417:5

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 99 of 119 PageID #: 1582

**parking** 415:19
**part** 321:13
  337:4 370:4
  379:14 380:21
  383:6 440:20
  474:7 486:4
  487:25 488:8
  498:15 527:14
**partially**
  312:23
**particular**
  424:2 504:8
**partners**
  472:21 475:24
  495:20 497:24
**parts** 314:3
  385:3
**passed** 342:7
  399:3
**past** 334:21
**paste** 331:9,10
**patterson**
  468:2
**paul** 467:21
**pay** 317:12
  360:3 368:18
  378:6 385:22
  545:10
**paychecks**
  386:10
**paying** 313:20
**payment** 340:2
  368:18
**payroll** 314:25
  315:4 495:12

**peak** 453:3
  457:8,10,17,18
  464:3,7 497:22
**pena** 368:21
  369:3 405:21
**pending** 332:5
**penske** 416:18
**people** 324:6
  325:8,12
  333:14 334:8
  334:13 350:21
  372:15 380:11
  382:25 425:13
  428:4 446:18
  458:11 459:13
  472:5 477:25
  483:24 493:23
  497:14 525:2
  543:8
**percent** 330:2
  436:17 437:3,4
  464:14 465:6,7
  480:25
**percentage**
  436:24
**perfect** 316:24
  354:6
**perfectly** 362:9
  492:24
**performed**
  374:3,5
**period** 332:7
  358:5,6,7
  381:19 398:25
  399:17 429:2

431:17 434:5
  458:5 529:2
**person** 318:10
  319:14 346:13
  399:24 404:18
  444:11 447:13
  449:9 454:21
  508:20 511:12
  511:13 518:12
**person's**
  470:22
**personal**
  335:10
**personally**
  316:8 497:6
**phases** 498:14
**phone** 318:2
  323:15 325:23
  325:24 339:9
  339:14 342:15
  342:20 343:10
  393:17 394:2
  398:23 444:15
  454:21 470:25
  471:2 481:13
  481:21 482:12
  483:24 491:19
  501:15 512:9
  512:11,19
  538:9
**phones** 311:9
**phrase** 483:14
**physically**
  501:8,10,13

**pick** 338:3
  371:3 380:10
  408:16,18,24
  432:7,19,21
  434:16 439:24
  440:3 442:23
  444:15 449:9
  496:15 535:20
**picked** 534:12
  535:5,10,16,19
**picking** 409:25
**picture** 551:17
**piece** 442:3
**pieces** 373:25
  387:20
**pilatowski**
  309:16 359:8
  359:12 360:7
  363:8,9 364:13
  364:20 407:1,9
  408:1,9 409:1
  410:1 411:1
  412:1 413:1
  414:1 415:1
  416:1 417:1
  418:1 419:1
  420:1 421:1
  422:1 423:1
  424:1 425:1
  426:1 427:1
  428:1 429:1
  430:1,23 431:1
  432:1 433:1
  434:1 435:1
  436:1,21 437:1

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 100 of 119
PageID #: 1583

[pilatowski - premises]    Page 36

438:1 439:1,23
440:1 441:1
442:1 443:1
444:1 445:1
446:1 447:1
448:1 449:1
450:1 451:1
452:1 453:1
454:1 455:1
456:1 457:1
458:1 459:1
460:1 461:1
462:1 463:1
464:1 465:1
466:1,4
**piles** 447:7
**pissed** 391:14
485:22,23
**place** 308:13
318:8 371:22
390:3 391:17
415:22 442:23
471:6 528:7
**plaintiff's**
401:18
**plan** 317:15
336:6 337:25
493:17 495:11
543:11,21,24
544:12
**planned** 339:25
340:7 501:4
**plans** 544:3
**platform**
440:12 441:18

441:19 442:16
442:24
**platforms**
442:13
**played** 530:11
**please** 311:8,16
312:10 344:8
349:2 407:11
408:3,11 467:3
506:4 507:5,7
**plenty** 364:5
399:7
**pllc** 308:5
**poindexter**
482:3
**point** 338:18
369:13 416:20
419:23 461:13
465:17 470:5
471:24 480:5
482:25 484:9
515:11
**police** 511:22
511:23
**policy** 463:7
**pond** 514:17
**ponds** 310:11
322:3 325:16
326:8 368:25
369:2 458:21
458:23 472:6
506:1 507:1,12
508:1 509:1,19
510:1 511:1
512:1 513:1,22

514:1 515:1,14
515:15,19
516:1 517:1
518:1 519:1,9
519:22,25
520:1 521:1
522:1 523:1
524:1 525:1
526:1 527:1
528:1 529:1
530:1 531:1
532:1 533:1
534:1 535:1
536:1 537:1
538:1,6,14
539:1 540:1
541:1 542:1
543:1 544:1
545:1,19,20
546:1,12 547:1
548:1 549:1
550:1 551:1,21
552:1,2
**port** 350:12
**portion** 330:22
331:3 479:9
**position** 408:15
409:3 415:19
417:14 418:11
419:24 420:3
436:25 437:8
439:9,14
440:14,17
441:14 442:18
443:6,14

449:18 465:22
**positions**
345:19 415:16
416:23 435:7
435:10,12
436:13 437:14
437:18,19
438:12,21,25
439:4 443:2
449:16,21,24
450:2,5,7,10
461:22 462:2,4
465:4
**positive** 345:20
**possibility**
518:3
**possible** 322:4
388:18 461:24
**possibly** 337:17
431:15 432:5
433:23 434:8,9
434:10
**potential**
512:22
**potentially**
322:3 522:6
**pp&e** 470:4
**predetermine**
446:22
**prefer** 525:7,12
**preferred**
459:5,7,8
**preload** 410:5
**premises**
451:25

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 101 of 119
PageID #: 1584

**[preparation - public]**                                      Page 37

| | | | |
|---|---|---|---|
| **preparation** | **previously** | 486:9 511:25 | **propose** 321:9 |
| 498:5 | 392:14 394:13 | 529:6 532:9 | **proprietorships** |
| **prepared** | 396:6 | 538:10 | 488:21 |
| 369:14 479:18 | **price** 317:7 | **procedure** | **prospective** |
| 490:5,6,12,14 | 318:6 368:9,11 | 346:8 | 320:2 |
| 490:16 491:16 | 473:4,18 477:7 | **proceed** 408:4 | **provide** 422:20 |
| 491:17,18 | 484:12 | **proceeding** | 423:23 424:2 |
| 495:5 | **printed** 397:5 | 309:3 310:4 | 458:11,18 |
| **prepping** 486:3 | **printing** 398:7 | 320:4,14 | 495:8 509:3 |
| **prerogative** | 399:16 | 346:17 347:13 | **provided** 454:2 |
| 415:10 448:8 | **printout** | 553:1,9 | 455:18 494:22 |
| **present** 308:17 | 376:19 490:7 | **proceedings** | 509:9,13 |
| 347:10 493:12 | **prior** 324:24 | 552:5 | 513:14 515:22 |
| **presented** | 328:17 339:7 | **process** 324:14 | 516:13 518:17 |
| 315:24 479:13 | 385:10 389:14 | 380:21 413:3 | 520:6 541:8 |
| **pressure** | 389:17 411:17 | 485:18 487:25 | **provider** 414:6 |
| 363:19,20,24 | 411:20,23 | 488:9 544:21 | 421:6 429:13 |
| 364:3 365:8 | 432:22 446:5 | **produced** | 447:3 459:2 |
| 366:5 399:7 | 446:18 496:24 | 392:14 394:13 | 460:3 |
| **pretty** 331:18 | 497:3,7 517:16 | 510:3 | **provider's** |
| 351:8,14,22 | 544:21,22,25 | **production** | 447:5 |
| 355:2 358:8 | 546:22 550:3 | 546:11 | **providers** |
| 359:21 360:25 | **private** 454:19 | **prohibited** | 422:18 426:17 |
| 361:4,5 363:17 | **privately** 335:7 | 451:24 | 426:20 459:18 |
| 364:10,19,25 | **probably** | **project** 470:10 | 483:15,16 |
| 367:13 371:2 | 334:14 373:24 | **promise** 311:18 | **providing** |
| 372:7,21 | 375:18 391:9 | 349:4 407:13 | 509:5 |
| 373:22 385:19 | 433:18 453:16 | 467:5 506:6 | **psychology** |
| 386:8 387:5,13 | 468:13 484:11 | **promoting** | 312:13,14 |
| 387:22 396:24 | 485:12 498:12 | 524:15 | **public** 307:20 |
| 471:18,20 | 517:7 524:24 | **proof** 495:8 | 312:4 349:11 |
| 477:11 482:24 | 535:19 537:18 | **properly** 357:9 | 407:20 454:23 |
| 485:8 494:6 | **problem** | 366:10 423:7 | 467:11 506:12 |
| **preventing** | 322:14 478:16 | **property** 485:4 | 553:7 |
| 463:11 | 478:17,18 | | |

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM
INDEX NO. 650428/2024

NYSCEF DOC. NO. 1
Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 102 of 119
RECEIVED NYSCEF: 01/26/2024
PageID #: 1585

**pull**  380:13
387:15 422:17
423:5,11
**pulled**  423:15
423:20 457:3
458:8 511:21
511:23
**pulling**  458:14
**purchase**
320:18 346:16
347:6 405:16
426:22 511:3
512:23 523:16
546:23
**purchased**
353:2 427:17
427:20 435:24
**purchasing**
317:4 367:19
516:6
**pure**  459:19,21
459:23
**purpose**  418:15
425:25
**purposes**
398:11 490:15
515:16
**push**  442:9
**pushed**  415:8
415:13 442:6
478:10
**put**  315:16
337:23 339:25
340:7 353:25
355:24 363:19

363:20,24
364:3 365:17
366:5,10,12,13
390:15 399:23
402:7 417:16
420:7 422:3
437:7 439:4
440:3,11
441:17,20
442:13,14,19
443:10 445:16
446:12,18
447:8 448:3
479:20 484:18
507:6 508:19
513:25 514:25
544:6
**putting**  318:2
322:25 382:9
446:19

**q**

**qualified**
451:10
**queens**  411:25
**question**  332:4
333:13,15,19
341:25 374:15
374:18 380:23
423:16 432:12
438:16 446:3
446:15 448:9
452:13 454:25
455:2 460:17
462:20 463:2
465:3 502:22

503:10 504:20
520:23 521:5
527:22,24
528:4 529:15
531:23 535:4
535:23 538:3
541:5 543:5
544:15 545:8
545:18 550:14
**questioning**
381:10
**questions**  309:7
310:14 326:11
326:12 345:23
345:25 346:3
374:20 375:8
380:22 406:3,5
430:20 436:6
460:25 461:5
463:18 464:11
465:25 487:12
487:17 488:2
497:19,21
498:7,13
502:20 503:11
503:14,16
504:11,12,18
505:7 514:3
515:7,9,14
519:20,21
538:9 545:7
546:2,6,8
**quick**  347:21
**quicker**  485:19
485:19

**quickly**  484:12
**quit**  363:25
**quite**  320:7
336:13 501:11
548:2
**quote**  454:16
526:16

**r**

**r**  308:1 309:1
310:1 312:2,2
312:2 349:9
467:9,9,17,17
553:2
**racing**  481:16
**rail**  484:19
**raise**  311:16
349:2 407:12
467:3 470:2
506:5
**ramp**  350:13
350:15
**ran**  472:25
542:9
**random**  455:13
**range**  436:24
452:19
**rate**  489:24
**reach**  385:5
421:11
**reached**  472:19
475:4
**read**  333:22
393:9 395:2,5
395:19 397:17
479:9 509:21

NYSCEF DOC. NO. 1        RECEIVED NYSCEF: 01/26/2024
Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 103 of 119
PageID #: 1586

[read - removed]                                              Page 39

| | | | |
|---|---|---|---|
| 513:17 | 547:25 | 400:16 402:9 | **related** 462:22 |
| **reading** 402:21 | **recently** 386:20 | 461:2 502:23 | **relations** 384:9 |
| **ready** 473:22 | **recognize** | **refer** 401:25 | 384:18,19 |
| 482:17,17 | 509:24 510:4,8 | 414:3 416:11 | 391:12 |
| 500:12 | **recollection** | **reference** | **relationship** |
| **real** 328:21 | 321:5 333:24 | 402:23 | 471:7 484:15 |
| 339:7 478:9 | 376:24 377:3 | **referenced** | 496:19 499:16 |
| **realign** 410:23 | 393:12 395:9 | 481:3 | **relationships** |
| **really** 329:2,15 | 396:21 397:23 | **references** | 469:16 |
| 338:22 361:8 | 433:13 452:11 | 430:3 | **relay** 339:11 |
| 374:5 389:16 | **reconvene** | **referencing** | **relayed** 346:24 |
| 481:18 484:18 | 347:25 | 503:7 | **relevance** |
| 485:4 486:7 | **record** 322:9 | **referring** 424:7 | 534:15 |
| 499:3,17 | 325:15 339:18 | **refers** 415:16 | **relevant** 534:18 |
| 516:21 | 349:23 374:24 | 464:2 | 540:10,12 |
| **realtime** 426:13 | 397:12 418:18 | **reflect** 541:17 | **rely** 456:3 |
| **rear** 388:12,16 | 426:15 453:20 | **refresh** 333:23 | 497:24 |
| 388:18 | 464:19 510:2 | 376:24 393:11 | **relying** 329:21 |
| **rearrange** | 551:23 | 395:9 396:21 | 344:23 |
| 387:13 | **recorded** | 397:23 480:8 | **remember** |
| **reason** 415:14 | 512:13 526:8,9 | **refreshed** | 340:4 364:17 |
| 417:7 | 526:16 527:17 | 377:4 | 369:6 380:5,7 |
| **reasons** 415:12 | 547:13 | **refrigeration** | 391:19,20 |
| 416:10 | **recording** | 313:25 327:2 | 405:18 433:5,6 |
| **recall** 333:6,11 | 512:19 526:25 | **regarding** | 445:3 450:20 |
| 366:6 404:9,10 | 530:10,12 | 398:19 463:4 | 456:10 463:20 |
| 404:12 410:20 | 537:5 | 511:7 | 481:22 482:6,8 |
| 452:15 456:12 | **recordkeeping** | **regulations** | 484:4 499:21 |
| 456:14 500:3 | 552:2 | 338:9 | 500:11 517:11 |
| 509:5 513:2 | **records** 463:15 | **reinstated** | 518:9 527:23 |
| 522:18 | **recross** 309:21 | 388:24 | 535:21 539:4 |
| **receive** 328:12 | 310:9 464:24 | **reiterate** 548:5 | 541:2 548:25 |
| 352:13 | 504:21 | **rejected** 320:25 | **removed** |
| **received** | **redirect** 309:14 | **rejuvenation** | 377:12 463:19 |
| 404:18 464:3 | 309:20 310:8 | 470:13 | |

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 104 of 119
PageID #: 1587

**renewed**
  405:10,12
**rent**  427:2,21
  428:4
**rental**  416:16
  435:24
**rentals**  416:17
  435:22
**rented**  416:18
  427:24
**rep**  308:19
**repeat**  408:21
  418:24 432:11
**rephrase**
  438:16 463:2
**replacement**
  470:14
**reply**  364:9,10
**report**  420:15
  420:17
**reporter**
  479:10
**reporting**
  538:20,20
**reports**  322:12
  538:21,22
  539:2,5,19
**represent**
  330:25 331:8
  398:10 487:16
  492:7 494:8
  523:4 532:18
**requested**
  479:8 490:20

**required**  383:3
  414:25
**requirements**
  336:2 338:15
  362:6,7 382:21
  477:16
**research**  491:6
**resources**
  423:25 424:4,7
  424:11
**respond**  514:12
  531:11
**respondent**
  307:8 308:11
**respondents**
  407:8 506:16
**response**
  323:11 484:13
**responsibilities**
  329:10
**responsibility**
  382:19
**responsible**
  345:12,13
  384:5,14 386:9
  430:13,15
**rest**  315:4
  390:13 428:16
  428:17
**restaurant**
  522:15,15,16
**restructuring**
  469:24
**result**  362:14
  362:15 411:16

  411:20
**resume**  315:8
  497:2
**returned**
  334:18
**returns**  474:16
**revenue**  474:4
  475:13 488:17
  490:2
**reverse**  366:16
  483:20
**review**  488:8
  488:14,24
  491:2 510:19
**reviewed**
  488:10,17
  489:24
**reworked**
  486:18
**rfi**  318:11,20
  318:21 320:7
  330:4,5,6,22
  331:2,10,10,13
  331:15,18,23
  332:8 346:12
  369:14 390:15
  479:2,12,12
  494:22,24
  495:5,7 503:7
  503:8 504:24
**rich**  308:9
  403:9
**richard**  308:8
  430:23

**richmond**
  553:5
**ride**  476:14
  493:14
**right**  311:17
  316:23 318:7
  321:25 322:2
  322:18,24
  323:8,9,10
  324:12,13
  325:24 326:5
  326:18,20
  329:2 330:7
  331:3 332:10
  332:14 333:4
  333:17 334:18
  335:18 336:20
  337:14 338:4,9
  338:18 339:2,8
  339:16,17,22
  341:22 342:23
  343:8 344:25
  345:16 349:3
  353:22 361:4
  364:5 366:2
  367:3 372:24
  376:9 377:10
  377:13,18
  378:12,20,24
  382:22 383:15
  384:4,9,16
  386:17 387:18
  388:4,9 394:8
  396:5 398:5,15
  403:15,17,20

[right - ruggiero]                                                    Page 41

| | | | |
|---|---|---|---|
| 404:22 407:12 | **rob's** 504:23 | 377:2 385:10 | 472:22 493:6 |
| 408:9 421:3 | **robbing** 372:21 | 392:20 394:14 | 518:19 523:11 |
| 422:25 424:12 | **role** 425:12 | 400:16,25 | 523:14 536:4 |
| 424:13 430:18 | 455:20,21 | 401:7,13,21 | **routes** 329:2 |
| 437:4 439:8,22 | **roles** 342:3 | 402:3,6,10 | 332:23 334:7 |
| 449:16 451:8 | 409:20 | 406:2 423:9 | 341:12 354:2 |
| 455:17 457:19 | **roll** 440:2 | 430:22,23 | 355:3 360:24 |
| 462:7,8 464:18 | **roller** 439:18 | 432:13 438:7 | 365:12,18 |
| 467:4 478:22 | 439:20 440:11 | 438:17 460:24 | 367:7 370:19 |
| 480:23 488:13 | 440:18,21 | 461:5 462:24 | 370:22 371:2 |
| 489:8 495:5 | 441:17,21,23 | 463:18 464:10 | 380:16 421:25 |
| 496:6 500:3,15 | 442:3,19 | 464:25 465:24 | 473:25 475:14 |
| 501:4 502:2 | **rollers** 441:24 | 466:3 467:23 | 476:15,24 |
| 505:4 506:5,19 | 442:6,9,22,23 | 482:5 487:11 | 501:7,14 |
| 506:22 508:5 | 443:7,9 | 499:19 502:21 | 521:12 522:23 |
| 509:23 512:2,4 | **room** 371:4,19 | 502:24 504:17 | 532:11,20 |
| 513:17 515:19 | 408:7 506:17 | 513:19,23 | 533:2,5 536:15 |
| 524:16 525:5 | 537:7 | 514:24 519:21 | **rrothlaw.com** |
| 525:21 528:13 | **rosa** 395:10 | 519:24 521:6 | 308:9 |
| 531:21 537:22 | 396:24 398:4,7 | 529:13,16 | **ruggiero** 309:4 |
| 540:13,22 | 400:7 404:11 | 530:8 545:6,25 | 311:1 312:1 |
| **ringers** 311:9 | **roth** 308:5,8 | 546:5 551:20 | 313:1 314:1 |
| **road** 336:8 | 309:5,10,14,19 | 552:3 | 315:1 316:1 |
| 381:20 | 309:21 310:6,8 | **roughly** 390:3 | 317:1 318:1 |
| **rob** 474:22 | 310:13 311:23 | **route** 315:20,22 | 319:1 320:1 |
| 475:17 489:12 | 312:8 322:13 | 315:25 316:9 | 321:1 322:1,6 |
| 489:15,17 | 322:17,21 | 316:11 318:4 | 322:7 323:1,13 |
| 490:18 493:20 | 326:10 330:3 | 320:23 336:23 | 324:1 325:1,17 |
| 494:11,14,17 | 332:4 333:10 | 336:25,25 | 326:1 327:1 |
| 495:14,19 | 339:22 343:3 | 337:2,6,9,10 | 328:1,16 329:1 |
| 496:11,11 | 343:12,17 | 341:15 350:22 | 330:1 331:1 |
| 498:6,9,25 | 344:5,9,16 | 352:5 353:3,18 | 332:1 333:1 |
| 501:3,6,12,16 | 345:24 347:20 | 361:9 368:24 | 334:1 335:1 |
| 501:21,23,24 | 349:15 374:19 | 371:19 464:13 | 336:1 337:1 |
| 502:9,12,12,15 | 375:24 376:3 | 464:15 470:24 | 338:1 339:1 |

Case 1:23-cv-01675-KAM-TAM Document 74-4 Filed 07/08/25 Page 106 of 119 PageID #: 1589

340:1,11,18,20
341:1 342:1
343:1 344:1
345:1 346:1,4
347:1 348:1
400:9 405:15
412:9,15,19
424:19 470:18
474:14 477:23
508:8,10,23
511:3,6 512:8
512:14,22
513:13 515:21
516:13 520:6
520:24 521:12
522:14 523:8
523:18 525:8
538:24 541:8
547:3

**ruggiero's**
350:22 412:12
422:6 516:23
523:5 524:6

**rule**  429:20
431:6

**rules**  326:18
338:9 379:3

**run**  324:17
361:7 371:25
377:25 378:7
378:14 489:24
506:23

**running**  319:8
321:6 384:5
436:22

**rushed**  365:21

**rv**  385:2

**s**

**s**  308:1 309:1
310:1 312:2
407:18,18
467:9,9,9,17,18
467:18 506:10
506:10 507:12
507:12

**safety**  336:10
416:9 418:20
429:8,9,11
455:15 498:8

**salaried**  328:3

**salary**  328:6

**sale**  324:20
389:10,11
472:2 474:8
476:9 477:11
491:15,23
492:6,9 524:6
525:17

**sales**  473:24

**salon**  501:17

**sam**  489:12,17
495:19

**sam's**  489:13

**sample**  540:3

**sat**  508:11
511:9

**saturday**
511:16,17,17
532:12,13,14
533:21 550:12

550:15,18,20
550:21 551:3,6
551:9

**saved**  317:13

**saw**  354:5
468:25 469:2
476:15,19
491:25 542:8

**saying**  333:6,25
334:3 335:8
340:4 342:2
344:21 351:19
357:8 374:12
379:22 380:24
391:15 446:16
447:2 450:20
450:21 454:9
457:22,24
477:18 478:13
485:13 486:13
499:21 511:21
522:4 526:21
527:23 535:24

**says**  322:14
323:13 343:8
344:6,19
376:21 383:3
387:20 390:19
393:5 394:9
403:16 423:13
472:24 509:19
514:7 516:17
520:6 522:4
540:9

**scammed**  387:8

**scan**  379:19
380:4,6,8
381:22,23
383:14 442:15

**scanned**  443:10

**scanner**  378:20
379:16,24
381:25 382:6
387:20 426:5,8
426:9,10,11,23
429:5

**scanners**
378:22 426:18
426:21,25
427:18,20,21
427:25 428:3
429:6

**scanning**
383:12,16,19

**scared**  483:2

**schedule**
314:24 332:19
334:5 430:4
463:22 464:5

**scheduling**
315:12 334:13

**scherer**  308:19
317:20,22,25
318:9,22
319:11,13,23
325:16 341:24
343:13,18
346:6 356:24
357:19,21,23

Case 1:23-cv-01675-KAM-TAM Document 74-4 Filed 07/08/25 Page 107 of 119 PageID #: 1590

364:6,16 367:3
367:12,17,24
384:3,13,18,21
384:21 385:5
390:18,19
391:11 405:16
420:11,14
421:11 441:7
448:16,21,24
449:2,2 455:20
482:2 517:23
524:5,8 525:16
525:24 544:13
**school** 312:20
313:14 327:15
409:10,12
**science** 409:15
**screen** 509:18
515:13
**scroll** 510:5
**sean** 551:19
**searched**
316:12
**searching**
316:22
**season** 339:3,6
457:8,17 464:4
464:7
**seasons** 356:4
453:3
**second** 311:3
313:10 314:10
351:16,20
381:10 453:18
476:25 510:6

510:13 519:10
527:13 546:14
546:15
**secure** 321:14
496:12
**security** 321:22
325:20 388:4
388:12 415:12
**see** 320:7 323:4
323:6,17
330:24 331:3,5
331:11,21
336:24 344:20
346:16 355:18
370:20 372:9
374:8 377:7
392:16,17,23
393:4 394:21
394:21,24
395:18,22
396:8,11,15
397:14,18,19
402:15,17,18
402:25 403:14
404:21 405:3
425:11,11
439:13 457:21
461:18 472:19
486:4 491:22
491:23 504:3
508:12,15
509:18 532:16
534:18 539:12
540:16 548:23
549:4

**seeing** 393:10
395:8 396:20
397:22 476:14
476:15
**seemed** 320:6
**seen** 335:11
336:18 492:8
**segment** 420:19
**self** 472:25
**sell** 316:14,18
316:21 318:6
320:21 325:7
325:10 326:5
347:3,4,4
391:15 472:17
521:21
**sellers** 478:17
**selling** 318:5
470:24 513:16
518:3,13 520:9
525:8 541:10
542:2
**send** 516:16,17
**sending** 525:25
526:3
**sense** 384:12
433:22 482:21
483:6
**sent** 317:9
404:25 442:21
460:10,15
474:19,21
489:4,5 490:21
511:20 515:23
539:23

**sentence**
395:18,21,23
396:16 527:14
531:5
**separate**
315:25 445:12
447:12
**separated**
445:17
**september**
433:2
**sergio** 350:20
**serious** 455:12
455:14 479:22
481:19
**sermont** 375:11
**service** 329:3
333:3,10,17
336:2 339:8
377:14,18
379:3 381:3,18
382:21 383:23
383:25 411:4
411:20 414:6
418:20 421:5
421:14 422:18
422:20,21
423:20,23
424:2 426:17
426:20 428:6,9
428:14,15
429:7,12,17
430:3,13,14,17
431:3,5 434:7
435:24 447:3,4

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 108 of 119
PageID #: 1591

[service - simultaneous]                                          Page 44

455:4,15
457:15 458:10
458:12 459:2
459:17 460:3
483:15,16
508:2 513:15
517:17 519:3
520:8 522:3,5
522:6 533:7
534:20 541:10
542:2
**serviced** 446:7
460:16
**services** 468:20
**servicing**
519:17
**set** 414:10
447:14 474:21
477:21 543:11
553:14
**sets** 541:16
**settlement**
516:19 538:21
538:25 539:5
**settlements**
539:11,17,19
**seven** 348:2
359:2,3 361:2
361:3 365:14
379:12 391:24
533:24 535:20
**sevens** 447:16
**several** 434:14
512:10

**shadowed**
493:6
**shape** 486:14
**shared** 468:17
**shawn** 310:11
325:16 326:8
368:25 369:2
458:21,23
472:6 506:1
507:1,5,11
508:1 509:1,19
510:1 511:1
512:1 513:1
514:1 515:1
516:1 517:1
518:1 519:1
520:1 521:1
522:1 523:1
524:1 525:1
526:1 527:1
528:1 529:1
530:1 531:1
532:1 533:1
534:1 535:1
536:1 537:1
538:1 539:1
540:1 541:1
542:1 543:1
544:1 545:1
546:1 547:1
548:1 549:1
550:1 551:1,25
552:1
**sheet** 474:3
488:18

**sheets** 474:15
489:20,22
490:4
**shift** 382:8
410:6
**shipper** 422:22
**shippers**
426:14
**shipping** 385:2
**shocked** 483:2
**shoes** 317:2
**short** 341:18
348:3 374:21
406:6 466:7
500:24 505:8
538:12
**shot** 530:5
**show** 318:12,15
323:3 330:15
352:4 376:16
376:17,21
398:12 425:13
425:17 444:12
474:14 476:21
481:19 491:21
509:16 513:7
516:8,9,10,21
526:17,23
527:4,7,8,12,15
527:20 528:6,7
528:9,10,14,19
528:23 529:5,6
545:17,23,23
546:3

**showed** 330:3
343:3 368:16
474:3,4 511:18
512:25 516:2,4
521:2
**showing** 333:15
392:13
**sic** 536:14
**side** 330:15,16
366:10,13,14
384:17,19,24
384:25 385:8,8
413:15 420:9
**sign** 352:12
492:12 532:25
533:3,8
**signature** 395:4
510:11 553:16
**signed** 352:14
397:4 453:22
479:4 481:15
492:15,19,21
493:2
**significant**
481:18
**similar** 331:14
331:16
**similarities**
331:20,24
332:3,6
**simple** 473:3
492:6 494:6
528:4 541:6
**simultaneous**
340:19

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 109 of 119
PageID #: 1592

**simultaneously**
389:10
**sir** 340:22
375:7 382:15
395:18 419:16
421:4 428:7,10
429:25 432:23
433:18 439:16
440:5 445:4
466:6 487:15
506:18 509:15
509:22 510:17
519:18 520:3
521:10 527:21
529:6 538:15
540:5 542:22
543:19 545:5
**sit** 329:14
433:25 444:11
508:14 518:18
**sitting** 394:7
**situation**
356:14 360:18
366:7 367:5
504:9
**situations**
345:5 384:13
424:10
**six** 330:19
331:7 358:25
362:21 363:4
363:11 436:9
452:3 482:23
494:5

**sixes** 447:16
**size** 373:3
417:10 453:12
**skim** 503:5
**skin** 470:10,11
470:14
**sleep** 358:22
**slightest** 521:24
**slip** 381:19
**slipping** 498:17
**slot** 390:8
**slow** 540:18,21
540:23,24
**small** 417:11
536:6
**smaller** 453:6
**smoothly** 476:4
**snapshot**
479:15
**sold** 389:14,17
405:21 471:19
472:9 521:15
521:23
**sole** 488:21
**solidify** 498:14
**solutions**
420:25
**somebody**
454:9 456:8
494:15 499:12
514:25 529:21
530:23
**son** 506:18
**soon** 429:15

**sorry** 311:4
340:17 341:4
361:21 375:25
375:25 403:3
408:23 435:9
451:5 452:25
454:24 459:21
463:8 482:10
482:14 521:18
534:4,6
**sort** 355:8,13
355:25 439:24
440:23 455:21
493:6
**sorted** 357:17
447:10
**sorting** 354:13
379:24 413:9
**sound** 472:7
**sounds** 334:2
**space** 366:8
420:7
**spaces** 443:19
443:20,21,25
**speak** 317:5
336:11 337:15
337:19 341:24
351:16 385:19
398:5
**speaker** 482:12
482:13 483:24
**speaking**
328:14 337:21
462:21

**specific** 338:24
340:6 346:7,8
393:9
**specifically**
329:16
**speech** 340:19
**spell** 467:14
**spelling** 507:10
**spend** 354:11
354:13 357:14
**spent** 375:17
486:2 499:19
501:11,14
**split** 354:3
440:9 518:19
**spoke** 317:8,20
317:21,24,25
318:9 319:25
337:20 346:23
367:2 388:3
395:3 396:16
404:13,14
405:15,15
481:23 484:7
502:15,17
511:8 512:22
515:25 520:15
524:2,5,8
537:21
**spoken** 456:7
**spot** 415:18,19
**spots** 435:4
**spreaded**
536:14

[square - stops]                                                     Page 46

| | | | |
|---|---|---|---|
| **square** 307:17 | 457:22,25 | 462:17 497:16 | 425:1 426:1 |
| 307:18 | **starts** 318:19 | 502:6 543:3,4 | 427:1 428:1 |
| **sr** 400:10 | **state** 307:20 | **stations** 410:23 | 429:1 430:1 |
| 444:22,23 | 312:5 349:12 | 410:25 411:3,4 | 431:1 432:1 |
| **stamp** 400:19 | 407:21 467:12 | 411:8 | 433:1 434:1 |
| 401:2,8,14 | 496:2 506:13 | **stay** 311:12 | 435:1 436:1 |
| **stand** 412:3 | 553:4,8 | 399:17 475:25 | 437:1 438:1 |
| 413:19 513:24 | **stated** 388:8 | 494:4 538:8 | 439:1 440:1 |
| 514:25 | **statement** | **stayed** 350:12 | 441:1 442:1 |
| **standing** 367:3 | 388:6 415:4 | 468:21 | 443:1 444:1 |
| 512:3 | 419:20,22 | **stealing** 386:21 | 445:1 446:1 |
| **start** 313:17 | 422:9,11 | **stenographer** | 447:1 448:1 |
| 353:9 375:10 | 424:21 509:9 | 467:15 | 449:1 450:1 |
| 376:11 377:4 | 541:7 547:9,21 | **stenographic...** | 451:1 452:1 |
| 431:2 506:15 | **statements** | 307:19 | 453:1 454:1 |
| 507:6,7 | 474:16 510:22 | **step** 416:10 | 455:1 456:1 |
| **started** 312:21 | 510:24 | **steps** 320:9,11 | 457:1 458:1 |
| 312:22 313:8 | **states** 395:21 | 320:14 346:15 | 459:1 460:1 |
| 313:13 314:5 | 513:13 | 346:19,21 | 461:1 462:1 |
| 314:16 316:5 | **static** 439:18 | 391:5,25 | 463:1 464:1 |
| 327:19 328:11 | 439:20 440:10 | 496:14 | 465:1 466:1 |
| 342:25 349:25 | 440:17,20 | **steve** 322:3 | **stipulate** 344:5 |
| 350:20 351:2 | 441:17,21 | 363:7 407:2,8 | 344:10 |
| 368:17 376:25 | **station** 329:18 | 407:25 430:19 | **stolen** 342:17 |
| 380:3 383:11 | 334:18 384:13 | 461:4 466:2 | 387:23 |
| 383:14,16 | 409:5 410:18 | **steven** 309:16 | **stood** 350:13 |
| 409:22 450:21 | 411:11,17,21 | 407:1 408:1 | **stop** 350:7 |
| 468:6,7,9,13,16 | 411:24 412:4,5 | 409:1 410:1 | 380:9 387:6,6 |
| 471:8 478:3 | 413:5 424:20 | 411:1 412:1 | 387:12 479:11 |
| 485:18 517:4 | 424:24 425:4 | 413:1 414:1 | 485:17 |
| 531:9 544:20 | 425:10 426:2 | 415:1 416:1 | **stopped** 482:19 |
| 548:20 | 427:3,4,5 | 417:1 418:1 | 530:13 |
| **starting** 312:23 | 444:5 447:25 | 419:1 420:1 | **stops** 372:16 |
| 368:15 407:7 | 457:11 460:15 | 421:1 422:1 | 453:14 474:2 |
| 431:22 432:8 | 461:9,15,19 | 423:1 424:1 | 475:7 |

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM INDEX NO. 650428/2024
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 01/26/2024

**straight** 376:2
**stream** 488:17
**street** 447:13
  447:14 459:14
  476:19
**streets** 413:14
  413:15 459:12
**structuring**
  494:12
**struggle** 475:22
**struggled** 486:8
**student** 313:14
**studied** 468:3
**stuff** 314:20
  339:19 387:8
  391:16 399:5
  400:2,3 469:2
  525:25 526:3
  549:2
**stunt** 380:13
**subject** 359:6
  514:18
**submit** 400:7
**submitted**
  332:8
**subsequent**
  528:12,12
  547:20
**substantive**
  438:5
**sudden** 533:12
  533:21
**summary** 393:6
  397:18

**summertime**
  540:18
**sunday** 550:12
  550:15,18,20
  550:22 551:4,6
  551:9
**support** 495:17
  514:2
**supposed**
  368:14,15
  371:10 372:22
  384:18,20,22
  385:7 477:9
  484:17 511:14
  511:15 513:7
**sure** 312:11
  318:14 324:25
  331:22 351:24
  361:10 362:8
  366:25 378:10
  378:14 380:20
  381:13 382:20
  382:25 383:4
  409:10 423:6
  435:2 436:15
  443:4 451:2
  493:3 495:4,25
  497:10 502:3
  504:8 519:12
  528:21 530:3
  538:6 548:2
**survive** 369:23
**suspended**
  388:21

**swiss** 350:12
**switch** 366:20
  375:14,18
**sworn** 311:11
  311:13 312:4
  349:11 407:20
  467:11 506:12
  509:9
**system** 307:6,7
  308:12,12
  311:5 354:5
  383:9 413:9,9
  417:6 439:21
  441:15 445:18

**t**

**t** 312:2 349:9
  407:18,18
  467:9,17 553:2
  553:2
**tab** 318:16,18
  322:15,17
  323:4 503:2,8
**table** 347:7
  473:22 482:20
**take** 328:6,7
  330:18 331:6
  339:4 347:21
  351:24 352:3
  365:14 370:21
  380:14,16
  389:25 390:2
  391:4,17,25
  423:18 441:18
  447:23 448:3,6
  483:21,22

  484:2 496:14
  518:20,21,23
  518:24 525:9
  530:5 532:20
  538:4,7 540:24
  541:3 549:9,17
  549:18,19
  550:21
**taken** 341:19
  348:4 374:22
  397:5 406:7
  437:18 466:8
  474:2,2 500:25
  505:9 538:13
  549:5,24
**takes** 542:23
**talk** 317:3
  349:22 351:17
  352:5 357:19
  359:5 367:15
  391:2 408:22
  412:22,23
  423:10 425:21
  425:21,22
  434:24 444:10
  444:15 453:18
  454:17 455:8
  470:16 481:3
  512:5
**talked** 319:10
  337:12 357:21
  366:21 367:16
  397:7 403:25
  456:8,25
  458:20 462:5

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM

463:17 464:9
482:9 511:10
511:10
**talking** 316:13
342:3 367:4
389:10,11
398:24 461:7
462:14 473:23
481:17 496:20
499:18 501:12
512:2,3 525:23
**tamora** 393:22
**tape** 325:15,21
530:9 537:4
**taped** 325:22
532:6
**tappan** 409:11
**task** 365:25
**tax** 474:16
**technically**
369:7
**telephone**
528:13
**tell** 311:18
313:11,15
314:20 316:10
317:23 319:22
325:4,8 346:4
346:9 349:4,19
352:23 353:5
357:23 359:20
360:3 361:16
364:3 370:16
371:13 373:9
373:15 385:19

385:20 386:16
387:4 390:21
391:7 397:8
399:11 400:3
407:13 421:19
427:9 431:7
436:23 456:21
458:13 460:5
467:5,24
470:20 471:13
472:13 473:16
476:8 480:16
480:24 481:6,7
481:9 487:24
489:23 500:6
500:15 503:3,5
506:6 512:18
517:18,23
518:5,11
525:14 530:15
530:21 531:6
531:14,18,20
531:25
**telling** 359:8
470:23 479:21
507:7,9
**ten** 382:8
433:15
**tenure** 416:21
449:22
**term** 369:17
377:15,22
378:2,4,8,12
413:23 415:15
418:8 421:17

424:6 428:5
487:19 490:24
490:25
**terminal**
353:22 354:12
355:20 357:18
362:19 366:8
366:16 379:17
379:20 380:11
380:12 381:23
382:10,12
384:5,22,24
385:8 399:18
414:17,18
415:2,22
476:21,22
517:11,12,13
542:5,19
543:14
**terminated**
523:5 524:7,9
529:19,20
537:11,17,24
**termination**
537:10,16
**terms** 338:23
353:11,13
421:13
**territory**
446:11 473:5
476:15
**test** 362:12,13
462:6,10
**tested** 361:18
361:20,23,24

362:3,11
451:11,14,18
451:20,21
452:7 462:12
462:16,23
463:6
**testified** 312:6
328:25 330:3,9
333:2 335:16
336:15 337:7
338:7,14
339:22 340:10
340:23 343:5
344:22 349:13
363:20 389:5
392:5 407:22
435:16,18
437:13,18
467:13 499:6
506:14
**testify** 311:12
424:15,18
445:11
**testimony**
311:13 333:23
385:17 414:24
419:17 422:5
432:16 438:3,6
438:8,18 445:3
447:18,22
501:3 514:2,9
**text** 323:19
343:5,8,14,21
480:13 511:20

**texted** 539:16
**thank** 311:22
  318:17 326:11
  347:17 407:17
  430:18 460:25
  465:25 466:3,6
  487:12 504:18
  507:2 519:20
  538:11 545:7
  546:5 551:17
  551:19,20
**thanks** 408:10
  466:2 507:5
**therapy** 314:12
**thing** 320:17
  364:13,14
  383:7 384:16
  397:25 445:21
  455:13 471:5
  475:24 479:24
  481:5 486:10
  496:16 498:19
  525:22 550:11
**things** 314:23
  323:25 324:3
  324:10 335:23
  400:8 425:23
  476:6 495:12
  497:22 498:8
  501:12 511:11
  511:22 516:17
  525:23 536:16
**think** 319:10
  327:23 328:24
  330:9 333:21

335:16 338:7
338:13 339:21
340:10 341:3
347:23 359:7
373:2 380:22
381:6,16
383:10 398:19
398:25 399:3,9
404:9 405:16
431:14 433:16
433:20 434:5
444:25 448:16
456:25 459:9
463:17 471:10
472:18 475:9
475:15 479:5
483:13 484:6
485:16 491:15
492:17 493:5
501:25 502:17
514:8,14 516:9
518:2 519:5,8
529:14 534:21
534:23
**thinking** 376:2
485:21
**thought** 324:23
324:24 331:22
337:7 471:17
480:8 500:22
521:6 535:16
**thousand**
339:25
**three** 319:16
321:11 350:4

353:24 358:22
362:20,21
375:17 387:23
418:7 420:5
428:13 431:14
431:16 434:6
447:16 465:15
465:18 473:11
493:22
**threshold**
380:17 430:6,8
**throw** 455:14
**thrown** 445:7,8
445:12,18
470:7
**till** 377:5
**time** 307:12
313:21,23
315:15 316:17
316:22 317:20
317:21,23
325:14,18
335:20 338:21
341:19 348:4
351:4 356:13
357:14 358:18
358:19,20
359:6,23
360:25 364:6
364:12 365:17
366:21 368:19
374:22 379:21
379:21 380:9
382:3,11,12
390:7,8 395:15

395:20 398:12
398:22,25
399:2,10,14,17
400:7 405:24
406:7 417:15
418:2 431:17
434:5 438:21
438:24 443:24
451:22 452:18
453:2 458:4,7
461:25 462:18
465:17 466:8
470:17,25
471:17 476:14
476:25 478:19
480:7,10 486:2
486:8 487:3
493:8 494:13
497:14 498:16
499:19 500:25
501:12,14
504:16 505:9
511:8,14
512:21,24,24
513:5 517:3,8
518:22 519:15
520:19 523:9
523:10 527:7,8
527:18 530:11
530:13 531:10
531:12 533:9
538:13 539:25
**timeframe**
451:3

FILED: NEW YORK COUNTY CLERK 01/26/2024 12:44 PM INDEX NO. 650428/2024
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 01/26/2024

**timeline** 364:18 383:20

**times** 307:17,18 314:23 372:8 374:8 380:10 399:8 416:25 475:9,13 476:12,13 478:15 508:12

**timing** 347:24

**today** 329:14 385:11,17 386:16 408:10 508:22

**together** 332:18,21 345:16 353:25 354:11 367:4 389:20 390:15 445:7,9,12,16 445:19 446:12 446:18 447:8 447:17 471:4,6 474:18 479:20 484:17,21 518:18 542:17

**told** 320:13,14 320:20 323:22 327:23 339:20 342:13 346:11 346:25 355:3 357:24 360:7,7 362:18 363:11 363:12 367:25 370:21 373:12

374:17 385:18 388:11,19 390:24 391:3 393:18 394:2 396:25 399:25 422:6 448:21 452:4 480:16 480:18 517:21 518:6,10 522:12 525:22 525:24 529:18 529:22,24 531:19 532:2

**tomorrow** 323:15 343:10

**ton** 331:25

**took** 313:21 365:18 367:6 370:25 387:17 476:24 493:19 494:4 522:23 532:11 536:13 550:24

**top** 396:15

**total** 360:23

**touch** 346:18 398:22 499:24

**towards** 478:22 517:8

**tower** 307:17

**track** 378:23 429:3,7 430:14 430:16

**tracking** 399:21 402:17

402:19,23

**trailers** 410:2

**train** 336:14 338:19 344:24

**training** 328:12 328:22 336:7

**transaction** 337:13,16 490:15 491:10 491:12 498:17 500:2 529:10

**transcribed** 307:19

**transcript** 479:9 515:9

**transfer** 544:6

**transferred** 326:8

**transition** 321:15 334:10 476:3 494:3 495:16

**transitioned** 321:11

**transitioning** 324:8

**transmitted** 429:8

**transportation** 429:20 497:4

**treated** 356:25

**trickle** 339:17

**trickled** 342:14

**tried** 380:14 508:14

**trip** 416:11

**truck** 337:3 355:10 356:3 356:12 365:18 366:9 370:23 372:22 381:24 383:19 387:11 387:11,12,14 387:18 388:9 388:10,12,14 388:16,19 414:2 416:11 438:25 440:4 440:16 442:8 443:5 447:13 480:15 500:21

**trucking** 336:3 507:16

**trucks** 332:21 337:11 353:14 359:25 367:5 372:16 413:15 413:16 415:24 416:4,18 417:12,12,13 420:9 421:24 422:4 424:8 434:20 435:4,6 435:15,16,18 435:20,23 436:2,9 437:7 438:22 439:7 440:14,25 441:8,11,20 442:10,15,20

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 115 of 119 PageID #: 1598

443:12 446:19
446:22 448:4
448:10,12,19
451:9 458:19
465:16,18
493:15 536:4,6
536:7,8
**true** 338:22
386:19 388:2
389:13 422:9
422:10 434:20
510:24 528:5
531:15 541:6
**trust** 480:2
**truth** 311:18,19
311:20 349:5,5
349:6 385:19
386:17 407:13
407:14,15
467:6,6,7
506:7,7,8
**try** 316:14
334:4 408:21
446:24 469:25
518:19 519:13
545:20 546:9
549:3
**trying** 329:16
329:19 337:16
380:18 388:15
388:17 436:6
477:19,20
478:13,13
484:18 499:19
517:10 550:23

**tunnel** 481:10
487:7
**turn** 311:8
352:14 356:11
356:12 403:3
404:4,19,24
**turned** 365:22
504:7
**turning** 333:12
**turnkey** 472:24
494:7
**twelve** 360:2
387:20 434:21
**twice** 327:24
373:3 493:6
**two** 314:22
321:22 336:8
354:2 361:2,3
365:15,15,15
365:17,18
370:22 372:7
389:11 404:5
412:17,19
431:14,16,19
433:16,18,19
437:14 438:11
447:16 457:8
457:18,22,25
459:13,13
475:24 476:19
481:23 482:7
483:24 488:11
488:25 493:22
502:6 535:7
541:16

**tyler** 372:12
**type** 314:20
317:15 337:25
412:25 416:13
499:15
**types** 345:19
416:3 428:13
**typical** 354:15
475:13
**typically**
398:21

**u**

**u** 312:2 416:19
**uh** 311:15
323:18 330:20
388:5 396:14
513:12 523:25
530:17 532:24
547:18 548:10
**ulog** 389:3
**ultimately**
345:11 430:12
**ulug** 376:9,23
376:25 377:5
391:22 461:9
**unable** 443:6
**uncle** 315:22
328:15 340:11
341:5,8
**undelivered**
339:10
**under** 321:23
326:17 351:21
370:13 375:2
386:20 433:15

433:16 514:10
**undergraduate**
312:18
**underlyingly**
345:14
**understand**
311:12 324:20
336:25 341:2
341:16 345:14
363:5 368:6
372:25 375:3
381:5 403:5,23
432:6 439:14
443:17 444:14
444:20 445:8
453:19 454:24
457:21 458:24
460:17 479:12
483:23 494:6
539:9,12
542:18
**understanding**
323:22 340:12
341:14 361:16
436:7 496:21
497:15 498:21
500:18 546:22
**understood**
380:2 393:7
395:21 479:14
490:3
**underwrite**
475:19
**underwriting**
490:20,22

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 116 of 119
PageID #: 1599

**[underwriting - warrant]** Page 52

491:5

**uneasy** 325:19

**unfortunately** 334:25 344:18 347:16

**uniforms** 314:24 315:11

**university** 312:14 313:4 314:6,8 327:12 409:14 476:17 476:18

**unnecessary** 311:10

**uphold** 314:8

**ups** 372:7

**upset** 485:24

**upsetting** 356:14

**use** 330:10 413:7,10 418:18 427:10 427:13 443:6

**used** 350:3 374:11 380:4 380:11,13,16 381:13 391:23 426:11 427:8 435:23 483:13

**using** 515:5

**usually** 380:8

**utilize** 439:15 441:14

**v**

**v** 407:18

**vacation** 451:21 462:17 466:5

**valuation** 317:9

**van** 415:17 417:2,3,4,8 418:4,6 419:24 420:7,8

**varied** 452:17 453:4

**various** 410:7 413:12

**vehicle** 413:2 414:12 415:9

**vehicle's** 414:9

**vehicles** 412:25 414:7 415:2,20 416:2,4,5,14,17 417:5,18 419:24 420:3 420:10 437:11 457:15

**ventured** 469:8

**verbal** 323:11

**verbatim** 463:25

**versa** 371:25

**versus** 311:4 415:21 436:14

**vetting** 488:9

**viability** 495:2

**vice** 371:25

**video** 407:25 408:3 519:8 543:22

**violate** 380:9 380:25 381:2 381:14,17

**violated** 380:9

**violating** 382:21,25 383:4

**violation** 428:9 428:15,20,24 430:9,10 431:5

**violations** 429:4 431:9 434:6

**voiced** 321:7

**volume** 338:23 339:5 410:24 411:3 417:13 452:10,14,16 498:22 547:9

**w**

**w** 349:9 407:18 506:10 507:12

**wait** 402:8

**waiting** 470:5 478:5

**walk** 374:7 379:20 382:12 382:13

**walked** 379:22 382:9

**wall** 414:20,21

**want** 321:8 351:18,25 381:12 391:7 391:14 394:14 412:23 413:13 425:21 436:20 473:18 474:6 484:14,15,25 502:21 513:8 522:11 528:15 529:3,4 538:8 541:3 546:21

**wanted** 315:25 321:18 325:2 325:21 332:12 332:16,25 342:14 347:4 368:7 398:4 415:9,11 421:7 425:16,20,22 445:22 447:11 448:6 479:15 481:14,14,15 481:18 483:21 486:4 490:19 491:20 492:18 501:2 502:25 503:22 514:15 516:6 525:4

**wanting** 318:3 325:12

**warning** 486:15

**warrant** 417:14

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 117 of 119
PageID #: 1600

**wash**  363:21,23
**waste**  395:20
**wasted**  504:16
**wasting**  471:17
**way**  313:20
   330:14 335:13
   383:18 386:6
   394:5 403:4
   411:5 414:14
   414:15 415:25
   447:19 459:10
   470:8 481:12
   492:25 504:7
   514:10 517:12
   517:14,15
   518:8,8 522:22
   524:8,21,25
   536:3 537:7
**wayne**  468:3
**ways**  426:24
**we've**  483:8,18
   483:18
**weather**  415:3
**week**  314:23
   327:24,24
   335:21 358:25
   359:3 365:15
   379:8,13
   381:17 391:24
   400:5 405:2
   540:8
**weekends**
   391:23
**weekly**  360:12
   380:17 386:13

448:17 452:15
   452:17
**weeks**  353:25
   365:15,16,17
   457:19,22
   458:2 539:7,8
   539:10,16,19
   539:22,23
   540:2,8,17,21
   541:13,19
**weight**  514:22
**welcome**  485:5
**went**  327:11
   336:23 337:10
   341:22 342:10
   342:12,16
   352:13 353:23
   354:21,25
   360:2 367:15
   369:11 370:21
   372:14 385:20
   387:14 388:19
   390:25 392:11
   392:12 409:11
   423:14 458:19
   460:20 468:2
   474:17 476:20
   480:7 482:22
   483:2 487:7,8
   493:8 503:17
   511:9,16
   512:25 519:8
   536:4,15 542:5
   543:2,2,18
   544:17

**whatnot**  469:7
**whatsoever**
   415:14
**whereof**  553:13
**whichever**
   389:24
**white**  350:3,8
**william**  468:2
**willing**  338:19
   545:10
**win**  324:25
**winter**  356:5
**withdrawn**
   320:11 533:21
   542:24
**witness**  309:4,9
   309:16 310:5
   310:11 311:15
   311:21 312:3
   323:2 341:7,13
   344:7 346:11
   346:22 347:12
   347:16,19
   349:7,10 375:4
   381:2,15
   390:24 402:2
   407:4,8,10,16
   407:19 408:8
   432:11 466:6
   467:8,10,16,21
   480:23 506:3,9
   506:11,18
   507:11 513:24
   538:10 545:9
   546:3,13,20,25

547:4,7,11,15
   547:18,23
   548:10,12,17
   548:21 549:13
   549:17,21,23
   550:8,11,16
   551:5,11,15
   553:13
**wonder**  374:11
**wondering**
   498:18
**word**  331:9,9
   331:14,14
   381:13 413:8
   418:24 427:8
   427:13 529:9
**words**  388:16
   447:5 455:6
**work**  312:21
   313:14,16,18
   314:15 327:15
   332:22 334:14
   340:5 349:25
   350:3,11
   375:20 376:25
   379:8,11 382:6
   408:12,13,25
   413:12,23,25
   414:2,3 418:2
   421:21 428:17
   432:3 439:10
   440:8 445:20
   445:23 447:12
   457:16 458:10
   468:15 494:2

Case 1:23-cv-01675-KAM-TAM   Document 74-4   Filed 07/08/25   Page 118 of 119
PageID #: 1601

[work - york]                                        Page 54

499:13 504:6
507:15,25
533:6,9,10
540:12,16,17
545:5 549:7
550:12,15,17
550:18 551:3,6
551:8
**worked** 313:23
321:23 326:22
327:2,11,23
335:3 338:5
350:5,21
355:16 382:15
409:24 410:4
473:3 477:13
**worker** 512:4
**working**
312:22 313:13
314:7,16 320:6
327:19,22
328:8 332:17
350:20 375:10
375:22 376:5
376:11 378:23
385:21 389:2
409:16 422:8
468:6 497:8
543:9
**workload**
413:18
**works** 511:11
516:10 529:8
**worry** 373:13

**worth** 386:22
423:18 469:6
469:17 539:10
539:16,19
540:12,15
**wow** 358:15
**wraps** 470:9
**write** 334:20
395:15 401:22
**writing** 491:10
**written** 369:21
**wrong** 342:16
352:2 522:3
**wrongfully**
361:18,24
362:10

---

**x**

**x** 307:1,8 309:1
310:1
**xxxx** 348:5
406:8 466:9
505:10

---

**y**

**y** 312:2
**yeah** 315:18
316:16 317:17
327:7 328:10
329:9 332:7
338:10 343:14
347:17 352:22
353:8 358:14
363:9,14,17
367:11 368:11
368:14 369:12

371:8 381:2,15
386:18 388:10
389:12 392:8
394:16 395:7
395:12 396:10
400:11 401:16
404:14 405:8
425:9 427:6
444:17 446:7
446:20 449:10
458:6 462:15
463:21 465:5
465:14 468:7
471:12 474:17
475:18 477:4
478:2,22
479:14,20
480:14,20
482:13 483:13
483:17 484:3
485:8 487:10
491:7,25
497:25 499:8
503:9 504:13
511:22 513:18
522:16 526:5
526:12 539:15
542:17 546:20
**year** 312:19
313:6 351:8
375:16,17
386:24 431:17
432:3 433:16
450:2,6,15,17
450:20,23

457:10 461:21
468:12 489:2
**year's** 540:11
540:15
**years** 312:17
350:6,8 389:14
389:17 409:4
409:18 431:20
433:16,18,19
444:21 468:8
469:12 488:24
538:16,18
**yonkers** 334:9
355:19 357:5
358:4 384:23
409:7 410:14
410:21 411:15
411:19 412:5
412:17,20
414:17 416:15
416:21 427:11
427:15 431:23
432:2,4,22,25
437:9 460:11
460:20 465:12
511:15,17
517:12,15
527:9 542:21
543:3,6,7,13,25
544:8,13,18
**york** 307:18,18
307:20 308:7,7
308:13,13
312:5 335:17
335:18 349:12

Case 1:23-cv-01675-KAM-TAM    Document 74-4    Filed 07/08/25    Page 119 of 119
PageID #: 1602

407:21 467:12
493:9 494:18
496:5,9 501:8
501:11,13,16
501:19 506:13
508:6,6 553:4
553:8

**younger**  353:22

**z**

**zero**  438:12
443:25

**zip**  353:25
354:2 367:19
369:4 389:11
389:14,18,19
405:23 413:6,6
445:2,6,15
446:6,8,9,11,14
447:4,6 460:11
460:21 508:3,4
516:4,4,6,8,15
525:5 533:13
534:19,22
535:7 548:16
549:7

**zoom**  309:17
320:19 346:24