# INDEPENDENT SERVICE PROVIDER AGREEMENT

This Independent Service Provider Agreement ("Agreement") is entered into effective as of 01/04/2020 ("Effective Date") between FedEx Ground Package System, Inc. ("FXG") and the party identified below ("Independent Service Provider" or "ISP").  FXG and the identified Independent Service Provider may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

Independent Service Provider:    FIRE & ICE TRUCKING CORP ("F&I")

**THE PARTIES HAVE READ AND UNDERSTAND THE PROVISIONS OF THIS AGREEMENT, AND HAVE HAD SUFFICIENT TIME AND OPPORTUNITY TO CONSULT WITH FINANCIAL, TAX AND LEGAL ADVISORS PRIOR TO EXECUTING THE DOCUMENT.  EACH SIGNATORY BELOW WARRANTS THAT HE OR SHE HAS AUTHORITY TO EXECUTE THIS AGREEMENT ON BEHALF OF AND TO LEGALLY BIND THE PARTY FOR WHOM EACH HAS SIGNED.**

This document has been signed electronically on 01/02/2020 at 10:54:45 AM by 8257071 - Cheryl Ann Owens for FIRE & ICE TRUCKING CORP and by 142698 - Keith Stanton for FXG, and the electronic signatures shall for all purposes be considered equal to manual signatures, as set forth in the Electronic Signatures in Global and National Commerce Act, the Uniform Electronic Transactions Act, and applicable state statutes.

# TABLE OF CONTENTS

1.  OBJECTIVES, INTENT, AND COMPLIANCE WITH LAW................................................3
2.  TERM.................................................................................................................................4
3.  CONTRACTED SERVICE AREA, SERVICES, AND SERVICE RESULTS.....................4
4.  NEGOTIATED CHARGES................................................................................................4
5.  CHARGEBACKS AND ADJUSTMENTS..........................................................................5
6.  ISP AS A CORPORATE ENTITY AND EMPLOYER........................................................5
7.  SUBCONTRACTING.........................................................................................................8
8.  LEASED EQUIPMENT.....................................................................................................8
9.  FACILITIES, SCANNERS AND SOFTWARE.................................................................11
10. CONFIDENTIAL INFORMATION....................................................................................13
11. INSURANCE COVERAGE..............................................................................................14
12. REPRESENTATIONS AND WARRANTIES....................................................................14
13. LIABILITY.......................................................................................................................14
14. INDEMNIFICATION........................................................................................................14
15. TERMINATION...............................................................................................................15
16. DISPUTE RESOLUTION................................................................................................16
17. ASSIGNMENT................................................................................................................19
18. GENERAL.......................................................................................................................19
    APPENDIX.......................................................................................................................22

1.      **OBJECTIVES, INTENT, AND COMPLIANCE WITH LAW**

1.1     **Objectives.**  The Parties have entered into this Agreement to achieve the following objectives:

(A)     FXG operates an information and distribution network throughout the United States and Canada and desires to contract with independent businesses to facilitate the physical package pickup and delivery services it offers to its customers.

(B)     FXG makes an ongoing and continuous investment into brand awareness, through marketing and brand protection; obtaining and maintaining customer accounts; technology to meet market demands and industry and consumer expectations; and attracting and contracting with corporate business entities that provide package pickup and delivery services.

(C)     F&I is a corporate business entity that provides package pickup and delivery services with its own vehicles and its own employees.  F&I agrees that, in addition to the services it provides to FXG under this Agreement, it is free to or not to, separately contract with and provide services to other customers.

(D)     F&I desires the advantage of contracting with FXG to gain access to national accounts and the additional revenue that access provides. F&I understands that this Agreement is between only it and FXG and not with any other company or person.

(E)     The Parties desire to meet the expectations and demands of customers, which include both shippers and recipients ("Customers"), by providing superior customer service and maintaining favorable brand identity.  The Parties agree that F&I retains exclusive authority to determine the best means to meet such Customer expectations and demands, including complete discretion over and responsibility for delivery work area configuration, route design, delivery sequence, type and number of equipment, and staffing and personnel decisions.

(F)     The Parties desire to comply with the United States Department of Transportation ("DOT") Leasing Regulations at 49 CFR 376 and all applicable laws relating to FXG's status as a duly licensed motor carrier.

(G)     The Parties acknowledge that safety, F&I's provision of the Services and Service Results, as defined herein, and service continuity are fundamental to this Agreement, and the Parties agree that this Agreement shall be performed and interpreted accordingly

(H)     F&I agrees that changing customer expectations and competitive market demands are better met by a Contracted Service Area ("CSA") that covers all business segments and/or services within a single geographic boundary.

To achieve this objective, the Parties agree to cooperate in good faith with each other, and with other ISPs, by, among other things, exchanging information; redefining CSAs; transferring service area; and/or modifying the Expiration Date or Termination Date of this Agreement.

In the event this Agreement or its Schedules or Attachments are modified pursuant to Schedule A, F&I further agrees that FXG may, after conferring with F&I and providing advance notice that is reasonable under the circumstances,

redefine the CSA to achieve the objective above, provided that F&I shall first have an opportunity to propose partial assignment(s) of the CSA to achieve the objective above and provided further that FXG shall undertake a good faith effort to ensure that a redefined CSA is reasonably comparable in terms of stops, geographic proximity (in relation to the FXG Station or point(s) at which packages are tendered), and projected net contract revenue.

1.2     **Contractual Relationship Between the Parties.**  The Parties intend to create by this Agreement a business to business relationship and not one of employment.  The Parties further agree that neither Party is, nor will be represented, alleged, or deemed to be a legal representative, joint venturer, joint employer, franchisor, franchisee, dealership, distributorship or legal partner of the other Party for any purpose.  As a corporate entity and employer, F&I has the sole right and obligation to supervise, manage, direct, procure, perform or cause to be performed, all services to be provided by F&I under this Agreement.  No officer, agent or employee of FXG has authority to direct F&I or F&I's "Personnel" (defined in Section 6.2) as to the methods, manner or means employed to provide the "Contracted Services" (defined in Attachment A-2 to Schedule A) or achieve the "Contracted Service Results" (defined in Attachment A-2 to Schedule A).  The Parties acknowledge their respective obligations to comply with Applicable Law, as defined below, governing the operation of businesses picking up, transporting and delivering packages and agree that neither Party shall allege that such compliance results in either Party exerting control over the other Party's business, business decisions, or Personnel.

1.3     **Compliance with Applicable Law.**  The Parties acknowledge and agree to abide by all applicable federal, state, and local laws, regulations and rules (hereinafter referred to as "Applicable Law").  As used in this Agreement, "Applicable Law" means and includes the common law and judicial decisions and all statutes, laws, rules, regulations, ordinances, executive orders, policies and procedures established by any governmental authority with jurisdiction over a Party to this Agreement in effect on or after the Effective Date.  By way of illustration and without limitation, Applicable Law includes those governing the following subjects: operation of businesses picking up, transporting and delivering packages; licensing and operation of vehicles; traffic laws pertaining to vehicle operators; business formation, reporting, recordkeeping, operation, and licensing requirements; hazardous waste and materials; occupational safety and health hazards; consumer protection; privacy;  trade regulation; workers compensation insurance; unemployment insurance; withholding and payment of federal, state, and local income taxes and social security taxes; governmental requirements; anti-terrorism; anti-bribery and corruption; employment practices; and anti-discrimination as well as any other obligations posted on MyGroundBizAccount and incorporated into this Agreement through Schedule H.

## 2.     TERM

Subject to the terms of Schedule A of this Agreement, the "Term" of this Agreement, as negotiated by the Parties, will commence on 01/04/2020 and will continue through 08/07/2020 ("Expiration Date"), unless terminated earlier or extended under Section 15 of this Agreement.

## 3.     CONTRACTED SERVICE AREA, SERVICES, AND SERVICE RESULTS

The geographical area F&I has agreed to service ("Contracted Service Area" or "CSA"), the services F&I has agreed to provide ("Contracted Services" or "Services") and the results F&I has agreed to achieve ("Contracted Service Results") are contractually defined and set forth in Schedule A of this Agreement, including its attachments.

## 4.     NEGOTIATED CHARGES

The "Negotiated Charges" FXG has agreed to pay F&I for the Services F&I provides are defined and set forth in Schedule C of this Agreement, including its attachments.

5.    **CHARGEBACKS AND ADJUSTMENTS**

With respect to any "Payment of Charges" by FXG to F&I as set forth in Schedule C and its Attachments, the Parties agree that FXG may chargeback to such Payment of Charges any garnishments, levies or attachments on the earnings or assets of F&I's business, or other adjustments which FXG is required to make by Applicable Law, and any adjustment which F&I consents to in writing at the time the adjustment is made.

6.    **ISP AS A CORPORATE ENTITY AND EMPLOYER**

6.1    **Registration as Corporate Entity and Employer.**  F&I represents and warrants that it is a corporation (and not some other form of business, such as a limited liability partnership ("LLP"), limited liability company ("LLC"), limited liability corporation, association, joint-stock company, joint-stock association, or similar entity), incorporated in NY, and that, as such, it is registered as a corporate business entity in good standing and as an employer in the states in which it does business.

F&I agrees that, throughout the Term of this Agreement, it will maintain its registration as a corporate business entity in good standing and as an employer in the states in which F&I provides Services under this Agreement.  Upon request, F&I agrees to provide to FXG, or to FXG's designee, documentation showing that its registrations as a corporate business entity in good standing and as an employer have been made and are being maintained.

6.2    **Responsibility for Employer-Related Expenses and Legal Compliance.**  Subject only to the subcontracting exception under Section 7, F&I agrees to assign only Personnel, including officers and managers, that F&I ensures are treated as employees of F&I in the provision of Services under this Agreement ("F&I Personnel" or "Personnel").  F&I agrees that neither it nor any of its Personnel are to be treated as or considered to be FXG's employees, directly, indirectly, or jointly, for any purpose, nor is F&I or its Personnel entitled to or eligible for any employee benefits from FXG or any FXG-sponsored benefit plans, even if subsequently reclassified as employees, under common law or otherwise, of FXG by a court, agency, or other adjudicative body.  F&I agrees, upon request by FXG, to submit documentation to FXG, or to FXG's designee, establishing that all of its Personnel are treated as F&I's employees under Applicable Law.  F&I agrees to:

(A)    bear all expenses associated with the training of its Personnel under Schedule I to this Agreement;

(B)    bear all expenses associated with the employment of such persons, including without limitation, wages, salaries, benefits, employment taxes, unemployment insurance, workers compensation coverage, and government mandated disability insurance, and, at the request of FXG, provide proof that these obligations and all related filings with federal, state and local authorities are being met, including but not limited to, collection and payment of withheld taxes and unemployment taxes, the procurement and maintenance of workers' compensation insurance and the satisfaction of any other obligations required by Applicable Law;

(C)    assume sole responsibility for payroll deductions and maintenance of payroll and employment records, and for compliance with Applicable Law, including without limitation, wage payment, final payment of wages, required withholdings from wages, deductions, overtime, and rest and meal periods, and, at the request of FXG, provide evidence of such compliance;

(D)    employ only persons who are legally authorized to work in the United States,

maintain an I-9 employment authorization form, if required, for each person utilized, and, at the request of FXG, provide evidence of such compliance; and

**(E)** comply with Applicable Law and, at the request of FXG, provide evidence of such compliance.

**6.3** **Identification of Authorized Officer and Business Contact.** F&I agrees to identify an "Authorized Officer" of F&I to deal with FXG on F&I's behalf. F&I agrees that the Authorized Officer is empowered to make binding decisions on behalf of F&I related to modification to the terms of this Agreement, including modifications to the Negotiated Charges agreed to in Schedule C and its Attachments, Termination of this Agreement pursuant to Section 15, Assignment of this Agreement pursuant to Section 17, and modifications to the Contracted Service Area defined in Attachment A-1 to Schedule A of this Agreement.

F&I agrees that it will identify from its Personnel a "Business Contact" for each FXG Station(s) F&I provides services for purposes of administering day-to-day operations under this Agreement, including business results and decisions related to Personnel. Unless F&I specifies otherwise in writing, F&I agrees that its Authorized Officer will be F&I's Business Contact. F&I agrees that its Business Contact(s) will not also serve as the Business Contact(s) for any other Independent Service Provider under an Independent Service Provider Agreement with FXG. F&I further agrees to make its Business Contact(s) available at mutually convenient times and locations for the purposes of dealing with FXG on matters within the Business Contact's purview.

F&I may change its Authorized Officer and Business Contact designations at any time and agrees to provide FXG with written notice of any such change together with appropriate corporate authorization for a change in F&I's Authorized Officer. FXG designates the Senior Manager of the FXG Station named in Attachment A-1 to Schedule A, or in the event of the Senior Manager's unavailability, his/her designee as its Business Contact for purposes of administering this Agreement, including day-to-day operational dealings.

**6.4** **ISP Personnel.** F&I has sole and complete discretion in the staffing, selection, hiring, training, supervision, assignment, hours and days worked, discipline, termination, compensation, benefits, and all other terms and conditions of employment of its Personnel assigned to provide Services under this Agreement, including conditions expressly agreed to in Section 6.4 and Schedule I, to F&I's obligation to treat its Personnel as its employees and comply with Applicable Law, and to the condition that F&I's Personnel assigned by it to provide Services under this Agreement not be employed by or under contract with a competitor of FXG. FXG agrees that the owners and officers of F&I have no obligations to personally provide the Services contracted for under this Agreement. The Parties further agree that the agreed upon terms for F&I's Personnel assignment set forth in this Agreement are in their mutual interests, as well as the interests of Customers and the public, for safety, security, and legal compliance.

**(A)** F&I agrees that it shall not assign to provide Services under this Agreement any Personnel who: (1) cause a breach of Section 5.5 of Attachment A-2 to Schedule A, including without limitation to making a false certification of fact such as forging a recipient's name as proof of delivery, intentionally miscoding or mis-scanning the status of a package, or falsifying DOT-related or other official documents; or (2) fail to comply with applicable safety, anti-violence, and anti-harassment standards and legal requirements. F&I agrees that it will not assign

such Personnel to provide Services under this Agreement.

**(B)**   The Parties agree that all Personnel assigned by F&I to operate a commercial motor vehicle ("CMV") while providing Services under this Agreement will meet the "<u>Safety</u>" and "<u>Background</u>" terms set forth in Schedule I.

**(C)**   The Parties agree that any other Personnel having the occasion to be in the vehicles listed in Schedule B ("<u>Equipment</u>") while operated under this Agreement will meet the terms set forth under the "<u>Non-Driving Personnel</u>" and Background Sections in Schedule I.

**(D)**   F&I agrees to train all its Personnel as provided in Schedule I, "<u>Training</u>".

**(E)**   F&I agrees to ensure that Personnel assigned by it to operate a CMV while providing Services under this Agreement are trained in and comply with the "<u>Safety</u>" terms set forth in Section 5 of Schedule I.

**(F)**   If at any time any F&I Personnel assigned by it to operate a CMV while providing Services under this Agreement no longer meet the terms of Schedule I, F&I agrees to not assign such persons to drive in performing Services.  If at any time any F&I Personnel do not meet the terms of Sections 6.2(D) or 6.2(E), or can no longer provide services for reasons related to the Background Section in Schedule I, F&I agrees to not assign such persons to provide any Services under this Agreement.

**(G)**   If a Customer objects to the presence of any F&I Personnel, or if either FXG or F&I has a reasonable basis to believe that any F&I Personnel pose a risk to the safety or security of business operations or persons affected by such operations under this Agreement, F&I agrees to not assign such persons to provide Services under this Agreement until the complaint or incident has been investigated and resolved.  F&I further agrees to cooperate with FXG in any related investigations.

**(H)**   If at any time FXG has a reasonable basis to believe that F&I Personnel present an imminent threat to safety or security and time is of the essence, F&I agrees that such Personnel will cease providing Services immediately and until the matter has been investigated and resolved.  F&I further agrees to cooperate with FXG in any related investigations.

**6.5**   **Appearance of F&I Personnel.**

**(A)**   **General.**  F&I agrees to ensure that Personnel assigned by it to visit Customer premises have an appearance consistent with reasonable Customer expectations and avoid wearing any items that pose a safety hazard.  F&I has discretion, subject to Customer requests or complaints, to ensure that these general appearance terms are met.  To ensure the access necessary for Customer service, F&I agrees that F&I Personnel will wear and visibly display an identification badge provided by FXG while providing Services under this Agreement and to ensure that any identification badges provided to F&I Personnel will be returned to FXG when F&I Personnel are no longer providing Services under this Agreement.  Additionally, F&I agrees to ensure that F&I Personnel obtain and abide by any government- and/or Customer-mandated badge, identification and clearance requirements.

**(B)**   **Business Identification Display; Apparel.**  Consistent with F&I's status as a

corporation, F&I agrees to display the name of its business on apparel worn by its Personnel while providing Services under this Agreement in accordance with identification and display terms posted on http://mygroundbiz.com, which are incorporated herein by reference.

**(C)**    **Optional Apparel Brand Promotion.** The Parties agree that F&I's Personnel need not wear FXG designated apparel when providing the Services, unless F&I has negotiated an Apparel Brand Promotion Charge in Schedule C of this Agreement.

**6.6**    **F&I Personnel as Business Invitees.** In the mutual interests of safety and security, F&I agrees that F&I Personnel will be subject to the same posted standards as other business invitees while on FXG premises and when operating any Equipment leased to FXG as listed in Schedule B, including posted standards prohibiting any form of violence, harassment, or possession of firearms and weapons.

## 7.    SUBCONTRACTING

**7.1**    **Subcontracting Generally.** F&I may subcontract its obligations to provide Services under this Agreement to any Independent Service Provider under an Independent Service Provider Agreement with FXG ("Subcontractor"). The parties further agree that the term subcontracting as used in this Agreement includes any transfer or re-direction of packages under a separate agreement, including when F&I is the named party to both agreements, which transfer or re-direction is both temporary in duration and limited in scope. Notwithstanding anything to the contrary in this Section 7.1, F&I agrees (a) not to directly or indirectly subcontract, assign or otherwise delegate its obligations under this Agreement to any third party that is not providing Services to FXG under an effective Independent Service Provider Agreement with FXG, or another agreement with FXG covering the same subject matter and for the same purpose, unless FXG agrees in advance in writing, and (b) not to subcontract for the purpose of manipulating the amount of charges (defined in Schedule C and Schedule K) or other compensation for services payable under an agreement.

**7.2**    **Responsibility for Subcontractors.** F&I will remain responsible for each Subcontractor's provision of (or failure to provide) the Services as if and to the same extent that such Services are provided by F&I. F&I agrees that FXG will pay the Subcontractor for the work performed in accordance with any agreement FXG has with the Subcontractor.

**7.3**    **Responsibilities as a Subcontractor.** When subcontracting Services or providing Services as a Subcontractor, F&I agrees to ensure that Customers' schedules, expectations and requirements for pickup and delivery are met. If F&I provides Services as a Subcontractor, F&I further agrees to provide the pickup and delivery of packages, together with any accompanying forms or documentation, to the appropriate station in time to meet the original service commitments for the packages and consistent with terms of this Agreement. F&I also agrees that its daily Inbound Local Service will be calculated under Section 5.2 of Attachment A-2 to Schedule A to include the subcontracted Services.

## 8.    LEASED EQUIPMENT

**8.1**    **Lease and Use of Equipment.** Pursuant to the DOT regulations at 49 CFR Part 376 ("Leasing Regulations"), F&I agrees to lease to FXG the Equipment listed in Schedule B and to utilize the Equipment for the provision of the Services. FXG agrees to issue to F&I a "Statement of Lease" showing that the Equipment is leased to FXG, and F&I agrees to

carry the Statement of Lease on the Equipment at all times.  F&I further agrees that the Statement of Lease will constitute the receipt for the Equipment required by the Leasing Regulations.

> **(A)    Title to and Registration of Equipment.**  F&I represents and warrants that F&I has title to or is otherwise authorized to contract the Equipment to FXG, that the Equipment listed in Schedule B is properly titled and registered, that any charges, fees, taxes and the like in connection with titling and registration have been paid, including any associated with F&I's participation in the International Registration Plan, and that the information in Schedule B is complete and accurate. F&I also certifies that the Equipment meets the requirements of Applicable Law.

**8.2    Selection, Replacement, Addition and Substitution of Equipment.**  The selection (including number and cargo capacity), replacement and addition of Equipment are within the discretion of F&I, provided that the Equipment (1) consists of tractors, cargo vans, straight trucks or trailers pulled by cargo vans or straight trucks, (2) is white in color with bed heights that are flush with the conveyor walkways or other access to the negotiated load/unload positions in the FXG Station, and (3) is of a size that allows for closure of exterior FXG Station doors and maneuverability within the FXG Station.  F&I may substitute for the Equipment on a temporary basis, not to exceed thirty days, provided the Equipment is rented from an entity authorized to lease vehicles in the state or leased to FXG.  F&I agrees to carry the rental agreement on the rental Equipment at all times and, upon request by FXG, to demonstrate the existence of its rental agreement. F&I agrees that the Equipment will meet all DOT requirements set forth in 49 CFR Part 393 and other safety requirements imposed by Applicable Law.

**8.3    Appearance and Identification of Equipment.**

> **(A)    General.**  Subject to Customer requests or complaints, F&I has the discretion to ensure that the Equipment has an appearance consistent with reasonable Customer expectations and be free of extraneous markings.  During the operation of the Equipment for the provision of the Services, F&I agrees to mark all Equipment with identification consisting of a designated unit number and other such identifying logos, numbers, marks and insignia as are required under Applicable Law, including 49 CFR Part 390.  When Equipment is withdrawn from providing Services, or upon termination of this Agreement, F&I agrees to remove any identification applied pursuant to either this Section 8.3(A) or Section 8.3(B) below, and to remove or mask all such identification while operating the Equipment for any purpose other than providing the Services.

> **(B)    Business Identification Display; Vehicle.**  Consistent with F&I's status as a corporation, F&I agrees to display the name of its business on the Equipment while providing Services under this Agreement in accordance with the identification and display terms posted on http://mygroundbiz.com, which are incorporated herein by reference.

> **(C)    Optional Vehicle Brand Promotion.**  The Parties agree that F&I need not display FXG logos on its vehicles (aside from government-required carrier identification) when providing the Services, unless F&I has negotiated an Optional Vehicle Brand Promotion Charge in Schedule C of this Agreement.

**8.4    Equipment Maintenance and Inspection.**

(A) **Maintenance and Inspection.**  Regardless of the size or weight of the Equipment being used by F&I to provide Services under this Agreement, F&I agrees, at F&I's expense, to have the Equipment maintained and inspected in accordance with the standards specified in 49 CFR Parts 393 and 396.

(B) **Proof of Timely Maintenance and Inspection.**  F&I agrees to provide FXG, as required by Applicable Law, with documentation of timely maintenance and inspection of the Equipment in accordance with the periodic mandatory vehicle maintenance and inspection regulations required by Applicable Law, including but not limited to 49 CFR Part 396.  The Parties agree that the periodic maintenance schedule recommended by the Equipment manufacturer will be deemed to meet the maintenance obligations of this Section 8, absent specific federal, state or municipal regulations to the contrary.

**8.5**   **Equipment Failing to Meet Regulatory Standards.**  In the event an inspection of the Equipment, as authorized by 49 CFR Part 396, reveals that the Equipment is not in compliance with applicable safety regulations, F&I agrees to remove the Equipment from service to FXG until the Equipment is brought into compliance.

**8.6**   **Equipment-Related Operating Expenses.**

(A) **F&I Responsibility for Operating Expenses.**  F&I agrees to bear all costs and expenses related to operation of the Equipment, whether empty or loaded, including, without limitation, all risks of depreciation, all maintenance (including cleaning and washing), fuel, oil, tires, repairs, business taxes, consumption and sales taxes, personal property taxes, ad valorem taxes, fuel and road-use taxes, ton-mile taxes, insurance coverage as provided herein, detention and accessorial services, licenses, permits, vehicle registration fees, vehicle registration renewal fees, base plates, and all highway, bridge and ferry tolls.  F&I is responsible for and will pay all F&I's expenses related to the loading or unloading of the Equipment, unless FXG agrees to perform the loading or unloading of the Equipment on any Service Day.  F&I acknowledges that the amount of Charges for the anticipated, but not guaranteed, amount of the Services under this Agreement is intended to fairly compensate F&I for all such incurred operating costs, and that F&I is responsible for payment of all its operating costs.

(B) **F&I Responsibility for Fines.**  F&I agrees to pay all fines, including parking and traffic fines and penalties, imposed for violation of Applicable Law or by the DOT where such violation results from the acts or omissions of F&I or Personnel assigned by it to operate a CMV while providing Services under this Agreement. Except when the violation results, in whole or part, from the acts or omissions of F&I or the Personnel assigned by it to operate a CMV while providing Services under this Agreement, FXG will assume the risks and costs of fines for overweight or oversize loads when trailers are preloaded and sealed by FXG, when loads are containerized, when oversized or overweight loads are improperly permitted, or when the trailer or lading is otherwise outside of F&I's control.

(C) **F&I Responsibility for Obtaining Operating Authority.**  Without limiting Section 8.6(A), if, at any time during the Term, applicable state regulations require F&I to obtain intrastate operating authority, F&I agrees, at its own expense, to acquire and maintain such operating authority and to cooperate with FXG in altering the arrangements set forth in this Agreement to the extent

necessary to ensure compliance by F&I and FXG with any such state regulations, practices and procedures.

**8.7    Fuel Tax Reporting for Certain Vehicles.**  F&I agrees to report and pay any fuel tax liability in connection with operation of the Equipment directly to the states in which F&I operates.  In the event FXG is audited in connection with its fuel tax liability to any jurisdiction, F&I agrees upon request to provide to FXG, or to FXG's designee, a copy of any fuel tax returns filed by F&I, together with supporting documentation, that report any fuel consumption in connection with the Services performed by F&I.

**8.8    Compliance with Leasing Regulations.**  The purpose of this Section 8.8 is to conform this Agreement to the Leasing Regulations.  As set forth in 49 CFR Part 376.12(c)(4), nothing in the provisions required by 49 CFR Part 376 is intended by the Parties to affect F&I's status as an independent business and its Personnel are not employees of FXG, directly, indirectly or jointly.

   **(A)    Use by FXG.**  In accordance with the Leasing Regulations, 49 CFR Part 376 et seq., the Equipment will be for FXG's exclusive possession, control, and use when F&I is providing Services under this Agreement.  FXG will assume complete responsibility for the operation of the Equipment for the duration of this Agreement as required by 49 CFR Part 376.  While the Equipment is on FXG premises, F&I agrees that FXG will have access to the cargo areas of the Equipment for the purpose of accurately and safely scanning, loading, and unloading packages.  Notwithstanding the provisions of this Section 8.8(A), FXG will have no right or authority, without the consent of F&I, to operate the Equipment for any purpose.

   **(B)    Use by F&I.**  In its complete discretion, F&I may or may not use the Equipment for other commercial or personal purposes, provided that during such times, F&I removes or covers FXG's DOT number and all logos, marks and insignia identifying FXG, and provided further that such use is in compliance with 49 CFR Part 376.

**8.9    Vehicle Mileage Reporting.**  To ensure the accuracy of any compliance reporting obligations of the Parties or calculation of the Charges payable to F&I which is based in whole or in part on the mileage of F&I vehicle(s), F&I agrees to report actual mileage based on the vehicle's original equipment manufacturer ("OEM") odometer.  F&I agrees to provide actual mileage reporting for each day that the Equipment identified in Schedule B is operated by Personnel assigned by F&I to provide services under this Agreement.  If the vehicle's odometer is repaired or replaced, or if another device which has been mutually agreed upon by F&I and FXG for reporting mileage is utilized, F&I agrees that such device's accuracy shall be at least equivalent to the vehicle's OEM odometer.  F&I agrees to accurately track and report the actual mileage of the Equipment incurred while providing Services under this Agreement to FXG.

**9.    FACILITIES, SCANNERS AND SOFTWARE**

**9.1    Lease or Purchase from FXG.**  F&I will not be required to purchase, lease or rent any products, equipment, or services from FXG as a condition to entering into or complying with this Agreement.

**9.2    Scanner Equipment; FXG Software.**  FXG uses two-way, cellular/satellite communications devices and certain associated equipment ("Scanners") and certain FXG-provided software (including updates to and new versions of such software that are

provided by FXG, "FXG Software") as the primary means of enabling interface with FXG's systems and collecting and transmitting Package Tracking Information as defined herein.  The Parties acknowledge that the collection and dissemination of such Package Tracking Information is part of the Services for which Customers pay. F&I agrees, at F&I's expense, to acquire and utilize Scanners in sufficient quantity to provide the Services, which Scanners will meet the specifications posted on http://mygroundbiz.com, which are incorporated herein by reference.  If the Scanner specifications change, FXG agrees to provide advance notice of the changes, and F&I agrees to acquire and utilize Scanners meeting any new specifications within the timeframe referenced in the notice, which shall be reasonable under the circumstances. F&I further agrees: (1) to install, update, and maintain the current version of the FXG Software on the Scanners which F&I provides; (2) to grant FXG permission to access and retrieve data from the Scanners F&I provides in the event of a Scanner or transmission failure; (3) to grant FXG permission to access the Scanners F&I provides to update or provide new versions of FXG Software without notice to F&I; (4) to keep the Scanners F&I provides free of any software applications that may conflict with the operation of the FXG Software; (5) to ensure the Scanners F&I provides have cellular and global positioning system (GPS) radios enabled at all times when providing Services under this Agreement; (6) to ensure transmission of collected Package Tracking Information to FXG on a daily basis or at more frequent times requested by FXG to meet Customer expectations; and (7) to maintain Scanner appearance and functionality consistent with Customer expectations.  FXG agrees to make available to F&I contact information for third-party manufacturers or suppliers of Scanners.

**9.3** **FXG Station Facilities; Equipment Loaded Per ISP Direction.**  The FXG Station will be made available to F&I during normal business hours on an "as is, where is" basis, with no warranties whatsoever, provided F&I shall not interfere with FXG's use of the FXG Station.  FXG agrees to make available to F&I the negotiated number of load/unload positions set forth in Attachment A-1 to Schedule A.  F&I will be responsible for providing all other facilities and support it needs to provide the Services.

For the purpose of loading, or staging for loading, packages into the Equipment consistent with the delivery work areas and sequencing determined by F&I, F&I agrees to provide information requested by FXG in the format and by the electronic or other mode of transmission requested by FXG.

**9.4** **FXG Software License.**  FXG grants to F&I, to the extent permitted under and subject to the restrictions set forth in any applicable third-party agreements, a non-exclusive, non-transferable, limited right to access and use, solely for the purposes of providing the Services, the FXG Software and any data or reports generated therefrom.  The rights granted to F&I hereunder will automatically expire effective as of the date F&I ceases, for any reason, to provide the Services.  F&I agrees to use the FXG Software to provide Services, including to collect and transmit all required Package Tracking Information as set forth herein.  As between FXG and F&I, except as expressly set forth in this Section 9.4, all right, title and interest in and to the FXG Software and any data or reports generated therefrom will remain the exclusive property of FXG or its licensor, and F&I agrees not to alter or otherwise use the FXG Software for unauthorized purposes.

**9.5** **FXG Trademark Use and Protection.**  All trademarks, trade names, service marks, logos and similar indicia used by FXG to identify itself, e.g., "FedEx Ground" and logo ("FXG Marks"), whether or not registered, will remain the sole and exclusive property of FXG's related company, Federal Express Corporation, as such term is defined in the

Lanham Act, which owns the rights, title and interest therein. Federal Express Corporation has granted FXG the right to use and sublicense use of the FXG Marks.

FXG hereby grants a revocable sublicense to F&I to use the FXG Marks on a non-exclusive, non-transferable, limited basis, solely in a manner as approved and directed by FXG from time to time, and solely for the purposes of providing the Services. Any rights licensed to F&I hereunder will automatically expire effective as of the date upon which F&I ceases, for any reason, to provide the Services, or as may otherwise be directed by FXG, following which, F&I agrees to immediately cease using the FXG Marks in any manner. F&I will not, at any time, claim any right, title or interest in FXG Marks or any indicia similar thereto or challenge the ownership of the FXG Marks in any manner, in whole or in part. F&I acknowledges that all use of FXG Marks by F&I and the goodwill generated thereby will inure to the benefit of Federal Express Corporation pursuant to the Lanham Act. F&I will not use, and will keep its employees, agents, and subcontractors from using the FXG Marks, and any other reference to or indicia of FXG, its parent or affiliate companies, and any similar indicia thereto, whether registered or not, in any oral or written communication to or for any third-party, including without limitation any sales, marketing, promotional, advertising, and other communicative materials, activities and items (e.g., signage, vehicle livery, etc.) without the prior written consent of FXG, which may be withheld or, upon reasonable notice, revoked at FXG's sole discretion.

**9.6    FXG-Hosted Products and FXG Data.** From time to time, FXG may make available for use on the Scanners that F&I provides additional FXG or third party software, databases, products, or services (collectively, "FXG-Hosted Products"). FXG grants to F&I, to the extent permitted under and subject to the restrictions set forth in any applicable third-party agreements, a non-exclusive, non-transferable, limited right to access and use the FXG-Hosted Products solely for the purpose of providing the Services. All right, title and interest in and to data and information accessed through, created in the use of, or made available in connection with the use of the Scanners by F&I or its Personnel and the provision of Services, including Package Tracking Information and information made available through or by the FXG Software and FXG-Hosted Products (collectively, "FXG Data"), will remain the exclusive property of FXG and/or its licensor(s). Except as otherwise set forth herein, no right in or to FXG Data is granted, transferred, or assigned to F&I. All FXG Software, FXG-Hosted Products, and FXG Data are provided on an "AS IS" basis. F&I 's sole and exclusive remedy with regard to any defect, claim, or other dispute relating to any FXG-Hosted Product is to cease use of the FXG-Hosted Product.

## 10.    CONFIDENTIAL INFORMATION

As used in this Agreement, "Confidential Information" means all information, in any form, furnished or made available directly or indirectly by one Party to the other Party that is either marked confidential or should reasonably be understood by the receiving Party to be confidential. The term Confidential Information will include any non-public information about the other Party, the other Party's business, the other Party's business prospects (including lists of current or potential Customers), and any other non-public information provided to a Party by the other Party. Confidential Information does not include any information which a Party can demonstrate (1) was in the public domain or in the possession of the receiving Party at time of disclosure, (2) became part of the public domain after disclosure through no fault of the receiving Party, (3) was disclosed to the receiving Party by a third party that had a lawful right to disclose it, or (4) was independently developed by the receiving Party. Neither Party may use the Confidential Information of the other Party, except as required for the purposes of this Agreement, nor disclose the other Party's Confidential Information to a third party. Each Party shall use at least

the same degree of care it uses to avoid unauthorized disclosure of its own information, but in any event, at least reasonable care to prevent disclosure to third parties.  In the event of any disclosure of, loss of, or inability to account for any Confidential Information of the furnishing Party, the receiving Party will promptly notify the furnishing Party upon becoming aware of it and take such actions as may be necessary or reasonably requested by the furnishing Party to minimize the violation and any damage resulting from it.  Each Party agrees to provide the other with prompt notice of any discovery request or subpoena seeking Confidential Information of the other Party, and in no event shall provide less than one week's notice prior to responding to the discovery request or subpoena.

**11.    INSURANCE COVERAGE**

The Insurance coverages the Parties have agreed to provide are set forth in Schedule L ("Insurance and Indemnification") of this Agreement.

**12.    REPRESENTATIONS AND WARRANTIES**

**12.1    Corporate Authorization.**  Each signatory represents and warrants to the other that:

**(A)**    He/she has the requisite power and authority to enter into this Agreement for the business entity on whose behalf the signatory executes this Agreement; and

**(B)**    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly authorized by the requisite formal business governance action on the part of the Party on whose behalf the signatory executes this Agreement.

**12.2    Disclaimer.**  OTHER THAN AS PROVIDED IN THIS AGREEMENT, THERE ARE NO EXPRESS WARRANTIES AND THERE ARE NO IMPLIED WARRANTIES, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  **F&I HAS NOT RECEIVED OR RELIED UPON ANY PROMISE OR GUARANTY, EXPRESS OR IMPLIED, ABOUT THE REVENUES, PROFITS OR SUCCESS OF THE UNDERTAKINGS CONTEMPLATED BY THIS AGREEMENT.**

**13.    LIABILITY**

**13.1    General Liability.**  Subject to the provisions of this Agreement, it is the intent of the Parties that each Party will be liable to the other Party for any actual damages incurred by the non-breaching Party as a result of the breaching Party's failure to perform its obligations under this Agreement.  Each Party will have a duty to mitigate damages for which the other Party is responsible.

**13.2    Waiver.  SUBJECT TO SECTION 13.3, IN NO EVENT, WHETHER IN CONTRACT, IN TORT (INCLUDING BREACH OF WARRANTY, NEGLIGENCE AND STRICT LIABILITY IN TORT), OR UNDER APPLICABLE LAW, WILL A PARTY BE LIABLE FOR INDIRECT, CONSEQUENTIAL, OR SPECIAL DAMAGES EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.**

**13.3    Exceptions.**  The limitations and disclaimers set forth in Section 13.2 will not apply with respect to damages occasioned by the willful, intentional or grossly negligent acts or omissions of a Party.

**14.    INDEMNIFICATION**

The respective indemnities that the Parties have agreed to provide are set forth in Schedule L

("Insurance and Indemnification") of this Agreement.

## 15.    TERMINATION

**15.1    Termination by Mutual Agreement.**  The Parties may mutually agree to terminate this Agreement without cause at any time during its Term.  The agreement to terminate (1) will be in writing, (2) will be signed by both Parties and (3) will specify the effective date of the termination ("Termination Date").

**15.2    Termination for Changed Circumstances.**

    **(A)    Change in Relationship.**  Either Party may terminate this Agreement in the event of a determination by a court, agency, or other adjudicative body in any jurisdiction that this Agreement or other similar Agreements with other independent service providers does not create the relationship of motor carrier and independent contractor, such determination being contrary to the intention of the Parties expressed in Section 1.2.

    **(B)    Substantial Reduction in Business.**  Either Party may terminate this Agreement by giving the other Party at least thirty days' prior written notice designating the Termination Date, in the event that FXG has a substantial reduction in business, or elects to cease doing business, in all or substantially all of a business segment or in the Contracted Service Area.

    **(C)    Declaration of Bankruptcy.**  Either Party may terminate this Agreement in the event the other Party is declared to be insolvent or bankrupt by a court, agency, or other adjudicative body in any jurisdiction.

**15.3    Termination for Cause by Either Party.**  Subject to Section 15.2, neither Party can unilaterally terminate this Agreement at will.  Either Party may, however, by giving notice to the other Party, terminate this Agreement for cause in the event that the other Party (1) commits a material breach of this Agreement, or (2) commits more than one breach which collectively constitute a material breach of this Agreement.  The Parties acknowledge and agree that, while it is impossible to define in advance each breach or combination of breaches that will constitute material breach, the following will be sufficient to constitute material breach: (1) an act of either Party, or an officer or owner of the Party, that is inconsistent with the honesty and integrity and compliance with Applicable Law requirements of Section 5.5 (of Attachment A-2 to Schedule A); (2) the failure of FXG to pay in accordance with Schedule C and its attachments and Schedule G, or the failure of F&I to pay any agreed to chargeback or adjustment in accordance with Section 5; (3) the failure of F&I to register, or maintain registration, as a corporate entity and employer under Section 6.1; (4) the failure of F&I to properly report employees under Section 6.2; (5) the failure of either Party or its agents, to comply and ensure compliance with posted standards prohibiting any form of violence, harassment or possession of firearms and weapons under Section 6.6 or Section 5.5 (of Attachment A-2 to Schedule A); (6) the failure of either Party to maintain required insurance coverage under Section 11; (7) violation by either Party of the assignment provisions of Section 17; (8) the failure of F&I to take reasonable care to ensure safe driving operations and regulatory compliance in accordance with Schedule I; and (9) an imminent disruption to a substantial volume of service where either Party fails to provide prompt and adequate assurance of performance upon request by the other Party.  For these enumerated examples of material breaches, the Parties agree that this Agreement is subject to termination without the other Party being afforded an opportunity to cure.  For all other

material breaches of this Agreement, upon receiving notice of an opportunity to cure, the Parties will have seven days to remedy the breach, if possible, and to take steps to ensure that similar future breaches will not occur, provided that FXG may proceed at its election to mitigate its damages as necessary by exercising its Right to Ensure Service. If within seven days the breaching Party demonstrably remedies any breach and takes steps to ensure that similar breaches will not occur in the future, termination of this Agreement will not be warranted.

**15.4    Extension of Expiration or Termination Date.**  The Parties acknowledge that this Agreement has no provision for renewal or automatic renewal and further acknowledge that there is no express or implied obligation upon either Party to enter into a subsequent agreement for the Services upon the expiration of this Agreement.  However, if the Parties agree in writing, either the Expiration Date or the Termination Date of this Agreement may be extended in weekly increments one or more times not to exceed fifty-two weeks in total ("Extension Period") beyond the original Expiration Date or Termination Date.  No oral agreement to extend this Agreement will be effective.  The level of Charges at the Termination Date or Expiration Date will continue in effect through any Extension Period.

**15.5    F&I's Obligations Upon Termination.**  Upon termination of this Agreement for any reason, F&I agrees promptly to return to the FXG Station any packages, documents, trailers, dollies or other FXG property.  F&I will also remove and return or permanently mask (such as by painting over) all of FXG vehicle identification and marks from the Equipment.  F&I acknowledges and agrees that payment of final charges is contingent upon receipt by FXG of evidence that all such identification has been removed or permanently masked.

## 16.    DISPUTE RESOLUTION

**16.1    Dispute Resolution Procedure.**  The Parties agree that "Dispute" includes any dispute, claim or controversy between the Parties arising out of or relating in any way to this Agreement and/or the relationship between the Parties resulting from this Agreement, either directly or indirectly, including without limitation with respect to the interpretation of any provision of this Agreement, the performance by either Party, the treatment by one Party of the other, and/or the termination of this Agreement, whether in contract or in tort, or for restitution of whatever kind, and whether arising pursuant to a statute, regulation, at common law, in equity or otherwise.

**16.2    Optional Informal Dispute Resolution.**  The Parties may notify each other of any Dispute.  FXG may notify F&I of a Dispute by bringing it to F&I's attention orally or in writing.  F&I may notify FXG of a Dispute by calling the FedEx Alert Line (1-866-423-3339) or by bringing the Dispute to the attention of the FXG Station or district management, or FXG Contractor Relations, orally or in writing.  Within a reasonable period of time following receipt of notice, the Parties will meet informally, either in person or by telephone, to attempt to resolve in good faith the Dispute.

**16.3    Arbitration.**  In their mutual interest to resolve Disputes promptly and efficiently, the Parties have elected to abide by the following mandatory arbitration provisions and the Arbitration Procedures in Section 16.5.  The Parties agree that any Dispute, including without limitation the scope or applicability of this agreement to arbitrate, shall be determined by final binding arbitration.  The arbitrator shall have exclusive authority to resolve any Disputes concerning the formation, existence, validity, enforceability, interpretation, or scope of this agreement to arbitrate.  No suit at law or in equity based

on any Dispute or controversy shall be instituted by either Party hereto, other than a suit to confirm, enforce, vacate, modify or correct the award of the arbitrator as provided by Applicable Law.  This clause shall not preclude the Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.  **THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO A COURT TRIAL AND TRIAL BY JURY IS OF VALUE.  BY SIGNING THIS AGREEMENT, THE PARTIES KNOWINGLY AND VOLUNTARILY WAIVE SUCH RIGHT FOR ANY DISPUTE, SUBJECT TO THE TERMS OF THIS AGREEMENT TO ARBITRATE.**

**16.4    Class Action Waiver for Arbitration and Civil Litigation.**  The Parties unconditionally agree that all Disputes and claims that accrued or arose on or after the effective date of this Agreement subject to arbitration pursuant to this Section 16 will be brought in a Party's individual capacity, and not as a plaintiff or class member in any purported class representative, multi-party, or multi-claimant proceeding.  There shall be no right or authority for any claims to be arbitrated on a class representative, multi-party, or multi-claimant basis, regardless of forum.  The arbitrator may not consolidate more than one Party's claims or more than one matter, and may not otherwise preside over any form of a representative class, multi-party, or multi-claimant proceeding.  Notwithstanding Section 18.6 of this Agreement, if the class action waiver set forth above is deemed unenforceable for any reason, the agreement to arbitrate set forth in paragraph 16.3 of this Agreement shall have no force or effect for those claims being sought in the class action.  Further, if the agreement to arbitrate set forth in paragraph 16.3 of this Agreement is deemed unenforceable for any reason, this class action waiver shall remain in full force and effect and, to the extent permitted by Applicable Law, there shall be no right or authority to litigate any claims on a class representative, multi-party, or multi-claimant basis.

**16.5    Arbitration Procedures.**

**(A)    Commencement of Arbitration.**  Arbitration must be commenced within one year of when the Party commencing arbitration knew, or in the exercise of reasonable diligence should have known, of the act or omission giving rise to the Dispute.  The Party commencing the arbitration shall elect either American Arbitration Association ("AAA") or Judicial Arbitration and Mediation Services ("JAMS") to administer the arbitration.  **FAILURE TO DEMAND ARBITRATION THROUGH AAA OR JAMS IN WRITING WITHIN THIS ONE-YEAR PERIOD WILL CONSTITUTE AN ABSOLUTE BAR TO THE INSTITUTION OF ANY PROCEEDINGS AND A WAIVER OF ALL CLAIMS.**  Except as expressly modified in this Section 16.5, the arbitration shall be administered pursuant to AAA's Commercial Arbitration Rules if AAA has been selected, or, if JAMS has been selected, the JAMS Streamlined or Comprehensive Arbitration Rules and Procedures provided, however, that if the Party commencing arbitration elects the JAMS Streamlined Arbitration Rules and Procedures, the arbitrator shall have all of the authority to permit a Party to file a motion for summary disposition as set forth in the JAMS Comprehensive Arbitration Rules and Procedures.  An arbitrator shall have the authority to act upon motions for summary disposition.  Arbitration under this Agreement will be decided by a single, neutral arbitrator, chosen pursuant to the procedures of AAA or JAMS.  Unless the Parties agree to a different location, any hearing will take place at the AAA or JAMS office that is nearest to the Contracted Service Area involved in the Dispute.

**(B)    Arbitration Fees and Costs.**  For all Disputes, FXG and F&I will initially each

pay its own AAA initial filing fees and case service fees or JAMS case management fees. Upon the written request of F&I, FXG will reimburse F&I for AAA initial filing fees or JAMS case management fees within thirty days of filing up to $2,500.00. However, the arbitrator may, in the award, allocate all or part of the initial filing fees. For Disputes arising from a Termination under Section 15.3 of this Agreement, FXG will pay for all arbitrator costs and fees and for court reporter fees for the arbitration hearing. This does not include the AAA initial filing fees and case service/management fees for JAMS or AAA. For all other Disputes, FXG and F&I will initially equally divide the arbitrator costs and fees and court reporter fees for the arbitration hearing, but the arbitrator may, in the award, allocate all or part of these costs of the arbitration hearing.

**(C)**    **Discovery.** Unless the Parties agree otherwise or the arbitrator rules on a showing of good cause, discovery will be limited to: twenty-five interrogatories (including discrete subparts); twenty-five document requests (including discrete subparts), including requests for documents submitted to a third-party through a third-party subpoena; and three depositions per side. The scope of any written discovery requests will be limited to the FXG Station(s) at issue in the Dispute, subject to a ruling by the arbitrator expanding the scope for good cause shown. Unless the Parties agree otherwise, the voluntary and informal exchange of documents and information discussed in the JAMS Streamlined Arbitration Rules and Procedures, effective July 1, 2014 or as subsequently amended, and the JAMS Comprehensive Arbitration Rules and Procedures, effective July 1, 2014 or as subsequently amended, will not apply to Arbitrations commenced with JAMS, and the provisions of the AAA Commercial Arbitration Rules, effective October 1, 2013 or as subsequently amended, will not apply to Arbitrations commenced with AAA.

**(D)**    **Awards.** Within thirty days after the conclusion of the arbitration hearing and upon request by either Party, the arbitrator shall issue a written award ("Award") with reasons given and evidence cited for the Award. Judgment on the Award may be entered in any court having jurisdiction. The arbitrator will have the authority to award all relief permitted by Applicable Law, except those specifically excluded by Section 13.2 of this Agreement. The arbitrator shall not have authority to alter, amend or modify any of the terms and conditions of this Agreement, and, further, the arbitrator may not enter any Award that alters, amends or modifies the terms or conditions of this Agreement in any form or manner. If the law applicable to the Dispute(s) being arbitrated, or any agreement, authorizes the award of attorneys' fees and costs (including administrative fees and costs of the arbitrator), then the arbitrator will apply the same standards a court would apply in determining whether, and the extent to which, to award attorneys' fees and/or costs.

**(E)**    **Confidentiality.** Disputes conducted pursuant to this Section 16, including but not limited to any discussions, discovery, filings, hearings, decisions, and Awards, shall be confidential, unless otherwise required by Applicable Law or unless such disclosure is necessary to either Party's attorneys, accountants, or other professional advisors to effect the purposes for which they have been consulted or retained. The Parties agree to ensure that any persons to whom such confidential information is provided, other than where a disclosure is required by Applicable Law, agree in writing to keep the information they receive confidential. If either Party is issued a subpoena or other judicial process

requiring disclosure of confidential information, that Party will notify the other Party consistent with the terms of Section 10 of this Agreement before such disclosure is to be made, if possible, and if not possible, then as soon as practicable, so that the other Party may move to quash the subpoena or judicial process if it so desires. Except as provided herein, no documents provided or submitted in connection with such proceedings or the information contained therein shall be disclosed to any non-party or used for any purpose other than the prosecution or defense of any Dispute without the prior written consent of the Party who has provided or produced the document or information. In the event of any disclosure that is inconsistent with these terms, the Parties will take all steps necessary to minimize dissemination of the information, as set forth in Section 10 of this Agreement.

**16.6    Continued Performance.**  Absent termination of this Agreement, each Party agrees to continue performing its obligations under this Agreement while a Dispute is being resolved in accordance with this Section 16, except to the extent the issue in dispute precludes performance (provided that a Dispute over payment will not be deemed to preclude performance) and without limiting either Party's right to terminate this Agreement as provided in Section 15.

## 17.    ASSIGNMENT

Neither Party is authorized to assign this Agreement without the prior written consent of the other, which consent will not be unreasonably withheld.  Without limiting the reasonable grounds for withholding such consent, the Parties agree that, in all instances, FXG's withholding consent shall be deemed reasonable if, in the judgment of FXG and upon consideration of the scale of the proposed assignment and the proposed assignee's current contracting relationship with FXG, or lack thereof (A) the proposed assignment would result in the inability of an Independent Service Provider to achieve the results contracted for in this Agreement or (B) such assignment would continue or result in FXG's undue reliance for service on a single Independent Service Provider, Independent Service Providers, or commonly controlled service providers.  Notwithstanding the foregoing, FXG may assign its rights and obligations under this Agreement without the consent of F&I to an entity which acquires all or substantially all of the voting stock or assets of FXG or of any affiliate of FXG or to any successor to FXG in a merger or consolidation by virtue of an acquisition of FXG or any affiliate of FXG.  For any assignment other than the exception stated in this Section 17, the Party proposing the assignment shall notify the other Party in writing, which notification shall include the nature, type and scope of the proposed assignment, and the other Party shall, within sixty days of being notified, notify the assigning Party of its consent or lack of consent to the proposed assignment.  Subject to the foregoing, any assignment made by a Party without the consent of the other Party will be void and of no effect as between the Parties, including the following, each of which shall be deemed to constitute an assignment hereunder: (1) any assignment by operation of Applicable Law or any court-ordered plan of merger, consolidation or liquidations; (2) any transfer of control, either directly or indirectly, of F&I through the appointment of new officers or directors, or through the sale or transfer of its stock or assets in a single transaction or series of related transactions; (3) any merger or acquisition by or of F&I with or into another entity to form or become part of a new or different entity; (4) subcontracting inconsistent with the provisions of Section 7.1; or (5) any other transaction, transfer, or the like that had or has the effect of assignment or design to circumvent the provisions of the Section 17.

## 18.    GENERAL

**18.1    Entire Agreement; Amendment.**  This Agreement, including any schedules, attachments or amendments referred to herein and the Confidentiality and Non-

Disclosure Agreement entered into in connection with the negotiations over this Agreement, each of which is incorporated herein for all purposes, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.  This is a fully integrated agreement.  Except as otherwise provided under this Agreement, no change, waiver, or discharge of this Agreement will be valid unless in writing (hard copy or electronic) and acknowledged by the Parties by written or electronic signature or other acknowledgement that is reasonable under the circumstances.  The Parties agree that any change in the Service Days, Services, Service Offerings, security measures, or other terms as provided herein will be reflected as set forth in this Agreement or by the Parties entering into an amendment.

**18.2    Interpretation.**  In the event of a conflict or inconsistency between the terms of this Agreement and a schedule, attachment or amendment to this Agreement, the terms of this Agreement will prevail, except where the schedule, attachment or amendment expressly clarifies or modifies this Agreement.  The Parties agree that the provisions of this Agreement shall be interpreted in a reasonable manner to effect the purposes, objectives and intentions as set forth herein.

**18.3    Legal Process.**  Each Party agrees to immediately forward to the other Party every demand, notice, summons or other legal process received that involves a claim, suit or other legal proceeding arising from or in any way related to that Party with respect to this Agreement or its subject matter.

**18.4    Duty to Cooperate; Compliance with Law; Certification of Compliance.**  Each Party will cooperate in good faith with the other Party in conducting investigations internal to its respective business operations, securing and giving evidence, responding to discovery, attending hearings and trials, and obtaining the attendance of witnesses at hearings, trials and meetings, and otherwise will cooperate in such matters. F&I acknowledges and agrees that it shall, at its sole cost and expense, comply with Applicable Law and its obligations under this Agreement; that it is obligated to maintain records regarding its compliance with such Applicable Laws and its obligations under this Agreement; and that it will, upon request, provide to FXG, or a third party designee, written certification or information demonstrating compliance with such Applicable Laws and performance of obligations under this Agreement.  Any third party designee(s) will be subject to the Confidential Information provision at Section 10 of this Agreement.

**18.5    Notices.**  All notices, requests, demands and determinations under this Agreement (other than routine operational communications), will be in writing (hard copy or electronic) and will be deemed duly given as follows: (1) when delivered by hand; (2) one business day after being provided for delivery to an express courier with a reliable system for tracking delivery; (3) when sent by confirmed facsimile with a copy sent by another means specified in this Section 18.5; (4) when sent by FXG to the electronic mail address listed in the Contracted Service Provider ("CSP") Profile on F&I's MyGroundBizAccount, which electronic mail address F&I agrees to keep active and accurate;  (5) when posted by FXG on F&I's MyGroundBizAccount; or (6) six business days after the day of mailing, when mailed by United States mail, registered or certified mail, return receipt requested, postage prepaid, in each such case addressed to each Party as listed below:

      **FIRE & ICE TRUCKING CORP**

      **Address:  See CSP Profile**

      **FedEx Ground Package System, Inc.**

**1000 FedEx Drive**
**Moon Township, PA 15108**

**Attention:  Contractor Relations**

A Party may from time to time change its address or designee for notice purposes by giving the other Party at least ten days' prior written notice of the new address or designee and the date upon which it will become effective.

18.6    **Severability.**  Subject to the right of either Party under Section 15.2(A) to terminate this Agreement for a change of relationship, if any provision of this Agreement conflicts with the Applicable Law under which this Agreement is to be construed or if any such provision is held invalid by a competent authority, such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with Applicable Law, and the remainder of this Agreement will remain in full force and effect.

18.7    **Force Majeure.**  No Party will be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent the default or delay is caused, directly or indirectly, by fire, flood, earthquake, elements of nature or acts of God, riots, terrorist attacks, civil disorders, or any other similar cause beyond the reasonable control of such Party, provided the non-performing Party is without fault in causing the default or delay, the default or delay could not have been prevented by reasonable precautions and could not reasonably be circumvented by the non-performing Party through the use of alternate sources, workaround plans or other means, and the non-performing Party has commenced and is pursuing all reasonable and available means and measures to minimize and eliminate the resulting default or delay.

18.8    **Waiver of Default.**  A delay or omission by either Party to exercise any right under this Agreement will not be construed to be a waiver of that right.  A waiver by either of the Parties of any breach of this Agreement will not be construed to be a waiver of any succeeding breach thereof or of any other covenant in this Agreement.

18.9    **Survival.**  The provisions of Sections 2 (in Schedule C), 5.5 (in Attachment A-2 to Schedule A), 6.2, 9.5, 10, 14, 15.5, 16 and 18.3, as well as any other provision of this Agreement which contemplates or reasonably requires performance or observance subsequent to termination or expiration of this Agreement, will survive termination or expiration of this Agreement and continue in full force and effect.

18.10    **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to choice of law principles.

**APPENDIX**

SCHEDULE A.....................Contracted Service Area, Services and Service Results, and Service Offerings

    Attachment A-1..........................................................................................Contracted Service Area

    Attachment A-2..............................................................Contracted Services and Service Results

    Attachment A-3...................................................................................................Service Offerings

SCHEDULE B....................................................................................................Leased Equipment

    Statement of Lease.............................................................................................Statement of Lease

SCHEDULE C...................................................................................................Negotiated Charges

    Attachment C-1......................................................................Negotiated Charges Table

    Attachment C-2......................................................................Additional Services

SCHEDULE D............................................................................................................[RESERVED]

SCHEDULE E............................................................................................................[RESERVED]

SCHEDULE F....................................................................................................Daily Stop Threshold

SCHEDULE G.........................................................................................................Shuttle Service

SCHEDULE H..........................................................................Compliance with Specific Laws

SCHEDULE I.................................................................................Safe Operating Practices

SCHEDULE J..............................................................................................................[RESERVED]

SCHEDULE K.................................................................................Enhanced Peak Service

SCHEDULE L..................................................................Insurance and Indemnification